**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| FRESH & EASY NEIGHBORHOOD MARKET INC., *et al.*,[1] | : | Case No. 13-_____ (___) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |

**DECLARATION OF JAMES DIBBO IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS AND APPLICATIONS**

I, James Dibbo, hereby certify and declare as follows:

1. I am the Chief Financial Officer of the above-referenced debtors and debtors in possession (collectively, the "Debtors" or "Fresh & Easy") in these proceedings. I have held this position with the company since September 1, 2010. As a result of my tenure with the Debtors and my roles as Chief Financial Officer, Treasurer and Assistant Secretary, I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, as well as with the Debtors' restructuring efforts.

2. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

3. To minimize the adverse effects of filing for chapter 11 protection and to enhance their ability to consummate a successful going concern sale of a significant portion of Fresh & Easy's business and confirm a chapter 11 plan thereafter, the Debtors will file a number of motions requesting various kinds of "first day" relief (collectively, the "First Day Motions"). I am familiar with the contents of each First Day Motion (including the exhibits and other

---

[1] The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Fresh & Easy Neighborhood Market Inc. (7028) and Fresh & Easy Property Company LLC (9636). The address of each of the Debtors is 2120 Park Place, Suite 200, El Segundo, California 90245.

attachments to such motions) and believe the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruptions; (ii) is critical to the Debtors' achievement of a successful sale and reorganization; and (iii) best serves the Debtors' estates and creditors interests. Further, it is my belief that the relief sought in the First Day Motions is narrowly tailored and necessary to achieve the goals identified above.

4. I submit this declaration (this "<u>Declaration</u>") in support of the First Day Motions. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (i) my personal knowledge; (ii) information supplied to me by other members of the Debtors' management or their professionals; (iii) my review of relevant documents; or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If called upon to testify, I could and would testify to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration.

5. Part I of this Declaration describes the Debtors' business, prepetition indebtedness and corporate structure. Part II describes the circumstances surrounding the commencement of these chapter 11 cases. Part III describes the Debtors' sale process and a proposed sale transaction whereby the Debtors would sell a substantial portion of their assets. Part IV sets forth the relevant facts in support of certain First Day Motions, and Part V describes certain funding the Debtors will have access to during the course of these cases.

## I.
## The Debtors' Business

### A. The Company

6. Fresh & Easy is a grocery chain operating in California, Nevada and Arizona that focuses on offering healthy and wholesome foods, including prepared foods, at affordable prices. Fresh & Easy was founded in 2006 as a wholly-owned subsidiary of Tesco PLC ("<u>Tesco</u>"), and quickly expanded to a total of 200 operating stores by 2012. The majority of Fresh & Easy's individual stores utilize a 10,000 square foot format ("<u>F10</u>" format), with some 7,000 square foot stores as well ("<u>F7</u>" format). The F10 and F7 grocery stores provide customers

with the ability to fulfill all of the requirements of a full weekly shopping trip.  Fresh and Easy's F10 and F7 markets are complemented by 3,000 square foot markets ("F3" format) that focus more tightly on convenient shopping and fresh meal solutions.

7. One hundred and sixty-seven (167) of Fresh & Easy's store locations are currently in operation.  Of these, 25 are owned freehold by Fresh & Easy, 50 are leased pursuant to ground leases and 92 are leased pursuant to store leases.  In addition, Fresh & Easy owns 61 store locations that are not being operated and is party to leases for 36 non-operating store locations (6 pursuant to ground leases and 30 pursuant to store leases).

8. In addition to its stores portfolio, Fresh & Easy operates state of the art production facilities in Riverside, California (the "Campus") including meat and produce facilities and a kitchen, each housed in its own building, providing Fresh & Easy branded fresh food products.  Fresh & Easy's sole active distribution center is located in close proximity to the Campus, and a second, inactive distribution center is located in Stockton, California.  The integrated approach to the preparation of meats, produce and manufacturing of prepared meals has allowed Fresh & Easy to achieve high marks in range and quality standards, with approximately 60 percent of all its fresh food sales in 2012 processed through the Campus.  In keeping with Fresh & Easy's hopes for continued growth of the business, the Campus has substantial untapped capacity, and could easily scale up to service a larger number of stores and other third party customers.

9. Fresh & Easy enjoys high levels of advocacy and loyalty within its current customer base.  Its loyalty program has approximately 2.6 million members, offering a 1 percent reward through an all-digital marketing effort.  Within one year of adoption, more than 50 percent of sales were conducted using the loyalty program.

### B. Corporate Structure

10. The corporate structure chart, attached hereto as <u>Exhibit A</u>, provides an overview of the relationships of the Debtors and their non-Debtor affiliates. Buttoncable Ltd. is the direct parent of both Fresh & Easy Neighborhood Market Inc. and Fresh & Easy Holding Company, a non-debtor affiliate. Fresh & Easy Holding Company is the sole member of Fresh & Easy Property Company LLC, which owns a majority of the Debtors' real property. Fresh & Easy Neighborhood Market Inc., which houses Fresh & Easy's retail grocery operations and employs approximately 4,187 total employees, leases and operates the store locations, and is the owner of the inventory and fixtures in the stores.

### C. Prepetition Indebtedness[2]

11. Fresh & Easy is not party to any third-party credit agreements and does not have any third-party debt other than ordinary course business obligations to, among other parties, vendors, suppliers, employees and landlords. However, Fresh & Easy owes over $738 million in principal amount to Tesco on account of various intercompany loans provided by Tesco (the "<u>Intercompany Loans</u>"). As a result of the amounts owed under the Intercompany Loans, Tesco is by far Fresh & Easy's largest single creditor. In addition to the amounts owed under the Intercompany Loans, the Debtors have historically purchased goods and services from over 800 vendors. As of the Petition Date, the Debtors estimate that they owe approximately $18.4 million to vendors for goods and services.

12. The Debtors also have significant liabilities arising from their leased stores in California, Arizona and Nevada. In addition, the Debtors are responsible for lease payments for certain equipment used at their facilities. Prior to the Petition Date (and disregarding the impact of certain lease termination agreements), the Debtors' annual expense for leased properties was approximately $72 million. In addition, prior to the Petition Date, the Debtors' approximate annual expense for leased equipment was $3.5 million.

---

[2] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

## II.
## Events Leading to the Chapter 11 Cases

13.  Since its founding in 2006, Fresh & Easy has built a substantial store base and an extensive infrastructure, with a core of strong brand advocates.  Over the course of 2006 and 2007, Tesco invested over $610 million to rapidly build out the business, and create substantial capacity for future growth.  The business proved successful on many fronts, growing to approximately $1.2 billion in annualized sales from launch to 2012.  Many of Fresh & Easy's own-label brands outperformed national brands in its stores.

14.  The economic downturn beginning in 2008 adversely affected the entire retail grocery industry, including Fresh & Easy.  Many of Fresh & Easy's leases are substantially above market relative to its competitors.  Given Fresh & Easy's geographic focus on California, Nevada and Arizona, the effect of the real estate market correction was especially pronounced.  Additionally, Fresh & Easy's retail format has been unsuccessful in obtaining a sufficiently broad customer-base.  As a result, Fresh & Easy incurred annual operating losses each year since 2006.

15.  Since 2008, Tesco has continued to provide significant amounts of additional funds (in the form of both debt and equity) to Fresh & Easy to support its operations.  In spite of these efforts, in its last fiscal year, which ended in February 2013, Fresh & Easy averaged $22 million in losses per month and was never able to generate a profit.  As a result in September 2012, Tesco retained Greenhill & Co., Inc. ("Greenhill") to help conduct a strategic review of the business, including an exploration of multiple restructuring or other strategic alternatives.

16.  Despite Tesco's continuing belief in the Fresh & Easy concept, Tesco determined that a shift in Fresh & Easy's business structure and strategy was necessary for Fresh & Easy to achieve profitability.  This required shift in Fresh & Easy's structure and strategy meant that the Fresh & Easy business model would no longer be in line with Tesco's other global business operations and core business strategy.  As a result, Tesco made the decision to exit the U.S. market.  To appropriately accomplish this exit, Tesco tasked Greenhill with pursuing a sale

-5-

of the Fresh & Easy business with the goal of continuing Fresh & Easy as a going concern, which Tesco felt would be in the best interests of Fresh & Easy's creditors, employees, vendors and other stakeholders.

### III.
### The Sale Transaction

17.  Beginning in December 2012, Tesco and Fresh & Easy, with the aid of Greenhill, investigated numerous sale opportunities, evaluating each not only in terms of the monetary consideration, but also for each proposed transaction's effect on Fresh & Easy's stakeholders and its prospects for a successful turnaround of the business.  Beginning in January 2013, Tesco and the Debtors, with the aid of Greenhill, developed a list of over 65 potentially interested parties and solicited initial interest in a going concern transaction that would transfer a substantial portion of the Debtors' assets to a new owner.  Thereafter, the Debtors signed non-disclosure agreements and provided a confidential information memorandum to approximately 45 parties.  The sale process resulted in the submission of 16 preliminary indications of interest for various assets of Fresh & Easy, including 4 indications of interest for the whole company.

18.  By April 2013, Tesco had narrowed the field of possible transactions to three third party alternatives.  By June 2013, one of the three parties withdrew from the process after significant due diligence had been completed. Frequent conversations with the remaining two parties were conducted through late August 2013 among the professionals and advisors of all parties involved, as well as among senior management of both Tesco and Fresh & Easy.  One of the transactions involved a straight liquidation of Fresh & Easy's assets and a complete wind-down of all business operations, while the other, involving an affiliate of The Yucaipa Companies, LLC, represented a sale of Fresh & Easy as a going concern. In parallel, conversations continued with three parties interested in the Campus and Riverside distribution facilities as a going concern.

19. As further described below, after significant analysis of the benefits of each transaction for Fresh & Easy's creditors, employees and shareholder, Fresh & Easy determined that the offer presented by the Yucaipa affiliate, YFE Holdings, Inc. (the "Proposed Buyer"), which called for the continued operation of approximately 150 Fresh & Easy stores along with the Campus and Riverside distribution facilities, was the best alternative for Fresh & Easy's stakeholders. Following intense good-faith negotiations, the Proposed Buyer and Fresh & Easy agreed to the terms of an asset purchase agreement (the "Stalking Horse APA") under which the Proposed Buyer is to serve as a stalking horse bidder for the sale of a substantial portion of the Debtors' operations as a going concern under section 363 of the Bankruptcy Code.

20. Under the terms of the Stalking Horse APA and as described more fully in the Debtors' Motion for (I) an Order (A) Establishing Bid Procedures for the Sale of a Substantial Portion of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief and (II) An Order (A) Approving the Sale of a Substantial Portion of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Expired Leases Related Thereto, and (C) Granting Certain Related Relief (the "Sale Motion"), the Proposed Buyer will acquire approximately 76 percent of Fresh & Easy's total assets and will assume significant liabilities and contracts of the business. An affiliate of Tesco will help to fund the transaction by providing the Proposed Buyer with a $120 million loan, secured by the Campus. In addition, the affiliate of Tesco will receive warrants to purchase 10 percent of the Proposed Buyer's equity.[3] As consideration, the Debtors will receive 22.5 percent of the Proposed Buyer's equity. Importantly, the transaction will preserve the jobs of more than 4,000 of Fresh & Easy's 4,187 current employees and keep approximately 150 of Fresh & Easy's stores open.

---

[3] Pursuant to the terms of the Stalking Horse APA and as set forth in detail therein, these warrants can be extinguished in whole or in part if the Proposed Buyer repays the loan within certain time periods.

21. After giving effect to the sale transaction, Fresh & Easy will continue to own real estate and other assets with a book value of in excess of $100 million, excluding the value of the Proposed Buyer's equity that the Debtors' are to receive in connection with the sale transaction.

22. The proposed bidding procedures provide for an auction to take place on November 11, 2013, for the Court to enter an order approving a sale to the Proposed Buyer or an alternate bidder presenting the highest or otherwise best bid at the auction (the "Sale Order") on or around November 13, 2013 (subject to the Court's availability).  The Proposed Buyer and Fresh & Easy expect the sale to close as soon as possible after the Court enters the Sale Order.

## IV.
## First Day Motions

23. Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Motions requesting various forms of relief.  Generally, the Debtors narrowly tailored the First Day Motions to enable the Debtors to meet their goals of:  (i) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible; (ii) maintaining the confidence and support of their customers, employees, vendors, suppliers and service providers during the Debtors' sale process; and (iii) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

24. I have reviewed each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference the factual statements set forth in the First Day Motions and the Postpetition Funding Motion.  It is my belief that the relief sought in each of the First Day Motions is necessary to meet the goals described above and, ultimately, will be critical to (i) the Debtors' ability to complete the going concern sale transaction with the Proposed Buyer (or some other buyer that provides a higher and better offer) and (ii) the ultimate success of these chapter 11 cases.

25.     It is my further belief that, with respect to those First Day Motions requesting the authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First Day Motions seeking relief related to the Debtors' obligations to their employees, customers, shippers and other distribution network providers, potential PACA and PASA[4] claimants, taxing authorities, insurers and vendors), the relief requested is essential to the Debtors' reorganization and necessary to avoid immediate and irreparable harm to the Debtors and their employees, customers and affected vendors.  Specifically, the success of these cases depends in large part on the Debtors' ability to maintain vendor, customer and employee confidence and continuing the operation of the Debtors' business in as normal course as possible until the Debtors can consummate the sale transaction with the Proposed Buyer or an alternate transaction that provides better and higher value for the Debtors' estates.

26.     Impairment of the Debtors' business operations, or of their relationships with their employees, customers or vendors at the early stages of these cases — the very time when the smooth operation of those operations and the dedication, confidence and/or cooperation of those constituencies is most critical — would clearly imperil the Debtors' ability to complete the sale process described above and successfully restructure.  The retail grocery sector in which the Debtors operate is a highly competitive sector of the domestic economy.  As such, any diminution in the Debtors' ability to maintain their operations in the ordinary course will have an immediate and irreparable harmful impact upon the going concern value of the Debtors' estates.

27.     Moreover, section 4.01 of the Stalking Horse APA specifically requires that the Debtors' (i) maintain their operations "in the ordinary course consistent with past practice" and (ii) "preserve the business operations, organization and goodwill associated with the Business at the Acquired Properties and present business relationships (contractual or otherwise) with customers, suppliers, resellers, employees, licensors, distributors and others having material business relationships with Sellers."

---

[4]     "PACA," The Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et seq. and "PASA," Packers and Stockyards Act of 1921, as amended 7 U.S.C. § 181 et seq.

-9-

28. Accordingly, the Debtors have an immediate need to continue the orderly operation of their business by securing goods and paying employees in the normal course of business. The Debtors' continued operations will enable the Debtors to preserve the going concern value of their estates and re-establish any lost vendor and customer confidence, thereby maximizing recoveries for the Debtors' stakeholders. As such, I believe that the payment of those selected prepetition claims identified in the First Day Motions is necessary to enable the Debtors to fulfill their obligations under the Stalking Horse APA and therefore prevent irreparable harm to the Debtors' estates for the direct benefit of the Debtors' creditors and other constituents.

29. I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted.

## V.
## Postpetition Funding

30. It is my belief that the Debtors possess sufficient liquidity to satisfy all administrative expenses and other postpetition obligations that may arise during the normal course of these cases. Nevertheless, out of an abundance of caution and to provide additional assurance to the Debtors' vendors and service providers that the Debtors possess adequate liquidity, the Debtors have filed the Debtors' Motion for Entry of an Order (I) Granting Adequate Protection to Tesco PLC to the Extent of Setoff Rights and (II) Granting Related Relief (the "Postpetition Funding Motion"). In accordance with the terms more fully described in the Postpetition Funding Motion, Tesco is willing to continue to support the Debtors by providing additional advances against Tesco's obligations under a tax sharing agreement between Tesco and Fresh & Easy to the extent necessary to provide Fresh & Easy with liquidity to pay post-petition ordinary course operating expenses through the consummation of the proposed sale. To the extent Tesco advances funding to the Debtors, the Debtors will provide Tesco with adequate protection to protect Tesco from any diminution in value of any right Tesco may possess to

setoff these obligations against any amounts the Debtors may owe to Tesco under the Intercompany Loans.  The Debtors are not seeking approval of the Postpetition Funding Motion on an expedited basis, because their present liquidity levels make such expedited relief unnecessary.

31. It is my belief that the proposed postpetition funding mechanism (the "Proposed Postpetition Funding") described in the Postpetition Funding Motion will enhance the Debtors' ability to operate on a postpetition basis by ensuring that the Debtors' vendors and service providers are confident the Debtors possess adequate liquidity levels.  Assuring the Debtors' vendors and other service providers that the Debtors possess sufficient liquidity likely will provide various benefits to the Debtors, including an increased likelihood that the Debtors' vendors and service providers will provide goods and services on traditional credit terms.  As such, I view obtaining approval of the Proposed Postpetition Funding as an important component of the Debtors' overall restructuring strategy.

I, James Dibbo, the undersigned Chief Financial Officer of Fresh & Easy Neighborhood Market Inc., declare under penalty of perjury that the foregoing is true and correct.

Dated:  September 30, 2013

/s/ James Dibbo
James Dibbo
Chief Financial Officer

# **EXHIBIT A**

