UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| FRESH & EASY NEIGHBORHOOD MARKET INC., *et al.*,[1] | Case No. 13-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR AN ORDER
AUTHORIZING THEM TO CONTINUE THEIR
INSURANCE PROGRAMS AND PAY RELATED OBLIGATIONS**

The above-captioned debtors (collectively, the "Debtors") hereby move the Court for the entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"): (i) authorizing the Debtors to (a) continue their Insurance Policies (as defined below) and (b) pay prepetition obligations related thereto; and (ii) granting certain related relief. In support of this Motion, the Debtors incorporate the statements contained in the Declaration of James Dibbo in Support of First Day Pleadings (the "First Day Declaration") filed contemporaneously herewith and further respectfully state as follows:

**Background**

1. On the date hereof (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.[2] By a motion filed on the Petition Date, the

---

[1] The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Fresh & Easy Neighborhood Market Inc. (7028) and Fresh & Easy Property Company LLC (9636). The address of each of the Debtors is 2120 Park Place, Suite 200, El Segundo, California 90245.

[2] This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

Debtors have requested that their chapter 11 cases be consolidated for procedural purposes only and administered jointly.

2. Founded in 2006 as wholly-owned subsidiaries of Tesco PLC ("Tesco"), the Debtors operate a chain of Fresh & Easy grocery stores offering high-quality, wholesome, fresh prepared and ready-to-eat products at affordable prices. The Debtors currently operate 167 stores located in California, Arizona and Nevada. In addition to their stores portfolio, the Debtors operate a state of the art production facility in Riverside, California (the "Campus") including meat and produce facilities and a kitchen, each housed in its own building, providing Fresh & Easy-branded fresh food products. In close proximity to the Campus is one of the Debtors' two distribution centers, with the other inactive distribution center located in Stockton, California. For the twelve months ending February 24, 2013, the Debtors generated approximately $1.1 billion in revenue.

3. As described in more detail in the First Day Declaration, the Debtors have commenced these chapter 11 cases to effectuate a sale of a substantial portion of their assets on a going concern basis to a stalking horse bidder, YFE Holdings, Inc. (the "Proposed Buyer"), a company affiliated with The Yucaipa Companies, LLC, subject to any higher and better offers received in connection with a proposed sale process. The Debtors intend to liquidate all other assets not included in the proposed sale. The Debtors believe the proposed sale and the liquidation of the remaining portion of the Debtors' assets represents the best strategy to maximize value for the Debtors' various stakeholders.

*The Debtors' Insurance Policies*

4. In the ordinary course of their business, the Debtors maintain numerous insurance policies that provide coverage for, among other things, general liability, automobile coverage, property damage, earthquake and flood damage, product recall, foreign package,

directors and officers liability, employment practices liability, commercial crime and fiduciary liability (together with the Workers' Compensation Program (as such term is defined below), the "<u>Insurance Policies</u>").  The Insurance Policies are essential for the preservation of the value of the Debtors' business, and are, in some cases, required by various laws, regulations or contracts that govern the Debtors' business.

    5.  The Debtors maintain the Insurance Policies through several different insurance carriers (collectively, the "<u>Insurance Carriers</u>").  The names of the Insurance Policies, the Insurance Carriers, the term of the current policies and the aggregate annual premiums due thereunder (collectively, the "<u>Premiums</u>"), are set forth on <u>Exhibit A</u> annexed hereto.  The aggregate annual Premiums under all of the Insurance Polices (including the Workers' Compensation Program) are approximately $12.5 million.  The Debtors are current with all of their premium payments under the Insurance Policies.

*The Workers' Compensation Program*

    6.  As of the Petition Date, approximately 279 open workers' compensation claims were pending against the Debtors.  In addition, there may be other workers' compensation claims by employees relating to prepetition injuries that have not yet been reported and processed**.**  The Debtors address the vast majority of claims through a workers' compensation program (the "<u>Workers' Compensation Program</u>") that utilizes a single workers' compensation liability insurance policy (the "<u>Workers Compensation Insurance Policy</u>"), which the Debtors have maintained with Liberty Mutual Insurance Company ("<u>Liberty</u>") since March 1, 2011 and renewed on an annual basis.[3]  The Workers' Compensation Insurance Policy provides the

---

[3]  Prior to March 1, 2011, National Fire Insurance Company of Pittsburgh provided the Debtors workers' compensation insurance (the "<u>National Policy</u>").  There remain approximately 50 open workers' compensation claims under the National Policy.  The Debtors have no further liabilities with respect to

-3-

Debtors with coverage that includes the payment of (i) workers' compensation claims in amounts required under applicable law and (ii) employer liability losses up to $1 million per accident. The current policy term runs from March 1, 2013 through March 1, 2014.

7. The Debtors prepetition obligations with respect to the Workers' Compensation Insurance Program all relate to the premium payment required under the Workers' Compensation Insurance Policy (the "<u>Workers' Compensation Premium</u>"). As part of the Workers' Compensation Premium, the Debtors prepay for estimated liabilities arising from the self-insured retention contained in the Workers' Compensation Insurance Policy (the "<u>Estimated Retention Payment</u>"). For the 2013-2014 policy year, the Estimated Retention Payment was $5,842,000. The full amount of the estimated Workers' Compensation Premium for the period of March 1, 2013 through March 1, 2014 was approximately $9,004,940 (subject to the adjustments described below). The Debtors are current with all obligations owed under the Workers' Compensation Insurance Policy.

8. The Workers' Compensation Premium (along with the Workers Compensation Premium for the two prior years) is subject to certain retroactive adjustments (a "<u>Premium Adjustment</u>"). Under the Workers' Compensation Insurance Policy, a Premium Adjustment may occur for two reasons. First, a Premium Adjustment may occur based upon the results of an annual audit that measures actual employee payroll for each policy year. These payroll audits occur a year in arrears and, for the Debtors' 2011 and 2012 policy years, resulted in a retroactive reduction in the Workers' Compensation Premium in the approximate amount of

---

(continued…)

    these claims, as there are no premiums or other amounts due under the National Policy, nor is there a self insured retention or deductible.

-4-

$57,379 for the 2011 policy year and $203,072 for the 2012 policy year. The Debtors anticipate the payroll audit for the 2013 policy year also will result in a reduction to the Workers' Compensation Premium for this policy year.

9. Second, the Workers' Compensation Program further contemplates a potential Premium Adjustment based upon evaluations of claim values that will be conducted in September of 2014 and 2015. These evaluations may cause a Premium Adjustment for the 2011, 2012 and 2013 Workers' Compensation Premiums. For the 2013-2014 year, the maximum additional amounts the Debtors may pay based upon any Premium Adjustment from the evaluations of claim values is $2,921,000. In addition, for the 2012-2013 year, the maximum additional amounts the Debtors may pay based upon any Premium Adjustment from the evaluations of claim values is $1,215,000. Finally, for the 2011-2012 year, the maximum additional amounts the Debtors may pay based upon any Premium Adjustment from the evaluations of claim values is $1,039,705.

10. The Debtors' obligation to satisfy any Premium Adjustment is secured by a letter of credit in the amount of $7,160,205.[4] The Debtors believe this letter of credit is sufficient to fully secure any obligation that may arise with respect to any Premium Adjustment that may occur under the Workers' Compensation Program.

## Legal Basis for Relief Requested

11. It is essential to the Debtors' businesses that the Debtors receive authority to: (i) continue their Insurance Policies (including their Workers' Compensation Program); (ii) satisfy any related prepetition obligations and any other payments to the Insurance Carriers

---

[4] This letter of credit also secures certain of the Debtor' obligations under their general liability insurance policy with Liberty Mutual Fire Insurance Company.

-5-

required as a result of any related claims against the Debtors (collectively, the "Prepetition Insurance Claims"), as such obligations become due in the ordinary course of the Debtors' business; and (iii) liquidate in an appropriate forum or settle such Prepetition Insurance Claims as necessary.[5]

*The Doctrine of Necessity Provides the Basis for Granting the Requested Relief*

12. Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent the abuse of process.

11 U.S.C. § 105(a). Section 105(a) of the Bankruptcy Code grants bankruptcy courts broad authority and discretion to enforce the provisions of the Bankruptcy Code either under specific statutory fiat or under equitable common law principles.

13. Courts have repeatedly recognized "the existence of the judicial power to authorize a debtor . . . to pay prepetition claims where such payment is essential to the continued operations of the debtor." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (finding that a debtor is entitled to pay certain prepetition creditors upon a showing that the payment is "essential to the continued operation of the business" (citations omitted)). The

---

[5] Nothing contained herein is intended or shall be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim against the Debtors would constitute a premium or Prepetition Insurance Claim; or (v) the assumption of any contract.

United States Supreme Court first articulated the equitable common law principle commonly referred to as the "doctrine of necessity" over 125 years ago in <u>Miltenberger v. Logansport, C. & S.W.R. Co.</u>, 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882). "The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11." <u>In re Just for Feet, Inc.</u>, 242 B.R. 821, 825 (D. Del. 1999).

14.  Under the doctrine of necessity, a bankruptcy court may exercise its equitable power to authorize a debtor to pay critical prepetition claims, even though such payment is not explicitly authorized under the Bankruptcy Code. <u>See</u> <u>In re Columbia Gas Sys., Inc.</u>, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (<u>citing</u> <u>In re Lehigh & New England Rwy. Co.</u>, 657 F.2d 570, 581 (3d Cir. 1981) (recognizing that "if payment of a prepetition claim 'is essential to the continued operation of [the debtor], payment may be authorized.'").

15.  The bankruptcy court's exercise of its authority under the "doctrine of necessity" is appropriate to carry out specific statutory provisions of chapter 11, specifically sections 1107(a), 1108 and 363(b)(1) of the Bankruptcy Code, which collectively authorize a debtor in possession to maintain and operate the debtor's business and use estate property outside of the ordinary course of business.  Indeed, a debtor in possession operating a business under section 1108 of the Bankruptcy Code has a duty to protect and preserve the value of the debtor's business, and prepetition claims may be paid if necessary to perform the debtor in possession's duty.  <u>See</u> <u>In re CoServ, L.L.C.</u>, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("There are occasions when this duty can only be fulfilled by the preplan satisfaction of a prepetition claim.").

16.     The relief requested in this Motion is necessary for the Debtors to continue their operations during the course of these chapter 11 cases and therefore preserve the value of the Debtors' going concern value.  Specifically, the guidelines for chapter 11 trustees, promulgated by the Department of Justice, Executive Office for the United States Trustee, require debtors to maintain appropriate levels of insurance.[6]  Further, if these Insurance Policies were to lapse, the Debtors would be required immediately to obtain replacement insurance, likely at a greater cost than to maintain the current Insurance Policies.[7]  Moreover, as fiduciaries for the chapter 11 estates, the Debtors could be violating their duties if they in any way jeopardize the coverage provided under the Insurance Policies.  As such, the Debtors submit that the relief sought herein is in the best interests of the Debtors, their estates, creditors and other parties in interest.

17.     Further, the prepetition amounts proposed to be paid in respect of the Insurance Policies, if any, are insubstantial compared with the size of the Debtors' estates, and the potential liability exposure absent insurance coverage.  The maintenance of the Insurance Policies and the payment of the Premiums are therefore in the best interests of the Debtors' estates, creditors and other parties in interest.

18.     It is further critical that the Debtors be permitted to continue the Workers' Compensation Program.  If the Workers' Compensation Program is not maintained, the Debtors

---

[6]     See U.S. Department of Justice, Executive Office of United States Trustees, CHAPTER 11 TRUSTEE HANDBOOK (May 2004), at 26-27 ("In securing the assets of the estate, the chapter 11 trustee is required to . . . maintain appropriate insurance for the estate. . . . [T]o the extent necessary, and if reasonably available, the chapter 11 trustee must maintain the following types of insurance adequate to protect the estate:  general comprehensive liability; fire and theft; workers' compensation; vehicle; product liability; flood and/or windstorm insurance; and other insurance as customary or prudent in the debtor's business or as required by law.").

[7]     In addition, the Debtors may need to renew or replace certain of their Insurance Policies in the upcoming months.  If the Debtors do not honor their obligations under the Insurance Policies, the Insurance Carriers may be reluctant to continue doing business with the Debtors.

would be required to make alternative arrangements for workers' compensation coverage—almost certainly at a much higher cost—because such coverage is required under many state laws, with severe remedies if an employer fails to comply with such laws.  In fact, if workers' compensation coverage is not maintained as required by such laws, without interruption, (i) employees could bring lawsuits seeking damages, (ii) the Debtors' ongoing business operations in certain states could be enjoined and (iii) the Debtors' officers could be subject to criminal prosecution.[8]  Furthermore, if the Workers' Compensation Program is not maintained, there is a risk that eligible claimants will not receive timely payments with respect to employment-related injuries.  This could have a negative impact on the financial well-being and morale of the Debtors' employees and their willingness to remain in the Debtors' employ at a time when a significant deterioration in employee morale will have a substantially adverse impact on the Debtors and the value of their assets and business.

19.     Further, as set forth in greater detail in the First Day Declaration, the Debtors negotiated an asset purchase agreement (the "Stalking Horse APA") to sell a substantial portion of the Debtors' assets (the "Sale Transaction").  Pursuant to Section 4.01(b)(xvi) of the Stalking Horse APA, the Debtors are required not to cancel insurance policies or replace or revise provisions providing insurance coverage with respect to the Debtors' assets to be acquired

---

[8]     See, e.g., ARIZ. REV. STAT. ANN. § 23-932 (providing for, among other things, criminal penalties for an employer that fails to maintain with workers' compensation insurance for its employees); CAL. LAB. CODE § 3700.5 (providing for criminal penalties for the failure of an employer to carry workers' compensation insurance); 19 DEL. CODE. ANN. § 2386(b) (establishing, among other things, criminal liability for failure to comply with obligatory provisions of workers' compensation statutes, including obligation to provide workers' compensation coverage); FLA. STAT. ANN. § 440.105 (providing for criminal penalties for an employer's violation of certain workers' compensation requirements, including the employer's obligation to secure workers' compensation insurance coverage); NEV. REV. STAT. §§ 616D.200, 616.D.345 (establishing, among other things, criminal penalties for an employer who fails to obtain or maintain workers' compensation insurance); 77 PA. CONS. STAT. ANN. § 501(b) (establishing, among other things, criminal liability for failure to provide workers' compensation coverage); VA. CODE ANN. §§ 65.2-805, 65.2-806 (permitting employee lawsuits against non-complying employers for on-the-job injuries and providing for a deemed waiver of certain common law defenses and civil and criminal penalties).

in the Sale Transaction.  Moreover, also pursuant to Section 4.01(a)(ii) of the Stalking Horse APA, the Debtors are required to continue to operate their businesses "in the ordinary course consistent with past practice" and to "preserve the business operations, organization and goodwill associated with the Business at the Acquired Properties and present business relationships (contractual or otherwise) with customers, suppliers, resellers, employees, licensors, distributors and others having material business relationships with Sellers."  In order to fulfill their obligations under the Stalking Horse APA to preserve and protect their businesses and business relationships, the Debtors must have the ability to (i) continue their Insurance Policies, (ii) satisfy Prepetition Insurance Claims and (iii) liquidate in an appropriate forum or settle such Prepetition Insurance Claims as necessary.

20. Relief similar to the relief requested herein has been granted in this District in other chapter 11 cases.  See, e.g., In re Oncure Holdings, Inc., No. 13-11540 (KG) (Bankr. D. Del. June 18, 2013); In re LCI Holding Co., Inc., No. 12-13319 (KG) (Bankr. D. Del. Dec. 13, 2012); In re AFA Inv. Inc., No. 12-11127 (MFW) (Bankr. D. Del. Apr. 3, 2012); In re Harry & David Holdings, Inc., No. 11-10884 (MFW) (Bankr. D. Del. Mar. 29, 2011); In re Appleseed's Intermediate Holdings LLC, No. 11-10160 (KG) (Bankr. D. Del. Feb. 23, 2011); In re Atrium Corp., No. 10-10150 (BLS) (Bankr. D. Del. Feb 23, 2010); In re Smurfit-Stone Container Corp., No. 09-10235 (BLS) (Bankr. D. Del. Feb. 23, 2009); In re Tribune Co., No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008);  In re Boscov's Inc., No. 08-11637 (KG) (Bankr. D. Del. Aug. 5, 2008).

### Request for Authority for Banks to Honor and Pay Checks in Connection Herewith

21. In addition, by this Motion, the Debtors request that all applicable banks and other financial institutions (collectively, the "Banks") be authorized, when requested by the

Debtors, to receive, process, honor and pay any and all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, Prepetition Insurance Claims, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments. The Debtors represent that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payment of Prepetition Insurance Claims. Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.

### Requests for Immediate Relief & Waiver of Stay

22. Pursuant to Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek (i) immediate entry of an order granting the relief sought herein and (ii) a waiver of any stay of the effectiveness of such an order. Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to pay all or part of a claim that arose before the filing of the petition." Accordingly, where the failure to grant any such requested relief would result in immediate and irreparable harm to the Debtors' estates, the Court may allow the Debtors to pay all or part of a claim that arose before the Petition Date prior to the twenty-first day following the Petition Date. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

23. As set forth above and in the First Day Declaration, the payment of the Prepetition Insurance Claims is necessary to prevent the immediate and irreparable damage to the value of the Debtors' business, property and assets that could result from, among other things,

(i) the exposure of (a) the Debtors to potentially catastrophic liability and (b) the Debtors' directors and officers to personal liability and/or (ii) the negative impact upon employee morale that would result if the Debtors were no longer able to continue the Workers' Compensation Program. Accordingly, the Debtors submit that ample cause exists to justify (i) the immediate entry of an order granting the relief sought herein and (ii) a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## Consent to Jurisdiction

24.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## Notice

25.     Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the parties included on the Debtors' consolidated list of twenty (20) largest unsecured creditors, as identified in their chapter 11 petitions; (iii) counsel to the Proposed Buyer; (iv) counsel to Tesco PLC; and (v) all parties entitled to notice pursuant to Local Rule 9013-1(m). Due to the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is necessary.

## No Prior Request

26.     No previous request for relief sought herein has been made to this Court or any other court.

[This remainder of this page is intentionally blank.]

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form attached hereto as <u>Exhibit B</u>:  (i) granting the relief sought herein; and (ii) granting to the Debtors such other and further relief as the Court may deem proper.

Dated:  September 30, 2013
       Wilmington, Delaware

Respectfully submitted,

/s/ Mark D. Collins
Mark D. Collins (DE 2981)
John H. Knight (DE 3848)
Lee E. Kaufman (DE 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Paul D. Leake
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

PROPOSED ATTORNEYS FOR DEBTORS

## **EXHIBIT A**

**FRESH & EASY — SCHEDULE OF INSURANCE POLICIES**

| CARRIER | INSURANCE POLICY | TERM | COVERAGE | ANNUAL PREMIUM |
|---|---|---|---|---|
| ACE Insurance Company | Foreign Package Liability | 3/1/2012 - 14 | - General Liability, Contingent Automotive Liability, Foreign Voluntary Workers' Compensation, Foreign Business Travel Accident, Kidnap & Extorsion | $4,500.00 |
| | Property & Business Income | 3/1/2013 - 14 | - Property Damage and Business Interruption | $638,981.74 |
| | D&O Liability | 3/1/2013 - 14 | - Directors and Officers | N/A (paid for by Tesco) |
| | Excess Umbrella | 3/1/2013 - 14 | - Excess General Liability<br>- Liquor Liability<br>- Auto Liability<br>- Employers Liability<br>- Foreign Package Liability | N/A (paid for by Tesco) |
| ACE American Insurance Company | Builder's Risk | 3/1/2012 - 14 | - Business Income, Flood, Soft Costs | $10,275.00 |
| Allianz | D&O Liability | 3/1/2013 – 14 | - Directors and Officers | N/A (paid for by Tesco) |
| AXA | Excess Umbrella | 3/1/2013 – 14 | - Excess General Liability<br>- Liquor Liability<br>- Auto Liability<br>- Employers Liability<br>- Foreign Package Liability | N/A (paid for by Tesco) |
| Chartis | D&O Liability | 3/1/2013 – 14 | - Directors and Officers | N/A (paid for by Tesco) |
| Chubb | D&O Liability | 3/1/2013 – 14 | - Directors and Officers | N/A (paid for by Tesco) |
| Crum & Forester Specialty Insurance Company | Excess Contaminated Products | 3/1/2013 - 14 | - Excess Product Recall Liability | $99,750.00 |
| HCC | D&O Liability | 3/1/2013 – 14 | - Directors and Officers | N/A (paid for by Tesco) |
| Hiscox Insurance Company | Employment Practices Liability | 3/1/2013 – 14 | - Employment Practices Liability | $149,253.00 |
| | Fiduciary Liability Mismanagement of Employee Benefit Plans | 3/1/2013 – 14 | - Fiduciary Liability Mismanagement of Employee Benefit Plans | $149,253.00 |
| Liberty Mutual Fire Insurance Company | General Liability | 3/1/2013 - 14 | - General Liability | $1,102,932.00 |
| | Commercial Automobile | 3/1/2013 - 14 | - Automotive – Comprehensive and Collision | $118,008.00 |
| Liberty Mutual Insurance Company | D&O Liability | 3/1/2013 – 14 | - Directors and Officers | N/A (paid for by Tesco) |
| | Umbrella | 3/1/2013 - 14 | - Excess General Liability<br>- Liquor Liability<br>- Auto Liability<br>- Employers Liability<br>- Foreign Package Liability | $242,854.00 |
| | Workers' Compensation and Employment Liability | 3/1/2013 - 14 | - Workers' Compensation in Arizona, California and Nevada | $9,004,940 |
| Liberty Surplus Insurance Corporation | Contaminated Product | 3/1/2013 – 14 | - Product Recall Liability | $214,321.00 |

NYI-4546451v1
RLF1 9415858v.1

| CARRIER | INSURANCE POLICY | TERM | COVERAGE | ANNUAL PREMIUM |
|---|---|---|---|---|
| **QBE** | **D&O Liability** | 3/1/2013 – 14 | - Directors and Officers | N/A (paid for by Tesco) |
| **RSA** | **Crime** | 3/1/2013 - 14 | - Crime | N/A (paid for by Tesco) |
| **Travelers Insurance Company** | **ERISA Bond** | 3/1/2013-16 | - ERISA Bond | $584.00 gross premium |
| **Travelers Property Casualty of America** | **Boiler and Machinery** | 3/1/2013 – 14 | - Boiler and Machinery | $135,151.00 |
| **Various providers** | **Difference In Conditions ("DIC") a/k/a Earthquake and Flood** | 3/1/2013 – 14 | - DIC Liability | $692,389.00 |
| **XL** | **D&O Liability** | 3/1/2013 – 14 | - Directors and Officers | N/A (paid for by Tesco) |
| **Zurich** | **Crime** | 3/1/2013 - 14 | - Crime | N/A (paid for by Tesco) |
| | **D&O Liability** | 3/1/2013 - 14 | - Directors and Officers | N/A (paid for by Tesco) |

## **EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| FRESH & EASY NEIGHBORHOOD | : | Case No. 13-_____ (___) |
| MARKET INC., *et al.*,[1] | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**ORDER AUTHORIZING DEBTORS TO CONTINUE THEIR**
**INSURANCE PROGRAMS AND PAY RELATED OBLIGATIONS**

This matter coming before the Court on the Motion of the Debtors for an Order Authorizing Them to Continue Their Insurance Programs and Pay Related Obligations (the "Motion"),[2] filed by the above-captioned debtors (collectively, the "Debtors"); the Court having reviewed the Motion and the First Day Declaration and having considered the statements of counsel and the evidence adduced with respect to the Motion at a hearing before the Court (the "Hearing"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) notice of the Motion and the Hearing was sufficient under the circumstances and (v) there is good cause to waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h) to the extent it is applicable; after due deliberation the Court having determined that the relief requested in the Motion is (i) in the best interests of the Debtors, their estates and their creditors and

---

[1] The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Fresh & Easy Neighborhood Market Inc. (7028) and Fresh & Easy Property Company LLC (9636). The address of each of the Debtors is 2120 Park Place, Suite 200, El Segundo, California 90245.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

(ii) necessary to prevent immediate and irreparable harm to the Debtors and their estates; and good and sufficient cause having been shown;

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED.

2. The Debtors are authorized to: (i) continue their Insurance Policies (including their Workers' Compensation Program); (ii) pay any Prepetition Insurance Claims including, without limitation, any Premium Adjustment, as such obligations become due in the ordinary course of the Debtors' business; and (iii) liquidate in an appropriate forum or settle such Prepetition Insurance Claims.

3. The Banks are authorized to receive, process, honor and pay all checks presented for payment of, and to honor all funds transfer requests made by the Debtors related to, Prepetition Insurance Claims, regardless of whether such checks were presented or funds transfer requests were submitted prior to or after the Petition Date, provided that funds are available in the Debtors' accounts to cover such checks and funds transfers. The Banks are authorized to rely on the Debtors' designation of any particular check or funds transfer as approved by this Order.

4. Nothing in the Motion or this Order, nor the Debtors' payment of claims pursuant to this Order, shall be deemed or construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim is a Prepetition Insurance Claim; or (v) the assumption of any contract.

5. The requirements of Bankruptcy Rule 6003(b) have been satisfied with respect to the payments authorized by this Order.

-3-

6. This Order shall be immediately effective and enforceable upon its entry. To the extent that it may be applicable, the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is hereby waived.

Dated: _____, 2013
       Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE