**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| FRESH & EASY NEIGHBORHOOD | : | Case No. 13-12569 (KJC) |
| MARKET INC., *et al.*,[1] | : |  |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |

**DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING
BID PROCEDURES FOR THE SALE OF A SUBSTANTIAL PORTION
OF THE DEBTORS' ASSETS, (B) APPROVING STALKING HORSE APA
AND BIDDING PROTECTIONS, AND (C) GRANTING CERTAIN RELATED
RELIEF AND (II) AN ORDER (A) APPROVING THE SALE OF A SUBSTANTIAL
PORTION OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES RELATED THERETO, AND (C) GRANTING CERTAIN RELATED RELIEF**

The above-captioned debtors (collectively, the "Debtors" or "Fresh & Easy")

move the Court, pursuant to sections 105, 363, 365, 503(b) and 507 of title 11 of the United

States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules for the

United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of

an order (the "Bidding Procedures Order"), substantially in the form attached hereto as

Exhibit A:

    (i)    approving the proposed procedures (the "Bidding Procedures") to be used
in connection with the sale of a substantial portion of the Debtors' assets
(the "Bid Assets");

    (ii)    approving and authorizing the stalking-horse asset purchase agreement
dated September 10, 2013 (the "Stalking Horse APA") entered into by the

---

[1] The Debtors are the following two entities (the last four digits of their respective taxpayer identification
numbers follow in parentheses): Fresh & Easy Neighborhood Market Inc. (7028) and Fresh & Easy
Property Company LLC (9636). The address of each of the Debtors is 2120 Park Place, Suite 200,
El Segundo, California 90245.

Debtors as sellers and YFE Holdings, Inc. as buyer, subject only to higher and better offers submitted in accordance with the Bidding Procedures;

(iii)     authorizing the Debtors to pay the customary break-up fee and expense reimbursement set forth in and pursuant to the terms of the Stalking Horse APA (together, the "Stalking Horse Protections");

(iv)     setting the dates for the Bid Deadline (as defined below), the auction of the Bid Assets (the "Auction"), the final hearing (the "Sale Hearing") and approval of notices related thereto; and

(v)     authorizing certain procedures related to the assumption and assignment of executory contracts and unexpired leases (the "Assignment Procedures").

The Debtors also move the Court, pursuant to Bankruptcy Code sections 105, 363 and 365, Bankruptcy Rules 2002, 6004 and 6006 and Local Rules 2002-1 and 6004-1, for the entry of an order (the "Sale Order"), substantially in the form attached hereto as Exhibit B:

(i)     authorizing the sale of the Bid Assets (the "Sale Transaction") free and clear of all liens, claims, interests and encumbrances;

(ii)     authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

(iii)     granting related relief.

In support of this Motion, the Debtors incorporate the statements contained in

(i) the Declaration of James Dibbo in Support of First-Day Pleadings [Docket No. 3] (the "First Day Declaration"), and (ii) the Declaration of Marc Liebman in Support of the Motion, attached hereto as Exhibit C, and further respectfully state as follows:

**Background**

1.     On the date hereof (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.[2]  By a motion filed on the Petition Date, the

---

[2]     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

Debtors have requested that their chapter 11 cases be consolidated for procedural purposes only and administered jointly.

2.    Founded in 2006 as wholly-owned subsidiaries of Tesco PLC ("Tesco"), the Debtors operate a chain of Fresh & Easy grocery stores offering high-quality, wholesome, fresh prepared and ready-to-eat products at affordable prices.  The Debtors currently operate 167 stores located in California, Arizona and Nevada.  In addition to their stores portfolio, the Debtors operate a state of the art production facility in Riverside, California (the "Campus") including a kitchen, meat and produce facilities, each housed in its own building, providing Fresh & Easy-branded fresh food products.  In close proximity to the Campus is one of the Debtors' two distribution centers, with the other inactive distribution center located in Stockton, California.  For the twelve months ending February 24, 2013, the Debtors generated approximately $1.1 billion in revenue.

3.    As described in more detail in the First Day Declaration, the Debtors have commenced these chapter 11 cases to effectuate a sale of a substantial portion of their assets on a going concern basis to a stalking horse bidder, YFE Holdings, Inc. (the "Proposed Buyer"), a company affiliated with The Yucaipa Companies, LLC, subject to any higher and better offers received in connection with a proposed sale process.  The Debtors intend to liquidate all other assets not included in the proposed sale.  The Debtors believe the proposed sale and the liquidation of the remaining portion of the Debtors' assets represents the best strategy to maximize value for the Debtors' various stakeholders.

***The Proposed Sale Transaction and Marketing Process***

4.    Fresh & Easy was founded in 2006 as a wholly-owned subsidiary of Tesco PLC ("Tesco").  Since its founding, Tesco has funded Fresh & Easy through both debt and equity contributions in the approximate amount of $3.3 billion.  In spite of these efforts, between 2008

and 2012, Fresh & Easy averaged $22 million in losses per month and was never able to generate a profit.  As a result, in December 2012, Tesco engaged Greenhill & Co., Inc. ("Greenhill") as its investment banker to conduct a strategic review of the Debtors' business, including an exploration of multiple restructuring or other strategic alternatives.  After Greenhill completed its evaluation, and despite Tesco's continuing belief in the Fresh & Easy concept and support of the business, Tesco determined that a shift in business structure and strategy was necessary for Fresh & Easy to achieve profitability.  This required shift in Fresh & Easy's structure and strategy meant that the Fresh & Easy business model would no longer be in line with Tesco's other global operations and core business strategy.  As a result, Tesco made the decision to exit the U.S. market.  To appropriately accomplish this exit,  Tesco tasked Greenhill with pursuing a going concern sale of the Debtors' business, which Tesco felt would be in the best interests of the Debtors' creditors, employees, vendors and other stakeholders.

5.      Beginning in December 2012, Tesco and Fresh & Easy, with the aid of Greenhill, investigated numerous sale opportunities, evaluating each not only in terms of the monetary consideration, but also for each proposed transaction's effect on Fresh & Easy's stakeholders and its prospects for a successful turnaround of the business.  Beginning in January 2013, Tesco and the Debtors, with the aid of Greenhill, developed a list of over 65 potentially interested parties and solicited initial interest in a going concern transaction that would transfer a substantial portion of the Debtors' assets to a new owner.  Thereafter, the Debtors signed non-disclosure agreements and provided a confidential information memorandum to approximately 45 parties.  The sale process resulted in the submission of 16 preliminary indications of interest for various assets of the Debtors, including four indications of interest for the whole company.

6.      Following the receipt of indications of interest, frequent conversations with the potential buyers occurred through the professionals, advisors and senior management of both Tesco and the Debtors.  Such conversations included discussions with parties interested in a going concern transaction as well as parties interested in select assets sales and liquidation oriented transactions.

7.      After significant analysis of the benefits of each transaction for the Debtors' creditors, employees, vendors and other stakeholders, the Debtors determined that the offer presented by the Proposed Buyer, which called for the continued operation of approximately 150 of the Debtors' stores along with the Campus and Riverside distribution facilities, was the best alternative for the Debtors' stakeholders.  Following intense, arm's length, good-faith negotiations, the Debtors and the Proposed Buyer agreed to the terms of the Stalking Horse APA under which the Proposed Buyer is to serve as a stalking horse bidder for the sale of a substantial portion of the Debtors' operations as a going concern under section 363 of the Bankruptcy Code.

8.      After entering into the Stalking Horse APA, the Debtors determined that it was necessary to obtain their own investment banker to further evaluate the proposed sale transaction and to perform additional marketing of the Bid Assets.  As a result, the Debtors retained Alvarez & Marsal Securities, LLC  ("A&M-S") on September 16, 2013.  A&M-S has since taken the primary advisory role for the Debtors with respect to the additional marketing of the Bid Assets and the evaluation of the proposed sale transaction and any potential alternative transactions.

9.      The Debtors believe that the Stalking Horse APA negotiated with the Proposed Buyer represents the best mechanism to maximize the value of the Debtors' estates and

is in the best interests of the Debtors' creditors, employees, vendors and other stakeholders. Consummating the proposed Sale Transaction also will enable the Debtors to maintain a significant portion of their ongoing businesses and preserve the jobs of approximately 4,000 of their approximately 4,187 current employees.

***The Need for a Timely Sale Process***

10.     The Debtors believe that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information necessary to formulate a bid to purchase the Bid Assets.  In formulating the procedures and time periods, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to quickly and efficiently sell the Fresh & Easy enterprise while it still has realizable value and can be maintained as a going concern business.  As described above, the Debtors' businesses have been extensively marketed over the last eight months to a broad group of strategic and financial buyers and substantial information regarding the Debtors' businesses has been made available during the process.  As such, the Debtors believe that numerous parties that may have an interest in bidding at the Auction will not be starting from scratch in formulating their bids.  Furthermore, potential bidders will have access to updated information prepared by the Debtors and their advisors and a substantial body of information, inclusive of a management presentation, financial projections and an extensive data room, including information gathered specifically based upon the due diligence requests of several potential buyers.

11.     Completion of the sale process in a timely manner will also maximize the value of the Bid Assets.  The time periods set forth in the Bidding Procedures were negotiated by the Proposed Buyer, and failure to adhere to such time periods could jeopardize the closing of the Sale Transaction, which the Debtors believe is the best means of maximizing the value of

their assets and the only means of maintaining Fresh & Easy as a going concern business, which will enable the Debtors retain approximately 4,000 jobs and significantly reduce claims against the estates.  In addition, Fresh & Easy loses over $22 million per month.  Although Tesco has continued to fund these losses in order to allow for a smooth transition of Fresh & Easy, it has done so with the understanding that the Debtors would be pursuing an efficient sale of the business.  Thus, the Debtors have determined that pursuing the Sale Transaction in the manner and with the procedures proposed is in the best interest of the Debtors' estates and will provide all interested parties with sufficient opportunity to participate.

***Stalking Horse APA and Sale Order[3]***

12.     A summary of the terms of the Stalking Horse APA, a complete copy of which is attached hereto as <u>Exhibit D</u> and incorporated herein by reference, and certain relief sought in the Sale Order, including the terms to be highlighted pursuant to Local Bankruptcy Rule 6004-1, is as follows:[4]

> **Acquired Assets**:  Section 1.01(a) of the Stalking Horse APA lists the Acquired Assets.  As set forth therein, the Proposed Buyer will acquire, among other things: (i) a substantial portion of the Sellers' owned and leased properties, including approximately 150 stores; (ii) the Sellers' Campus Facility; (iii)  $36,315,000 of non-cash working capital and $20,000,000 of cash working capital (with a dollar-for-dollar purchase price adjustment if either amount is different at closing); and (iv) all of the Sellers' contractual rights and intellectual property that relate primarily to the Fresh & Easy business (subject to certain exceptions)..

> **Assumed Liabilities**:  As set forth in Section 1.02(a) of the Stalking Horse APA, the liabilities to be assumed by the Proposed Buyer include, among other things, certain obligations and liabilities primarily relating to the Sellers' Business, including:  (i) all liabilities set forth on the Seller Financial Statements, dated May 31, 2013 and all obligations and liabilities of the Business incurred since

---

[3]    The following summary is qualified in its entirety by reference to the provisions of  the Stalking Horse APA.  In the event of any inconsistencies between the provisions of the Stalking Horse APA and the terms herein, the terms of the Stalking Horse APA shall govern.  Capitalized terms used in this summary and not otherwise defined herein have the meanings given to them in the Stalking Horse APA.

[4]    The Debtors believe these provisions are typical and customary for transactions of this kind and are a result of arms-length and good faith negotiations between the Debtors and the Proposed Buyer.

May 31, 2013; (ii) the Assumed Leases and Assumed Contracts; (iii) the continued employment of and related liabilities for approximately 4,000 of the Debtors' employees; (iv) warranty obligations and product liabilities; (v) environmental liabilities relating to the business; and (vi) obligations under letters of credit in an amount not to exceed $15,500,000 and capital leases in an amount not to exceed $8,000,000.[5]

**Purchase Price**:  Section 1.03 of the Stalking Horse APA provides that the Purchase Price for the Acquired Assets will include the Buyer's assumption of an estimated $130 million of Assumed Liabilities and the Buyer's delivery to Sellers of a warrant to purchase shares of the Buyer Common Stock representing 22.5% of Buyer's outstanding capital stock on a fully diluted basis as of the Closing, subject to dilution pro rata with all other holders of Buyer Common Stock and Buyer Voting Common Stock for Buyer Common Stock issued or reserved for issuance to Buyer's management or debt financing sources.  At the closing, under the Stalking Horse APA, Sellers will become parties to a securityholders agreement applicable to the equity of the Buyer held by them containing the terms provided for in the Stalking Horse APA.

**Campus Note**:  Section 1.07(b)(iii) of the Stalking Horse APA provides that at closing, Tesco or one of its affiliates will lend $120,000,000 to the Buyer pursuant to a secured promissory note in accordance with the terms of the Stalking Horse APA.  In return for its provision of the Campus Note, the affiliate of Tesco will receive warrants to purchase up to 10% of the Buyer's equity.  Any prepayments made on the Campus note in the first 18 months after the closing will reduce the number of shares of Buyer equity that are issuable pursuant to the warrant (potentially to zero) according to a formula set forth in an exhibit to the Asset Purchase Agreement.[6]

**Termination and Other Deadlines**:  Section 7.01 of the Stalking Horse APA sets forth circumstances under which the Stalking Horse APA may be terminated. Among other things, the provisions allow the Buyer to terminate the Stalking Horse APA if (i) Sellers have not commenced the Bankruptcy Cases on or before October 10, 2013; or (ii) the Bankruptcy Court has not entered the Bidding Procedures Order within 30 days after the Petition Date or the first date thereafter available on the calendar of the Bankruptcy Court in the event the Bankruptcy Court's calendar does not accommodate such deadline.

---

[5]     Section 1.02(b) of the Stalking Horse Asset Purchase Agreement sets forth the Excluded Liabilities.

[6]     Local Rule 6004-1 requires certain disclosures with respect to sales to insiders.  The Debtors do not believe that the sale pursuant to the Stalking Horse APA is a sale to an insider because Tesco is receiving warrants as consideration for the provision of the Campus Note.  Furthermore, the Debtors do not believe that these warrants have significant value, because if the Buyer is able to find alternative financing within 18 months from the closing of the sale transaction, the number of shares of Buyer's equity that are issuable pursuant to the warrants will be reduced to zero.  Additionally, the Bidding Procedures provide information for any potential purchaser who seeks to request the provision of financing from Tesco in connection with their bid.

Among other things, both the Buyer and/or Sellers can terminate the Stalking Horse APA if: (i) the Bankruptcy Court has not entered the Approval Order within 90 days after the Petition Date or the first date thereafter available on the calendar of the Bankruptcy Court in the event the Bankruptcy Court's calendar does not accommodate such deadline; (ii) the Bankruptcy Court enters an order approving an Alternative Transaction; or (iii) the Closing has not occurred on or before December 31, 2013 (the "Termination Date"); provided that if (i) the Petition Date shall not have occurred on or prior to October 4, 2013 and (ii) Buyer's commitments for the Financing then remain in effect, the Termination Date may, upon 14 days' prior notice, be extended by Buyer to January 15, 2014.

**Break-Up Fee, Buyer Expense Reimbursement Amount and Overbid Protection**: Section 7.02(b) and section 7.02(c) of the Stalking Horse APA provide that (A) if the Stalking Horse APA is terminated pursuant to Section 7.01(d)(ii) or Section 7.01(e) thereof, then Sellers shall pay to Buyer the Break-Up Fee in the amount of $1,500,000 and (B) if the Stalking Horse APA is terminated other than pursuant to Section 7.01(a) or 7.01(c), then Sellers shall, in addition to the Break-Up Fee, if applicable, pay to the Buyer the Expense Reimbursement Amount not to exceed $750,000, equal to Buyers' reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred after the date hereof by Buyer in connection with the Stalking Horse APA. The Break-Up Fee and the Expense Reimbursement Amount shall have administrative expense priority obligations pursuant to section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in section 503(b) and 507(b) of the Bankruptcy Code.[7]

**Releases**: Section 9.10(a) of the Stalking Horse APA provides for the following releases effective upon the Closing: (i) Buyer releases each Seller from any and all actual or potential claims relating in any way to the Acquired Assets or the Assumed Liabilities and (ii) each Seller releases Buyer from any and all actual or potential claims relating in any way to the Excluded Assets or the Excluded Liabilities provided that, (x) nothing contained within this section shall constitute a release of any person arising from conduct of such person that is determined by a final order of a court of competent jurisdiction to have constituted an actual fraud, willful breach, knowing and intentional misrepresentation or criminal act by such person and (y) nothing in the Stalking Horse APA shall be construed to release any person from any of its contractual obligations under the Stalking Horse APA and the other Transaction Agreements, including any of the Buyers' or Sellers' respective obligations in respect of the Acquired Assets, Assumed Liabilities, Excluded Assets and Excluded Liabilities, as the case may be, each of which shall remain fully effective and enforceable from and after the Closing Date.

---

[7]     In addition to the Break-Up Fee set forth in the Stalking Horse APA, Tesco has agreed to provide the Buyer with an additional break-up fee in an amount equal to $8,500,000.

**Closing Conditions**.  The respective obligations of the Buyer and the Sellers to consummate the closing of the transactions contemplated by the Stalking Horse APA are subject to the satisfaction or waiver of the closing conditions set forth in Article 6 of the Asset Purchase Agreement.  The obligations of the Buyer under the Stalking Horse APA are not subject to a financing condition or a general "absence of material adverse changes" condition.

**Transition Services Agreement**.  Pursuant to section 1.07(b) of the Stalking Horse APA, an affiliate of Tesco and the Buyer will enter into a Transition Services Agreement pursuant to which certain transitional services (including IT Support, Human Resources, Finance, Supply Chain, and Commercial Services) will be provided to Buyer in connection with the operation of the Business for a period of at least 12 months following the closing for a $5,900,000 initial annual service fee.

**Non-Solicitation of Competing Bid**:  Section 9.03 of the Stalking Horse APA provides that as of the execution of the Stalking Horse APA until the date the Court enters the Bidding Procedures Order, Sellers shall not, and shall not cause their Representative and Affiliates not to, directly or indirectly, (a) initiate contact with, pursue, knowingly facilitate, solicit or encourage submission of, or discuss, negotiate or assist with, any inquiries, proposals or offers by any Person (other than Buyer and its Affiliates, agents and Representatives) with respect to a Competing Bid or (b) provide any Person (other than Buyer and its Affiliates, agents and Representatives) with access to the books, records, operating data, contracts, documents or other information in connection with any Competing Bid; provided that this section  shall not require Sellers to withhold from any Person access to the electronic data room containing information regarding the Business, the Acquired Assets and the Assumed Liabilities following entry of the Bidding Procedures Order.

Each Seller shall, and shall cause the officers, directors, employees, Representatives, agents, investment bankers and Affiliates of Sellers to, (a) immediately cease and cause to be terminated any and all contacts, discussions and negotiations with any Person other than Buyer and its Affiliates and Representatives regarding the foregoing; (b) promptly notify Buyer if any Competing Bid, or any inquiry or contact with any Person with respect thereto which has been made as of the date of this Agreement or is subsequently made, and the details of such contact (including the identity of the third party or third parties and copies of any proposals and the specific terms and conditions discussed or proposed); and (c) keep Buyer fully informed with respect to the status of the foregoing.  Sellers agree not to, without the prior consent of Buyer, release any Person from, or waive any provision of, any standstill agreement or confidentiality agreement to which any Seller is a party.

**Sale Free and Clear of Unexpired Leases**:  Section 9.11(b) of the Stalking Horse APA and paragraph 13 of the proposed Sale Order provide that the Approval Order shall provide that, on the Closing Date and concurrently with the

Closing, all then existing or thereafter arising obligations, liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estates, will be fully released from and with respect to the Acquired Assets, which shall be transferred to Buyer free and clear of all obligations, liabilities and Encumbrances except for Assumed Liabilities and Permitted Encumbrances. The Sale Motion will be deemed to provide sufficient notice as to the sale and assignment of the Acquired Assets free and clear of all Liens and Excluded Liabilities in accordance with Local Rule 6004-1. Following the Closing, no holder of any Lien on the Acquired Assets may interfere with the Buyer's use and enjoyment of the Acquired Assets based on or related to such Lien, or any actions that the Debtors may take in their chapter 11 cases and no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Transactions or by this Order.

**Record Retention**: Section 9.13 of the Stalking Horse APA provides that prior to the Closing, Sellers and Buyer shall negotiate mutually acceptable terms of an agreement providing Sellers with access, for a period of at least nine months following the Closing Date, to Buyer's personnel, including the Transferred Employees, information technology systems, including email, third party service providers and books and records, and use of office space and office support for employees of Sellers, as is reasonably necessary or appropriate in connection with the administration of the Bankruptcy Case and to permit Sellers to wind-down and liquidate the Sellers' Bankruptcy estates following the Closing.

**No Successor Liability**: Paragraphs U and 13 of the proposed Sale Order provide that the Proposed Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, principals, directors, officers, and shareholders (or equivalent) have no obligations with respect to any liabilities of the Debtors other than the Assumed Liabilities assumed under or pursuant to the Stalking Horse APA.

**Relief From Bankruptcy Rule 6004(h)**: Paragraph 44 of the Sale Order provides that the Sale Order will be effective and enforceable immediately upon entry and its provisions will be self-executing. Time is of the essence in closing the Sale Transaction and the Debtors and the Buyer intend to close the Sale Transaction as soon as practicable. Any party objecting to the Sale Order must exercise due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing, or risk its appeal being foreclosed as moot.

*The Bidding Procedures*

13.    The Bidding Procedures are designed to maximize value for the Debtors'

estates and will enable the Debtors to review, analyze and compare all bids received to determine

which bid is in the best interests of the Debtors' estates and creditors. The Bidding Procedures

describe, among other things, the procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing Bidding Procedures.  The Debtors submit that the Bidding Procedures afford the Debtors a sufficient opportunity to pursue a sale process that will maximize the value of their estates.

14.    Certain of the key terms of the Bidding Procedures are highlighted as follows pursuant to Local Rule 6004-1(c):[8]

(a)    **Interested Parties**:  To participate in the Bidding Process, each interested person or entity (each an "Interested Party") must deliver the following to the Financial Advisors so as to be received by no later than 5:00 p.m. (Eastern Time) on November 1, 2013:  (A) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; (B) a statement and other factual support demonstrating that the Interested Party has a bona fide interest in purchasing the Acquired Assets and assuming the Assumed Liabilities; and (C) sufficient information, as defined by the Debtors, to allow the Debtors to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal or other authorizations to close the Sale Transaction and satisfy its adequate assurance of future performance requirement with respect to any executory contract or unexpired lease to be assigned.

If the Debtors determine, after receipt of the items identified above, that an Interested Party has a bona fide interest in the Acquired Assets and Assumed Liabilities, no later than two (2) business days after the Debtors make that determination and have received all of the materials required above, such Interested Party will be deemed a "Potential Bidder" and the Debtors will deliver to such Potential Bidder: (A) an electronic copy of the Stalking Horse APA and (B) access information for the Debtors' confidential electronic data room concerning the Acquired Assets and Assumed Liabilities (the "Data Room").  The Debtors reserve the right to determine whether an Interested Party has satisfied the above participation requirements such that it is eligible to be a Potential Bidder.

---

[8]    The brief description of the key milestones in the Bidding Procedures described herein is for the convenience of the Court and parties in interest.  The full copy of the Bidding Procedures should be reviewed in its entirety and will control in the event of any inconsistency or ambiguity in any descriptions of them herein.  Capitalized terms used in this summary and not otherwise defined herein have the meanings given to them in the Bidding Procedures Order.

(b) <u>**Qualified Bids**</u>: Each offer, solicitation or proposal by a Potential Bidder must satisfy each of the following conditions to be deemed a "<u>Qualified Bid</u>," and for the Potential Bidder to be deemed a "<u>Qualified Bidder</u>."

(i) <u>**Bid Deadline**</u>: A Potential Bidder who desires to be a Qualified Bidder must deliver the Required Bid Documents (as defined below) so as to be received not later than 12 noon (Eastern Time) on November 7, 2013 (the "<u>Bid Deadline</u>") to the Financial Advisors, with copies to Jones Day, 222 East 41st Street, New York, New York 10017 (Attn: Paul D. Leake and Lisa Laukitis). The Debtors may extend the Bid Deadline with the written consent of the Proposed Buyer. If the Debtors extend the Bid Deadlines, the Debtors will promptly notify all potential bidders who have signed a confidentiality agreement of such extension.

(ii) <u>**Bid Requirements**</u>: All bids must include the following (the "<u>Required Bid Documents</u>"):

(1) <u>Irrevocable Bid</u>. A letter stating that the bidder's offer is irrevocable until consummation of a transaction involving any other bidder for the Acquired Assets and Assumed Liabilities identified in such offer;

(2) <u>Stalking Horse APA</u>. A duly authorized and executed purchase agreement, including the purchase price for the Acquired Assets and Assumed Liabilities, together with all exhibits and schedules marked to show those amendments and modifications to the Stalking Horse APA and the proposed Sale Order; and

(3) <u>Financing</u>. Written evidence of a firm commitment for financing, or other evidence of ability to consummate the proposed transaction without financing, that is satisfactory to the Debtors.[9]

(iii) In addition, a bid will be considered <u>only</u> if the bid:

(1) identifies the assets to be purchased and the contracts and leases to be assumed and assigned;

(2) sets forth the consideration for the assets to be purchased and the contracts and leases to be assumed and assigned;

(3) provides for consideration that is higher or better than the consideration provided for by the Stalking Horse APA, taking

---

[9] As set forth in the Bidding Procedures, any Interested Party that seeks to request the provision of financing from Tesco in connection with their bid should contact Greenhill & Co., LLC.

into account the Break-Up Fee and Expense Reimbursement Amount;

(4)    is not conditioned on obtaining financing or on the outcome of unperformed due diligence or corporate, stockholder or internal approval;

(5)    provides evidence satisfactory to the Debtors, in their sole discretion, of the bidder's financial wherewithal and operational ability to consummate the transaction and satisfy its adequate assurance of future performance requirement with respect to any executory contract or unexpired lease to be assigned to it;

(6)    is irrevocable until the Debtors have chosen the Successful Bid(s) (as defined below) and the Alternate Bid(s) (as defined below);

(7)    to the extent the bid is for any or all of the Acquired Assets, is accompanied by a deposit by wire transfer to an escrow agent selected by the Debtors (the "Deposit Agent") equal to $10,000,000, and to the extent the bid is for any asset that is not an Acquired Asset, is accompanied by a deposit by wire transfer to the Deposit Agent of an amount equal to 10% of the consideration set forth in connection with such bid (any such deposit, a "Good Faith Deposit");

(8)    sets forth the representatives who are authorized to appear and act on behalf of the contemplated transactions;

(9)    indicates that the bidder will not seek any transaction or Break-Up Fee, expense reimbursement or similar type of payment;

(10)   includes evidence of the Qualified Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases; and

(11)   is received on or before the Bid Deadline.

(c)    **Break-Up Fees and Expense Reimbursement Amount**:  Recognizing the Proposed Buyer's expenditure of time, energy, and resources, and the benefit that these efforts provided to all Interested Parties, the Debtors have agreed that if the Proposed Buyer is not the Successful Bidder, the Debtors will, in certain circumstances, pay to the Proposed Buyer a Break-Up Fee and an Expense

Reimbursement Amount.  The payment of the Break-Up Fee and Expense Reimbursement Amount will be governed by the provisions of the Stalking Horse APA and the order of the Bankruptcy Court approving proposed Bidding Procedures Order.  The Break-Up Fee is in an amount equal to $1,500,000.[10]  The Expense Reimbursement Amount is an amount up to $750,000.

(d)     **Auction**:  The Proposed Buyer is deemed a Qualified Bidder and its bid is deemed a Qualified Bid.  In the event that the Debtors timely receive more than one Qualified Bid, the Debtors shall conduct an auction (the "Auction") of the Bid Assets.  The Auction shall be in accordance with these Bidding Procedures and upon notice to all Qualified Bidders who have submitted Qualified Bids.  The Auction will be conducted at the offices of Jones Day, 222 East 41st Street, New York, New York 10023 on November 13, 2013 at 10:00 a.m. (Eastern Time).

Only representatives or agents of the Debtors, Tesco, the Proposed Buyer, the Official Committee of Unsecured Creditors appointed in the chapter 11 cases (the "Creditors' Committee"), and any Qualified Bidder that has submitted a Qualified Bid (and the legal and financial advisors to each of the foregoing), will be entitled to attend the Auction, and only the Proposed Buyer and Qualified Bidders will be entitled to make any subsequent bids at the Auction.

At least two business days prior to the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtors believe is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders which have informed the Debtors of their intent to participate in the Auction and, if requested, will provide an explanation of how the Starting Bid is valued and a list containing the identification of all Qualified Bidders.

The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids (as defined below)) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any Order of the Bankruptcy Court entered in connection herewith and (ii) disclosed to each Qualified Bidder; and provided further than all bids shall be made openly, in the presence of all parties at the Auction.

(e)     **Selection of Successful Bid(s)**:  Prior to the conclusion of the Auction, the Debtors will:  (A) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction; (B) identify the highest or otherwise best offer or collection of offers (the "Successful Bid(s)"); (C) determine which Qualified Bid is the Successful Bid(s) and which is the next highest or otherwise best offer or collection of offers (the "Alternate Bid(s)") for the Acquired Assets; and

---

[10]     In addition to the Break-Up Fee set forth in the Stalking Horse APA, Tesco has agreed to provide the Buyer with an additional break-up fee in an amount equal to $8,500,000.

(D) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder(s) (the "Successful Bidder(s)"), the amount and other material terms of the Successful Bid and the identity of the party or parties that submitted the Alternate Bid(s) (the "Alternate Bidder(s)").  Within one business day of the completion of the Auction, the Successful Bidder(s) and the applicable Debtors shall complete and execute all agreements, instruments or other documents necessary to consummate the applicable Sale(s) or otherwise contemplated by the applicable Successful Bid(s).

(f)     **Alternate Bidder(s)**:  If for any reason, the entity or entities that submit(s) the highest or otherwise best Qualified Bid(s) fails to consummate the purchase of the Acquired Assets and assumption of the Assumed Liabilities, or any part thereof, the Debtors and the Alternate Bidder(s) are authorized to effect the sale of the Acquired Assets and assumption of the Assumed Liabilities to such Alternate Bidder(s) as soon as is commercially reasonable.  If such failure to consummate the purchase is the result of a breach by the Successful Bidder(s), the Debtors reserve the right to seek all available remedies from the defaulting Successful Bidder(s) subject to the terms of the applicable purchase agreement.

*Assignment Procedures*

15.     The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume such contracts or leases and assign them to the eventual purchaser:

**Notice of Assignment and Cure**:  Attached to the Stalking Horse APA as Schedules 1.01(a)(ii)(A), 1.01(a)(ii)(B) and 1.01(a)(iii) (together, the "Assignment Schedule") listing all Assumed Contracts and Assumed Leases proposed to be assumed and assigned pursuant to the Stalking Horse APA on the date the Sale Order is entered (the "Assumed Contracts and Leases").  The Debtors will serve each of the non-Debtor counterparties to the Assumed Contracts and Leases a notice, which shall be in form and substance acceptable to the Proposed Buyer a "Notice of Assignment and Cure"), by first class mail, that will include (i) the title of the Assumed Contracts and Leases to be assumed, (ii) the name of the counterparty to the Assumed Contracts and Leases, (iii) any applicable cure amounts, (iv) that the assignee is the Proposed Buyer or its designee, or any other Successful Bidder(s), and (v) the deadline by which any such Assumed Contracts and Leases counterparty must object.

**Assignment and Cure Objection Deadline**:  Any objections to the assumption and/or assignment of any Assumed Contracts and Leases identified on a Notice of Assignment and Cure, including to the cure amount set forth on such notice, must be in writing, filed with the Court, and be actually received by the Notice Parties **no later than fourteen (14) days after such Notice of Assignment and Cure is mailed to the affected party**, as indicated by the date noted on such Notice of

Assignment and Cure (the "Assignment and Cure Objection Deadline"), and must set forth a specific default under the Assumed Contracts and Leases and claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in such Notice of Assignment of Cure.

**Resolution of Objections to Assumption and/or Assignment of Assumed Contracts and Leases**:  If no objection is received by the Assignment and Cure Objection Deadline, then the assumption and assignment of the applicable Assumed Contract or Lease is authorized pursuant to section 365 of the Bankruptcy Code and the cure amounts, if any, set forth on the Notice of Assignment and Cure shall be binding upon the non-Debtor party to the Assumed Contracts and Leases for all purposes and will constitute a final determination of total cure amounts required to be paid to the Assumed Contracts and Leases counterparty in connection with any potential assignment of such Assumed Contracts and Leases to the Successful Bidder(s).  In addition, each non-Debtor party to such Assumed Contracts and Leases shall be forever barred from objecting to the assumption and assignment of such contract or lease or the cure information set forth in the Notice of Assignment and Cure, including, without limitation, the right to assert any additional cure or other amounts with respect to the Assumed Contracts and Leases arising or relating to any period prior to such assumption or assignment.  Furthermore, if no timely objection is received by the Assignment and Cure Objection Deadline, the Proposed Buyer (or Successful Bidder(s), if applicable) shall enjoy all of the rights and benefits under all Assumed Contracts and Leases acquired under the Stalking Horse APA (or such other purchase agreement of an alternative Successful Bidder(s), if applicable), without the necessity of obtaining any party's written consent to the Debtors' assumption and assignment of such rights and benefits, and each such party shall be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment.

*Notice*

16.    Within seven days after entry of the Bidding Procedures Order (the "Mailing Deadline"), the Debtors (or their agents) shall:

(a)    provide notice of the Sale (the "Sale Notice") (in substantially the form of the proposed notice attached to this Motion as Exhibit E), the Bidding Procedures Order, the Motion, the Auction, the Objection Deadlines, and the Sale Hearing by first-class mail upon:  (i) the Office of the United States Trustee for the District of Delaware; (ii) applicable state and local taxing authorities; (iii) the Internal Revenue Service; (iv) the Securities & Exchange Commission; (v) the United States Attorney General/Antitrust Division of Department of Justice; (vi) each of the non-Debtor counterparties to the Assumed Contracts and Leases; (vii) counsel to Tesco; and (viii) all entities who are known to possess or assert a claim against the Debtors (collectively, the "Notice Parties"); and

(b)     cause the Sale Notice to be published on one occasion in the national edition of *The Wall Street Journal* on the Mailing Deadline, or as soon as practicable thereafter.

17.     Within one business day after the conclusion of the Auction, the Debtors will file a notice (i) identifying the Successful Bidder(s) and (ii) providing adequate assurance materials demonstrating the ability of the Successful Bidder(s) to perform under the Assumed Contracts and Leases (the "<u>Notice Of Successful Bidder</u>").

18.     The Debtors submit that the proposed Sale Notice and Notice of Successful Bidder, and providing notice of this Motion, the Auction and the Sale Hearing as described herein, complies fully with Bankruptcy Rule 2002 and Local Bankruptcy Rule 2002-1 and constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto.  Therefore, the Debtors respectfully request that this Court approve the form of the Sale Notice and the notice procedures proposed above.

## Legal Basis for Relief Requested

***The Bidding Procedures Are Fair, Appropriate and Are Designed to Maximize the Value Received for the Acquired Assets.***

19.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Debtors submit that the Bidding Procedures are appropriate, consistent with procedures routinely approved by courts in this district, ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.  The Bidding Procedures proposed herein are designed to maximize the value received for the Bid Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.  The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information

necessary to submit a timely and informed bid.  Thus, the Debtors and all parties in interest can

be assured that the consideration for the Bid Assets will be fair and reasonable.  At the same

time, the Bidding Procedures provide the Debtors with an adequate opportunity to consider all

competing offers and to select, in their reasonable business judgment, and with reasonable

consultation with the Creditors' Committee and its advisors, the highest and best offer for the Bid

Assets.  Accordingly, the Debtors submit that the Court should approve the Bidding Procedures.

***The Break-Up Fee and Expense Reimbursement Amount Have Sound Business Purpose and Should Be Approved.***

20.     The Stalking Horse APA provides for a Break-Up Fee in the amount of

$1,500,000  to be paid to the Proposed Buyer upon the entry of an order approving, or the

consummation of, an Alternative Transaction.[11]  The Stalking Horse APA also provides for the

reimbursement of the Proposed Buyer's expenses, up to $750,000, to be paid upon the occurrence

of certain events typical and customary for transactions of this kind.  The Debtors believe that

the Stalking Horse Protections were necessary for the Proposed Buyer to enter into the Stalking

Horse APA.  In addition, the Debtors believe that the presence of a stalking horse bidder will set

a floor for the value of the Bid Assets and attract other potential buyers to bid for the Bid Assets,

thereby maximizing the realizable value of the Bid Assets for the benefit of the Debtors' estates,

creditors and other parties-in-interest.

21.     Approval of the bid protections to the Proposed Buyer is governed by

standards for determining the appropriateness of bid protections in the bankruptcy context.

Courts have identified at least two instances in which bid protections may benefit the estate.

First, a break-up fee or expense reimbursement may be necessary to preserve the value of the

---

[11]     In addition to the Break-Up Fee set forth in the Stalking Horse APA, Tesco has agreed to provide the Buyer with an additional break-up fee in an amount equal to $8,500,000.

estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (hereinafter, "O'Brien").  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  Id.; see also In re Reliant Energy Channel View LP, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

22.    In O'Brien, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee.  Such factors are as follows:

a.   the presence of self-dealing or manipulation in negotiating the break-up fee;

b.   whether the fee harms, rather than encourages, bidding;

c.   the reasonableness of the break-up fee relative to the purchase price;

d.   whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;

e.   the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

f.   the correlation of the fee to a maximum of value of the debtor's estate;

g.  the support of the principal secured creditors and creditors committees of the break-up fee;

h.  the benefits of the safeguards to the debtor's estate; and

i.  the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

23.     The Break-Up Fee set forth in the Stalking Horse APA falls squarely within the O'Brien factors.  For example, it will enable the Debtors to secure an adequate floor for the Bid Assets and, thus, insist that competing bids be materially higher or otherwise better than the Stalking Horse APA and attracts other potential buyers to bid for all of the Bid Assets subject to the Stalking Horse APA – a clear benefit to the Debtors' estates.  Moreover, the Proposed Buyer would not agree to act as a stalking horse without the Break-Up Fee and the Expense Reimbursement Amount, and there has been no showing of any self-dealing or manipulation in the negotiation of the Break-Up Fee.  Without the Break-Up Fee and the Expense Reimbursement Amount, the Debtors might lose the opportunity to obtain the highest or best offer for the Bid Assets and would certainly lose the downside protection that will be afforded by the existence of the Proposed Buyer.  Furthermore, without the benefit of the Proposed Buyer, the bids received at Auction for the Bid Assets could be substantially lower than that offered by the Proposed Buyer.

24.     The Break-Up Fee and Expense Reimbursement Amount are reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Proposed Buyer.  Moreover, the Break-Up Fee and Expense Reimbursement Amount are actually necessary to preserve the value of the estate.  First, the

combined Break-Up Fee of $1.5 million and Expense Reimbursement of no more than $750,000 represent approximately 1.15% of the estimated $130 million of Assumed Liabilities that will be assumed by the Proposed Buyer (exclusive of other consideration provided to the estates by the Proposed Buyer).  Additionally, both the Break-Up Fee and Expense Reimbursement Amount were heavily negotiated in good faith, and both were necessary to secure the Proposed Buyer's commitment under the Stalking Horse APA.  In sum, the Debtors' ability to offer the Break-Up Fee and Expense Reimbursement Amount enables them to ensure the sale of the Bid Assets at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates.  The Debtors do not intend to terminate the Stalking Horse APA if to do so would incur an obligation to pay the Break-Up Fee and Expense Reimbursement Amount, unless to accept an alternative bid, which bid must exceed the consideration offered by the Proposed Buyer by an amount sufficient to pay the Break-Up Fee and Expense Reimbursement Amount.

25.    This Court has approved protections similar to the proposed Break-Up Fee and Expense Reimbursement Amount as reasonable and consistent with the type and range of bidding protections typically approved, and also has granted superpriority administrative expense status to breakup fees that become due under the terms of a stalking horse purchase agreement. See, e.g., In re Orchard Supply Hardware Stores Corp., No. 13-11565 (CSS) (Bankr. D. Del. July 8, 2013) [Docket No. 155] (approving as administrative expenses a break-up fee of 3% of stalking horse purchase price and expense reimbursement of up to $850,000 in connection with sale of $205 million of sale assets); In re Vertis Holdings, Inc, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (approving as administrative expenses a break-up fee of 3% of purchase price and expense reimbursement of up to $2,500,000 in connection with sale of $258 million of sale

assets) [Docket No. 206]; In re Solyndra LLC, No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28, 2012) (approving as administrative expenses a break-up fee of 2.6% of purchase price and expense reimbursement of up to $500,000 in connection with $90 million sale of assets) [Docket No. 1113]; In re Chef Solutions Holdings, LLC, No. 11-13139 (KG) (Bankr. D. Del. Oct. 19, 2011) [Docket No. 129] (approving as administrative expenses a break-up fee of 3.4% of $36.4 million cash portion of purchase price and expense reimbursement of up to $500,000).

26.     Accordingly, the Debtors submit that the Stalking Horse Protections reflect a sound business purpose, are fair and appropriate under the circumstances and, because the standard used by courts in this district in approving similar protections has been satisfied here, the Debtors respectfully submit that the Stalking Horse Protections should be approved.

***Approval of the Sale Is Warranted Under Section 363 of the Bankruptcy Code.***

27.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  See, e.g., In re Martin, 91 F.3d 389 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513 (7th Cir. 1991)); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).

28.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

(a)     whether a sound business justification exists for the sale;

(b)     whether adequate and reasonable notice of the sale was given to interested parties;

(c)     whether the sale will produce a fair and reasonable price for the property; and

(d)     whether the parties have acted in good faith.

In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

29.     As set forth in the First Day Declaration, the Debtors possess ample and sound business reasons for selling the Bid Assets at this time.  As structured, the sale will enable the Debtors to shed significant liabilities and will allow Fresh & Easy to continue as a going-concern business, thereby preserving approximately 4,000 jobs.  Following the removal of these liabilities from the estates, holders of claims not assumed by the Proposed Buyer can look to the significant and valuable assets that will remain in the Debtors' estates following the sale for recovery.  On the other hand, the alternative to the sale is a liquidation of the Debtors and a complete shut-down of the Fresh & Easy business.  For these reasons, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interests of the Debtors' estates.

30.     The Debtors also meet the additional requirements necessary to approve a sale under section 363 of the Bankruptcy Code.  The Debtors have conducted an eight month long sale marketing process, and entered into the Stalking Horse APA only after contacting approximately 45 potentially interested parties and following long and deliberate negotiations with the Proposed Buyer.  As stated herein, the Debtors will provide adequate notice of the Sale Transaction to interested parties, and the Debtors submit that the aforementioned notice procedures are reasonable and adequate under the circumstances.  In addition, the Debtors will continue to market the Bid Assets up until the Bid Deadline in order to maximize the number of participants who may participate as buyer at the Auction.  Accordingly, the Debtors are confident that their sale process will maximize the value to be achieved from the Sale Transaction and that the sale price is fair and reasonable.

31.    Finally, the Proposed Buyer has proceeded in good faith.  Both the

Debtors and the Proposed Buyer were represented by practical and experienced advisors in the

arm's-length negotiations of the Stalking Horse APA.  As such, it is a valid exercise of the

Debtors' business judgment to seek the relief requested by this Motion.

***The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear.***

32.    The Debtors request approval to sell the Bid Assets free and clear of any

and all liens, claims, interests and encumbrances (except for Assumed Liabilities) in accordance

with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession

may sell estate property "free and clear of any interest in such property of an entity other than the

estate" if any one of the following conditions is satisfied:

(a)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345

(Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve

a "free and clear" sale even if only one of the subsections is met).

33.    Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code,

which provides that "[t]he Court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); see In re

Trans World Airlines, Inc., 2001 WL 1820325, at *3, 6 (Bankr. D. Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

34.     The Debtors submit that the Sale Transaction will satisfy the requirements of section 363(f) of the Bankruptcy Code.  For example, the Debtors are not aware of any parties who hold liens or encumbrances on the Bid Assets.  To the extent a party objects to Sale Transaction on the basis that it does hold a lien or encumbrance on the Bid Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such Claims or that such lien is in bona fide dispute.  In addition, to the extent the Debtors discover any party may hold a lien on all, or a portion of, the Bid Assets, the Debtors will provide such party with notice of, and an opportunity to object to, the Sale Transaction.  Absent objection, each such party will be deemed to have consented to the sale of the Bid Assets.

35.     Accordingly, the Debtors believe that the Sale Transaction (i) will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and (ii) should be approved free and clear of all liens, claims, interests and encumbrances.

***A Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m).***

36.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  In re Abbotts Dairies, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other

bidders); <u>see also</u> <u>In re Bedford Springs Hotel, Inc.</u>, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); <u>In re Perona Bros., Inc.</u>, 186 B.R. 833, 839 (D.N.J. 1995).

37.    In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith.  <u>See</u> <u>Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)</u>, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); <u>see also</u> <u>In re Angelika Films, 57th, Inc.</u>, 1997 WL 283412, *7 (S.D.N.Y. 1997); <u>In re Balcalis</u>, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).  Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings."  <u>In re Pisces Leasing Corp.</u>, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting <u>In re Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1998 (7th Cir. 1978)).

38.    The Debtors submit the Proposed Buyer, or other successful bidder arising from the Auction, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and the Stalking Horse APA, or any marked version thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  <u>First</u>, the consideration to be received by the Debtors pursuant to the Stalking Horse APA is substantial, fair and reasonable.  <u>Second</u>, the parties entered into the Stalking Horse APA in good faith, and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel of similar bargaining positions.  <u>Third</u>, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would

cause or permit the Sale Transaction or Stalking Horse APA to be avoided under section 363(n)

of the Bankruptcy Code.  Finally, the Proposed Buyer's offer was evaluated and approved by the

board in consultation with the Debtors' professionals.  Accordingly, the Debtors believe that the

Proposed Buyer (or other successful bidder) and Stalking Horse APA (or marked APA) should

be entitled to the full protections of Section 363(m) of the Bankruptcy Code.

***Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be
Authorized.***

   39. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession "subject to the court's approval, may assume or reject any executory

contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing

bankruptcy court approval of a debtor's decision to assume or reject an executory contract or

unexpired lease is whether the debtor's reasonable business judgment supports assumption or

rejection.  See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003)

(finding that debtor's decision to assume or reject executory contract is governed by business

judgment standard and can only be overturned if decision was product of bad faith, whim or

caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (finding that

assumption or rejection of lease "will be a matter of business judgment by the bankruptcy

court").

   40. The business judgment test "requires only that the trustee [or debtor in

possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel

Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the

administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's

provision for private control of administration of the estate, and threaten the court's ability to

control a case impartially.  See Richmond Leasing Co. v. Capital Bank, 762 F.2d 1303, 1311 (5th

Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to

assume an executory contract, it must "cure, or provide adequate assurance that the debtor will

promptly cure," any default, including compensation for "actual pecuniary loss" relating to such

default.  11 U.S.C. 365(b)(1).

   41. Once an executory contract is assumed, the trustee or debtor in possession

may elect to assign such contract.  See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d

Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of

the debtor's estate."); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994)

(noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the

debtor's assets).

   42. Section 365(f) of the Bankruptcy Code provides that the "trustee may

assign an executory contract . . . only if the trustee assumes such contract . . . and adequate

assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate

assurance of future performance" depends on the facts and circumstances of each case, but

should be given a "practical, pragmatic construction."  In re DBSI, Inc., 405 B.R. 698, 708

(Bankr. D. Del. 2009); see also In re Decora Indus., 2002 U.S. Dist. LEXIS 27031, at *23 (D.

Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate

assurance may be provided by demonstrating the assignee's financial health and experience in

managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc. 56 B.R. 596,

605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective

assignee of lease from debtor has financial resources and has expressed willingness to devote

sufficient funding to business to give it strong likelihood of success).

43.     The Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Assumed Contracts and Leases to the Proposed Buyer or the Successful Bidder(s).  The Debtors further request that the Sale Order provide that the Assumed Contracts and Leases will be transferred to, and remain in full force and effect for the benefit of, the Proposed Buyer or the Successful Bidder(s) notwithstanding any provisions in the Assumed Contracts and Leases, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (f)(3) that prohibit such assignment.

44.     To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial credibility, willingness and ability of the Proposed Buyer or the Successful Bidder(s) to perform under the Assumed Contracts and Leases.  The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Proposed Buyer or the Successful Bidder(s) to provide adequate assurance of future performance under the Assumed Contracts and Leases, as required under Bankruptcy Code section 365(b)(1)(C). Further, as set forth above, the Debtors will give notice to all parties to the Assumed Contracts and Leases.  This notice will include the amounts the Debtors believe are necessary to cure any defaults in accordance with section 365(b) of the Bankruptcy Code.  Accordingly, the Debtors submit that implementation of the proposed Assignment Procedures is appropriate in these cases.

## Consent to Jurisdiction

45.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## Requests for Immediate Relief & Waiver of Stay

46.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless

the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Bidding Procedures Order and Sale Order(s) be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

47.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶6004.11 (L. King, 16th rev. ed. 2011).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

48.    Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## **Notice**

49.    Notice of this Motion shall be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the parties included on the Debtors' consolidated list of twenty (20) largest unsecured creditors, as identified in their chapter 11 petitions; (iii) counsel to the Proposed Buyer; (iv) counsel to Tesco; and (v) all parties entitled to notice

pursuant to Bankruptcy Rule 2002.  Due to the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is necessary.

**<u>No Prior Request</u>**

50.    No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

[The remainder of this page is intentionally blank.]

WHEREFORE, the Debtors respectfully request that the Court:  (a) enter the Bidding Procedures Order in substantially the form attached hereto as <u>Exhibit A</u>; (b) enter a Sale Order in a form attached hereto as <u>Exhibit B</u>, authorizing the sale of the Assets to the Proposed Buyer or another Successful Bidder(s) at the Auction; and (c) grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  September 30, 2013
      Wilmington, Delaware

Respectfully submitted,

<u>*/s/ Amanda R. Steele*</u>
Mark D. Collins (DE 2981)
John H. Knight (DE 3848)
Lee E. Kaufman (DE 4877)
Amanda R. Steele (DE 5530)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

      -and-

Paul D. Leake
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

PROPOSED ATTORNEYS FOR DEBTORS