# EXHIBIT C

**Declaration of Marc Liebman**

NYI-4545761
RLF1 9419081v.1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| FRESH & EASY NEIGHBORHOOD | : | Case No. 13-12569 (KJC) |
| MARKET INC., *et al.*,[1] | : | |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

**DECLARATION OF MARC LIEBMAN IN SUPPORT OF
DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING
BID PROCEDURES FOR THE SALE OF A SUBSTANTIAL PORTION
OF THE DEBTORS' ASSETS, (B) APPROVING STALKING HORSE APA
AND BIDDING PROTECTIONS, AND (C) GRANTING CERTAIN RELATED
RELIEF AND (II) AN ORDER (A) APPROVING THE SALE OF A SUBSTANTIAL
PORTION OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES RELATED THERETO, AND (C) GRANTING CERTAIN RELATED RELIEF**

I, Marc Liebman, declare as follows:

1. I am a Managing Director with Alvarez & Marsal Securities, LLC ("A&M-S"), an investment banking firm that is providing investment banking services to the above-captioned debtors (the "Debtors").

2. I submit this declaration in support of the Debtors' Motion for (I) an Order (A) Establishing Bid Procedures for the Sale of a Substantial Portion of the Debtors' Assets, (B) Approving Stalking Horse APA and Bidding Protections, and (C) Granting Certain Related Relief and (II) An Order (A) Approving the Sale of a Substantial Portion of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving the

---

[1] The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Fresh & Easy Neighborhood Market Inc. (7028) and Fresh & Easy Property Company LLC (9636). The address of each of the Debtors is 2120 Park Place, Suite 200, El Segundo, California 90245.

Assumption and Assignment of Certain Executory Contracts and Expired Leases Related Thereto, and (C) Granting Certain Related Relief (the "<u>Motion</u>").[2]

3. Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge, my review of relevant documents, my opinion, my experience as an investment banker or my conversations with the Debtors' employees and Greenhill & Co., Inc. ("<u>Greenhill</u>"), investment banker to the Debtors' ultimate parent, Tesco PLC ("<u>Tesco</u>"). If called on to testify, I could and would testify to the facts set forth herein. I am authorized to submit this declaration on behalf of the Debtors. I am not being compensated specifically for this testimony other than payments received by A&M-S as a professional retained in these chapter 11 cases.

## Qualifications

4. I have nearly 15 years of investment banking and financial advisory experience, having spent time at Donaldson, Lufkin & Jenrette and Credit Suisse prior to joining and co-founding A&M-S, where I oversee the Western region.

5. During my career, I have worked on a number of transactions in the retail and consumer products industries, ranging from debt and equity financings to mergers & acquisitions and restructurings, including for such clients as Big 5 Sporting Goods, Eurofresh Farms, CSK Auto and Nellson Nutraceuticals. My previous restructuring-oriented assignments in other industries include Grubb & Ellis, Conexant Systems, Top-Flite Golf, Washington Group and AMERCO (U-Haul).

---

[2] Capitalized terms used but not otherwise defined herein have the meanings set forth in the Motion.

6. I have served as investment banker on numerous M&A transactions, including section 363 sales, traditional sale assignments involving public and private companies, corporate divestitures and acquisition advisory assignments.

### The Marketing of the Bid Assets

7. In December 2012, the Debtors' ultimate parent, Tesco PLC ("Tesco"), engaged Greenhill & Co., Inc. ("Greenhill") as its investment banker to conduct a strategic review of the Debtors' business, including an exploration of multiple restructuring or other strategic alternatives. After completing this review and despite Tesco's continuing belief in the Fresh & Easy concept, Tesco determined that a shift in Fresh & Easy's business structure and strategy was necessary for Fresh & Easy to achieve profitability. This required shift in Fresh & Easy's structure and strategy meant that Fresh & Easy would no longer be in line with Tesco's other business operations and overall core business strategy. As a result, Tesco made the decision to exit the U.S. market. To do so, Tesco tasked Greenhill with pursuing a going concern sale of the Debtors' business, which Tesco felt would be in the best interests of the Debtors' creditors, employees, vendors and other stakeholders.

8. Beginning in January 2013, Tesco and the Debtors, with the aid of Greenhill, solicited initial interest in a transaction that would transfer ownership of the Debtors to a new party. Tesco and the Debtors, with the aid of Greenhill, developed a list of potential buyers that eventually exceeded 65 parties. The Debtors signed non-disclosure agreements and provided a confidential information memorandum to approximately 45 parties. The sale process resulted in the submission of 18 preliminary indications of interest for various assets of the Debtors, including four indications of interest for the entire company.

9. Following the receipt of indications of interest, frequent conversations with the potential buyers occurred through the professionals, advisors and senior management of

both Tesco and the Debtors. Such conversations included discussions with parties interested in a going concern transaction as well as parties interested in select assets sales and liquidation oriented transactions.

10. After significant analysis of the benefits of each transaction for the Debtors' creditors, employees, vendors and other stakeholders, the Debtors determined that the offer presented by the Proposed Buyer, which called for the continued operation of approximately 150 of the Debtors' stores along with the Campus and Riverside distribution facilities, was the best alternative for the Debtors' stakeholders. Following intense, arm's length, good-faith negotiations, the Debtors and the Proposed Buyer agreed to the terms of the Stalking Horse APA on September 10, 2013.

11. After entering into the Stalking Horse APA, the Debtors determined that it was necessary to obtain their own investment banker to further evaluate the proposed sale transaction and to perform additional marketing of the Bid Assets. As a result, the Debtors retained A&M-S on September 16, 2013. A&M-S has since taken the primary advisory role for the Debtors with respect to the additional marketing of the Bid Assets and the evaluation of the proposed sale transaction and any potential alternative transactions.

12. Following the approval of the Bid Procedures, the Debtors, with the aid of A&M-S and, as necessary, Greenhill, will continue to market the Bid Assets to a group of potential buyers, including but not limited to, those approached during the Greenhill process, up until the Bid Deadline by (a) engaging potential buyers and investors that may have an interest in bidding for the Bid Assets; (b) delivering an updated confidential information memorandum; (c) providing access to a data room of confidential information on the Bid Assets to all Qualified Bidders; and (d) providing customized information packets to potential purchasers. In this way,

the Debtors, with the assistance of A&M-S, intend to maximize the number of participants that may participate as buyers at the Auction and thereby maximize the value to be achieved from the Sale Transaction.

### The Offer From the Proposed Buyer

13. The Proposed Buyer's offer appears to be the only way for the Debtors to sell a substantial portion of its business as a going concern and in doing so preserve several thousand jobs. Furthermore, the Proposed Buyer's offer will be subject to higher and better bids and thus ultimately, the successful bidder will have submitted the highest and best bid.

### The Reasonableness of the Proposed Break-Up Fee and Expense Reimbursement

14. The Break-Up Fee and Expense Reimbursement are reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Proposed Buyer. Moreover, the Break-Up Fee and Expense Reimbursement are actually necessary to preserve the value of the estate. First, the combined Break-Up Fee of $1.5 million[3] and Expense Reimbursement of up to $750,000 represent approximately 1.15% of the estimated $130 million[4] of Assumed Liabilities that will be assumed by the Proposed Buyer. Additionally, both the Break-Up Fee and Expense Reimbursement Amount were heavily negotiated in good faith, and both were necessary to secure the Proposed Buyer's commitment under the Stalking Horse APA. In sum, the Debtors' ability to offer the Break-Up Fee and Expense Reimbursement Amount enables them to ensure the sale of the Bid Assets at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates. Moreover, the payment of the Break-Up Fee and Expense

---

[3] Tesco agreed to pay the Proposed Buyer $8.5 million, in addition to the $1.5 million Break-Up Fee to be paid by the Debtors, in the event that the Stalking Horse APA is terminated pursuant to Section 7.01(d)(ii) or Section 7.01(e) thereof.

[4] Calculated as based on statutory limitations per section 502(b)(6) of the Bankruptcy Code.

Reimbursement Amount will not diminish the Debtors' estates.  The Debtors do not intend to terminate the Stalking Horse APA if to do so would incur an obligation to pay the Break-Up Fee and Expense Reimbursement Amount, unless to accept an alternative bid, which bid must exceed the consideration offered by the Proposed Buyer by an amount sufficient to pay the Break-Up Fee and Expense Reimbursement Amount.

15. Given these circumstances, the Break-Up Fee and Expense Reimbursement are:  (a) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Proposed Buyer; (b) reasonable and appropriate in light of the size and nature of the proposed Sale Transaction and comparable transactions, the commitments that have been made, the condition of the Bid Assets, and the efforts that have been and will be expended by the Proposed Buyer; and (c) necessary to induce the Proposed Buyer to pursue the Sale Transaction and to continue to be bound by the Stalking Horse APA.

## The Reasonableness Of The Bidding Procedures

16. The proposed Bidding Procedures are designed to maximize the value received for the Bid Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.  The proposed Bid Deadline requires bids for the purchase of the Bid Assets to be delivered no later than noon on November 7, 2013, which will ensure that the Sale Transaction is completed in a timely manner. The Bid Deadline provides parties with sufficient time to obtain information and formulate and submit a timely and informed bid to purchase the Bid Assets.

17. As described above, the Debtors' assets have been extensively marketed over the last eight months to a broad group of strategic and financial buyers and substantial information regarding the Debtors' businesses has been made available during the process.  As such, numerous parties that may have an interest in bidding at the Auction will not be starting

from scratch in formulating their bids.  Furthermore, potential bidders will have access to updated information prepared by A&M-S and a substantial body of information, inclusive of management presentations, financial projections and an extensive data room, including information gathered specifically based upon the due diligence requests of several potential buyers.  Thus, based upon the extensive marketing efforts of Tesco and the Debtors, with the aid of Greenhill, prior to the Petition Date, and the level of preparedness at the outset of the marketing process, the time contained in the Bidding Procedures for the Debtors to further market the Bid Assets is reasonable.

19. In my opinion, the proposed Bidding Procedures will ensure that the consideration received for the Bid Assets will be fair and reasonable and that the Debtors will have an opportunity to consider all competing offers and to select, in their reasonable business judgment, and with reasonable consultation with the Creditors' Committee and its advisors, the highest and best offer for the Bid Assets.

### Arms' Length Negotiations

19. To my knowledge, the parties have entered into the Stalking Horse APA without collusion, in good faith and from arm's-length bargaining positions.  Further, I am not aware of any indication of fraud, collusion between the Proposed Buyer and other bidders or any similar conduct that would taint the sale process for the Bid Assets.

20. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 30, 2013

          /s/ Marc Liebman
Marc Liebman
Managing Director
Alvarez & Marsal Securities, LLC