## Exhibit D

**Stalking Horse APA**

**Execution Version**

# ASSET PURCHASE AGREEMENT

by and among

YFE HOLDINGS, INC.

as Buyer

and

FRESH & EASY NEIGHBORHOOD MARKET INC.

and

FRESH & EASY PROPERTY COMPANY LLC

as Sellers

Dated as of September 10, 2013

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
### PURCHASE AND SALE

Section 1.01 . *Sale of Assets* ............................................................. 2
Section 1.02 . *Liabilities* ................................................................... 7
Section 1.03 . *Purchase Price* .......................................................... 10
Section 1.04 . *Closing* ..................................................................... 11
Section 1.05 . *Post-Closing Adjustment* ........................................... 11
Section 1.06 . *Transfer Expenses* .................................................... 13
Section 1.07 . *Closing Deliverables* ................................................ 13
Section 1.08 . *Purchase Price Allocation* ........................................ 17
Section 1.09 . *Withholding* .............................................................. 18

## ARTICLE 2
### REPRESENTATIONS AND WARRANTIES OF SELLERS

Section 2.01 . *Organization* ............................................................ 18
Section 2.02 . *Authority* .................................................................. 19
Section 2.03 . *Assets* ....................................................................... 20
Section 2.04 . *Intellectual Property* ................................................ 20
Section 2.05 . *Litigation* .................................................................. 22
Section 2.06 . *Compliance with Law* ............................................... 22
Section 2.07 . *Financial Statements* ............................................... 23
Section 2.08 . *Absence of Certain Changes* .................................... 24
Section 2.09 . *No Undisclosed Liabilities* ........................................ 25
Section 2.10 . *Labor Matters* .......................................................... 25
Section 2.11 . *Employee Benefits* .................................................... 27
Section 2.12 . *Tax Matters* .............................................................. 28
Section 2.13 . *Permits* ..................................................................... 29
Section 2.14 . *Real Property* ........................................................... 29
Section 2.15 . *Contracts* .................................................................. 32
Section 2.16 . *Suppliers* .................................................................. 33
Section 2.17 . *Product Warranty/Liability* ...................................... 33
Section 2.18 . *Environmental* .......................................................... 34
Section 2.19 . *Affiliated Transactions* ............................................. 34
Section 2.20 . *Insurance* .................................................................. 35
Section 2.21 . *Finder's Fee* ............................................................. 35

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF BUYER

Section 3.01 . *Organization* ............................................................ 35
Section 3.02 . *Authority* .................................................................. 35
Section 3.03 . *Capitalization* .......................................................... 36

i

Section 3.04 .  *Interim Operations of Buyer* ............................................................ 37
Section 3.05 .  *Financing* ......................................................................................... 37
Section 3.06 .  *Finder's Fee* ..................................................................................... 38

## ARTICLE 4
### COVENANTS OF SELLERS

Section 4.01 .  *Conduct of Business* ......................................................................... 38
Section 4.02 .  *Consents* ........................................................................................... 41
Section 4.03 .  *Litigation Support* ............................................................................ 42
Section 4.04 .  *Assistance to Buyer* ......................................................................... 42
Section 4.05 .  *Title Insurance Matters* ................................................................... 42
Section 4.06 .  *Monthly Financial Statements* ........................................................ 43
Section 4.07 .  *Notices* ............................................................................................. 43

## ARTICLE 5
### COVENANTS OF BUYER

Section 5.01 .  *Confidentiality* ................................................................................ 44
Section 5.02 .  *Conduct of Buyer* ............................................................................ 44
Section 5.03 .  *Litigation Support* ............................................................................ 44
Section 5.04 .  *Notices* ............................................................................................. 45

## ARTICLE 6
### CONDITIONS

Section 6.01 .  *Conditions to the Obligations of Buyer* ........................................... 45
Section 6.02 .  *Conditions to Obligations of Sellers* ............................................... 46
Section 6.03 .  *Frustration of Conditions* ................................................................ 47

## ARTICLE 7
### TERMINATION OF AGREEMENT

Section 7.01 .  *Termination* ...................................................................................... 48
Section 7.02 .  *Effect of Termination* ...................................................................... 50

## ARTICLE 8
### TERMINATION OF WARRANTIES; AS IS TRANSACTION, INDEMNIFICATION

Section 8.01 .  *Termination of Representations and Warranties* .............................. 51
Section 8.02 .  *No Other Representations and Warranties; As Is Transaction* ......... 51
Section 8.03 .  *Indemnification* ............................................................................... 52

## ARTICLE 9
### ADDITIONAL COVENANTS AND AGREEMENTS

Section 9.01 .  *Reasonable Best Efforts; Consents to Assignment* ........................... 54
Section 9.02 .  *Submission for Bankruptcy Court Approval* .................................... 56

LA\3283950.15(NY) 19884/002/YUMA 363 SALE/Asset.Purchase.Agreement.docx

Section 9.03 . *Non-Solicitation of Competing Bid* ........................................................ 56
Section 9.04 . *Bankruptcy Process* ............................................................................... 57
Section 9.05 . *Financing* ............................................................................................... 59
Section 9.06 . *Access and Information* ......................................................................... 62
Section 9.07 . *Collection of Accounts Receivable* ....................................................... 63
Section 9.08 . *Employee Matters* ................................................................................. 64
Section 9.09 . *Tax Matters* ........................................................................................... 66
Section 9.10 . *Releases; Acknowledgements* ............................................................... 67
Section 9.11 . *Additional Bankruptcy Matters* ........................................................... 68
Section 9.12 . *Liquor License Matters* ......................................................................... 69
Section 9.13 . *Access Agreements* ............................................................................... 70
Section 9.14 . *Access to Additional Fixtures and Fittings* .......................................... 70

### ARTICLE 10
MISCELLANEOUS

Section 10.01 . *Fees and Expenses* ............................................................................. 71
Section 10.02 . *Governing Law; Consent to Jurisdiction* ........................................... 71
Section 10.03 . *Waiver of Right to Trial by Jury* ........................................................ 72
Section 10.04 . *Notices* ................................................................................................ 72
Section 10.05 . *Entire Agreement* ............................................................................... 73
Section 10.06 . *Assignability; Binding Effect; Third Party Beneficiaries* .................. 74
Section 10.07 . *Construction* ....................................................................................... 74
Section 10.08 . *Execution in Counterparts; Facsimile* ............................................... 76
Section 10.09 . *Amendments, Supplements, Etc* ......................................................... 76
Section 10.10 . *Publicity and Disclosures* .................................................................. 76
Section 10.11 . *Extension; Waiver* .............................................................................. 76
Section 10.12 . *Disclosure Schedules* ......................................................................... 76
Section 10.13 . *Severability* ......................................................................................... 77
Section 10.14 . *Further Assurances* ............................................................................ 77
Section 10.15 . *Specific Performance* ......................................................................... 77
Section 10.16 . *Guarantee* ........................................................................................... 78

### ARTICLE 11
DEFINITIONS

## EXHIBITS

EXHIBIT A       Form of Purchase Price Warrant
EXHIBIT B       Securityholders Agreement Term Sheet
EXHIBIT C       Form of Assignment and Assumption Agreement
EXHIBIT D       Form of Bill of Sale
EXHIBIT E       Form of Campus Note
EXHIBIT F       Form of Financing Warrant
EXHIBIT G       Form of Transition Services Agreement
EXHIBIT H       Form of IP Assignment Agreement

EXHIBIT I        Form of Approval Order
EXHIBIT J        [Omitted]
EXHIBIT K        Form of Bidding Procedures Order
EXHIBIT L        Net Working Capital Line Items
EXHIBIT M        Consulting Services Agreement
EXHIBIT N        Procedures for Transferring Friends Rewards Program
EXHIBIT O        Cash and Cash Equivalents

LA\3283950.15(NY) 19884/002/YUMA 363 SALE/Asset.Purchase.Agreement.docx

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is entered into as of September 10, 2013 by and among YFE Holdings, Inc., a Delaware corporation ("**Buyer**"), Fresh & Easy Neighborhood Market Inc., a Delaware corporation ("**Opco**"), Fresh & Easy Property Company LLC, a Delaware limited liability company ("**Propco**"; each of Opco and Propco are sometimes referred to herein together as "**Sellers**" and individually as a "**Seller**") and, solely for purposes of Section 10.16, OA3, LLC, a California limited liability company ("**Guarantor**").

### W I T N E S S E T H

WHEREAS, Sellers are preparing to file voluntary petitions for relief under Chapter 11 of Title 11 (the "**Bankruptcy Cases**") of the United States Bankruptcy Code, §§ 101, et seq. (as amended) (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, Sellers conduct a business which develops, owns and operates retail grocery stores in California, Nevada and Arizona; develops, produces and distributes products for sale at such stores; develops and produces product packaging, marketing materials and marketing programs including customer loyalty programs; and owns certain real properties and leases certain other real properties in connection therewith (collectively, the "**Business**");

WHEREAS, subject to the terms and conditions hereof, (a) Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase from Sellers, the properties and assets of Sellers used in or held for use in the Business, other than the Excluded Assets (as defined below), and (b) Sellers desire to transfer and assign to Buyer and Buyer desires to assume from Sellers certain liabilities of Sellers relating to the Business;

WHEREAS, concurrently with the execution of this Agreement, and as a condition to the willingness of Buyer to enter into this Agreement, Tesco PLC has entered into a Support Agreement in favor of Buyer pursuant to which, among other matters and on the terms and subject to the conditions set forth therein, Tesco PLC has agreed to support the consummation of the transactions contemplated by this Agreement (the "**Support Agreement**");

WHEREAS, upon the terms and subject to the conditions set forth herein, following the filing of the Bankruptcy Cases, Sellers intend to request that the Bankruptcy Court authorize and approve the transactions contemplated by this Agreement pursuant to Sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, unless otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth in Article 11 hereto.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties hereto agree as follows:

# ARTICLE 1
## PURCHASE AND SALE

**Section 1.01**. *Sale of Assets*. (a) *Acquired Assets*. Upon the terms and subject to the conditions set forth in this Agreement, each Seller agrees to sell, assign, transfer, convey and deliver to Buyer and Buyer agrees to purchase, at the Closing, all of the properties, assets and interests of such Seller primarily used in or held primarily for use in the Business and all rights, title and interests of such Seller therein, thereto and thereunder (other than any Excluded Assets) (collectively, the "**Acquired Assets**"), free and clear of all Encumbrances (other than Permitted Encumbrances), including all rights, title and interests of such Seller in, to and under the following to the extent primarily relating to the Business (except to the extent listed or otherwise included as an Excluded Asset):

(i) *Acquired Owned Properties*.  All real property and improvements thereon set forth on Schedule 1.01(a)(i) (the "**Acquired Owned Properties**");

(ii) *Assumed Leases*.  (A) All ground leases of real property and the leasehold estates created thereby and subleases with respect to ground leases in each case set forth on Schedule 1.01(a)(ii)(A) (including any and all amendments, extensions, modifications and renewals thereof), other than the ground leases set forth on Schedule 1.01(b)(ii)(A) that are identified as being excluded (the "**Ground Leases**") and (B) all leases, subleases and licenses of real property (including any and all amendments, extensions, modifications and renewals thereof) set forth on Schedule 1.01(a)(ii)(B) (collectively with the Ground Leases, the "**Assumed Leases**"; the leased premises demised pursuant to the Assumed Leases are referred to herein as the "**Leased Premises**" and, together with the Acquired Owned Properties, the "**Acquired Properties**");

(iii) *Assumed Contracts*.  (A) all Contracts (other than real property leases, subleases and licenses) (x) set forth on Schedule 1.01(a)(iii) or (y) which are not set forth on Schedule 1.01(a)(iii) but which primarily relate to the Business or the Acquired Assets and either (i) were not specifically Known by Sellers as of the date hereof or (ii) were entered into by a Seller in the ordinary course of business

2

(whether before or after the date hereof), other than, in the case of the foregoing clauses (x) and (y), the Excluded Contracts, and (B) the Licenses (collectively, the "**Assumed Contracts**");

(iv) *Accounts Receivable*.  All accounts receivable (whether billed or unbilled), determined in accordance with the Accounting Principles ("**Accounts Receivable**");

(v) *Prepaid Expenses*.  All prepaid expenses and all rights to manufacturers' sales incentives, rebates, allowances and other similar programs;

(vi) *Cash and Cash Equivalents*.  Cash and Cash Equivalents (but excluding the amounts of deposits under clause (xv) of this subsection and chattel paper, notes receivable and negotiable instruments under clause (xviii) of this subsection) of up to $20,000,000 in the aggregate;

(vii) *Intellectual Property*.  (A) All rights in Intellectual Property of such Seller ("**Owned IP**"), (B) all documentation and media constituting, describing or relating to such Owned IP, including memoranda, manuals, technical specifications and other records wherever created and regardless of form and (C) the right to sue for past, present, or future infringement, misappropriation or violation thereof, and to collect and retain all damages and profits related to the foregoing;

(viii) *Goodwill*.  All goodwill and general intangibles;

(ix) *Inventory and Supplies*.  All raw materials, work-in-progress, finished goods, supplies and other inventories located at any Acquired Property;

(x) *Equipment and Personal Property*.  (i) All equipment, computers, furniture, supplies, fixtures, fittings, vehicles and other tangible personal property of any Seller located at, and all improvements made to, the Acquired Properties and (ii) all fixtures and fittings of any Seller in the possession and control of Sellers at any other property as of the Closing, but only to the extent that Buyer, at its sole cost, takes possession of such fixtures and fittings and removes them from such properties (A) within 30 days after the Closing Date with respect to Leased Premises or (B) within 60 days after the Closing Date with respect to Acquired Owned Properties (the "**Additional Fixtures and Fittings**"); *provided* that at Sellers' election, Sellers may exclude fixtures and fittings at up to three stores that are Excluded Properties as Excluded Assets;

(xi) *IT Systems*.  All IT Systems;

3

(xii) *Card Program*.  All elements of the Card Program, except only if and only to the extent applicable Law prohibits Seller from assigning to Buyer its right, title and interest in such components ("**Non-Assignable Card Program Elements**"); *provided, however*, (A) all elements of the Card Program to which the prohibition does not apply shall be included in Acquired Assets; and (B) if such legal prohibition ceases to exist within 12 months after the Closing, then the Acquired Assets shall be deemed to include the Non-Assignable Card Program Elements as of the time such legal prohibition ceases;

(xiii) *Permits*.  All Permits held by Sellers, to the extent transferable, required to conduct the Business at the Acquired Properties;

(xiv) *Causes of Action, etc*.  All claims, causes of action (other than Avoidance Actions), choses in action and rights of recovery, off-set and subrogation against third Persons (including, without limitation, rights under vendors' and manufacturers' warranties or guarantees);

(xv) *Deposits*.  All deposits (including security deposits for rent, electricity, telephone or otherwise, but excluding any deposits described in Section 1.01(b)(vi)) and prepaid or deferred charges and expenses of Sellers, including all prepaid rentals and unbilled charges, fees or deposits;

(xvi) *Seller Benefit Plans*. All Seller Benefit Plans, all assets funding or otherwise related to such Seller Benefit Plans (including without limitation all such assets held in trust, all such insurance policies and all other funding vehicles of any type), and all rights of Sellers associated with the foregoing, but excluding any and all Excluded Arrangements and any related assets.

(xvii) *Confidentiality Agreements and Non-Competes*.  All rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements;

(xviii) *Chattel Paper, etc.*  All chattel paper, notes receivable and negotiable instruments owned or held by Sellers;

(xix) *Promotional Materials*.  In addition to the Card Program, all elements of sales and promotional materials, marketing materials and databases, catalogues and advertising literature (collectively, "**Marketing Materials**") except only if and only to the extent applicable Law prohibits Seller from assigning to Buyer its right, title and interest in such components ("**Non-Assignable Marketing Elements**"); *provided, however*, (A) all elements of Marketing Materials to which the prohibition does not apply shall be included in Acquired Assets; and (B) if such legal

4

prohibition ceases to exist within 12 months after the Closing ceases to exist, then the Acquired Assets shall be deemed to include the Non-Assignable Marketing Materials as of the time such legal prohibition ceases;

(xx) *Campus Facility/Distribution Center*.  All assets located at Sellers' Campus Facility and Distribution Center; and

(xxi) *Records and Documentation*.  All books and records (including accounting and financial records, customer lists and supplier lists) in the possession of Sellers and other documentation in the possession of Sellers to the extent primarily related to the Acquired Assets referred to in clauses (i) through (xx) of this Section 1.01(a) and transferable to Buyer in accordance with applicable Law without the consent of any Person (other than the Bankruptcy Court, to the extent such consent is generally required in connection with the transfer of the Acquired Assets and the Assumed Liabilities hereunder), unless consent of such Person has been received.

(b)    ***Excluded Assets***.  The purchase and sale of the Acquired Assets contemplated by this Agreement shall not include any of the following assets (collectively, the "**Excluded Assets**"):

(i) *Excluded Owned Properties*.  The real properties and improvements set forth on Schedule 1.01(b)(i) (the "**Excluded Owned Properties**");

(ii) *Excluded Leases*.  (A) the ground leases of real property and the leasehold estates created thereby and subleases with respect to ground leases set forth on Schedule 1.01(b)(ii)(A) (including any and all amendments, extensions, modifications and renewals thereof) and (B) the real property leases, subleases and licenses set forth on Schedule 1.01(b)(ii)(B) (including any and all amendments, extensions, modifications and renewals thereof) (collectively, the "**Excluded Leases**"; the leased premises demised pursuant to the Excluded Leases are referred to herein as the "**Excluded Leased Premises**" and, together with the Excluded Owned Properties, the "**Excluded Properties**"); *provided, however*, that additional leases may be designated as Excluded Leases if Buyer and Sellers mutually agree;

(iii) *Excluded Contracts*.  The Contracts set forth on Schedule 1.01(b)(iii) and any Licenses not listed on Schedule 1.01(a)(iii) that contain licenses from Seller or, after the Closing, Buyer, of Intellectual Property Rights to another Person (together with the Intercompany Contracts (as defined below), the "**Excluded Contracts**");

(iv) *Intercompany Contracts and Receivables*.  All Contracts between a Seller, on the one hand, and any direct or indirect Affiliate of such Seller (other than the other Seller), on the other hand (collectively, the "**Intercompany Contracts**"), and all intercompany receivables owed to a Seller by any direct or indirect Affiliate of such Seller (other than the other Seller), including Contracts or intercompany receivables relating to Taxes;

(v) *Assets Related to Excluded Properties*.  All raw materials, work-in-progress, finished goods, supplies, inventories, equipment, computers, furniture, supplies, fixtures, fittings and other tangible personal property of any Seller (other than the Additional Fixtures and Fittings) located at, and all improvements made to, any Excluded Property;

(vi) *Bank Accounts*.  Any bank accounts, security accounts and lockboxes of Sellers, and the Cash and Cash Equivalents therein in excess of the amount set forth in Section 1.01(a)(vi);

(vii) [Intentionally deleted];

(viii) *Taxes*.  Any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon, for any Tax period (or portion thereof) ending on or prior to the Closing Date;

(ix) *Certain Records and Documentation*.  Sellers' organizational documents, minutes and other corporate record books, and any books, records and other documents that any Seller is required by Law to retain or that any Seller determines is necessary or advisable to retain, including Tax Returns, financial statements and corporate or other entity filings; *provided, however*, that Buyer shall have the right, to the extent permitted by applicable Law, to make copies of any portions of such retained books, records and documents that relate to the Acquired Assets;

(x) *Sellers' Rights Under Agreement*.  Each Seller's rights arising under the Transaction Agreements and the transactions contemplated hereby and thereby;

(xi) *Disposed Assets*.  Any rights, properties and assets sold or otherwise disposed by any Seller in the ordinary course of business from the date hereof until the Closing Date;

(xii) *Insurance Policies*.  All insurance policies of Sellers and all claims, credits, causes of action or rights thereunder and proceeds thereof, including any prepaid and unearned premiums;

6

(xiii) *Avoidance Actions*.  All Avoidance Actions;

(xiv) *Other*.  All other assets, properties, rights, interests and claims of every kind and description of any Seller that are (A) primarily used or held primarily for use at the Excluded Properties (as opposed to the Acquired Properties), (B) neither used primarily nor held primarily for use in the Business or (C) set forth on Schedule 1.01(b)(xiv); and

(xv) *Certain Claims*.  Any claims, causes of action, choses in action and rights of recovery, offset and subrogation to the extent (A) related to any asset described in (i) through (xiv) above or (B) available as a defense, counterclaim, cross-claim, offset or third-party claim in connection with any Excluded Liability.

(c)    ***Assignment of Contracts and Rights***.  Sellers and Buyer shall use their commercially reasonable efforts (but without any payment of money by Sellers or Buyer) to obtain the consent of third parties to any Acquired Asset the assignment of which without the consent of such third party would constitute a breach or other contravention of such Acquired Assets, or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may request.  If such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Buyer would not in fact receive all such rights, Sellers and Buyer shall negotiate in good faith a mutually agreeable arrangement under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including sub-contracting, sub-licensing, or sub-leasing to Buyer, or under which a Seller would enforce for the benefit of Buyer, with Buyer assuming a Seller's obligations, any and all rights of a Seller against a third party thereto.  This covenant shall apply both before and after the Closing.  For the avoidance of doubt, it shall not be a condition to Closing that Sellers obtain the consent of any third parties referred to in this Section 1.01(c) or that Sellers and Buyer shall have agreed to any such arrangement to transfer to Buyer the benefits and obligations of any applicable Contract or right described above.

**Section 1.02**.  ***Liabilities***.  (a) ***Assumed Liabilities***.  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective as of the Closing, to assume all debts, obligations, contracts and liabilities of Sellers of any kind, character or description primarily relating to or arising out of the Acquired Assets or the conduct of the Business (as currently or formerly conducted), except for the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), including the following:

(i) all obligations and liabilities of the Business set forth on the Seller Financial Statements and all obligations and liabilities of the Business incurred since May 31, 2013;

7

(ii)  all obligations and liabilities arising under the Assumed Leases and Assumed Contracts;

(iii)  all Environmental Liabilities relating to or arising out of the Business or the Acquired Assets;

(iv)  all obligations and liabilities arising out of (A) any action, suit, investigation or proceeding set forth on Schedule 1.02(a)(iv) or (B) any other action, suit, investigation or proceeding relating to or arising out of the Business or the Acquired Assets by or before any arbitrator or Governmental Authority that is commenced or otherwise becomes Known to Sellers after the Closing (it being understood that any action, suit, investigation or proceeding Known by Sellers as of the Closing and that is not listed on Schedule 1.02(a)(iv) is not an Assumed Liability);

(v)  all obligations and liabilities relating to any products manufactured or sold by the Business on or prior to the Closing Date, including warranty obligations and product liabilities (but excluding any claims or actions with respect to the foregoing Known by Sellers as of the Closing);

(vi)  all liabilities or obligations with respect to (x) the current portion of any Indebtedness and (y) the non-current portion of any Indebtedness in respect of (I) letters of credit set forth on Schedule 1.02(a)(vi) in an amount not to exceed $15,500,000 and (II) capital leases and equipment financing set forth on Schedule 1.02(a)(vi) in an amount (calculated net of any related lease or other similar deposits) not to exceed $8,000,000 (collectively, "**Assumed Long Term Debt**");

(vii)  except as expressly provided in Section 1.02(b)(ix), all obligations and liabilities arising under any Seller Benefit Plans assumed in accordance with Section 1.01(a)(xvi), but excluding all obligations and liabilities arising under or in connection with any Excluded Arrangement; and

(viii)  all obligations and liabilities that arise pursuant to Sections 1.06, 9.08 and 9.09, in each case, to the extent allocated to Buyer therein.

(b)  ***Excluded Liabilities***.  Notwithstanding anything contained in this Agreement to the contrary, neither Buyer nor any of its Affiliates will assume or agree or undertake to pay, satisfy, discharge or perform in respect of, and will not be deemed by virtue of the execution and delivery of this Agreement or any document delivered at the Closing pursuant to this Agreement, or as a result of the

8

consummation of the transactions contemplated by this Agreement, to have assumed, or to have agreed to pay, satisfy, discharge or perform in respect of, any liability, obligation, indebtedness or Taxes of any Seller or of any other Person or in any way relating to the Business other than the Assumed Liabilities (such liabilities and obligations retained by Sellers being referred to herein as the "**Excluded Liabilities**").  Sellers shall themselves retain and, as between Sellers and Buyer, shall remain solely liable for, all of the Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, the term "**Excluded Liabilities**" includes:

(i)  all liabilities or obligations primarily relating to any Excluded Asset;

(ii)  all liabilities or obligations arising under the Excluded Leases and the Excluded Contracts, including Indebtedness owed by any Seller to any direct or indirect Affiliate of such Seller, including without limitation, the Tesco Loans, and any obligations or liabilities under debtor in possession financing incurred by the Sellers during the Bankruptcy Cases;

(iii)  all liabilities or obligations arising out of any action, suit, investigation or proceeding that are (A) Known by Sellers as of the Closing, except for any proceeding set forth on Schedule 1.02(a)(iv) or (B) not Known by Sellers but, in the case of this clause (B), solely to the extent covered by an insurance policy of any Seller;

(iv)  all liabilities with respect to the non-current portion of any Indebtedness, other than Assumed Long Term Debt;

(v)  all Transfer Expenses not specifically allocated to Buyer under Section 1.06;

(vi)  all liabilities or obligations for Taxes (A) of any Seller or its stockholders (or members) for any Tax period (including any liability of any Seller for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise) or (B) arising from or attributable to the ownership of the Acquired Assets or the operation of the Business for any Tax period (or portion thereof) ending on or prior to the Closing Date;

(vii)  all liabilities relating to the failure to comply with any bulk sales Laws relating to this transaction;

(viii)  all liabilities and obligations arising under or in connection with any Excluded Arrangement;

9

(ix) all liabilities arising out of or with respect to any Seller's status as an ERISA Affiliate of any other entity;

(x) any claim against any Seller of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation Law or regulation or under any federal or state employment Law or other Law or regulation relating to employment, discrimination, classification or other matters relating to service providers, in any case, with respect to (A) any employee or other service provider of any Seller or any Affiliate of such Seller (including without limitation, any Business Employee) who does not become a Transferred Employee (as defined in Section 9.08(a)) (or any dependent or beneficiary thereof) or (B) any Transferred Employee, *provided* that, in the case of Transferred Employees only, liabilities or obligations with respect to (x) only such claims that are made in writing against any Seller prior to the Closing Date or (y) other claims arising after the Closing based on acts or omissions prior to the Closing solely to the extent Sellers are entitled to coverage under one or more policies of insurance held by Sellers as of the date hereof shall be Excluded Liabilities;

(xi) all liabilities or obligations with respect to PACA Claims arising prior to the Petition Date;

(xii) all liabilities arising out of or with respect to activities of Sellers not related to the Business; and

(xiii) all liabilities and obligations for legal or accounting fees and any other expenses incurred by any Seller in connection with this Agreement or the consummation of the transactions contemplated herein, including any fees, expenses or other payments incurred or owed by any Seller to any agent, broker, investment banker or other firm or Person retained or employed by any Seller in connection with the transactions contemplated herein.

**Section 1.03**. *Purchase Price*.  (a) ***Purchase Price***.  As consideration for the sale by Sellers of the Acquired Assets to Buyer, in addition to the assumption by Buyer of the Assumed Liabilities, at the Closing, Buyer will deliver to Sellers a warrant to purchase the Purchase Price Shares in the form of Exhibit A hereto (the "**Purchase Price Warrant**"), subject to Section 1.03(c).

(b)      ***Pre-Closing Statement***.  Sellers shall prepare and deliver to Buyer not less than two (2) Business Days prior to the Closing Date a statement (the "**Closing Statement**") setting forth Sellers' good faith estimate of Net Working Capital ("**Estimated Net Working Capital**"), which shall be calculated in accordance with the Accounting Principles.  If Estimated Net Working Capital

10

exceeds Target Working Capital, Buyer shall pay Sellers the amount of such excess in cash by wire transfer of immediately available funds at the Closing. If Estimated Net Working Capital is less than Target Working Capital, Sellers shall pay Buyer the amount of such shortfall in cash by wire transfer of immediately available funds at the Closing. Sellers agree to perform a complete count and valuation of inventory to support a Closing Balance Sheet audit. The inventory valuation is to be as of the Closing Date. Sellers agree to provide reasonable access to accounting records, systems and personnel and Buyer agrees to coordinate with Sellers to minimize disruptions to the operations. Such complete count and valuation of inventory shall be at Buyer's sole expense and shall be conducted according to the Accounting Principles applied in substantially the same manner as previous counts and valuations of inventory.

(c) **Warrant Shares**. Sellers may, in their sole discretion, elect to receive at the Closing any number of the shares of Buyer Common Stock for which the Purchase Price Warrant will be exercisable. If Sellers so elect by written notice to Buyer no later than five (5) Business Days prior to the Closing, Buyer shall issue such number of shares of Buyer Common Stock to Sellers at the Closing, and the number of shares of Buyer Common Stock underlying the Purchase Price Warrant shall be reduced by such number of shares delivered directly to Sellers. For the avoidance of doubt, no exercise price shall be payable with respect to any such shares of Buyer Common Stock delivered to Sellers at the Closing (whether directly by Sellers or by reduction of the remaining shares of Buyer Common Stock underlying the Purchase Price Warrant).

**Section 1.04**. **Closing**. The closing of the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities provided for in this Agreement (the "**Closing**") shall take place at the offices of Davis Polk & Wardwell LLP at 450 Lexington Avenue, New York, New York 10017 commencing at 10:00 a.m. Eastern Time as soon as possible, but no later than the second Business Day, following the satisfaction or, if applicable, waiver of the conditions to closing set forth in Article 6 hereto, or at such other time and place as may be otherwise mutually agreed by the parties (the "**Closing Date**"). At the Closing, Sellers shall take actions reasonably requested by Buyer to transfer possession of the tangible Acquired Assets, subject to the rights of third parties under any written or oral leases disclosed in Schedule 2.14(k).

**Section 1.05**. **Post-Closing Adjustment**. (a) *Delivery of Post-Closing Statement*. As promptly as practicable, but in no event later than thirty (30) days, after the Closing Date, Buyer shall prepare and deliver to Sellers a statement (the "**Post-Closing Statement**") setting forth Buyer's calculation of (i) Net Working Capital and (ii) Closing Cash. The Post-Closing Statement shall be prepared in accordance with the Accounting Principles on a basis consistent with the application of the Accounting Principles in the Seller Financial Statements. The Post-Closing Statement shall also set forth in reasonable detail the basis for such

11

determination as well as Buyer's calculation of the amount required to be paid pursuant to Section 1.05(d).  Buyer shall provide to Sellers such additional back-up or supporting data relating to the preparation of the Post-Closing Statement and the calculation of Net Working Capital as Sellers may reasonably request.

(b)     *Acceptance Period; Delivery of Dispute Notice*.  Sellers may, within thirty (30) days following receipt of the Post-Closing Statement, provide Buyer with written notice (a "**Dispute Notice**") of their disagreement with the calculation of Net Working Capital or Closing Cash reflected on the Post-Closing Statement.  If no such notice is delivered to Buyer by Sellers within such period, the Post-Closing Statement and the calculation of Net Working Capital and Closing Cash reflected thereon shall be deemed final and binding upon the parties hereto.  A Dispute Notice shall set forth Sellers' determination of Net Working Capital and/or Closing Cash and, in reasonable detail, the basis for such determination.  Buyer and Sellers shall endeavor in good faith to resolve any such disagreement within fifteen (15) days following the delivery by Sellers of such Dispute Notice.  Any resolution (including any partial resolution) of such a disagreement shall be set forth in a writing executed by Buyer and Sellers, and any such resolution shall be final and binding on the parties hereto.

(c)     *Determination of Disputes by Neutral Firm*.  If Buyer and Sellers are unable to completely resolve any such disagreement within the 15-day period referred to in Section 1.05(b), the unresolved issues (and only such unresolved issues) (such unresolved issues collectively, the "**Dispute**") shall be promptly submitted for resolution to Deloitte Touche Tohmatsu Limited ("**Deloitte**"), or, if Deloitte is unwilling or unable to act, a recognizable, reputable and impartial certified public accounting firm that is mutually acceptable to Buyer and Sellers (Deloitte or such other accounting firm, as applicable, the "**Neutral Firm**").  If Buyer and Sellers cannot agree upon a Neutral Firm within ten (10) days, the New York City office of the American Arbitration Association shall choose a recognized, reputable and impartial certified public accounting firm to act as the Neutral Firm.  The Neutral Firm shall be instructed to resolve any outstanding Dispute; *provided*, that, the Neutral Firm's determination of any amount subject to the Dispute shall be no (x) less than the lesser of the amounts claimed by Buyer and Sellers, respectively, or (y) greater than the greater of the amounts claimed by Buyer and Sellers, respectively.  The parties shall instruct the Neutral Firm to render its determination with respect to the entire Dispute within thirty (30) days of the referral of the Dispute thereto, and the determination of the Neutral Firm shall be final and binding upon the parties hereto for all purposes of this Agreement.  The fees and expenses of the Neutral Firm shall be borne by Buyer, on the one hand, and Sellers, on the other hand, in the same proportion that the dollar amount subject to Dispute which is not resolved in favor of Buyer and Sellers, as applicable, bears to the total dollar amount subject to the Dispute resolved by the Neutral Firm.  For illustration purposes only, if the total amount

12

of the Dispute is $100,000, and Sellers are awarded $25,000 by the Neutral Firm, Sellers shall bear seventy-five percent (75%) and Buyer shall bear twenty-five percent (25%) of the Neutral Firm's fees and expenses.

(d)    *Net Working Capital Adjustment*.  If Estimated Net Working Capital is greater than Net Working Capital as finally determined pursuant to Section 1.05(b) or 1.05(c), as the case may be ("**Final Net Working Capital**"), Sellers shall pay Buyer the amount of such excess in cash by wire transfer of immediately available funds within five (5) Business Days of the date on which the Final Net Working Capital is so determined.  If Estimated Net Working Capital is less than Final Net Working Capital, Buyer shall pay Sellers the amount of such shortfall in cash by wire transfer of immediately available funds within five (5) Business Days of the date on which the Final Net Working Capital is so determined.  Any payment pursuant to this Section 1.05(d) shall be treated for all Tax purposes as a purchase price adjustment, unless otherwise required by applicable law.

(e)    *Closing Cash Adjustment*.  If Closing Cash as finally determined pursuant to Section 1.05(b) or 1.05(c), as the case may be, exceeds $20,000,000, Buyer shall pay Sellers the amount of such excess by wire transfer of immediately available funds within five (5) Business Days of the date on which Closing Cash is so determined.  If Closing Cash as finally determined pursuant to Section 1.05(b) or 1.05(c), as the case may be, is less than $20,000,000, Sellers shall pay Buyer the amount of such shortfall in cash by wire transfer of immediately available funds within five (5) Business Days of the date on which Closing Cash is so determined.

**Section 1.06**.  *Transfer Expenses*.  All federal, state, local and foreign sales, transfer, stamp, documentary and notarial taxes, fees and other duties (collectively, "**Transfer Expenses**"), if any, under applicable Law incurred in connection with the sale and transfer of the Acquired Assets pursuant to this Agreement will be borne equally by Buyer, on the one hand, and by Sellers, on the other hand.

**Section 1.07**.  *Closing Deliverables*.  (a) At the Closing, Sellers shall deliver, or cause to be delivered, to Buyer the following:

(i)  the officer's certificates contemplated by Section 6.01(a);

(ii)  a securityholders agreement of Buyer by and between Buyer, Sellers, Tesco Corporate Treasury Services PLC and Ronald W. Burkle providing for the terms set forth in the term sheet attached hereto as Exhibit B and such other terms as are mutually agreed among the parties thereto (the "**Securityholders' Agreement**"), duly executed by Sellers;

13

(iii)  Assignment and Assumption Agreement[s] duly executed by each Seller, in substantially the form[s] attached hereto as Exhibit C (the "**Assignment and Assumption Agreement[s]**");

(iv)  Bill[s] of Sale duly executed by each Seller, in substantially the form[s] attached hereto as Exhibit D (the "**Bill[s] of Sale**");

(v)  a Transition Services Agreement substantially in the form attached hereto as Exhibit G (the "**Transition Services Agreement**"), duly executed by Sellers and the Affiliates of Sellers required to be parties thereto;

(vi)  an Intellectual Property transfer agreement substantially in the form attached hereto as Exhibit H (the "**IP Assignment Agreement**"), duly executed by Sellers and each other party thereto;

(vii)  the agreement referred to in Section 9.12(c), duly executed by Sellers;

(viii)  instruments reasonably requested by Buyer sufficient to transfer domain names and substitutions of administrators designated by Buyer for websites primarily used in the Business;

(ix)  tangible media containing (a) formulae, recipes and instructions for private label food products and in the possession of or under the control of Sellers, (b) to the extent not prohibited by applicable Law, materially complete copies of all data delivered to Dunnhumby International Limited ("**Dunnhumby**") relating to the Business and in the possession or under the control of Sellers (with the understanding that Buyer has covenanted not to use such data in a manner that violates applicable law or in a manner that would cause Sellers to violate applicable law);

(x)  a materially complete digitally retrievable record of (i) all current and former cardholders' names, addresses, telephone numbers and other personal identification information for purposes of the mailing of communications approved in advance by Sellers by Buyer or Buyer's designee of supermarket club card information, including information relating to transitioning the Card Program to Buyer, to cardholders on behalf of Opco, and (ii) all other CMS data relating to cardholders, in each case, to the extent not prohibited by applicable Law and in the possession or control of Sellers; *provided, however*, for avoidance of doubt, Sellers shall not be required to deliver or share with Buyer any marketing information created and received from Dunnhumby U.S.A. where the delivery or sharing such data would result in a breach by any Affiliate of

14

Sellers that is party thereto, Dunnhumby U.K., or Opco of an agreement with Dunnhumby U.S.A. As to the data made available under clause (i) above, Buyer and Buyer's designee covenant and agree not to use such data for any purpose prohibited by law;

(xi) copies of any waivers, consents and approvals obtained by Sellers pursuant to Section 4.02;

(xii) a copy of the resolution adopted by the Board of Directors of each Seller evidencing authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified by an authorized officer of such Seller;

(xiii) customary termination statements, lien releases, discharges, financing change statements or other customary documents, notices or other instruments with respect to the Acquired Properties that the sources of the Debt Financing reasonably require to consummate the Debt Financing, each in form and substance reasonably satisfactory to Buyer duly executed by the holders of such Encumbrances;

(xiv) [Intentionally deleted]

(xv) by each Seller of the Acquired Properties located in the United States, an affidavit of non-foreign status, dated as of the Closing Date, in form and substance as required under the Treasury Regulations issued pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and reasonably acceptable to Buyer;

(xvi) by each Seller of the Acquired Properties located in California, a Withholding Exemption Certificate Form 593, duly executed by each applicable Seller;

(xvii) by each Seller of the Acquired Owned Properties, a grant deed (or similar deed required in a particular jurisdiction where the Acquired Owned Properties are located) to the applicable Acquired Property in recordable form, duly executed by the applicable Seller;

(xviii) by each Seller of Acquired Owned Properties, a separate statement of documentary transfer tax for each Acquired Owned Property, attached to each grant deed referred to in Section 1.07(a)(xvii) for such Acquired Owned Property;

(xix) owner affidavits and other materials (such as resolutions and corporate documentation) customarily delivered to title companies by

sellers in sale and purchase transactions as may reasonably be requested by Buyer for title insurance purposes;

(xx) such other documents as Buyer may reasonably request that are not inconsistent with the terms of this Agreement and reasonably necessary to evidence or consummate the transactions contemplated by this Agreement.

(b)     At the Closing, Buyer shall deliver, or cause to be delivered, to Sellers the following:

(i) the officer's certificate contemplated by Section 6.02(a) hereto;

(ii) the Purchase Price Warrant, duly executed by Buyer;

(iii) a secured promissory note of Buyer, as borrower, in a principal amount equal to $120,000,000, substantially in the form attached hereto as Exhibit E (as so reduced, the "**Campus Note**"), duly executed by Buyer;

(iv) a warrant to purchase the Financing Warrant Shares in the form of Exhibit F hereto (the "**Financing Warrant**"), duly executed by Buyer;

(v) the Securityholders Agreement duly executed by Buyer and Ronald W. Burkle;

(vi) the Assignment and Assumption Agreement[s] duly executed by Buyer;

(vii) the Bill[s] of Sale duly executed by Buyer;

(viii) the Transition Services Agreement duly executed by Buyer;

(ix) the agreement referred to in Section 9.12(c), duly executed by Buyer; and

(x) resale certificates or the equivalent under the applicable state and local Law duly completed and executed by Buyer with respect to any inventory or the equivalent items of personal property included in the Acquired Assets pursuant to which Buyer certifies that Buyer is purchasing such Acquired Assets for purposes of re-sale.

16

(c)    At the Closing, Buyer shall deliver a consulting services agreement with The Yucaipa Companies LLC, duly executed by The Yucaipa Companies LLC and Buyer, substantially in the form of Exhibit M.

Section 1.08. ***Purchase Price Allocation***.  (a) The purchase price (plus Assumed Liabilities, to the extent properly taken into account under the Code), shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "**Allocation**").  The Allocation shall be prepared by Buyer and delivered to Sellers as promptly as reasonably practicable after the Closing Date.  The Allocation shall be considered final and binding on the parties unless Sellers convey written objections (a "**Allocation Dispute Notice**") to Buyer within ten (10) Business Days. Buyer and Sellers shall endeavor in good faith to resolve any such disagreement within ten (10) Business Days following the delivery of the Allocation Dispute Notice.  If Buyer and Sellers are unable to completely resolve any such disagreement within ten (10) Business Days, the unresolved issues (the "**Allocation Dispute**") shall be resolved by the Neutral Firm in accordance with Section 1.05(c).  Upon the Allocation becoming binding, Buyer and Seller agree to (i) be bound by the Allocation, (ii) act in accordance with the Allocation for all U.S. federal income Tax purposes (including filing Internal Revenue Service Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the Closing Date and in the course of any audit, review or litigation), and (iii) take no position and cause their affiliates to take no position inconsistent with the Allocation for U.S. federal income Tax purposes, unless otherwise required by applicable law or unless the other party consents thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    Buyer and Sellers acknowledge and agree that (i) for purposes of calculating the applicable state and local sales and use tax with respect to those Acquired Assets which are personal property subject to sales tax, fair value shall be determined separately for each such Acquired Asset, and (ii) for purposes of calculating the applicable real property transfer taxes with respect to the Acquired Owned Properties, fair value shall be determined separately for each Acquired Owned Property.  To determine fair value, a valuation of the Acquired Assets subject to sales tax and the Acquired Owned Properties shall be prepared by Buyer, with input from Sellers as appropriate, and delivered to Sellers as promptly as reasonably practicable no less than thirty (30) Business Days prior to the Closing Date to allow for timely payment of the sales tax on the Acquired Assets subject to sales tax and the payment of the documentary transfer tax for each Acquired Owned Property concurrent with the recording of the grant deed for such Acquired Owned Property.  The valuation shall be considered final and binding on the parties unless Sellers convey written objections (a "**Transfer Expense Allocation Dispute Notice**") to Buyer within ten (10) Business Days. Buyer and Sellers shall endeavor in good faith to resolve any such disagreement

17

within ten (10) Business Days following the delivery of the Allocation Dispute Notice.  If Buyer and Sellers are unable to completely resolve any such disagreement within ten (10) Business Days, the unresolved issues (the "**Transfer Expense Allocation Dispute**") shall be resolved by the Neutral Firm in accordance with Section 1.05(c).  Upon the valuation becoming binding, Buyer and Seller agree to (i) be bound by the valuation, (ii) act in accordance with the valuation for all Transfer Expense purposes, and (iii) take no position and cause their affiliates to take no position inconsistent with the valuation for state and local Tax purposes, unless otherwise required by applicable law or unless the other party consents thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

Section 1.09.  *Withholding*.  Buyer shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to the Sellers or any other Person such amounts as Buyer is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment.  To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.  Each party represents that, to its Knowledge as of the date hereof, no amounts are required to be deducted or withheld.

## ARTICLE 2
### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules, each Seller jointly and severally represents and warrants to Buyer as of the date hereof and as of the Closing Date that:

Section 2.01.  *Organization*.  Each Seller is a corporation or other entity duly incorporated or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or formation, except where any such failure to be in good standing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each Seller has the requisite corporate or company power and authority to own, lease or license and use the Acquired Assets and to conduct the Business in the manner and in the places where such properties are owned, leased, licensed or used or such business is currently conducted (subject, on and after the Petition Date, to the applicable provisions of applicable bankruptcy and insolvency Law).  Each Seller is duly qualified or licensed to conduct the Business at the Acquired Properties and is in good standing in each jurisdiction in which the ownership, leasing, licensing or use of the Acquired Assets or the current conduct of the Business requires it to be so qualified or licensed and in good standing, except where any such failure to be so qualified or licensed and in good standing would not reasonably be expected to

18

have, individually or in the aggregate, a Material Adverse Effect.

Section 2.02. *Authority*. (a) Each Seller has the requisite corporate or company power and authority to execute and deliver this Agreement and the other Transaction Agreements to be executed and delivered by such Seller prior to the Petition Date and to carry out the transactions contemplated hereby and thereby prior to the Petition Date. Each Seller has the requisite corporate or company power and authority to execute and deliver the Transaction Agreements to be executed and delivered by such Seller on or after to the Petition Date pursuant to this Agreement and, subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.02(b) hereof) and the Approval Order (in the case of all other provisions), to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance by each Seller of the Transaction Agreements to which such Seller is a party have been duly authorized by all necessary action of such Seller and subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.02(b) hereof) and the Approval Order (in the case of all other provisions but solely with respect to actions to be taken following the Petition Date), no other action on the part of such Seller is required in connection therewith.

(b)     The Transaction Agreements to which a Seller is a party, assuming due authorization, execution and delivery by the other parties hereto and thereto, constitute, or when executed and delivered by such Seller will constitute (subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.02(b) hereof) and the Approval Order (in the case of all other provisions but solely with respect to actions to be taken following the Petition Date that require approval pursuant to the Approval Order to be effective), valid and binding obligations of such Seller enforceable against such Seller in accordance with their terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity that restrict the availability of equitable remedies. Except as set forth on Schedule 2.02(b), the execution, delivery and performance by each Seller of the Transaction Agreements, the consummation of the transactions contemplated hereby and thereby and the compliance by Seller with the provisions hereof and thereof:

(i) do not and will not violate any provision of the charter or bylaws (or comparable organizational documents) of any Seller;

(ii) subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.02(b) hereof) and the Approval Order (in the case of all other provisions but solely with respect to actions to be taken following the Petition Date that require approval pursuant to the Approval Order to be effective) (in each case, other than with respect

19

to execution and delivery of the Transaction Agreements or performance of the Transaction Agreements prior to the Petition Date), and except as may be required pursuant to the HSR Act, do not violate any law, statute, rule, regulation, ordinance, code, plan, judgment, injunction, ruling, order, writ, decree or award, (including final determinations under arbitration proceedings) or other restriction of any court, arbitrator or Governmental Authority ("**Law**") or Permit applicable to Sellers or by which any property or assets of any Seller are bound, or require any Seller to provide notice or obtain prior to the Closing any approval, authorization, consent or waiver of, or make any filing with, any Governmental Authority that has not been obtained or made, other than any violation, approval, consent, waiver or filing that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and

(iii) subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.02(b) hereof) and the Approval Order (in the case of all other provisions but solely with respect to actions to be taken following the Petition Date that require approval pursuant to the Approval Order to be effective), and except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, do not (A) result in a violation or breach of, conflict with, constitute a default (with or without notice or lapse of time, or both) under, accelerate any obligation under, result in the loss of any benefit or right under, or give rise to a right of termination or cancellation of, any Contract material to the Business or by which any of the Acquired Assets are bound or affected,  (B) result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any of the Acquired Assets or (C) require any consent by any Person, or giving notice to any Person.

**Section 2.03**.  *Assets*.  Except as would not reasonably be expected to be material to the Business, taken as a whole, (i) Sellers own and hold good and valid title, leasehold title or license to, as the case may be, all the Acquired Assets, free and clear of any Encumbrances, except for Permitted Encumbrances and (ii) at the Closing, Buyer will be vested with good and valid title to all of the Acquired Assets, free and clear of any Encumbrances, except for Permitted Encumbrances.

**Section 2.04.**  *Intellectual Property*.  (a) Schedule 2.04(a) sets forth a true and complete list of (i) each Owned IP which is Registered and (ii) each Trademark included in the Owned IP which is not Registered and which is material to the Business.

(b)     Schedule 2.04(b) sets forth a true and complete list of each material License that is used in or necessary to the conduct of the Business and which is

material to the Business; *provided, however*, off-the-shelf commercially available licenses of software that have not been customized, modified or misused ("**Off-the-Shelf Software**") need not be listed.

(c)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to Sellers' Knowledge, each License required to be set forth on Schedule 2.04(b) and of Off-the-Shelf Software is a valid and binding agreement enforceable against the other Person thereto in accordance with its terms; and neither Sellers nor any of their Affiliates are in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any such license.

(d)     All material Owned IP that Sellers actually own is valid, subsisting and enforceable.  All necessary registration, maintenance, renewal and other relevant filing fees in connection with any of the Owned IP that is actually owned by the Sellers that has been issued or registered or is the subject of a pending application have been timely paid, and all the relevant Governmental Authorities in the United States for the purpose of maintaining such Owned IP and all issuances, registrations and applications therefor, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)     To Sellers' Knowledge, neither Sellers nor any of their Affiliates is violating, nor has any Seller violated, any Intellectual Property of another Person in any material respect.  Except as set forth on Schedule 2.04(e), no suit, action, reissue, reexamination, interference, arbitration, mediation, opposition, cancellation or other proceeding ("**Suit**") to which any Seller or any Affiliates thereof is a party is pending or, to Sellers' Knowledge, threatened concerning any claim or position that any Seller or any of their Affiliates has violated any Intellectual Property of another Person.

(f)     (i) To Sellers' Knowledge, no Affiliate of any Seller or any other Person, is violating any Owned IP that Seller actually owns; and (ii) no Suit is pending concerning any Owned IP that Seller actually owns, including any Suit concerning a claim or position that any Owned IP that Seller actually owns has been violated or is invalid, unenforceable, unpatentable, unregisterable, cancelable, not owned or not owned exclusively by any Seller, nor, to Sellers' Knowledge has any such Suit been threatened.

(g)     With respect to Owned IP that Sellers actually own and which is material to the Business, Sellers and/or their Affiliates have taken reasonable measures, as appropriate for their industry, to maintain and protect the proprietary nature of the Owned IP that Seller actually owns, and to maintain the secrecy of the trade secrets that Sellers use.

21

(h)     To the Knowledge of Sellers, the conduct of the Business does not infringe, misappropriate or violate the intellectual property or privacy rights of any Person.

(i)     The Acquired Assets, together with the properties and services required to be provided under the Transition Services Agreement, include all of the Intellectual Property and data rights needed to operate the Business.

(j)     The IT Systems are in reasonably good working order and have not, to Sellers' Knowledge, been the subject of an unauthorized intrusion or unauthorized release of data within the last five years.

(k)     To the extent permitted by applicable Law, all past and present privacy policies used by Sellers and their Affiliates in connection with the Business affirmatively permit the assignment of all customer information, including personally identifiable information in connection with a sale of the Acquired Assets, including the subject transaction.

**Section 2.05**.  *Litigation*.  Other than in connection with the Bankruptcy Cases or as set forth on Schedule 2.05 or as would not reasonably be expected to result in any material fine, penalty or expense, there is no pending or, to Sellers' Knowledge, threatened action, suit, arbitration, proceeding, claim, opposition, challenge, charge or investigation before any court or other Governmental Authority affecting the Business or any of the Acquired Assets, or pending or threatened by Sellers against any third party.  Except as set forth on Schedule 2.05, no Seller is subject to any judgment, order or decree of any court or other Governmental Authority.

**Section 2.06**.  *Compliance with Law*.  (a)  Sellers are in material compliance with all Laws, orders and settlements applicable to the conduct or operations of the Business, including all applicable regulations and requirements, including labeling requirements, of the USDA and FDA and other similar Governmental Authorities relating to the products made or sold by the Business, privacy laws, consumer protection laws and laws, regulations and operating rules of governmental authorities.  In addition, Sellers are in material compliance with all requirements of the Consent Decree.

(b)     No Seller has received written notice of any material violation or alleged violation of any Laws, orders and settlements applicable to the conduct or operations of the Business.

(c)     No Seller nor, to the Knowledge of Sellers, any of their respective directors, officers, agents, representatives or employees (in their capacity as directors, officers, agents, representatives or employees of such Seller) has at any time during the past three years:  (a) used any funds for unlawful contributions,

22

gifts, entertainment or other unlawful expenses relating to political activity in respect of the Business, or failed to disclose fully any such contribution in violation of applicable Laws; (b) directly or indirectly, paid or delivered any fee, commission or other sum of money or item of property, however characterized, to any finder, agent, or other party acting on behalf of or under the auspices of a governmental official or Governmental Authority, in the United States or any other country, which is in any manner illegal under any Law of the United States or any other country having jurisdiction; (c) made any unlawful payment or given any other unlawful consideration to any customer or supplier of any Seller or any officer, director, partner, employee, consultant or agent of any such customer or supplier in respect of the Business; or (d) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended.

    Section 2.07. *Financial Statements*. (a) Sellers have delivered to Buyer copies of the Seller Financial Statements. Each of the Seller Financial Statements (i) is consistent with the books and records of Sellers; (ii) has been prepared in accordance with the Accounting Principles consistently applied throughout the periods covered thereby (except as may be indicated in the notes thereto, if any); and (iii) on such basis presents fairly in all material respects the financial condition and results of operations of Sellers as of the dates and for the periods referred to therein, subject to normal year-end adjustments and the absence of notes.

    (b)    The values at which inventories are shown on the Seller Financial Statements have been determined in accordance with the normal valuation policy of Sellers.

    (c)    All accounts payable of Sellers reflected in the Seller Financial Statements or arising after the date thereof are the result of bona fide transactions.

    (d)    Sellers maintain accurate books and records reflecting their assets and liabilities and maintain proper and adequate internal accounting controls which are intended to provide reasonable assurance that (i) transactions are executed with management's authorization; (ii) transactions are recorded as reasonably necessary to prepare the consolidated financial statements of Sellers and to maintain accountability for Sellers' consolidated assets; (iii) access to Sellers' assets is permitted only in accordance with management's authorization; and (iv) accounts, notes and other receivables and inventory are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis. To Sellers' Knowledge, there is no fraud or allegation of fraud affecting Sellers by management of Sellers, employees who have significant roles in Sellers' internal controls or other employees of Sellers whose fraud could have a material effect on the financial statements.

(e)　　Schedule 2.07(e) sets forth all outstanding Indebtedness of Sellers, and for each item of Indebtedness set forth thereon, identifies the debtor, the principal amount as of the date of this Agreement, the creditor, the maturity date, and the collateral, if any, securing such Indebtedness.  Schedule 2.07(e) sets forth all letters of credit, fidelity bonds and surety bonds are in full force and effect and that will need to be replaced at Closing.

(f)　　Schedule 2.07(f) sets forth, as of August 25, 2013, the amount of points outstanding under the Card Program and converted under the Card Program and the amount of liability attached thereto.

**Section 2.08**.  ***Absence of Certain Changes***.  Since May 31, 2013, Sellers have conducted the Business in the ordinary course of business in all material respects.  Except as set forth on Schedule 2.08 or as permitted pursuant to Section 4.01, since May 31, 2013, no Seller has:

(a)　　sold, leased, licensed (as licensor), assigned, disposed of or transferred (including transfers to any other Seller or any subsidiary, Affiliates or employee of any Seller) any material portion of its assets (whether tangible or intangible), except for sales of surplus fixtures and equipment and sales of inventory in the ordinary course of business;

(b)　　mortgaged, pledged or subjected to any Encumbrance any material portion of its properties or assets, other than Permitted Encumbrances;

(c)　　committed to make or authorized any capital expenditure, under which there remains outstanding on the date hereof payment or expenditure obligations of (i) $500,000 or more under any individual commitment or (ii) $2,000,000 or more in the aggregate under all such commitments;

(d)　　acquired (including, without limitation, by merger, consolidation, or acquisition of stock or assets) any interest in any Person or any division thereof;

(e)　　incurred any Indebtedness for money borrowed or assumed, guaranteed or endorsed the obligations of any Person, except for Indebtedness incurred in the ordinary course of business with a maturity of not more than one year in a principal amount not, in the aggregate, in excess of $250,000 for the Sellers taken as a whole;

(f)　　issued, sold, pledged, disposed of, encumbered or transferred any equity securities, securities convertible, exchangeable or exercisable into equity securities, or warrants, options or other rights to acquire equity securities, of any Seller;

24

(g)     declared, set aside, or distributed any dividend or other distribution (whether payable in cash, stock, property or a combination thereof) with respect to any of its capital stock (or other equity securities), or entered into any agreement with respect to the voting of its capital stock (or other equity securities);

(h)     reclassified, combined, split, subdivided or redeemed, purchased or otherwise acquired, directly or indirectly, any of its capital stock (or other equity securities);

(i)     suffered theft, damage, destruction or casualty loss in excess of $2,000,000, to its assets, whether or not covered by insurance;

(j)     made loans or any investments in, any Person in excess of $250,000 in the aggregate;

(k)     made any material change in accounting policies, practices, principles, methods or procedures, other than as required by the Accounting Principles or by a Governmental Authority;

(l)     made any material Tax election or settle or compromise any material liability for Taxes; or

(m)     agreed or committed to do any of the foregoing.

**Section 2.09**.  *No Undisclosed Liabilities*.  There are no liabilities, Indebtedness or obligations of any nature, whether or not accrued, absolute, contingent, unliquidated or otherwise, relating to the Business or the Acquired Assets, other than (i) as set forth in the Seller Financial Statements or notes thereto, (ii) those incurred in the ordinary course of business since May 31, 2013, (iii) liabilities or obligations arising out of this Agreement and the other Transaction Agreements and the transactions contemplated hereby and thereby (including liabilities or obligations arising after the date hereof which are permitted by Section 4.01 hereof) and (iv) liabilities arising pursuant to the terms of the Assumed Leases and Assumed Contracts listed on Schedule 1.01(a)(ii)(A), 1.01(a)(ii)(B)or 1.01(a)(iii), respectively (but not liabilities for breaches thereof), (v) liabilities that are Excluded Liabilities and (vi) liabilities or obligations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 2.10**.  *Labor Matters*.  (a)  Sellers have previously delivered to Buyer a schedule dated September 6, 2013 setting forth a true and complete list of the Business Employees as of such date, including each such employee's current annual salary or current hourly wage rate, bonus opportunity for the current quarter, hire date, accrued vacation ("**Accrued PTO**"), principal work location,

25

leave status and status as being exempt or nonexempt from the application of state and federal wage and hour laws applicable to employees who do not occupy a managerial, administrative, or professional position.

(b)     Except as set forth on Schedule 2.10(b), no Seller is a party to any material written employment agreement with a Business Employee, other than agreements terminable by either party at will and without any severance obligation on the part of Sellers.

(c)     No Seller is or has been a party or subject to, any labor union or collective bargaining Contract with respect to any current and/or former Business Employee.  During the past three years, no labor organization or group of employees has filed any representation petition.  No Seller has experienced, during the past three years, any strike, organized slowdown, work stoppage, lockouts or other organized work interruption with respect to any current and/or former Business Employees, nor, to Sellers' Knowledge, are any such strikes, organized slowdowns, work stoppages, lockouts or other organized work interruptions threatened.

(d)     Except as previously made available to Buyer, there is no material workers' compensation liability, claim/loss or matter pending or, to Sellers' Knowledge, threatened.  To Sellers' Knowledge, there are no material liabilities with respect to any current or former Business Employees, whether contingent or absolute, relating to workers' compensation benefits that are not fully insured against by a bona fide third-party insurance carrier.

(e)     Each Seller is in material compliance with respect to all current and former Business Employees with all applicable Laws relating to employment practices, the terms and conditions of employment and occupational safety and health (including, without limitation, Laws relating to collective bargaining, discrimination, civil rights, safety and health, wrongful discharge, workers' compensation and the collection and payment of withholding and/or social security taxes and any similar taxes). Except for any Excluded Liabilities or as set forth on Schedule 2.10(e), no lawsuits, legal complaints, formal administrative charges filed with any Governmental Authority, unfair labor practices or arbitrations relating to employment practices are pending or, to Sellers' Knowledge, threatened, with respect to any Business Employee.

(f)     Each Seller has paid in full to each current or former Business Employee or adequately accrued for in accordance with the Accounting Principles all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such employees, and except as set forth on Schedule 2.10(f), there is no claim with respect to the payment of wages, salary or overtime pay that has been asserted or is now pending or, to the Knowledge of any Seller, threatened

26

before any Governmental Authority with respect to any current or former Business Employee.

(g)    In the three years prior to the date of this Agreement, no Seller has effectuated (i) a "plant closing" (as defined in the WARN Act or any similar state, local or foreign regulation) affecting any site of employment or one or more facilities or operating units within any site of employment or facility of any Seller or (ii) a "mass layoff" (as defined in the WARN Act, or any similar state, local or foreign regulation) affecting any site of employment or facility of any Seller.

Section 2.11. *Employee Benefits*.  (a) Schedule 2.11(a) sets forth a list of each Seller Benefit Plan.  For purposes of this Agreement, a "**Seller Benefit Plan**" means any Benefit Plan that is maintained by Sellers or to which any Seller is required to contribute or to provide compensation or benefits to or for the benefit of any current or former Business Employees, or the spouses, beneficiaries or other dependents thereof.  Each Seller Benefit Plan has been established and administered in accordance with its terms and in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable Laws, and each Seller Benefit Plan intended to qualify under Section 401(a) of the Code is the subject of a favorable determination or opinion letter from the IRS as to its qualified status and, to Sellers' Knowledge, no event has occurred and no condition exists which would be reasonably likely to result in the revocation of any such determination or opinion letter. Sellers have made available to Buyer a true and complete copy, as applicable, of (A) each Seller Benefit Plan (including any amendments thereto) and descriptions of all material terms of any such plan that is not in writing, (B) the most recent annual report with accompanying schedules and attachments, filed with respect to Sellers' 401(k) program, (C) the most recent summary plan description for each Seller Benefit Plan for which a summary plan description is required by applicable law, (D) the most recently received IRS determination or opinion letter, if any, issued by the IRS, (E) the three most recently prepared financial statements, trust agreements and trustee reports, if any, relating to the Seller Benefit Plans (as applicable), and (F) all material records, notices and filings concerning IRS or Department of Labor audits or investigations.  Sellers have not made any filing in respect of any Seller Benefit Plan under the Employee Plans Compliance Resolution System or the Department of Labor Delinquent Filer Program. No Seller Benefit Plan is subject to the laws of any jurisdiction outside of the United States or provides compensation or benefits to any employee or former employee (or any dependent thereof) subject to the laws of any jurisdiction outside of the United States.

(b)    No Seller Benefit Plan is, and neither Seller nor any ERISA Affiliate has within the past six years maintained, participated in or contributed to (or been obligated to maintain, participate in or contribute to) a (i) "multiemployer plan" (as defined in Section 3(37) of ERISA), (ii) "pension plan" (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA or Section 412 of the Code, (iii)

27

"multiple employer plan" (as defined in Section 413(c) of the Code), (iv) "multiple employer welfare arrangement" (as defined in Section 3(40) of the ERISA) or (v) a "voluntary employee's beneficiary association," (within the meaning of Section 501(c)(9) of the Code).

(c)     There are no pending material Suits or, to Sellers' Knowledge, threatened material Suits by, on behalf of or against any Seller Benefit Plan, the assets of any trust under any Seller Benefit Plan, or the plan sponsor, plan administrator or any fiduciary of any Seller Benefit Plan, other than routine claims for benefits in the ordinary course that have been or are being handled through an administrative claims procedure.  No Seller Benefit Plan, and neither any Seller nor any Seller Benefit Plan fiduciary with respect to any Seller Benefit Plan, in any case, is the subject of an audit or investigation by the IRS, the Department of Labor, the Pension Benefit Guaranty Corporation or any other Governmental Authority, nor is any such audit or investigation pending or, to the Knowledge of Sellers, threatened.

(d)     No Seller Benefit Plan provides, and no Seller has any obligation to provide, benefits to former employees or other service providers of Sellers or their ERISA Affiliates (or any dependents or beneficiaries of the foregoing), other than group health plan continuation coverage pursuant to Section 4980B of the Code or any similar legal requirements.  Each Seller and each of their ERISA Affiliates are in compliance in all material respects with the applicable requirements of Section 4980B of the Code and any similar state law.

(e)     Except as set forth in Schedule 2.11(e) or as contemplated by this Agreement (including any payments contemplated under Section 9.08), neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, either alone or in combination with another event (whether contingent or otherwise), (i) result in any payment or benefit becoming due or payable, or required to be provided, by Sellers to any director, employee or independent contractor of any Seller, (ii) increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any such director, employee or independent contractor of any Seller, or (iii) result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation.

    **Section 2.12**.  *Tax Matters*.

(a)     There are no material liens for Taxes (other than for current Taxes not yet due and payable) on any of the Acquired Assets.

(b)     Except to the extent that it would not subject Buyer or any of its Affiliates to any material liability as a result of the transactions contemplated hereby, there are no examinations, audits or inquiries pending or, to Sellers'

28

Knowledge, threatened of any Tax Return of a Seller or of any affiliated, consolidated, combined or unitary group (under any federal, state, local or foreign tax Law) of which any Seller is or has been a member (each, an "**Affiliated Group**") the resolution of which could reasonably be expected to result in a material tax liability.  No material deficiency with respect to Taxes relating to the Business and/or the Acquired Assets has been proposed, asserted or assessed in writing or, to Sellers' Knowledge, otherwise against a Seller or any Affiliated Group.  No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(c)     No Acquired Asset (i) is property that is required to be treated for Tax purposes as being owned by any other Person (other than any Acquired Asset that is leased); (ii) is tax-exempt bond financed property or tax-exempt use property within the meaning of Section 168 of the Code; (iii) directly or indirectly secures any debt the interest on which is tax exempt under Section 103(a) of the Code; or (iv) is subject to a "section 467 rental agreement" as defined in Section 467 of the Code.

(d)     Each Seller Benefit Plan and each other contract, agreement, plan, program or arrangement maintained, established or entered into by any Seller that constitutes a "nonqualified deferred compensation plan" (within the meaning of Section 409A of the Code) is in material documentary and material operational compliance with Section 409A or the Code or an available exemption therefrom.

**Section 2.13**.  *Permits*.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, Sellers are in possession of all permits, licenses, authorizations, approvals, entitlements, accreditations, certifications, franchises, consents, orders and registrations of all Governmental Authorities which are material to the Business, taken as a whole, and necessary to operate the Business consistent with past practice (collectively, the "**Permits**"), and all such Permits are valid and in full force and effect.  Sellers are in compliance in all material respects with the terms of the Permits, and to Sellers' Knowledge, no condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in (i) the default or violation of any term, condition or provision of any such Permit, (ii) the suspension, revocation, impairment, forfeiture or non-renewal of any such Permit or (iii) any Encumbrances on any Acquired Asset.  All material applications for or renewals of all such Permits have been timely filed.  No material proceeding is pending or, to Sellers' Knowledge, threatened to revoke or limit any such Permit.

**Section 2.14**.  *Real Property*.

(a)     Except as set forth on Schedule 2.14(a), each Seller enjoys peaceful and undisturbed possession and access to the Acquired Owned Properties and the Leased Premises and has title to each Acquired Owned Property and valid and

29

binding leasehold interest in each of the Leased Premises free and clear of any Encumbrances other than Permitted Encumbrances and Encumbrances that may exist against the fee interest owned by the landlord thereunder the existence of which, and which if violated or defaulted, would not reasonably be expected to have the effect of terminating or canceling or otherwise adversely affecting the rights of the tenant under any Assumed Lease.

(b)     On or before the Closing Date, the Sellers, at their sole cost and expense, will have obtained all required consents, releases and permissions and will have complied with all applicable statutes, laws, ordinances and regulations of every kind and nature to the extent required, in order to convey to Buyer title to the Acquired Properties.

(c)     No Seller, and to Sellers' Knowledge, no landlord, is in breach or default in the performance, observance or fulfillment of any obligation, covenant or condition under any Assumed Lease.

(d)     To Sellers' Knowledge, the Assumed Leases are valid agreements in full force and effect which constitute valid and binding obligations of the respective parties thereto and which are legally enforceable in accordance with their respective terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (ii) the availability of injunctive relief and other equitable remedies.

(e)     Seller has not assigned, transferred, conveyed, mortgaged, or otherwise encumbered any Leased Premises, except for any Permitted Encumbrances.

(f)     To Sellers' Knowledge, on or prior to the date hereof, all material certificates of occupancy, permits, licenses, approvals and other authorizations required in connection with the present operation of the Business on the Acquired Properties have been lawfully issued to the applicable Seller and/or its landlords and are, as of the date hereof, in full force and effect and, to Sellers' Knowledge, Sellers are not in material violation thereof.

(g)     To Sellers' Knowledge, the Acquired Owned Properties and the Leased Premises have no material defects, and no other facts or conditions exist, which would reasonably be expected to materially impair the day to day use or occupancy thereof for the conduct of the Business.

(h)     Sellers have received no written or, to Sellers' Knowledge, oral notification that they are in violation of any applicable law, rule or regulation, including but not limited to building, zoning, health, safety, fire or other Law which would reasonably be expected to materially adversely affect the use or

operations of any of the Acquired Properties, except for any written notifications that pertain to violations that have been cured or resolved.

(i)     There are no pending condemnation or eminent domain proceedings, lawsuits or administrative actions related to any Acquired Owned Property or Leased Premises and, to Sellers' Knowledge, no Seller has received any written notice of any condemnation or eminent domain proceedings, lawsuits or administrative actions related to any Acquired Owned Property or Leased Premises that would reasonably be expected to materially, adversely affect the current use of such Acquired Owned Property or Leased Premises by Sellers.

(j)     To Sellers' Knowledge, all utilities necessary to service the Acquired Properties and to conduct the Business as now conducted thereat, are connected and available to Sellers.

(k)     Except as disclosed on Schedule 2.14(k), there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any party or parties the right of use or occupancy of any portion of the Acquired Properties.

(l)     There are no outstanding options or rights of first refusal to purchase or lease the Acquired Properties, or any portion thereof or interest therein.

(m)     There are no parties (other than the Sellers) in possession of any Acquired Properties, other than tenants under any written or oral leases disclosed in Schedule 2.14(m).

(n)     There are no leasing commissions now or hereafter due with respect to the Acquired Properties, except for leasing commissions of third parties other than Sellers and leasing commissions which become due with respect to extensions occurring after the Closing Date, and neither Seller has entered into any brokerage or leasing commission agreements with respect to the Acquired Properties, where a leasing commission for any lease in effect as of the Closing Date has been earned as of the Closing Date but not fully paid.

(o)     As of the date hereof, Sellers have in full force and effect the property insurance listed on Schedule 2.14(o).

(p)     Sellers have not received any written notice from any insurance carrier of any material defects or inadequacies in the Acquired Properties or the improvements thereto.  To Sellers' Knowledge, there are no pending insurance claims relating to any damage or destruction of any of the Acquired Properties or improvements thereto.

31

(q)    All fixtures, machinery and equipment included in this sale are owned free and clear of any liens and encumbrances except for Permitted Encumbrances.

(r)    With respect to each Assumed Lease, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (i) there are no material disputes or forbearance programs in effect with respect to such Assumed Lease and Sellers have received no written notice of any default under such Assumed Lease (or condition or event, which, after notice or a lapse of time or both, would constitute a default thereunder), other than any default arising as a result of the Bankruptcy Cases; (ii) to Sellers' Knowledge, there are no material defaults (or condition or event, which, after notice or a lapse of time or both, would constitute a material default thereunder) under such Assumed Lease on the part of the landlord thereunder, other than any default arising as a result of the Bankruptcy Cases; (iii) Sellers have not received any written notice asserting that Sellers are in default under any lease, contract or agreement relating to any of the Acquired Properties; and (iv) no security deposit or portion thereof deposited with respect to such Assumed Lease has been applied in respect of a material breach or default thereunder which has not been redeposited in full.

Section 2.15.  *Contracts*.  (a)  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and as set forth on Schedule 2.15(a), no Seller is a party to or bound by any written or oral:

(i) collective bargaining agreements with any labor union or organization;

(ii) written Contract for the employment of any individual working on a fill-time basis, other than agreements terminable by either party at will and without any severance obligation on the part of Sellers that is not otherwise required by Law;

(iii) bonus, pension, severance, profit sharing, retirement or other forms of deferred compensation plans;

(iv) Contract under which any Seller has borrowed any money from, or issued any note, bond, debenture or other evidence of Indebtedness in excess of $250,000 to, any Person (other than Contracts with Related Parties) or placed a Lien on any material portion of Sellers' assets;

(v) Contract under which any Seller is lessee of, or holds or operates, any personal property owned by any other party, for which the annual lease payments exceed $250,000;

32

(vi) Contract which materially limits or restricts where any Seller may conduct the Business or the type or line of business in which any Seller may engage;

(vii) Contract with any Related Party; or

(viii) Contract with any Governmental Authority.

(b) Except as set forth on Schedule 2.15(a), a true, correct and complete copy of each written Contract listed on Schedule 2.15(a) has been delivered to Buyer.

(c) Each Assumed Contract that is material to the Business, taken as a whole (a "**Material Contract**"), is, assuming the due authorization, execution and delivery by the other parties thereto, a legal, valid and binding agreement of the Seller(s) party thereto, enforceable in accordance with its terms subject, as to the enforcement of remedies, to the applicable provisions of bankruptcy, insolvency, moratorium or other similar Laws and is in full force and effect.

(d) Sellers (to the extent party thereto) have performed all material obligations required to be performed by them under the Material Contracts and none of Sellers or, to Sellers' Knowledge, the other parties thereto, is in breach of any Material Contract, except as a result of the Bankruptcy Cases.

(e) Except for this Agreement and the other Transaction Agreements, no Seller has assigned, delegated or otherwise transferred, or entered into any agreement to so assign, delegate or otherwise transfer, any of its rights or obligations with respect to any Material Contract.

**Section 2.16**. *Suppliers*. Schedule 2.16 sets forth each vendor, supplier and service provider from whom Sellers purchased greater than $100,000 in goods or services over the course of the 12 months ending September 1, 2013, the amounts owing to each such Person, and whether such amounts are past due.

**Section 2.17**. *Product Warranty/Liability*. (a) Except as set forth on Schedule 2.17(a), since January 1, 2011 and except as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect (i) there have been no recalls by any manufacturer of any products marketed or sold by Sellers; (ii) no Seller has received written or oral notice of any action, arbitration, charge, claim, complaint, demand, grievance, hearing, inquiry, investigation, suit or proceeding by or before any Governmental Authority, and no Seller has been a party or subject to any such proceeding (A) relating to, bodily or personal injury, death, or property or economic damages, (B) for punitive or exemplary damages, (C) for contribution or indemnification, or (D) for injunctive relief, in any such case in connection with any product manufactured, marketed,

sold or distributed by it, and (iii) no Seller has been required to file any notification or other report with or provide information to any Governmental Authority or product safety standards group concerning actual or potential defects or hazards with respect to any product manufactured, marketed, sold or distributed by it.

(b)     To Sellers' Knowledge, no Seller has committed any act or omission which would reasonably be expected to result in, and no facts or circumstances exist which would reasonably be expected to give rise to, (i) any material product liability or (ii) any material costs to cure any breach of warranty or failure to meet or exceed product specifications.

Section 2.18. *Environmental*.  Except as set forth on Schedule 2.18:

(a)     Except as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect, no Hazardous Material (i) is presently maintained, used, generated, or permitted to remain in place by Sellers in violation of any Environmental Law or (ii) is required by any Governmental Authority pursuant to any Environmental Law to be removed, treated or remediated by Sellers, given the nature of its present condition, location, nature, material or maintenance.

(b)     Except as would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect, no investigation or review is pending or threatened in writing by any Governmental Authority, and since February 25, 2013, no written notice, citation, summons, directive or order has been received by any Seller nor has any penalty been assessed against any Seller, in each case with respect to (i) any alleged violation by any Seller of any Environmental Law, (ii) any alleged failure by any Seller to have any environmental permit, certificate, license, approval, registration or authorization required under any Environmental Law in connection with the Business, or (iii) any use, possession, generation, treatment, storage, recycling, transportation, release or disposal by or on behalf of Sellers of any Hazardous Material, unless such written notice, citation, summons, directive or order has been reasonably cured.

(c)     No Seller has received any written notice of claim, demand or notification that it is or that it may be a "potentially responsible party" with respect to any investigation or remediation of any threatened or actual release of any Hazardous Material.

(d)     The representations and warranties contained in this Section 2.18 are Sellers' sole representations and warranties with respect to environmental matters.

Section 2.19. *Affiliated Transactions*.  Except as set forth on Schedule 2.19, no Related Party or joint venture to which an Seller or any Seller

34

Affiliate is a party (a) is a party to any Contract with any Seller or (b) to the Knowledge of Sellers, directly or indirectly provides or causes to be provided any material assets, properties or services to Sellers (except services rendered as a director or officer of any Seller) other than services and intellectual property licenses contemplated by the Transition Services Agreement.

Section 2.20. *Insurance*. Schedule 2.20 sets forth a list of each material property and casualty insurance policy presently in effect which covers Sellers or the Business. All of such Policies are in full force and effect as of the date hereof and all premiums due and payable with respect thereto have been paid to date. Sellers are in compliance in all material respects with its obligations under any such Policy.

Section 2.21. *Finder's Fee*. Sellers and their Affiliates have not incurred or become liable for any broker's commission or finder's fee relating to or in connection with the transactions contemplated by this Agreement which would be payable by Buyer or any of its Affiliates

### ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to each Seller as of the date hereof and as of the Closing Date that:

Section 3.01. *Organization*. Buyer is a corporation duly formed, validly existing and in good standing under the Laws of Delaware with all requisite corporate power to own or lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is conducted by it.

Section 3.02. *Authority*. Buyer has the requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Agreements to be executed and delivered by Buyer pursuant to this Agreement and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of the Transaction Agreements to which it is a party have been duly authorized by all necessary corporate action of Buyer and no other action on the part of Buyer is required in connection therewith. The Transaction Agreements to which Buyer is a party constitute, or when executed and delivered will constitute, valid and binding obligations of Buyer enforceable in accordance with their terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity that restrict the availability of equitable remedies. The execution, delivery and performance by Buyer of the Transaction Agreements:

35

(a)    does not and will not violate any provision of the organizational documents of Buyer;

(b)    except as may be required pursuant to the HSR Act, does not and will not violate any Law or Permit applicable to Buyer or require Buyer to obtain any approval, consent or waiver of, or make any filing with, any Governmental Authority which has not been obtained or made, except as would not reasonably be expected to prevent, impair or materially delay the ability of Buyer to consummate the transactions contemplated hereby; and

(c)    does not result in a breach of, constitute a default under, accelerate any obligation under, or give rise to a right of termination of any Contract by which Buyer is bound, except as would not reasonably be expected to prevent, impair or materially delay the ability of Buyer to consummate the transactions contemplated hereby.

Section 3.03. *Capitalization*. (a) As of the date hereof, the authorized capital stock of Buyer consists of 1,000 shares of common stock, par value $.0001 per share, of which 1,000 shares are issued and outstanding. As of the Closing Date, the authorized capital stock of Buyer will consist of (i) 200,000 shares of Buyer Common Stock, (ii) 200,000 shares of voting common stock, par value $.0001 per share ("**Buyer Voting Common Stock**") and 100,000 shares of undesignated preferred stock ("**Buyer Preferred Stock**").  As of the Closing Date, after giving effect to the transactions contemplated by this Agreement, there will be outstanding: (i) zero shares of Buyer Common Stock (assuming that the Seller has not elected to receive shares of Buyer Common Stock pursuant to Section 1.03(c)), (ii) 67,500 shares of Buyer Voting Common Stock and zero shares of Buyer Preferred Stock.  There will also be outstanding  40,027 Warrants.  The terms, rights and priority of the Buyer Common Stock and Buyer Voting Common Stock will be identical in all respects except for voting rights. All outstanding shares of capital stock of Buyer have been, and all shares that may be issued pursuant to the Warrants will be, duly authorized and validly issued and fully paid and non-assessable and were or will be, as the case may be, issued free of preemptive rights, and there is no restriction on the issue and delivery thereof.  No outstanding shares of capital stock of Buyer were issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right (including under any provision of Delaware General Corporation Law, Buyer's certificate of incorporation or by-laws or any Contract to which Buyer is or was a party or otherwise bound).  Buyer does not have outstanding any bonds, debentures, notes or other obligations the holders of which have the right to vote (or which are convertible into, or exercisable or exchangeable for, securities having the right to vote) with the stockholders of Buyer on any matter.

36

(b)       Except as set forth in Section 3.03(a), a 15% employee and consultant equity pool and with respect to the Warrants, there are no issued, reserved for issuance or outstanding:  (i) shares of capital stock or other equity or voting securities or ownership interests in Buyer, (ii) securities of Buyer convertible into or exchangeable for shares of capital stock or other equity or voting securities of or ownership interests in Buyer, (iii) warrants, calls, options or other rights to acquire from Buyer, or other obligation of Buyer to issue, any capital stock or equity or voting securities or securities convertible into or exchangeable for any capital stock or equity or voting securities of Buyer or (iv) any rights (either preemptive or other and including restricted shares, restricted stock units, stock appreciation rights, performance units, contingent value rights, "phantom" stock or similar securities or rights) that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock or equity or voting securities of Buyer (the items in clauses (i) through (iv) being referred to collectively as the "**Buyer Securities**").  There are no outstanding obligations (contingent or otherwise) of Buyer to repurchase, redeem or otherwise acquire or retire any of the Buyer Securities.

Section 3.04.  *Interim Operations of Buyer*.  Buyer was formed solely for the purpose of engaging in the transactions contemplated by this Agreement, has engaged in no other business activities and has conducted its operations only as contemplated by this Agreement.  Buyer has no liabilities and is not a party to any agreement other than this Agreement, the agreements contemplated herein and agreements with respect to capital contributions by its shareholders and the appointment of registered agents and similar matters.  Buyer has no Subsidiaries.

Section 3.05.  *Financing*.  (a) Buyer has and on the Closing Date will have sufficient funds or legally binding commitments for sufficient funds, in each case in form and substance reasonably satisfactory to Sellers, to consummate the transactions contemplated by this Agreement.

(b)       Buyer has (i) delivered to Sellers true and complete copies of fully executed commitment letters (the "**Debt Commitment Letters**") from (A) Fortress Credit Corp. confirming its commitment to provide Buyer with financing in connection with the transactions contemplated hereby in connection with a sale-leaseback transaction to be consummated concurrently with the Closing and (B) Wells Fargo Bank, National Association confirming its commitment to provide Buyer with a working capital credit facility as of the Closing (collectively, the "**Debt Financing**") and (ii) indicated that an equity investment of $10,000,000 will be made into Buyer at the Closing (the "**Equity Financing**" and, together with the Debt Financing, the "**Financing**").

(c)       Except for fee letters with respect to fees and related arrangements with respect to the Financing, of which Buyer has delivered redacted copies to Sellers prior to the date of this Agreement, there are no side letters or other

37

agreements, contracts or arrangements related to the funding of the full amount of the Financing other than as expressly set forth in the Debt Commitment Letters and delivered to Sellers prior to the date of this Agreement.

(d)    Each of the Debt Commitment Letters is in full force and effect and is a valid and binding obligation of Buyer and, to the knowledge of Buyer, the other parties thereto.  As of the date hereof, none of the Debt Commitment Letters have been amended or modified in any respect, and the respective commitments contained therein have not been withdrawn, rescinded or otherwise modified in any respect.  To Buyer's knowledge, assuming the accuracy of Sellers' representations and warranties in Article 2 of this Agreement, no event has occurred which would constitute a breach or default (or an event which with notice or lapse of time or both would constitute a default), or the failure of any condition, on the part of Buyer or its Affiliates under the Debt Commitment Letters or, to the knowledge of Buyer, on the part of lenders party thereto.  There are no conditions precedent to the funding of the full amount of the Financings other than the conditions precedent set forth in the Debt Commitment Letters, and Buyer has no reason to believe that it will not be able to satisfy any term or condition of closing of the Financing that is required to be satisfied as a condition of the Financing, or that the Financing will not be made available to Buyer on the Closing Date.  Subject to the terms and conditions of the Debt Commitment Letters, the aggregate proceeds of the Financings are in an amount sufficient to consummate the transactions contemplated by this Agreement.  Buyer (or an Affiliate thereof) has fully paid any and all commitment fees or other fees required by the Debt Commitment Letters to be paid.

(e)    Buyer acknowledges and agrees that notwithstanding anything to the contrary in this Agreement, the consummation of the Financing shall not be a condition to the obligation of Buyer to consummate the transactions contemplated hereby.

**Section 3.06**.  ***Finder's Fee***.  Buyer and its Affiliates have not incurred or become liable for any broker's commission or finder's fee which would be payable by any Seller or any of its Affiliates relating to or in connection with the transactions contemplated by this Agreement.

## ARTICLE 4
### COVENANTS OF SELLERS

Each Seller hereby agrees that:

**Section 4.01**.  ***Conduct of Business***.  Except (i) as set forth on Schedule 4.01, (ii) as expressly permitted in this Section 4.01, (iii) as required by Law, (iv) as required by any Order of the Bankruptcy Court (*provided*, Sellers shall (a) not seek any Order of the Bankruptcy Court requiring them to refrain

from taking any action described in Section 4.01(a) or compelling them to take any action described in Section 4.01(b), and (b) use their reasonable best efforts to oppose any motion or other request seeking such an Order of the Bankruptcy Court) or, following the Petition Date, as reasonably necessary in order for the Sellers to comply with their duties under the Bankruptcy Code, (v) as contemplated by the terms of any Transaction Agreements, or (vi) as otherwise consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed), between the date of this Agreement and the Closing Date:

(a)    Sellers shall use their reasonable best efforts (taking into account the commencement of the Bankruptcy Cases, the anticipated shut-down of operations of the Business at the Excluded Properties and other changes, facts and circumstances that customarily result from the events leading up to and following the commencement of bankruptcy proceedings) to:

(i) operate the Business at the Acquired Properties in the ordinary course consistent with past practice and to comply in all material respects with all applicable Laws with respect to the Business;

(ii) preserve the business operations, organization and goodwill associated with the Business at the Acquired Properties and present business relationships (contractual or otherwise) with customers, suppliers, resellers, employees, licensors, distributors and others having material business relationships with Sellers with respect to the Business at the Acquired Properties;

(iii) keep available the services of its current officers, directors, employees and consultants that are anticipated to provide services to the Business after the Closing;

(iv) preserve in all material respects the Acquired Properties and the tangible and intangible Acquired Assets related thereto, ordinary wear and tear excepted, subject to sales of inventory or obsolete assets in the ordinary course of business;

(v) comply in all material respects with the Assumed Contracts;

(vi) replenish inventory at the Acquired Properties in the ordinary course of business; and

(vii) maintain existing material Licenses and Permits applicable to the Business at the Acquired Properties and the Acquired Assets;

(b)    Sellers shall not:

39

(i) reject pursuant to Section 365 of Bankruptcy Code any Assumed Contract or Assumed Lease;

(ii) grant a participation or security interest in, mortgage, pledge or otherwise encumber or subject to an Encumbrance (other than a Permitted Encumbrance) any material Acquired Asset;

(iii) sell, lease, license (as licensor), assign, dispose of or transfer any material tangible or intangible property or contract right that is an Acquired Asset, other than sales of inventory or obsolete assets in the ordinary course of business consistent with past practice or pursuant to the Bidding Procedures Order;

(iv) materially amend, modify, terminate or cancel, or waive any of their material rights under, any contract right that is embodied in any Assumed Lease or any Material Contract, other than in the ordinary course of business;

(v) remove any inventory from an Acquired Property except in the ordinary course of business;

(vi) acquire for the Business (by merger, consolidation, or acquisition of stock or assets, inbound license or otherwise) any interest in any corporation, partnership, or other business organization or division thereof or other material assets or properties outside of the ordinary course of business;

(vii) incur any Indebtedness or assume, guarantee or endorse the obligations of any Person, in each case, other than (i) in the ordinary course of business or (ii) Indebtedness or assumptions, guarantees or endorsements of obligations of any Person that do not constitute Assumed Liabilities;

(viii) waive, release, assign, settle or compromise any material rights or claims that constitute Acquired Assets, or any material litigation or arbitration that constitute Acquired Assets, except in each case in the ordinary course of business;

(ix) enter into any Assumed Contract which materially restricts the ability of the Business to engage in any business in any geographic area or channel of distribution;

(x) engage any Business Employee other than in the ordinary course of business;

40

(xi) enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization with respect to any employee;

(xii) make loans or advances to, guarantees for the benefit of, or any investments in, any Person other than (i) in the ordinary course of business or (ii) to the extent such loans, advances, guarantees or investments do not constitute Acquired Assets or Assumed Liabilities, as the case may be;

(xiii) forgive any loans to directors, officers, employees or any of their respective affiliates, other than (i) in the ordinary course of business or (ii) to the extent such loans do not constitute Acquired Assets;

(xiv) make any material change in accounting policies, practices, principles, methods or procedures applicable to the Acquired Assets or the Assumed Liabilities, other than as required by the Accounting Principles or by a Governmental Authority;

(xv) make, change or revoke any Tax election, file any amended Tax Return, or enter into any agreement with respect to Taxes, in each case to the extent such action would adversely affect the Acquired Assets or the Business, or subject Buyer or any of its Affiliates to any Tax liability, after the Closing Date;

(xvi) cancel insurance policies or replacement or revised provisions providing insurance coverage with respect to the Acquired Assets as are currently in effect;

(xvii) enter into any agreement or transaction with any Related Party that constitutes an Assumed Contract or gives rise to an Assumed Liability, except in the ordinary course of business;

(xviii) cancel or devalue any loyalty program points in any material respect, other than in the ordinary course of business;

(xix) purposefully delete or destroy any material portion of its customer data that would otherwise constitute an Acquired Asset; or

(xx) agree or commit to any of the foregoing.

**Section 4.02**.  ***Consents***.  From the date of this Agreement until the Closing, Sellers shall use commercially reasonable efforts to obtain all authorizations, consents and approvals of, give all notices and make all filings to be obtained, given or made in connection with the transactions contemplated by

41

the Transaction Agreements to, (a) all third parties as required under Section 2.02(b)(ii) and 2.02(b)(iii) and (b) all other third parties reasonably requested by the Buyer; *provided* that Sellers shall not be required to pay any consideration or grant any accommodation to any such third party in connection with giving any such third party consents.  For the avoidance of doubt, the parties acknowledge and agree that obtaining any such authorizations, consents and approvals, giving such notices and making such filings shall not be a condition to Closing.

Section 4.03.  *Litigation Support*.  After the Closing, in the event that, and for so long as, Buyer is actively contesting or defending against any charge, audit, complaint, action, suit, proceeding, hearing, investigation, grievance, arbitration, claim, or demand (other than any such matter opposing Buyer and any Seller or its Affiliates) in connection with (a) any transaction contemplated by the Transaction Agreements or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Business and/or any Acquired Assets, Sellers will, and will instruct their Representatives to, reasonably cooperate with Buyer and its counsel in the contest or defense, make available their personnel, and provide such testimony and, to the extent reasonably practicable and permitted by applicable Law, access to their books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of Buyer (unless Buyer is entitled to indemnification therefor under the provisions of this Agreement).

Section 4.04.  *Assistance to Buyer.*  From the date of this Agreement until the Closing, Sellers shall, and shall instruct their employees, counsel, accountants, financial advisors and other representatives to, reasonably consult with Buyer (and its Affiliates, counsel, financial advisors, auditors, employees, agents and other representatives) in connection with planning by Buyer with respect to customers, products, pricing, distribution, suppliers and any other matters related to the post-Closing operation of the Business.

Section 4.05.  *Title Insurance Matters*.  In order to facilitate the timely delivery of commitments for title insurance policies for the Acquired Owned Properties and Ground Leases on the Closing Date, Sellers hereby agree to use their commercially reasonable efforts to co-operate with Buyer and the title insurers, at Buyer's sole cost and expense and without requiring Sellers to indemnify the title insurer, in order to facilitate the timely issuance of commitments for the Title Insurance Policies on the Closing Date by: (a) providing information that the title insurer may require that is in any Seller's possession and (b) having a knowledgeable officer(s) of Sellers executing and delivering a customary and reasonable owner's affidavit to the title insurer (in form and substance reasonably satisfactory to Sellers) whereby said officer confirms (without personal liability) to the title insurer: (i) the nature of any work of improvement that has been done to the relevant Acquired Owned Property

42

within the relevant mechanics lien period (provided, however, except as otherwise specifically provided in this Agreement, Sellers shall not be liable to Buyer or the title insurer for any mechanics or materialmens liens arising therefrom); (ii) that, except as set forth on a schedule thereto, there are no unpaid bills for material or labor arising out of any such improvements period (provided, however, except as otherwise specifically provided in this Agreement, Sellers shall not be liable to Buyer or the title insurer for any mechanics or materialmens liens arising therefrom); and (iii) that Sellers have no knowledge of any liens, judgments, taxes or other monetary encumbrances (except for Permitted Encumbrances) which are liens on the Acquired Owned Property.

Section 4.06. *Monthly Financial Statements*.  As soon as reasonably practicable, but in no event later than 20 calendar days after the end of each calendar month during the period from the date of this Agreement to the Closing, Sellers shall provide Buyer with (i) unaudited monthly financial statements and (ii) operating or management reports (such reports to be in the form prepared by Sellers in the ordinary course of business) of Sellers for such preceding month.

Section 4.07. *Notices*.  From the date of this Agreement until the Closing, Sellers shall promptly notify Buyer in writing after becoming aware of all events, circumstances, facts and occurrences arising subsequent to the date of this Agreement which are reasonably likely to result in any of the conditions set forth in Section 6.01(a) not being capable of being satisfied prior to the Termination Date; *provided* that no disclosure by Sellers pursuant to this Section 4.07 shall be deemed to amend or supplement the Schedules, to prevent or cure any misrepresentation, breach of warranty or breach of covenant, or to affect the rights of Buyer under Section 8.03.

Section 4.08. *Card Program Transition*.  Seller and Buyer will take the measures described in Exhibit N to facilitate the smooth transition of the Card Program.

Section 4.09. *March Air Force Base*.  As soon as reasonably practicable, Sellers shall use commercially reasonable efforts to locate and provide to Buyer evidence, if any, that the Acquired Properties  that are within the March Air Force Base site are benefitted by covenants made by the United States as recorded in the original grant deeds from the United States for those Acquired Properties, and that at the Closing Date those same covenants will benefit the Acquired Properties that are within the March Air Force Base site.

## ARTICLE 5
### COVENANTS OF BUYER

Buyer hereby agrees that:

**Section 5.01**. *Confidentiality*. The terms of the Confidentiality Agreement shall continue in full force and effect until the Closing, at which time Buyer's obligations under the Confidentiality Agreement shall terminate only in respect of that portion of the items in the Confidentiality Agreement relating to the Acquired Assets. Except as set forth in the foregoing sentence, the provisions of the Confidentiality Agreement shall continue in full force and effect after the Closing and will survive any termination of this Agreement.

**Section 5.02**. *Conduct of Buyer*. Except (i) as set forth on Schedule 5.02, (ii) as required by Law, (iii) as contemplated by the terms of any Transaction Agreement, or (iv) as otherwise consented to in writing by Sellers (such consent not to be unreasonably withheld, conditioned or delayed), Buyer shall not, between the date of this Agreement and the Closing Date:

(a) amend its articles of incorporation or bylaws;

(b) (i) split, combine or reclassify any shares of its capital stock, (ii) declare, set aside or pay any dividend or other distribution (whether in cash, stock, property or other securities or any combination thereof), or otherwise make any payments to its stockholders in their capacity as such, or (iii) redeem, repurchase or otherwise acquire or retire or offer to redeem, repurchase, or otherwise acquire or retire, directly or indirectly, any Buyer Securities;

(c) (i) except pursuant to the Equity Financing, on the terms set forth in Schedule 0, issue, deliver, pledge or sell any shares of Buyer Securities or any rights (either preemptive or other rights and including restricted shares, performance units, contingent value rights, "phantom" stock or similar securities or rights) that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock or equity or voting securities of Buyer; or (ii) amend, waive or otherwise modify any term of any Buyer Security;

(d) knowingly take any action that would reasonably be expected to prevent, impede or materially delay the consummation of the transactions contemplated hereby; or

(e) agree or commit to any of the foregoing.

**Section 5.03**. *Litigation Support*. After the Closing, in the event that, and for so long as, any Seller is actively contesting or defending against any charge,

44

audit, complaint, action, suit, proceeding, hearing, investigation, grievance, arbitration, claim, or demand (other than any such matter opposing such Seller and Buyer or its Affiliates) in connection with (a) any transaction contemplated by the Transaction Agreements or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Business and/or any Excluded Assets, Buyer will, and will instruct their Representatives to, reasonably cooperate with such Seller and its counsel in the contest or defense, make available their personnel, and provide such testimony and, to the extent reasonably practicable and permitted by applicable Law, access to their books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of such Seller (unless Seller is entitled to indemnification therefor under the provisions of this Agreement).

Section 5.04. *Notices*.  From the date of this Agreement until the Closing, Buyer shall promptly notify Sellers in writing after becoming aware of all events, circumstances, facts and occurrences arising subsequent to the date of this Agreement which are reasonably likely to result in any of the conditions set forth in Section 6.02(a) not being capable of being satisfied prior to the Termination Date; *provided* that no disclosure by Buyer pursuant to this Section 5.04 shall be deemed to amend or supplement the Schedules, to prevent or cure any misrepresentation, breach of warranty or breach of covenant, or to affect the rights of any Seller under Section 8.03.

# ARTICLE 6
## CONDITIONS

Section 6.01. *Conditions to the Obligations of Buyer*.  The obligation of Buyer to consummate the Closing is subject to the fulfillment (or waiver by Buyer, to the extent permitted by applicable Law) of the following conditions:

(a)    *Representations; Warranties; Covenants*.  Each of the representations and warranties of Sellers contained in this Agreement shall be true and correct (disregarding any materiality and "Material Adverse Effect" qualifiers therein) at the signing of this Agreement and at and as of the Closing as though made at and as of such time, other than representations and warranties that speak as of another specified date or time (which need only be true and correct as of such date and time), in each case, with only such exceptions that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Sellers shall have performed in all material respects all of their material obligations hereunder required to be performed by them on or prior to the Closing Date.  Sellers shall have delivered to Buyer a certificate, dated

45

as of the Closing Date, executed on behalf of each Seller by an authorized executive officer thereof, certifying that the conditions specified above have been fulfilled.

(b)   ***Regulatory Approvals***.  All waiting periods (and extensions thereof) under the HSR Act shall have expired or terminated early.

(c)   ***Bankruptcy Court Orders***.  The Approval Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been stayed, modified, amended, reversed or vacated.

(d)   ***No Injunction; Absence of Certain Litigation***.  No Law or preliminary or permanent injunction issued by any court of competent jurisdiction restraining or prohibiting the transactions contemplated hereby shall have taken effect after the date hereof and shall still be in effect.

(e)   ***Campus Note Proceeds***.  The lender under the Campus Note shall have funded, or shall fund concurrently with the Closing, the principal amount of the Campus Note in accordance therewith.

(f)   ***Absence of Certain Material Adverse Effects***.  Since the date of this Agreement, there shall have been no change, event or development involving any casualty loss, destruction of life or property or other catastrophic event, any wrongful conduct or any governmental action that has had or would reasonably be expected to have a Material Adverse Effect.

(g)   ***Closing Deliverables***.  Sellers shall be ready, willing and able to deliver the items required to be delivered by Sellers at the Closing pursuant to 1.07(a), and the applicable Affiliate of Sellers shall deliver duly executed copies of the Campus Note, the Securityholders Agreement, the IP Assignment Agreement and the Transition Services Agreement.

(h)   ***Termination of Related Party Agreements***.  Sellers shall have delivered, or caused to be delivered, to Buyer, written evidence, in form and substance reasonably satisfactory to Buyer, evidencing the termination of each Contract with Related Parties listed on Schedule 2.19 that would (if not so terminated) have been an Assumed Contract, and Sellers shall have provided written confirmation thereof to Buyer.

**Section 6.02**.  ***Conditions to Obligations of Sellers***.  The obligation of Sellers to consummate the Closing is subject to the fulfillment (or waiver by Sellers, to the extent permitted by applicable Law) of the following conditions:

(a)   ***Representations; Warranties; Covenants***.  Each of the representations and warranties of Buyer contained in this Agreement shall be true

46

and correct (disregarding any materiality qualifiers therein) at the signing of this Agreement and at and as of the Closing as though made at and as of such time, other than representations and warranties that speak as of another specified date or time (which need only be true and correct as of such date and time), in each case, with only such exceptions that have not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.  Buyer shall have performed in all material respects all of its material obligations hereunder required to be performed by it on or prior to the Closing Date.  Buyer shall have delivered to Sellers a certificate, dated as of the Closing Date, executed by an authorized executive officer of Buyer, certifying that the conditions specified above have been fulfilled.

(b)    *Regulatory Approvals*.  All filings required to be made under the HSR Act shall have been made and any applicable waiting period thereunder shall have expired or been terminated.

(c)    *Bankruptcy Court Approval*.  The Approval Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been stayed.

(d)    *Financings*.  Buyer shall have received, or shall receive concurrently with the Closing, the proceeds of the Financings from the sources thereof.

(e)    *No Injunction; Absence of Certain Litigation*.  No Law or preliminary or permanent injunction issued by any court of competent jurisdiction restraining or prohibiting the transactions contemplated hereby shall have taken effect after the date hereof and shall still be in effect.

(f)    *Closing Deliverables*.  Buyer shall be ready, willing and able to deliver the items required to be delivered by Sellers at the Closing pursuant to Section 1.07(b) hereto.

**Section 6.03**.  *Frustration of Conditions*.  Neither Buyer nor Sellers may rely, either as a basis for not consummating the Closing or for terminating this Agreement, on the failure of any condition set forth in Section 6.01 (in the case of Buyer) or Section 6.02 (in the case of Sellers) to be satisfied if such failure was caused by such party's breach of any provision of this Agreement or failure to use the standard of efforts required under this Agreement from such party to consummate the transactions contemplated hereby.

47

## ARTICLE 7
### TERMINATION OF AGREEMENT

**Section 7.01**.  *Termination*.  At any time prior to the Closing, this Agreement may be terminated as follows:

 (a) by mutual written consent of Buyer and Sellers;

 (b) by Buyer, *provided* that Buyer is not then in breach of any of its representations, warranties, covenants or agreements contained in this Agreement in a manner that would cause the condition set forth in Section 6.02(a) not to be satisfied:

  (i)  if any Seller is in breach of any of its representations and warranties or fails to perform any of its covenants or agreements contained in this Agreement and such breach, individually or combined with any other such breach, would cause the condition set forth in Section 6.01(a) not to be satisfied and shall remain uncured for a period of thirty (30) days after Buyer shall have given written notice of such breach to Sellers;

  (ii)  if Sellers have not commenced the Bankruptcy Cases on or before October 10, 2013; or

  (iii)  if (a) the Bankruptcy Court has not entered the Bidding Procedures Order within 30 days after the Petition Date or the first date thereafter available on the calendar of the Bankruptcy Court in the event the Bankruptcy Court's calendar does not accommodate such deadline or (b) at any time later than the date set forth in Section 7.01(b)(iii) but before the condition in Section 6.01(c) is satisfied, the Bidding Procedures Order is stayed, modified, amended, reversed, vacated or otherwise no longer in full force and effect;

 (c) by Sellers, *provided* that no Seller is then in breach of any of its representations, warranties, covenants or agreements contained in this Agreement in a manner that would cause the condition set forth in Section 6.01(a) not to be satisfied:

  (i)  if Buyer is in breach of any of its representations and warranties or fails to perform any of its covenants or agreements contained in this Agreement (other than the obligations of Buyer to consummate the Closing, which is the subject of Section 7.01(c)(ii)) and such breach, individually or combined with any other such breach, would cause the condition set forth in Section 6.02(a) not to be satisfied and shall remain uncured for a period of thirty (30) days after Sellers shall have given written notice of such breach to Buyer; or

48

(ii) if all of the conditions set forth in Section 6.01 have been satisfied (other than those conditions that by their nature can only be satisfied at the Closing), Sellers have given written notice to Buyer that they are prepared to consummate the Closing and Buyer fails to consummate the Closing within five (5) Business Days after the date that the Closing should have occurred pursuant to Section 1.04;

(d)    by Buyer or Sellers (provided the party exercising its right to terminate this Agreement is not then in breach of any of its representations, warranties, covenants or agreements contained in this Agreement in a manner that would cause the condition set forth in Section 6.02(a) (if the terminating party is Buyer) or Section 6.01(a) (if the terminating party is a Seller) not to be satisfied), if:

(i) the Bankruptcy Court has not entered the Approval Order on or before 90 days after the Petition Date or the first date thereafter available on the calendar of the Bankruptcy Court in the event the Bankruptcy Court's calendar does not accommodate such deadline;

(ii) the Bankruptcy Court enters an order approving an Alternative Transaction;

(iii) consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction; or

(iv) the Closing has not occurred on or before December 31, 2013 (the "**Termination Date**"); *provided* that if (i) the Petition Date shall not have occurred on or prior to October 4, 2013 and (ii) Buyer's commitments for the Financing then remain in effect, the Termination Date may, upon 14 days prior notice, be extended by Buyer to January 15, 2014; *provided further* that the right to terminate this Agreement pursuant to this Section 7.01(d)(iv) shall not be available to any party whose breach of any provision of this Agreement results in the failure of the Closing to be consummated on or before the Termination Date; or

(e)    automatically, upon the consummation of an Alternative Transaction.

The party desiring to terminate this Agreement pursuant to Section 7.01(b), 7.01(c) or 7.01(d) shall give written notice of such termination to the other party.  The Bidding Procedures Order shall provide that Buyer may give notice of termination to the Sellers pursuant to this Section 7.01 without the need for further approval of or notice to the Bankruptcy Court, and that delivery of

49

such notice shall not constitute a violation of the stay arising under Section 362 of the Bankruptcy Code.

### Section 7.02. *Effect of Termination*.

(a)      ***Effect of Termination***.  If this Agreement is terminated as permitted by Section 7.01, this Agreement shall become null and void and of no further force and effect, except for the following provisions, which shall remain in full force and effect: Sections 5.01, 7.02, 9.05(d) (last two sentences only), 9.06(a) (last sentence only) and Article 10; *provided* that if such termination shall result from any willful breach by any party, such party shall be fully liable for any and all liabilities and damages incurred or suffered by the other party as a result of such willful breach.  Except as expressly provided in Sections 7.02(b) and 7.02(c), nothing in this Section 7.02 shall be deemed to release any party from any liability for any such failure or impair the right of any party to compel specific performance by any other party of its obligations under this Agreement prior to such termination to the extent permitted by Section 10.15.

(b)      ***Break-Up Fee***.  Notwithstanding Section 7.02(a), if (i) this Agreement is terminated pursuant to Section 7.01(d)(ii) or Section 7.01(e) and (ii) at the time of such termination, Buyer is not then in breach of any of its representations, warranties, covenants or agreements contained in this Agreement in a manner that would cause the condition set forth in Section 6.02(a) not to be satisfied, then Sellers shall pay the Break-Up Fee to Buyer by wire transfer of immediately available funds concurrently with the consummation of the applicable Alternative Transaction.  The parties hereto acknowledge and agree that, subject only to Sellers' obligation to pay the Expense Reimbursement Amount pursuant to Section 7.02(c) and Tesco PLC's obligation to pay or cause to be paid the Parent Topping Fee (as defined in the Support Agreement) pursuant to the Support Agreement, upon any termination of this Agreement under circumstances where the Break-Up Fee is payable by Sellers pursuant to this Section and such amount is paid in full, Buyer shall be precluded from any other remedy against Sellers, at law or in equity or otherwise, and Buyer shall not seek to obtain any recovery, judgment, or damages of any kind, including consequential, indirect, or punitive damages, against Sellers or any of their respective directors, officers, employees, partners, managers, members, shareholders or Affiliates or any of their respective Representatives in connection with this Agreement or the transactions contemplated hereby.  In no event shall Sellers be required to pay more than one Break-Up Fee pursuant to this Agreement.

(c)      ***Expense Reimbursement Amount***.  Notwithstanding Section 7.02(a), if this Agreement is terminated other than pursuant to Section 7.01(a) or 7.01(c), then Sellers shall pay the Expense Reimbursement Amount to Buyer by wire transfer of immediately available funds (i) within three (3) Business Days

50

following such termination of this Agreement, if this Agreement is terminated pursuant to Section 7.01(b), 7.01(d)(i), 7.01(d)(iii) or 7.01(d)(iv) (without limitation of prejudice to any other right or remedy Buyer may have arising out of any breach of this Agreement by Sellers), or (ii) concurrently with the consummation of any Alternative Transaction, if this Agreement is terminated pursuant to Section 7.01(d)(ii) or Section 7.01(e).

(d)    ***Administrative Claims***.  The Bidding Procedures Order shall provide that Sellers' obligations to pay the Break-Up Fee and the Expense Reimbursement Amount shall be super-priority administrative expense priority obligations under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 502(b) and 507(b) of the Bankruptcy Code.

## ARTICLE 8
### TERMINATION OF WARRANTIES; AS IS TRANSACTION, INDEMNIFICATION

**Section 8.01**.  ***Termination of Representations and Warranties***.  All representations and warranties in this Agreement shall terminate upon and shall not survive the Closing.  After the Closing, except for instances of actual fraud or knowing and intentional misrepresentation, no party will have any liability for, and no party will have any right to make a claim or seek damages with respect to, any breach of any representation or warranty contained in this Agreement.

**Section 8.02**.  ***No Other Representations and Warranties; As Is Transaction***.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE 2, SELLERS HAVE NOT MADE AND HEREBY EXPRESSLY DISCLAIM, AND BUYER HEREBY EXPRESSLY WAIVES, ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, AT COMMON LAW OR OTHERWISE, EXPRESS OR IMPLIED, CONCERNING SELLERS, THE BUSINESS, THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EXCEPT FOR ACTUAL FRAUD OR KNOWING AND INTENTIONAL MISREPRESENTATION, BUYER HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST SELLERS AND THEIR AFFILIATES AND EACH OF THEIR REPRESENTATIVES IN CONNECTION WITH THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER OR ITS REPRESENTATIVES BY OR ON BEHALF OF SELLERS OR ANY OF THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES IN CONNECTION THEREWITH.

51

Section 8.03. *Indemnification*. (a) *Buyer Indemnity*. Effective at and after the Closing, Buyer hereby indemnifies each Seller and its Affiliates against and agrees to hold each of them harmless from any and all damage, loss and expense (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding whether involving a third party claim or a claim solely between the parties hereto) ("**Damages**") suffered by a Seller or any of its Affiliates arising out of or related to the Assumed Liabilities.

(b)    *Sellers Indemnity*. Effective at and after the Closing, Sellers, jointly and severally, hereby indemnify Buyer and its Affiliates against and agrees to hold each of them harmless from any and all Damages suffered by Buyer or any of its Affiliates arising out of or related to the Excluded Liabilities. For a period of three years following the Closing (the "**Warrant Retention Period**"), the Purchase Price Warrant shall remain in the estates created in the Bankruptcy Cases, shall not be distributed, pledged or transferred in any way to or for the benefit of any creditors or other parties in interest and shall constitute a source of payment or other satisfaction exclusively for any claims described in this Section 8.03(b) that Buyer and its Affiliates may have against Sellers without the need for Buyer and its Affiliates to file a proof of claim. In the event the Bankruptcy Cases is closed, dismissed or converted to one under chapter 7 of the Bankruptcy Code before the expiration of the Warrant Retention Period, any order closing, dismissing or converting the Bankruptcy Case, as applicable, shall preserve (a) the respective rights of Buyer and its Affiliates to obtain payment or satisfaction of any claims described in this Section 8.03 and (b) shall preserve Buyer and its Affiliates' respective exclusive rights to obtain payment or other satisfaction of such against the Purchase Price Warrant as if the Bankruptcy Case had not been closed, dismissed or converted, in each case without the need to file a proof of claim. The provisions of this Section 8.03(b) shall be expressly incorporated in and made a part of the Approval Order and any order confirming any plan in the Bankruptcy Cases.

(c)    *Third Party Claims*. (i) The party seeking indemnification under Section 8.03 (the "**Indemnified Party**") agrees to give prompt notice in writing to the party against whom indemnity is to be sought (the "**Indemnifying Party**") of the assertion of any claim or the commencement of any suit, action or proceeding by any third party (a "**Third Party Claim**") in respect of which indemnity may be sought under this Section. Such notice shall set forth in reasonable detail such Third Party Claim and the basis for indemnification (taking into account the information then available to the Indemnified Party). The failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent such failure shall have materially and adversely prejudiced the Indemnifying Party.

52

(ii)  The Indemnifying Party shall be entitled to participate in the defense of any Third Party Claim and, subject to the limitations set forth in this Section 8.03(c), shall be entitled to control and appoint lead counsel for such defense, in each case at its own expense.  If the Indemnifying Party shall assume the control of the defense of any Third Party Claim in accordance with the provisions of this Section 8.03(c), (x) the Indemnifying Party shall obtain the prior written consent of the Indemnified Party before entering into any settlement of such Third Party Claim if such settlement does not expressly unconditionally release the Indemnified Party and its Affiliates from all liabilities and obligations with respect to such Third Party Claim or if such settlement imposes injunctive or other equitable relief against the Indemnified Party or any of its Affiliates and (y) the Indemnified Party shall be entitled to participate in the defense of any Third Party Claim and to employ separate counsel of its choice for such purpose.  The fees and expenses of such separate counsel shall be paid by the Indemnified Party.

(iii)  The Indemnifying Party shall not have the right to control and appoint lead counsel for such defense, and shall pay the fees and expenses of counsel retained by the Indemnified Party, to the extent (but only to the extent) that the Third Party Claim which the Indemnifying Party seeks to assume control (I) seeks non-monetary relief, (II) involves criminal or quasi-criminal allegations or (III) involves a claim that the Indemnifying Party is failing to vigorously prosecute or defend; *provided* that the consent of the Indemnifying Party shall still be required for any settlement of such claim.

(iv)  Each party shall cooperate, and cause their respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

(d)  ***Direct Claims***.  In the event an Indemnified Party has a claim for indemnity under Section 8.03 against an Indemnifying Party that does not involve a Third Party Claim, the Indemnified Party agrees to give prompt notice in writing of such claim to the Indemnifying Party.  Such notice shall set forth in reasonable detail such claim and the basis for indemnification (taking into account the information then available to the Indemnified Party).  The failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent such failure shall have materially and adversely prejudiced the Indemnifying Party.  If the Indemnifying Party does not notify the Indemnified Party within thirty (30) days following the receipt of a notice with respect to any such claim that the Indemnifying Party disputes its indemnity

53

obligation to the Indemnified Party for any Damages with respect to such claim, such Damages shall be conclusively deemed a liability of the Indemnifying Party and the Indemnifying Party shall promptly pay to the Indemnified Party any and all Damages arising out of such claim.  If the Indemnifying Party has timely disputed its indemnity obligation for any Damages with respect to such claim, the parties shall proceed in good faith to negotiate a resolution of such dispute and, if not resolved through negotiations, such dispute shall be resolved by litigation in an appropriate court of jurisdiction determined pursuant to Section 10.02.

(e)    *Amount of Damages*.  The amount of any Damages payable under Section 8.03 by the Indemnifying Party shall be net of any tax benefits actually realized by the Indemnified Party with respect to such Damage or any amounts recovered by the Indemnified Party under applicable insurance policies or from any other Person alleged to be responsible therefor.  If the Indemnified Party receives any tax benefits with respect to the Damages or amounts under applicable insurance policies, or from any other Person alleged to be responsible for any Damages, subsequent to an indemnification payment by the Indemnifying Party, then such Indemnified Party shall promptly reimburse the Indemnifying Party for any payment made or expense incurred by the Indemnifying Party in connection with providing such indemnification payment up to the amount received by the Indemnified Party, net of any expenses incurred by such Indemnified Party in collecting such amount.

(f)    *Tax Treatment*. Any indemnification payment pursuant to this Article 8 shall be treated for all Tax purposes as a purchase price adjustment, unless otherwise required by applicable law.

## ARTICLE 9
### ADDITIONAL COVENANTS AND AGREEMENTS

**Section 9.01**.  *Reasonable Best Efforts; Consents to Assignment*. (a) Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable, including the prompt preparation and filing of all forms, registrations and notices required to be filed to consummate the transactions contemplated by this Agreement and the taking of such commercially reasonable actions as are necessary to obtain any requisite approvals, consents, orders, exemptions or waivers by any Governmental Authority or any other Person, including filings pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**") and any actions necessary to cause the expiration of the notice periods under the HSR Act. Each party shall promptly consult with the others with respect to, provide any

54

necessary information with respect to, and provide the other parties (or their counsel) copies of, all filings made by such party with any Governmental Authority or any other Person or any other information supplied by such party to a Governmental Authority or any other Person in connection with this Agreement and the transactions contemplated by this Agreement.  Buyer and Sellers shall make all filings under the HSR Act as promptly as practicable, and no later than 10 Business Days, following the date hereof.

(b)     Each party hereto shall promptly inform the others of any communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement and promptly provide the others with copies of all related correspondence or filings.  If any party or Affiliate thereof receives a request for additional information or documentary material from any such Governmental Authority with respect to the transactions contemplated by this Agreement, then such party will endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other party, an appropriate response in compliance with such request.  Each party hereto shall provide any necessary information and reasonable assistance as the others may request in connection with its preparation of any additional necessary filings or submissions to any Governmental Authority, including any additional filings necessary under the HSR Act.

(c)     Neither Sellers nor Buyer will independently participate in any meeting with any Governmental Authority (other than the Bankruptcy Court or the Office of the United States Trustee) in respect of any findings or inquiry in connection with the transactions contemplated by this Agreement and the other Transaction Agreements without giving, in the case of Sellers, Buyer, and in the case of Buyer, Sellers, prior notice of the meeting and, to the extent reasonably practicable and not prohibited by the applicable Governmental Authority, the opportunity to attend and/or participate in such meeting.

(d)     Each party hereto shall use its commercially reasonable efforts to resolve objections, if any, as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement, including under the HSR Act.  In connection therewith, if any administrative or judicial action or proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as violative of the HSR Act, each of the parties hereto shall cooperate and use its commercially reasonable efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, unless Sellers and Buyer shall agree in writing that litigation is not in their respective best interests.

(e)    At Closing, pursuant to Section 365 of the Bankruptcy Code and the Approval Order, Sellers shall assume and assign to Buyer, the Assumed Contracts and Assumed Leases.  To the extent cure costs relating to the Assumed Leases and Assumed Contracts are included in the Closing Statement as a short-term liability, then Buyer shall pay such cure costs.  Sellers shall serve on all non-Seller counterparties to all Contracts and Leases set forth on Schedules 1.01(a)(ii)(A), 1.01(a)(ii)(B) and 1.01(a)(iii) a notice stating that Sellers are or may (as applicable) be seeking the assumption and assignment of such Contracts and Leases, and shall notify such non-Seller counterparties of the deadline for objecting to the cure costs relating to such Leases and Contracts, if any, which deadline shall be not less than three (3) Business Days prior to the Sale Hearing (as defined in the Bidding Procedures Order).

Section 9.02.  *Submission for Bankruptcy Court Approval*.  As promptly as practicable, but in no event later than two (2) Business Days after the filing date of the Bankruptcy Cases, Sellers shall file with the Bankruptcy Court a motion seeking (a) entry of the Bidding Procedures Order and authorizing the observance and performance of the terms of Section 7.02(b) and Section 7.02(c) and the Bidding Procedures Order by Sellers and Buyer and (b) the Approval Order, including the approval of this Agreement and the sale of the Acquired Assets to Buyer on the terms and conditions hereof if determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order.  Sellers shall deliver to Buyer prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for Buyer and its counsel to review and comment, a draft of such motion, and such motion when filed by Sellers with the Bankruptcy Court shall be reasonably acceptable to Buyer.

Section 9.03.  *Non-Solicitation of Competing Bid.*.  From the date hereof until the date the Bankruptcy Court enters the Bidding Procedures Order, Sellers shall not, and shall cause their Representatives and Affiliates not to, directly or indirectly, (a) initiate contact with, pursue, knowingly facilitate, solicit or encourage submission of, or discuss, negotiate or assist with, any inquiries, proposals or offers by any Person (other than Buyer and its Affiliates, agents and Representatives) with respect to a Competing Bid or (b) provide any Person (other than Buyer and its Affiliates, agents and Representatives) with access to the books, records, operating data, contracts, documents or other information in connection with any Competing Bid; *provided* that the foregoing shall not require Sellers to withhold from any Person access to the electronic data room containing information regarding the Business, the Acquired Assets and the Assumed Liabilities following entry of the Bidding Procedures Order.  Each Seller shall, and shall cause the officers, directors, employees, Representatives, agents, investment bankers and Affiliates of Sellers to, (a) immediately cease and cause to be terminated any and all contacts, discussions and negotiations with any Person other than Buyer and its Affiliates and Representatives regarding the

56

foregoing; (b) promptly notify Buyer if any Competing Bid, or any inquiry or contact with any Person with respect thereto which has been made as of the date of this Agreement or is subsequently made, and the details of such contact (including the identity of the third party or third parties and copies of any proposals and the specific terms and conditions discussed or proposed); and (c) keep Buyer fully informed with respect to the status of the foregoing.  Sellers agree not to, without the prior consent of Buyer, release any Person from, or waive any provision of, any standstill agreement or confidentiality agreement to which any Seller is a party.

Section 9.04. ***Bankruptcy Process***.  (a) Sellers and Buyer acknowledge and agree that this Agreement, the sale of the Acquired Assets and the other transactions contemplated by this Agreement are subject to higher or otherwise better bids (in accordance with the Bidding Procedures) and Bankruptcy Court approval.  Buyer and Sellers acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best offer for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers' business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an auction (the "**Auction**").

(b)      The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order, which shall be substantially in the form attached hereto as Exhibit K and with such modifications or supplements reasonably satisfactory to Buyer.  Buyer agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as entered by the Bankruptcy Court to the extent such order is substantially in the form attached hereto as Exhibit K and with such modifications or supplements reasonably satisfactory to Buyer.  Buyer agrees and acknowledges that (i) following the Bankruptcy Court's entry into the Bidding Procedures Order, Sellers and their Affiliates shall be permitted, and shall be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Buyer and its Affiliates, agents and Representatives), so long as the Board of Directors of any Seller in good faith believes that any such inquiry, proposal or offer constitutes, or is reasonably likely to lead to, a Competing Bid that, if consummated, would be reasonably likely to maximize the value of Sellers' estates, taking into account any delay, additional risks (including closing risks) and added costs of pursuing such alternative inquiry, proposal or offer; and (ii) the bidding procedures contained in the Bidding Procedures Order may be supplemented by other customary procedures not inconsistent with the matters

57

otherwise set forth therein and the terms of this Agreement and reasonably satisfactory to Buyer.  Following entry of the Bidding Procedures Order, Sellers shall be permitted to inform prospective bidders that the lender under the Campus Note may provide debt financing in connection with any Competing Bid on the terms set forth in the Campus Note (or on other terms no less favorable to such lender and Sellers), and Sellers shall be permitted to facilitate discussions between prospective bidders and such lender with respect to such financing.  In connection with the actions permitted pursuant to this (iii), Sellers may supply information relating to the Business and the Acquired Assets to prospective bidders.  In the event that Sellers, their Affiliates or Representatives provide or make available to any prospective bidders any non-public information not previously provided or made available to Buyer and its agents and Representatives, or non-public information in a form not previously provided or made available to Buyer and its agents and Representatives, Sellers shall, in each case, promptly post all such non-public information to Sellers' online data room.  Notwithstanding anything herein to the contrary, neither Sellers nor their Affiliates or Representatives shall disclose to any third person any work product of Buyer or any Affiliate of Buyer, including without limitation any business plan of Buyer.

(c)    Buyer shall provide adequate evidence and assurance under the Bankruptcy Code of the future performance by Buyer of each Assumed Contract and each Assumed Lease.  Buyer shall, and shall cause its Affiliates to, reasonably promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Representatives available to testify before the Bankruptcy Court.  Subject to the other terms and conditions of this Agreement, Buyer shall, from and after the Closing Date, (i) assume all liabilities and obligations of Sellers under the Assumed Contracts and the Assumed Leases and (ii) satisfy and perform all of the liabilities and obligations related to each of the Assumed Contracts and the Assumed Leases when the same are due thereunder.

(d)    If this Agreement and the sale of the Acquired Assets to Buyer on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, Buyer and Sellers agree to use reasonable efforts to cause the Bankruptcy Court to enter an order approving such sale substantially in the form attached hereto as Exhibit I with such changes or modifications as may be requested by Buyer or Sellers that are consented to in writing by the other party, with such consent not to be unreasonably withheld, conditioned or delayed (the "**Approval Order**").

(e)    Sellers covenant and agree that if the Approval Order is entered, the terms of any plan submitted by Sellers to the Bankruptcy Court for confirmation

58

shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement including any transaction that is contemplated by or approved pursuant to the Approval Order.

(f)     If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed or petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto, Sellers agree to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Buyer agrees to cooperate in such efforts and each party hereto agrees to use its reasonable efforts to obtain an expedited resolution of such appeal; *provided* that the absence of an appeal of the Approval Order shall not be a condition to any party's obligation to consummate the transactions contemplated hereby at the Closing.

(g)     For the avoidance of doubt, nothing in this Agreement shall restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets or from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

**Section 9.05**.  *Financing*.  (a) Buyer shall use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange and obtain the Financing on the terms and conditions described in or contemplated by the Debt Commitment Letters, including commercially reasonable efforts to (i) maintain in effect the Debt Commitment Letters, (ii) satisfy on a timely basis all conditions to obtaining the Financing, (iii) enter into definitive agreements with respect to each Debt Commitment Letter on terms and conditions contained in such Debt Commitment Letter (or terms and conditions no less favorable, in the aggregate, to Buyer than the terms and conditions in such Debt Commitment Letter), (iv) in the event that all conditions in a Debt Commitment Letter have been satisfied, consummate the Financing thereunder at or prior to Closing, and (v) enforce its rights under the Debt Commitment Letters (including by taking enforcement actions against the applicable lenders and other Persons providing the Financing).  In addition, from and after the date hereof, Buyer shall not agree to any amendment or modification to be made to, or any waiver of any provision or remedy, under the Debt Commitment Letters without the prior written consent of Sellers if such amendments, modifications or waivers could reasonably be expected to (w) reduce the aggregate amount of the Financing, (x) impose new or additional conditions to the receipt of the Financing, (y) prevent or materially delay the consummation of the transactions contemplated by this Agreement or (z) adversely impact the ability of Buyer to enforce its rights against the other parties to the Debt Commitment Letters.

59

(b)    If funds in the amounts set forth in the Debt Commitment Letters, or any portion thereof, become unavailable, or it becomes reasonably likely that such funds will be unavailable to Buyer on the terms and conditions set forth therein, Buyer shall, and shall cause its Affiliates, as promptly as practicable following the occurrence of such event to (i) notify Sellers in writing thereof, (ii) use commercially reasonable efforts to obtain substitute financing (on terms and conditions that are not materially less favorable to Buyer than the terms and conditions as set forth in the Debt Commitment Letters) sufficient to enable Buyer to consummate the transactions contemplated by this Agreement in accordance with the terms hereof (the "**Substitute Financing**") and (iii) use commercially reasonable efforts to obtain new financing commitment letter(s) that provide for such Substitute Financing and, promptly after execution thereof, deliver to Sellers true, complete and correct copies of the new commitment letter(s) and fee letter(s) (in a redacted form removing only the fee information, but which fee information does not relate to the amounts or conditionality of, or contain any conditions precedent to, the funding of the Financing or the Substitute Financing) and related definitive financing documents with respect to such Substitute Financing.  Upon obtaining any commitment for any such Substitute Financing, such financing shall be deemed to be a part of the "Financing" and any commitment letter for such Substitute Financing shall be deemed a "Debt Commitment Letter" for all purposes of this Agreement.

(c)    Buyer shall give Sellers prompt notice:  (i) of any breach or default (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach or default) by any party to any Debt Commitment Letter or definitive document related to the Financing; (ii) of the receipt of any written notice or other written communication from any party to any Debt Commitment Letter or any definitive document related to the Financing with respect to any actual or threatened breach, default, withdrawal, termination or repudiation by any party to any Debt Commitment Letter or any definitive document related to the Financing or any provisions of the Debt Commitment Letter or any definitive document related to the Financing; (iii) of any material written dispute or disagreement between or among Buyer and any of the other parties to the Debt Commitment Letters or any definitive document related to the Financing; (iv) of any amendment or modification of, or waiver under, the Debt Commitment Letters or any related fee letters and (v) if Buyer becomes aware that it will not be able to timely obtain all or any portion of the Financing on the terms, in the manner or from the sources contemplated by the Debt Commitment Letters or the definitive documents related to the Financing. As soon as reasonably practicable, after the date Sellers make a written request therefor, Buyer shall provide confirmation as to whether notice is required pursuant to clauses (i), (ii), (iii), (iv) or (v) of the immediately preceding sentence. Buyer shall keep Sellers informed on a reasonably current basis in reasonable detail of the status of its efforts to arrange the Financing (or Substitute Financing

obtained in accordance with Section 9.05(b)) and provide to Sellers copies of all documents related to the Financing (or Substitute Financing obtained in accordance with Section 9.05(b)), other than any ancillary agreements subject to confidentiality agreements (except to the extent such agreements relate to the amounts or conditionality of, or contain any conditions precedent to, the funding of the Financing (or Substitute Financing obtained in accordance with Section 9.05(b)).

(d)      Prior to the Closing, Sellers shall, at Buyer's sole expense, use their commercially reasonable efforts to cooperate, and to cause their respective officers, employees and Representatives to cooperate, with Buyer's efforts to consummate the Financing as may reasonably be requested by Buyer, including the following: (i) using commercially reasonable efforts to cause Sellers' senior officers and other Representatives to participate in customary meetings, presentations, road shows, due diligence sessions (including accounting due diligence sessions), drafting sessions and sessions with rating agencies; (ii) assisting with the preparation of appropriate and customary materials for rating agency presentations, offering documents, bank information memoranda (including the delivery of customary representation letters) and similar documents reasonably required in connection with the Financing; (iii) assisting with the preparation of any pledge and security documents, any loan agreement, currency or interest hedging agreement, other definitive financing documents on terms satisfactory to Buyer, or other certificates, legal opinions or documents as may be reasonably requested by Buyer; (iv) facilitating the pledging of collateral; (v) furnishing to Buyer and its financing sources, as promptly as reasonably practicable, such financial and other pertinent information regarding Sellers as may be reasonably requested by Buyer, including all financial statements and other financial data required by the Debt Commitment Letters; (vi) providing monthly financial statements to the extent Sellers customarily prepare such financial statements within the time such statements are customarily prepared; (vii) using commercially reasonable efforts to obtain such accountant's comfort letters, legal opinions, surveys and title insurance as reasonably requested by Buyer or its financing sources in connection with the Financing; (viii) using commercially reasonable efforts to instruct its independent accountants to cooperate with and assist Buyer in preparing customary and appropriate information packages and offering materials as the parties to the Debt Commitment Letters may reasonably request for use in connection with the Financing (including in connection with the offering or syndication of debt securities, loan participations and other matters contemplated by the Debt Commitment Letters); and (ix) taking such corporate or entity actions, subject to the occurrence of the Closing, reasonably requested by Buyer to permit the consummation of the Financing and to permit the proceeds thereof to be made available at the Closing; *provided* that (A) nothing in this Agreement shall require any such cooperation to the extent that it would (1) require any Seller to waive or

61

amend any terms of this Agreement or agree to pay any commitment or other fees or reimburse any expenses or give any indemnities or otherwise commit to take any similar action, (2) unreasonably interfere with the ongoing business or operations of any Seller or the Business, (3) require any Seller to take any action that will conflict with or violate either Seller's organizational documents or any applicable Law or result in the contravention of, or that would reasonably be expected to result in a violation or breach of, or default under, any Contract to which any Seller is a party, (4) require any Seller to enter into or approve any financing or purchase agreement for the Financing or (5) result in any officer or director of any Seller incurring any personal liability with respect to any matters relating to the Financing and (B) the parties agree that the preparation of documents (including offer documents in connection with the Financing) and provision of information with respect to the prospects and plans for the Business in connection with the Financing remain the sole responsibility of Buyer and no Seller shall have any liability or incur any losses, damages or penalties with respect thereto or be required to provide any information or make any presentations with respect to capital structure, the incurrence of the Financing or other *pro forma* information relating thereto or the manner in which Buyer intends to operate, or cause to be operated, the Business after the Closing.  Buyer shall reimburse Sellers or cause Sellers to be reimbursed for all reasonable and documented out-of-pocket costs and expenses (including the reasonable attorneys' fees of outside counsel) incurred by any Seller or any of its Subsidiaries in connection with the actions and cooperation pursuant to this Section 9.05 and shall indemnify and hold harmless Sellers and their respective Affiliates and Representatives from and against any and all Damages suffered or incurred by them in connection with the arrangement of the Financing (including any action taken in accordance with this Section 9.05) and any information utilized in connection therewith (other than historical information relating to any Seller or other information furnished by any Seller).  All non-public information regarding any Seller provided to Buyer and its Affiliates pursuant to this Section 9.05(d) shall be kept confidential in accordance with the Confidentiality Agreement.

        **Section 9.06**.  *Access and Information*.  (a) Prior to the Closing Date (or any earlier date from and after the Bid Deadline when this Agreement shall be determined not to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order), Sellers shall permit Buyer and its Representatives, at Buyer's sole cost and expense and without material disruption to the Business, to have full access, during regular business hours and upon reasonable advance notice, to the properties, officers and employees of Sellers (and shall use their commercially reasonable efforts to cause their outside independent accountants to be available to Buyer on the same basis), and shall furnish, or cause to be furnished, to Buyer any financial and operating data, work papers and other information and documents regarding tax information, books and records, contracts and documents and other information that is available with respect to

Sellers and the Acquired Assets as Buyer shall from time to time reasonably request, in each case in furtherance of the transactions contemplated hereby.  Any and all information obtained by Buyer or its Representatives pursuant to this Section 9.06(a) shall be subject to and maintained in compliance with the Confidentiality Agreement.

(b)     From and after the Closing Date, Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets (including access to books and records) as is reasonably necessary for the filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax or for any other reasonable purpose relating to Sellers' ownership of the Acquired Assets and/or Assumed Liabilities prior to the Closing. Buyer shall not destroy or permit the destruction of any such records without first offering to provide them to Sellers.  Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Acquired Assets, the Business or the Allocation.

(c)     Sellers will, and will use commercially reasonable efforts to cause their Affiliates, to provide to Buyer the names and addresses of customer loyalty cardholders for purposes of mailing supermarket club card information to such cardholders on behalf of Sellers, to the extent permitted by applicable Law.  Such mailings shall be approved by Sellers in advance.  Buyer agrees, represents and warrants that it shall not use such transferred information for any other purpose and that it shall destroy or return to Sellers all such information upon the posting of the last permitted mailing.

**Section 9.07**.  *Collection of Accounts Receivable*.  (a) As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Acquired Assets and delivered to the Acquired Properties or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable made payable or endorsed to a Seller or a Seller's order, for Buyer's own account.

(b)     As of the Closing Date, Sellers agree that any monies, checks or negotiable instruments received by any Seller after the Closing Date relating to Accounts Receivable shall be held in trust by such Seller for Buyer's benefit and account, and upon receipt by a Seller of any such payment, such Seller shall pay over to Buyer the amount of such payments without any right of set off or reimbursement.

63

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable and Sellers shall not instigate or threaten to instigate any claims or litigation in connection with such collection efforts.

**Section 9.08**.  *Employee Matters*.

(a)     ***Transferred Employees***.  Prior to the Closing Date, subject in each case to verification of eligibility for employment, Buyer shall, or shall cause one of its Affiliates to, offer employment to (i) each of the Business Employees whose principal work location is not at an Excluded Property or is not Company Headquarters (other than any Business Employees set forth on a schedule previously provided to Sellers on September 9, 2013), and (ii) such other Business Employees as Buyer may, in its sole discretion, determine, with such employment to commence immediately following the Closing. Sellers and their Affiliates shall cooperate with and use their best efforts to assist Buyer and its Affiliates in their efforts to secure the satisfactory transition of  Business Employees to Buyer. Without limiting the generality of the foregoing, Sellers and their Affiliates shall provide all relevant information in their possession necessary to the hiring and transfer of the Transferred Employees, including all relevant payroll, compensation, benefits participation and withholding tax information with respect to the Transferred Employees; *provided* that Buyer shall not have access to personnel records of any Seller the disclosure of which is prohibited by applicable Law.  Business Employees who receive offers of employment from Buyer or an Affiliate of Buyer, execute all documents required by Buyer to begin employment with Buyer and who accept employment with Buyer or its Affiliates are referred to as "**Transferred Employees**". Seller and its Affiliates shall terminate the employment of all Business Employees who agree to become Transferred Employees, effective immediately prior to the Closing, *provided, however*, that the parties intend and shall take commercially reasonable steps to ensure that the Transferred Employees have continuous employment through the Closing. The parties acknowledge and agree that the termination of employment of Transferred Employees as required by this Agreement shall not constitute a "separation from service" (within the meaning of Code Section 409A) with respect to each Transferred Employee.  Buyer agrees to provide credit to the Transferred Employees for all periods of service with Seller and their Affiliates upon commencing their employment with Buyer for  purposes of eligibility for and calculation of benefits, vacation, paid time off and participation under any Benefit Plans maintained by Buyer.  For a six-month period following the Closing, Buyer shall provide each Transferred Employee with (i) duties and responsibilities that are at least equivalent to the position held by such Transferred Employee with Seller at the time of Closing; (ii) a primary work location that is the same as or within a reasonable commuting distance from the work location at which the Transferred Employee worked at the time of Closing; (iii) a base salary or standard hourly wage rate and bonus opportunities that are no less favorable to the

64

Transferred Employees than that provided by Seller at the time of the Closing; and (iv) employee benefits (excluding equity and equity-linked compensation) that are no less favorable to Transferred Employees than under Seller's Benefit Plans in effect at the time of the Closing.  Upon request, Buyer shall be entitled to receive the names and position titles of those Business Employees whose employment is terminated by Seller prior to the Closing Date; *provided*, *however*, that Buyer shall not disclose the names of any such Business Employees to any third party (including any Business Employee not in possession of such information) prior to the Closing Date.

(b)     ***Performance of Existing Obligations***.  Sellers shall, or shall cause one or more of their Affiliates to, timely perform in full all obligations arising under the Stay Bonuses, the Employment Agreements and the Equity Plans, and Sellers and their Affiliates shall be and remain solely liable for, and shall indemnify and hold harmless Buyer and its Affiliates from, all liabilities and obligations in connection with each of the foregoing.

(c)     ***Waiver of Restrictions on Conduct***.  With respect to each Transferred Employee , (i) Sellers hereby waive and release such individual from any and all contractual, common law or other restrictions enforceable by Sellers on the employment, activities or other conduct of such individual after such individual's termination of employment with Sellers (other than any obligation not to disclose confidential information of Sellers and their clients to Persons other than Buyer and its Affiliates) and (ii) Sellers hereby waive and release, and shall cause their Affiliates to waive and release, any other employee or former employee of a Seller or its Affiliates who is employed by Buyer from any restriction on working with such Transferred Employee.

(d)     ***WARN Act***.  Sellers shall be solely liable for complying with the WARN Act and any and all comparable obligations under other applicable Laws (and for any failures to so comply), in any case, applicable to employees of any Seller or any Seller Affiliate who do not become Transferred Employees for any reason including, to the extent applicable, Business Employees who do not accept and commence employment with Buyer or any of its Affiliates.

(e)     ***Limitations***.  Buyer shall have no obligation to continue any employment or other service relationship with any Transferred Employee or other service provider.  Any employment opportunity offered by Buyer hereunder shall be "at will" and may be terminated by Buyer and/or any of its Affiliates at any time for any reason; *provided*, *however*, that for the six-month period following the Closing, to the extent that the employment of any Transferred Employee is involuntarily terminated by Buyer, Buyer shall offer to such Transferred Employee the separation pay set forth on Schedule 9.08(e).  Except as set forth in this paragraph and in subsection (a) above, nothing in this Agreement shall: (i) be deemed to prevent the right of Buyer to terminate, reassign, or promote any of the

65

Transferred Employees after Closing or to change the title, powers, duties, responsibilities, functions, locations, or other terms or conditions of employment of such Transferred Employees; or (ii) create any third-party rights in any Transferred Employees or any current or former employees or other service providers of any Seller or any Seller Affiliate (or any beneficiaries or dependents of the foregoing).  Nothing contained herein shall constitute an amendment to any Benefit Plan.

Section 9.09.  *Tax Matters*.  (a) All real property taxes, personal property taxes and similar *ad valorem* obligations levied with respect to the Acquired Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Sellers and Buyer based on the number of days of such taxable period included in the Pre-Closing Tax Period (defined below) and the number of days of such taxable period after the Closing Date (any such portion of such taxable period, the "**Post-Closing Tax Period**").  In addition, with respect to real property taxes, the apportionment of the real property taxes for the Pre-Closing Tax Period shall be based on  the assessed value of the real property during such Pre-Closing Tax Period.  Seller shall be liable for the proportionate amount of such taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such taxes that is attributable to the Post-Closing Tax Period.  For purposes of this Section, "**Pre-Closing Tax Period**" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(b)     Apportioned Obligations and Transfer Expenses described in Section 1.06 and Section 1.08 shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable Law. Notwithstanding the foregoing, in the event that (i) Buyer delivered the valuation described in Section 1.08(b) to Sellers less than ten (10) Business Days prior to the due date for any filing, report or return, or (ii) Sellers have delivered any Transfer Expense Dispute Notice and any Transfer Expense Allocation Dispute remains unresolved, then the applicable filing, report and/or return shall not be filed until the valuation described in Section 1.08(b) is final, and Buyer and Seller shall equally be responsible for any applicable interest and penalties resulting from any late filing.  The party with the primary legal obligation for the reporting and payment of any Apportioned Obligations and Transfer Expenses shall be responsible for causing the preparation and filing of applicable filings, reports and returns and the payment of such Apportioned Obligations and Transfer Expenses. The party with the primary legal obligation shall be entitled to reimbursement from the non-paying party in accordance with Section 1.06 or Section 9.09(a) as the case may be.  Upon payment of any such Apportioned Obligation or Transfer Expense, the paying party shall present a statement to the non-paying party setting

66

forth the amount of reimbursement to which the paying party is entitled under Section 1.06 or Section 9.09(a), as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.  For the avoidance of doubt, the party with the primary legal obligation may, in its sole discretion, seek reimbursement from the non-paying party prior to such party's payment of any such Apportioned Obligation or Transfer Expense.  The non-paying party shall make such reimbursement promptly but in no event later than 20 days after the presentation of such statement.

Section 9.10.  *Releases; Acknowledgements*.  (a) Notwithstanding anything to the contrary contained herein, effective upon the Closing, (i) Buyer (individually and on behalf of its Affiliates) hereby releases and forever discharges each Seller and each of its Affiliates and their respective successors and assigns and all officers, directors, partners, members, shareholders, employees, agents of each of them from any and all actual or potential claims, causes of action, proceedings, liabilities, damages, expenses and/or losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such party had, have, or may have in the future relating in any way to the Acquired Assets or the Assumed Liabilities and (ii) each Seller (individually and on behalf of its Affiliates) hereby releases and forever discharges Buyer and each of its Affiliates and their respective successors and assigns and all officers, directors, partners, members, shareholders, employees, agents of each of them from any and all actual or potential claims, causes of action, proceedings, liabilities, damages, expenses and/or losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such party had, have, or may have in the future relating in any way to the Excluded Assets or the Excluded Liabilities; *provided* that (x) nothing in this Section 9.10 shall constitute a release of any person arising from conduct of such person that is determined by a final order of a court of competent jurisdiction to have constituted an actual fraud, willful breach, knowing and intentional misrepresentation or criminal act by such person and (y) nothing in this Agreement shall be construed to release any person from any of its contractual obligations under this Agreement and the other Transaction Agreements, including its obligations in respect of the Acquired Assets, Assumed Liabilities, Excluded Assets and Excluded Liabilities, as the case may be, each of which shall remain fully effective and enforceable from and after the Closing Date.

(b)     Buyer acknowledges that Sellers are the sole Persons bound by, or liable with respect to, the obligations and liabilities of Sellers under this Agreement, and that, without limiting the obligations of Tesco PLC expressly set forth in the Support Agreement, no Affiliate of any Seller or any current or former

67

shareholder, agent, Representative, advisor or consultant of any Seller or any such Affiliate shall be bound by, or liable with respect to, any aspect of this Agreement.

(c)     Sellers acknowledge that Buyer and the Guarantor are the sole Persons bound by, or liable with respect to, the obligations and liabilities of Buyer under this Agreement, and that, other than the Guarantor, no Affiliate of Buyer or any current or former shareholder, agent, Representative, advisor or consultant of Buyer shall be bound by, or liable with respect to, any aspect of this Agreement.

**Section 9.11**.  *Additional Bankruptcy Matters*.

(a)     From and after the date of this Agreement and until the Closing Date (or any earlier date from and after the Bid Deadline when this Agreement shall be determined not to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order), to the extent reasonably practicable, Sellers shall deliver to Buyer drafts of any and all material pleadings, motions, notices, statements, applications, schedules, reports and other papers to be filed or submitted by Sellers in connection with this Agreement for Purchaser's prior review.  Sellers shall make reasonable efforts to consult and cooperate with Buyer regarding (i) any such pleadings, motions, notices, statements, applications, schedules, reports or other papers, (ii) any discovery taken in connection with the motions seeking approval of the Bidding Procedures Order or Approval Order (including, without limitation, any depositions) and (iii) any hearing relating to the Bidding Procedures Order or Approval Order, including, without limitation, the submission of any evidence, including witnesses testimony, in connection with such hearing.

(b)     Sellers acknowledge and agree, and the Approval Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estates, shall be fully released from and with respect to the Acquired Assets, which shall be transferred to Buyer free and clear of all obligations, liabilities and Encumbrances except for Assumed Liabilities and Permitted Encumbrances.

(c)     As soon as reasonably practicable following the Closing, Sellers shall discontinue the use of their current name and shall not subsequently change their name to or otherwise use or employ any name which includes the words "Fresh," "Easy," "Neighborhood Market," "F&E" or any combination thereof without the prior consent of Buyer, and Sellers shall cause the names of Sellers in the caption of the Bankruptcy Cases to be a name mutually agreed upon by Buyer and Sellers.  From and after the Closing, Sellers covenant and agree not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any

68

mark that is confusingly similar to the Intellectual Property rights utilized by Sellers in the conduct of the Business.

(d)    Sellers acknowledge and agree that they shall be liable for all PACA Claims arising in connection with the Bankruptcy Cases.

(e)    Schedules 1.01(a)(ii)(A) and 1.01(a)(ii)(B) shall be filed with the Bankruptcy Court on the date the Bankruptcy Court enters the Bidding Procedures Order.  Prior to such time, such schedules may be used by Sellers for noticing purposes in the Bankruptcy Cases.

(f)    *Retention Period*.  Sellers and their estates shall not transfer, distribute or pledge the Purchase Price Warrant or any Buyer Common Stock acquired in connection therewith, to any party prior to the date that is two years from the date of the Closing (the "**Retention Period**"), *provided, however*, that nothing herein shall prevent the Sellers from exercising their tag-along rights as provided in the Securityholders Agreement, or transferring the Purchase Price Warrant or Buyer Common Stock in connection therewith.  Regardless of any conversion, dismissal or other disposition of the Bankruptcy Cases, including confirmation of a plan in the Bankruptcy Cases, the provisions of this paragraph shall continue to apply until the end of the Retention Period and any valid claims of Buyer described in Section 8.03(b) of this Agreement arising and asserted during the Retention Period shall not be barred notwithstanding the failure to file a proof of claim in the Bankruptcy Cases.

**Section 9.12**.  *Liquor License Matters*.

(a)    To the extent permitted by applicable law, Sellers will cooperate with Buyer, at Buyer's sole cost and expense, to provide Buyer with information in Sellers' possession necessary to transfer the licenses and permits for the sale of alcoholic beverages used or held for use by Sellers in connection with the operation of the Business as of the date hereof (the "**Liquor Licenses**") or obtain issued by the California Department of Alcoholic Beverage Control, Arizona Department of Liquor Licenses and Control, and the Nevada Department of Taxation and County or municipal offices in Nevada required to obtain or maintain liquor licenses (collectively, the "**Liquor License Departments**"), to obtain temporary permits from the Liquor License Departments to continue to sell alcoholic beverages at the Acquired Properties prior to the issuance of Liquor Licenses to Buyer and to permit posting of the temporary permits and other activities reasonably required by the Liquor License Departments in connection therewith.  To the extent applicable law precludes the transfer of Liquor Licenses, Seller will cooperate with Buyer, at Buyer's sole cost and expense, to provide Buyer with information necessary, if any, to obtain liquor licenses for the Acquired Properties,  will negotiate in good faith, to the extent necessary to permit the continued sale of alcoholic beverages, the terms of any management

69

agreement necessary for Buyer to obtain a temporary or interim license or permit and will permit any posting required by the relevant Liquor License Department.

(b)     As promptly as practicable following the Petition Date, Buyer shall use it reasonable best efforts to provide all information and take all other action necessary, at its sole cost and expense, to apply for new Liquor Licenses or the transfer of the existing Liquor Licenses and to cause the issuance of temporary or interim licenses or permits, as applicable, permitting the continued sale of alcoholic beverages at the Acquired Properties following the Closing.  Buyer shall be responsible for any and all costs and fees imposed by the respective Liquor License Departments in connection with the transfer of Liquor Licenses, the issuance of new Liquor Licenses and issuance of the temporary or interim permits or licenses.  Sellers shall not be responsible for any of Buyer's costs relating to or arising out of the license transfer, applications, management agreements or issuance of new Liquor Licenses and temporary or interim licenses or permits by the Liquor License Departments. Buyer shall not file any application with any Liquor License Departments before the Petition Date.

(c)     Nothing contained in this Agreement shall be deemed to be a representation on the part of Sellers that the Liquor Licenses will transfer to Buyer, new, interim or temporary licenses or permits will be issued to Buyer or that Buyer is qualified to hold a liquor license in the State of California, State of Arizona or State of Nevada or any applicable licensing jurisdiction therein, or that Buyer's applications will be approved by the respective Liquor License Departments.  Neither the transfer of the Liquor Licenses to Buyer nor the obtaining by Buyer of new licenses or permits or temporary or interim licenses or permits as contemplated in this Section 9.12 shall be a condition to Buyer's obligation to close the transactions contemplated by this Agreement.

Section 9.13.  *Access Agreements*.  Prior to the Closing, Sellers and Buyer shall negotiate mutually acceptable terms of an agreement providing Sellers with access, for a period of at least nine months following the Closing Date, to Buyer's personnel, including the Transferred Employees, information technology systems, including email, third party service providers and books and records, and use of office space and office support for employees of Sellers, as is reasonably necessary or appropriate in connection with the administration of the Bankruptcy Case and to permit Sellers to wind-down and liquidate the Sellers' Bankruptcy estates following the Closing.

Section 9.14.  *Access to Additional Fixtures and Fittings*.  After the date hereof, Sellers shall, and shall instruct their employees and other appropriate representatives to, permit Buyer with reasonable access and provide reasonable assistance for Buyer's removal of the Additional Fixtures and Fittings pursuant to Section 1.01(a)(x), in each case to the extent reasonably practicable.

70

# ARTICLE 10
## Miscellaneous

**Section 10.01**. *Fees and Expenses*. Except as set forth in Section 7.02(b), in the last sentence of this Section 10.01 or in a separate agreement with third parties, whether or not the Closing occurs, all costs and expenses incurred in connection with this Agreement and the other Transaction Agreements and the transactions contemplated hereby and thereby shall be borne by the party incurring such costs and expenses. Notwithstanding the foregoing, the Transfer Expenses shall be borne equally by Buyer, on the hand, and Sellers, on the other hand, and the filing fees relating to filings under the HSR Act shall be borne by Buyer.

**Section 10.02**. *Governing Law; Consent to Jurisdiction*. This Agreement shall be governed, including as to validity, interpretation and effect, by, and construed in accordance with, the internal Laws of the State of Delaware applicable to agreements made and fully performed within the State of Delaware. Each of the parties hereto, for itself and its property, irrevocably submits to the exclusive jurisdiction of any state or federal courts sitting in Delaware. To the fullest extent permitted by applicable Law, each party hereto (a) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with the Transaction Agreements or the transactions contemplated hereby or thereby shall be brought only in (i) the Bankruptcy Court, if brought prior to the entry of a final decree closing the Bankruptcy Cases, and (ii) in the federal courts in the District of Delaware and the state courts of the State of Delaware (collectively, the "**Delaware Courts**"), if brought after entry of such final decree closing the Bankruptcy Cases, and shall not be brought, in each case, in any other state or federal court in the United States of America or any court in any other country, (b) agrees to submit to the exclusive jurisdiction of the Bankruptcy Court or the Delaware Courts, as applicable, pursuant to the preceding clauses (a)(i) and (ii), for purposes of all claims, actions or proceedings arising out of, or in connection with the Transaction Agreements or the transactions contemplated hereby or thereby, (c) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (d) agrees that mailing of process or other papers in connection with any such claim, action or proceeding in the manner provided in Section 10.04 hereto shall be valid and sufficient service thereof, (e) agrees that (i) this Agreement involves at least $100,000.00 and (ii) this Agreement has been entered into by the parties hereto in express reliance upon 6 Del. C. § 2708; and (f) agrees that a final judgment in any such Action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

71

**Section 10.03**.  *Waiver of Right to Trial by Jury*.  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM, ACTION OR PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE TRANSACTION AGREEMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**Section 10.04**.  *Notices*.  All notices, requests, demands, claims, consents and other communications hereunder among the parties hereto shall be in writing and shall be deemed given: (a) upon personal delivery; (b) three (3) Business Days after being mailed by certified or registered mail, postage prepaid, return receipt requested; (c) one (1) Business Day after being sent via a nationally recognized overnight courier service; or (d) upon receipt of electronic or other confirmation of transmission if sent via facsimile to the parties hereto, their successors in interest or their assignees at the following addresses and facsimile numbers, or at such other addresses or facsimile numbers as the parties may designate by written notice in accordance with this Section 10.04:

(a)    if to Buyer:

YFE Holdings, Inc.
9130 W. Sunset Blvd.
Los Angeles, CA 90069
Fax:  (310) 789-1791
Attn:  Robert P. Bermingham, Esq.

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Fax:  (213) 891-8763
Attn:  Thomas C. Sadler, Esq.
        Robert M. O'Shea, Esq.

(b)    if to Sellers:

Fresh & Easy Neighborhood Market Inc.
2120 Park Place, Suite 200
El Segundo, CA  90245
Fax:  (310) 341-1501

72

Attn:   Mary Kasper, Esq.
        James Dibbo

with a copy (which shall not constitute notice) to each of:

Tesco plc
Tesco House
Delamare Road
Cheshunt
United Kingdom
EN8 9SL
Fax:  +44(0) 1992 646 721
Attn:  Company Secretary

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York  10017
Fax:  212-701-5800
Attn:   George R. Bason, Jr.
        Donald S. Bernstein
        John H. Butler

Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Fax:  213.629.1033
Attn:   Christopher H. Patay

Jones Day
222 East 41st Street
New York, New York 10017
Fax:  (212) 755-7306
Attn:   Paul D. Leake
        Randi C. Lesnick
        Lisa G. Laukitis

Any notice given hereunder may be given on behalf of any party by his counsel or other authorized Representatives.

   **Section 10.05**.  ***Entire Agreement***.  The Transaction Agreements, including the Schedules and Exhibits hereto and thereto, the Confidentiality Agreement and that certain expense reimbursement letter agreement, dated August 8, 2013, between Opco and an Affiliate of Buyer contain the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and thereof, and supersede all previous written or oral negotiations,

73

representations, commitments, understandings and writings with respect to the
subject matter hereof and thereof.

Section 10.06. *Assignability; Binding Effect; Third Party Beneficiaries*.
This Agreement and the rights and obligations of the parties hereunder shall not
be assigned, delegated or otherwise transferred by Buyer or by Sellers; *provided*
that (i) Sellers may assign their right to receive all or any portion of the Purchase
Price Warrant to one or more Affiliates without the prior consent of Buyer,
(ii) Buyer shall have the right to assign, without such consent of Sellers but with
prior notice to Sellers, all or any portion of any Transaction Agreements
(including rights hereunder and thereunder) to any of its lenders as collateral
security (whether prior to or subsequent to the Closing) and (iii) Buyer shall have
the right to direct, without such consent of Sellers but with prior notice to Sellers,
all or any grant deeds to be delivered hereunder to Buyer to any counterparty
under the contemplated sale-leaseback transaction; *provided*, *however*, that no
such assignment or direction by Buyer shall (i) relieve Buyer of its obligations
under this Agreement or any other Transaction Agreement, (ii) enlarge, alter or
change any obligation of any other party hereto or thereto due to Buyer or its
assignees or (iii) be permitted if such assignment would reasonably be expected to
prevent, impair or delay the consummation of the transactions contemplated
hereby; *provided*, *further*, that if such assignment or direction shall cause an
increase in the Transfer Expenses related to such grant deeds, such increase in the
Transfer Expense shall be the sole liability of Buyer.  This Agreement shall be
binding upon and enforceable by, and shall inure to the benefit of, the parties
hereto and their respective successors, administrators and permitted assigns.
Nothing expressed or referred to in this Agreement will be construed to give any
Person other than the parties hereto any legal or equitable right, remedy or claim
under or with respect to this Agreement or any provision of this Agreement.

Section 10.07. *Construction*.  (a) All Article, Section, Schedule and
Exhibit references used in this Agreement are to Articles, Sections, Schedules and
Exhibits to this Agreement unless otherwise specified.  The Schedules and
Exhibits attached to this Agreement constitute a part of this Agreement and are
incorporated herein for all purposes.

(b)     If a term is defined as one part of speech (such as a noun), it shall
have a corresponding meaning when used as another part of speech (such as a
verb).  Terms defined in the singular have the corresponding meanings in the
plural, and vice versa.  Unless the context of this Agreement clearly requires
otherwise, words importing the masculine gender shall include the feminine and
neutral genders and vice versa.  The term "includes" or "including" shall mean
"including without limitation," whether or not so stated.  The words "hereof,"
"hereto," "hereby," "herein," "hereunder" and words of similar import, when used
in this Agreement, shall refer to this Agreement as a whole and not to any
particular section or article in which such words appear.  The phrase "the date of

74

this Agreement," "date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.

(c)  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(d)  The parties hereto acknowledge that each party hereto and its attorney has reviewed this Agreement and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party, or any similar rule operating against the drafter of an agreement, shall not be applicable to the construction or interpretation of this Agreement.  Any controversy over construction of this Agreement shall be decided without regard to events of authorship or negotiation.

(e)  The parties hereto intend that each representation, warranty, and covenant contained herein shall have independent significance.  If any party hereto has breached any representation, warranty, or covenant contained herein (or is otherwise entitled to indemnification) in any respect, the fact that there exists another representation, warranty, or covenant (including any indemnification provision) relating to the same subject matter (regardless of the relative levels of specificity) which such party has not breached (or is not otherwise entitled to indemnification with respect thereto) shall not detract from or mitigate the fact that such party is in breach of the first representation, warranty, or covenant (or is otherwise entitled to indemnification pursuant to a different provision).

(f)  Titles and headings to sections herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

(g)  All references to currency herein shall be to, and all payments required hereunder shall be paid in, U.S. Dollars.

(h)  All accounting terms used herein and not expressly defined herein shall have the meanings given to them under IFRS.

(i)  Where a document or other information is described as "delivered to" or "made available to" Buyer prior to the date of this Agreement, it shall be construed to mean that such document or other information was actually delivered or made available to the Buyer, including by posting to the virtual data room.

LA\3283950.15(NY) 19884/002/YUMA 363 SALE/Asset.Purchase.Agreement.docx

Section 10.08.  *Execution in Counterparts; Facsimile*.  This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement.  Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

Section 10.09.  *Amendments, Supplements, Etc*.  This Agreement may be amended or supplemented at any time by written agreement of Buyer and Sellers.

Section 10.10.  *Publicity and Disclosures*.  Neither Buyer, on the one hand, nor Sellers, on the other hand, shall issue any press release or make any public disclosure concerning this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby without obtaining the prior written approval of the other, which approval shall not be unreasonably withheld, conditioned or delayed, unless in the sole judgment of the disclosing party, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any listing authority, national securities exchange or over-the-counter market, *provided* that the party intending to make such disclosure shall use its commercially reasonable efforts to consult with the other parties with respect to the text thereof.

Section 10.11.  *Extension; Waiver*.  Any Seller party hereto may, by written notice to Buyer, and Buyer hereto may, by written notice to any Seller party hereto, (a) extend the time for performance of any of the obligations of the other party(ies) under this Agreement, (b) waive any inaccuracies in the representations or warranties of the other party(ies) contained in this Agreement, (c) waive compliance with any of the conditions or covenants by the other party(ies) contained in this Agreement or (d) waive or modify performance of any of the obligations of the other party(ies) under this Agreement.  Except as otherwise expressly provided herein, any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.  Except as provided in the first two sentences of this Section 10.11, no action taken pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representations, warranties, conditions or covenants contained in this Agreement and will not operate or be construed as a waiver of any subsequent breach, whether of a similar or dissimilar nature.

Section 10.12.  *Disclosure Schedules*.  It is expressly understood and agreed that (a) no fact or item shall be deemed to have been disclosed to Buyer unless such fact or item is listed in the Schedules, (b) the disclosure of any fact or item in any section of the Schedule shall be deemed disclosure with respect to any other Section or subsection of this Agreement or the Schedules to the extent it is reasonably apparent that such disclosure also qualifies, or is disclosure for

76

purposes of, another Section or subsection, (c) the disclosure of any matter or item in the Schedules shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, and (d) the mere inclusion of an item in the Schedules as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect.

Section 10.13.  *Severability*.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations under this Agreement of Sellers, on the one hand, and Buyer, on the other hand, will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 10.14.  *Further Assurances*.  From time to time after the Closing, without additional consideration, each party hereto will (or, if appropriate, cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by the other party(ies) to make effective the transactions contemplated by this Agreement and to provide the other parties with the intended benefits of this Agreement.  Without limiting the foregoing, upon reasonable request of Buyer, Sellers shall and shall cause their Affiliates to, as applicable, execute, acknowledge and deliver all such further assurances, deeds, assignments, consequences, powers of attorney and other instruments and paper as may be required to sell, transfer, convey, assign and deliver to Buyer all right, title and interest in, to and under the Acquired Assets. If any party to this Agreement shall, following the Closing, have in its possession any asset or right (including with respect to any Intellectual Property) which under this Agreement should have been delivered to any other party, such party shall promptly deliver such asset or right to such other party.

Section 10.15.  *Specific Performance*.  The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties hereto shall be entitled to specific performance and injunctive and other equitable relief (without the posting of any bond) to prevent breaches of this Agreement and to enforce specifically the terms hereof.

77

**Section 10.16**. ***Guarantee***. (a) Subject to the limitations below, Guarantor hereby irrevocably and unconditionally guarantees to Sellers the prompt and full discharge by Buyer of all of Buyer's covenants, agreements and obligations under this Agreement, in accordance with the terms and subject to the conditions of this Agreement, to be performed up to and including the Closing. Guarantor acknowledges and agrees that, with respect to any obligations of Buyer to pay money, such guarantee shall be a guarantee of payment and not of collection and shall not be conditioned or contingent upon the pursuit of any remedies against Buyer. If Buyer shall default in the due and punctual performance of any of its obligations hereunder to be performed up to and including the Closing, Guarantor will forthwith perform or cause to be performed such obligations and will forthwith make full payment of any amount due with respect thereto. Notwithstanding anything to the contrary herein, no obligation of Guarantor under this Agreement shall survive the Closing.

(b)    Guarantor hereby represents and warrants to each Seller as of the date hereof and as of the Closing Date that:

(i) Guarantor is a limited liability company duly formed, validly existing and in good standing under the Laws of California with all requisite company power to own or lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is conducted by it.

(ii) Guarantor has the requisite company power and authority to execute and deliver this Agreement and to carry out the transactions contemplated hereby. The execution, delivery and performance by Guarantor of this Agreement has been duly authorized by all necessary company action of Guarantor and no other action on the part of Guarantor is required in connection therewith. This Agreement constitutes, or when executed and delivered will constitute, valid and binding obligations of Guarantor enforceable in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity that restrict the availability of equitable remedies.

(iii) The execution, delivery and performance by Guarantor of this Agreement (A) does not and will not violate any provision of the organizational documents of Guarantor; (B) does not and will not violate any Law or Permit applicable to Guarantor or require Guarantor to obtain any approval, consent or waiver of, or make any filing with, any Governmental Authority which has not been obtained or made; and (C) does not result in a breach of, constitute a default under, accelerate any obligation under, or give rise to a right of termination of any Contract by

78

which Guarantor is bound, except as would not reasonably be expected to prevent, impair or materially delay the ability of Guarantor to consummate the transactions contemplated hereby.

## ARTICLE 11
### DEFINITIONS

As used herein the following terms have the following meanings:

"**Accounting Principles**" shall mean, collectively, the accounting rules, principles, methods and practices required by Sellers' ultimate parent company, Tesco PLC as reflected in the preparation of the Seller Financial Statements.

"**Affiliate**" shall mean, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.  For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Alternative Transaction**" shall mean the consummation of a sale transaction in respect of any Qualified Bid with respect to any Acquired Assets as defined in the Bidding Procedures Order.

"**Avoidance Action**" shall mean any avoidance, preference or recovery claim, action or proceeding arising under Chapter 5 of the Bankruptcy Code or under any similar state or federal law.

"**Benefit Plan**" shall mean each (i) employment, consulting, compensation, profit-sharing, thrift, savings, bonus, incentive, change in control, severance, retention, retirement, pension benefit or deferred compensation plan, program, policy, practice, contract, agreement or arrangement, (ii) Equity Plan, and (iii) fringe benefit, health, dental, vision, life, cafeteria, accident, hospitalization, insurance, disability, transportation, vacation, sabbatical, accidental death and dismemberment, workers' compensation or supplemental unemployment benefit plan, program practice, contract, agreement or arrangement, or other employee benefits or remuneration of any kind, whether written or unwritten or otherwise, funded or unfunded, including without limitation any "employee benefit plan" within the meaning of Section 3(3) of ERISA (and any trust, escrow, funding, insurance or other agreement related to any of the foregoing), whether or not such plan is subject to ERISA.

"**Bidding Procedures Order**" shall mean an order of the Bankruptcy Court (including any attachment thereto) in substantially the form of Exhibit K.

"**Break-Up Fee**" shall mean $1,500,000.00.

"**Business Day**" shall mean any day other than a Saturday, Sunday or a day on which banks in London, England, New York, New York or Los Angeles, California are authorized or obligated by Law or executive order to close.

"**Business Employee**" shall mean an employee of a Seller who provides services to such Seller in connection with the Business.

"**Buyer Common Stock**" shall mean the non-voting common stock, par value $0.0001 per share, of Buyer.

"**Campus Facility**" shall mean, collectively, that certain campus meat facility located at 15555 Meridian Parkway, Riverside, California 92518, that certain campus produce facility located at 1730 Eastridge Avenue, Riverside, California 92507, and that certain campus kitchen facility located at 14950 Innovation Drive, Riverside, CA 92518.

"**Card Program**" shall mean the program sometimes referred to as the "Friends Rewards Program" and all of its features and functionalities, including (a) the enrollment of customers in such program, (b) earning of points through qualifying purchases and other activity, (c) monitoring and tracking of points, point conversion to rewards, rewards redemption, point and rewards expiration and rewards spending, (d)  issuance, redemption and expiration of coupons, (e) reporting of points balances, (f) carrying over of points balances from year-to-year and (g) data and databases of or relating to customers and potential customers.  For the avoidance of doubt, the foregoing includes (i) all platforms of the program, including web-based, mobile device-based and all methods of communicating over such platforms, including email, SMS and other; (ii) all past, present and future versions of the program and its features and functionalities; and (iii) all Intellectual Property rights actually owned by Sellers and contract rights of Sellers in all of the foregoing, but excluding any rights of Sellers under any Excluded Contract or Intercompany Contract.

"**Cash and Cash Equivalents**" shall mean, as of any date, all cash and cash equivalents (including marketable securities and short term investments) of Sellers, determined in accordance with Exhibit O and the Accounting Principles.

"**Closing Cash**" shall mean the Cash and Cash Equivalents of the Business as of 11:59 p.m. New York time on the day prior the Closing Date.

"**Closing Severance**" means any severance, separation, termination or other payment or benefit arising in connection with a Person's cessation of employment and/or other services with any Seller or any Affiliate of any Seller, in any case, on or prior to the Closing Date.

80

"**Competing Bid**" shall mean any bid contemplating an Alternative Transaction.

"**Confidentiality Agreement**" shall mean that certain Confidentiality Agreement, dated as of January 2013, between Tesco Stores Limited and The Yucaipa Companies, LLC and Wild Oats Marketing, LLC.

"**Consent Decree**" shall mean the Final Judgment by Stipulation entered into by the People of the State of California and Opco that was lodged with the Superior Court of California for the County of San Diego on January 18, 2013 under Case No. 37-2013-00030655-CU-BT-CTL, including any subsequent amendments thereto.

"**Contract**" shall mean any mortgage, note, bond, indenture, guarantee, lease, license, sublicense, covenant, agreement, contract, trust, instrument, arrangement or other commitment or obligation, to which a Person is a party or by which a Person or its assets or properties are bound.

"**Current Assets**" shall mean, as of any date, the combined current assets of Sellers with respect to the Business (which current assets shall include only the line items, and reflect the exclusions, set forth on Exhibit L hereto under the heading "Current Assets" and no other assets), determined in accordance with the Accounting Principles.

"**Current Liabilities**" shall mean, as of any date, the combined current liabilities of Sellers with respect to the Business (which current liabilities shall include only the line items, and reflect those exclusions, set forth on Exhibit L attached hereto under the heading "Current Liabilities" and no other liabilities), determined in accordance with the Accounting Principles.

"**Distribution Center**" shall mean that certain Riverside distribution center located at 14900 Innovation Drive, Riverside, California 92513.

"**Employment Agreement**" means each of the employment agreements set forth on Schedule 11.01 hereto.

"**Encumbrance**" shall mean any encumbrance, title defect, mortgage, lien, pledge, charge, security interest, bailment (in the nature of a pledge or for purposes of security), deed of trust, the grant of a power to confess judgment, conditional sales and title retention agreement (including any lease or license in the nature thereof), claim, easement, right-of-way, option, right of first refusal or last negotiation, offer or refusal, or other similar arrangement or interest in real or personal property.

81

"**Environmental Law**" shall mean all federal, state and local laws, ordinances, rules and regulations in force during Sellers' ownership or occupancy of the Acquired Owned Properties and the Leases Premises and prior to the Closing Date, in any way relating to or regulating environmental conditions, protection of the environment or pollution or contamination of the air, soil, surface water or groundwater, and includes, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq. ("**CERCLA**"), the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., the Clean Water Act, 33 U.S.C. § 1251, et seq., the Hazardous Substance Account Act, California Health and Safety Code § 25300, et seq., the Hazardous Waste Control Law, California Health and Safety Code § 25015, et seq., and the Porter-Cologne Water Quality Control Act, California Water Code § 13000, et seq.

"**Environmental Liabilities**" shall mean any and all liabilities, obligations or commitments arising in connection with the Business (as currently or previously conducted), the Acquired Assets or any activities or operations occurring or conducted at the Acquired Owned Properties or the Leased Premises (including offsite disposal), whether accrued, contingent, absolute, determined, determinable or otherwise, which arise under or relate to any Environmental Law.

"**Equity Plan**" shall mean any stock option, stock appreciation, restricted stock, restricted stock unit, performance stock or other equity or equity-based plan, program, agreement or arrangement.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" shall mean any Person or entity under common control with a Seller and required to be aggregated therewith pursuant to Section 414(b), (c), (m) or (o) of the Code and/or Section 4001(b) of ERISA.

"**Excluded Arrangements**" means (i) each plan, program, agreement, policy or other arrangement, including without limitation any Benefit Plan, in any case, that provides for the payment of any amount or the provision of any benefit, whether paid or provided in cash, equity, other property or in-kind, in any case, (A) the vesting and/or payment of which is contingent upon or otherwise linked to (x) the consummation of the transactions contemplated by this Agreement or any other corporate transaction or (y) continued employment or other service through or following any such transaction, including without limitation, any retention, stay, transaction, change-in-control, liquidity event or other transaction-linked payment or benefit arrangement, (B) disclosed under (1) or (2) on Schedule 2.11(e) or under (3) or (4) on Schedule 2.15(a)(iii) (the items in Clauses (A) and (B), collectively, "**Stay Bonuses**") and/or (B) to any employee or other service provider of any Seller or any Affiliate of any Seller, in any case, who is

82

not a Business Employee, (ii) each Equity Plan and any and all awards, agreements and policies thereunder, (iii) each of the Employment Agreements, and (iv) all Closing Severance liabilities and obligations.

"**Expense Reimbursement Amount**" shall mean an amount, not to exceed $750,000, equal to Buyers' reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred after the date hereof by Buyer in connection with this Agreement and the transactions contemplated hereby.

"**Financing Warrant Shares**" shall mean shares of Buyer Common Stock representing 10% of Buyer's outstanding capital stock on a fully diluted basis as of the Closing, subject to dilution *pro rata* with all other holders of Buyer Common Stock and Buyer Voting Common Stock for Buyer Common Stock issued or reserved for issuance to Buyer's management or debt financing sources.

"**GAAP**" shall mean U.S. generally accepted accounting principles.

"**Governmental Authority**" shall mean any multinational, transnational, domestic or foreign federal, regional, provincial, state, municipal or local governmental, quasi-governmental, regulatory or administrative authority, branch, bureau, department, court, tribunal or agency, including any official of any of the foregoing and any political subdivision thereof.

"**Hazardous Materials**" shall mean any substance or material defined or designated as a hazardous or toxic substance, hazardous material or hazardous waste or words of similar import by any applicable Environmental Law in effect during Sellers' ownership or occupancy of the Acquired Owned Properties and the Leased Premises and prior to the Closing Date, including but not limited to petroleum and petroleum by-products.

"**IFRS**" shall mean international financial reporting standards.

"**Indebtedness**" shall mean, at any specified time with respect to any specified Person, any of the following indebtedness of such Person  (whether or not contingent and including, without limitation, any and all principal, accrued and unpaid interest, prepayment premiums or penalties, related expenses, commitment and other fees, sale or liquidity participation amounts, reimbursements, indemnities and other amounts which would be payable in connection therewith): (a) any obligations of such Person for borrowed money or in respect of loans or advances (whether or not evidenced by bonds, debentures, notes, or other similar instruments or debt securities); (b) any obligations of such Person as lessee under any lease or similar arrangement required to be recorded as a capital lease in accordance with GAAP; (c) all liabilities of such Person under or in connection with letters of credit or bankers' acceptances, performance bonds,

83

sureties or similar obligations; (d) any obligations of such Person to pay the deferred purchase price of property, goods or services other than trade payables; (e) all liabilities of such Person arising from cash/book overdrafts; (f) all liabilities of such Person under conditional sale or other title retention agreements; (g) all liabilities of such Person arising out of interest rate and currency swap arrangements and any other arrangements designed to provide protection against fluctuations in interest or currency rates; and (h) any liability or obligation of others of the type referred to in clauses (a) through (g) guaranteed by, or secured by any Encumbrance on the assets of, such Person.

"**Intellectual Property**" shall mean legally recognizable rights in trade names, business names, trademarks, trademark registrations, trademark applications, service marks, service mark registrations, service mark applications and domain names (collectively, the "**Trademarks**"), trade secrets, patents, patent applications, copyrights, copyrights registrations and applications for registration, copyrightable works and websites, mask works, publicity rights, database rights, data and other information.

"**IT Systems**" shall mean the information technology systems and components thereof (including personal computers, computer servers, point of sale equipment, assisted registers, scanning devices, printers, check-out stand equipment, communications equipment and technology, firmware and software) owned by Sellers and used, or held for use, in the Business and, in each case, all Intellectual Property rights and contract rights in all of the foregoing.

"**Knowledge**" shall mean, in the case of Sellers, the knowledge of the individuals set forth on Schedule 11.02, after reasonable inquiry, and, in the case of Buyer, the knowledge of the individuals set forth on Schedule 11.03, after reasonable inquiry.

"**License**" shall mean all covenants not to sue, licenses, sublicenses, agreements and instruments involving any Intellectual Property used in or necessary for the conduct of the Business, including (a) licenses by Sellers to any Person of any Owned IP, and (b) all licenses from any other Person to any Seller of any Intellectual Property.

"**Material Adverse Effect**" shall mean any change, event, occurrence or circumstance that, individually or in the aggregate with all other changes, events, occurrences and circumstances, results in or would reasonably be expected to result in a material adverse effect in the results of operations, financial condition, assets or liabilities of the Business, taken as a whole, except any change, event, occurrence or circumstance resulting from (a) changes in the Accounting Principles or changes in the regulatory accounting requirements applicable to any industry in which any Seller operates, except to the extent (and only to the extent) such change disproportionately affects the Business, (b) changes in the financial

84

or securities markets or general economic or political conditions in the United States or any other country or region, except to the extent (and only to the extent) such change, event or occurrence disproportionately affects the Business, (c) changes (including changes of applicable Law) or conditions generally affecting the industry in which any Seller operates, except to the extent (and only to the extent) such change, event or occurrence disproportionately affects the Business, (d) acts of war, sabotage or terrorism or natural disasters involving the United States or any other country or region, except to the extent (and only to the extent) such change, event or occurrence disproportionately affects the Business, (e) the announcement, pendency or consummation of the transactions contemplated by this Agreement (including any impact on customers, suppliers, vendors or employees), including the filing of the Bankruptcy Cases, the shut-down of operations at the Excluded Properties, the conduct of the auction process as contemplated by the Bidding Procedures, any facts, changes, circumstances or occurrences that customarily result from the events leading up to and following the commencement of bankruptcy proceedings or (f) any action taken (or omitted to be taken) as required by this Agreement or at the request, or with the consent, of Buyer.

"**Net Working Capital**" shall mean all Current Assets *minus* all Current Liabilities, in each case, as of 11:59 p.m. New York time on the day prior the Closing Date as determined using the methodology set forth on Exhibit L and determined in accordance with the Accounting Principles.

"**Order**" shall mean any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final, including any Order entered by the Bankruptcy Court in the Bankruptcy Cases.

"**PACA Claims**" shall mean all claims arising prior to the Petition Date having the benefit of the Perishable Agricultural Commodities Act, 7 USC § 499a *et seq.*

"**Permitted Encumbrances**" shall mean (a) Encumbrances for Taxes (i) not yet due and payable or (ii) that are being contested by appropriate proceedings in good faith and for which appropriate reserves have been established in accordance with GAAP, (b) statutory Encumbrances which secure payments not yet due that arise, and are customarily discharged, in the ordinary course of business, (c) Encumbrances disclosed in the Seller Financial Statements or notes thereto or securing liabilities reflected in the Seller Financial Statements or notes thereto, (d) mechanic's, materialman's, carrier's, repairer's and other similar Encumbrances arising or incurred in the ordinary course of business or that are not yet due and payable or are being contested in good faith, (e) Encumbrances arising or incurred in the ordinary course of business since February 25, 2013, (f) Encumbrances against any Acquired Assets to the extent

85

such Encumbrances will not be enforceable following the Closing by virtue of the Approval Order, and (g) the Encumbrances listed on Schedule 11.04 and (h) other Encumbrances which would not reasonably be expected to be, individually or in the aggregate, material to the Business, taken as a whole.

"**Person**" shall mean any natural person, corporation, partnership (general or limited), limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, association, Governmental Authority or other entity.

"**Petition Date**" shall mean the date on which the Bankruptcy Cases are filed by Sellers.

"**Purchase Price Shares**" shall mean shares of Buyer Common Stock representing 22.5% of Buyer's outstanding capital stock on a fully diluted basis as of the Closing, subject to dilution *pro rata* with all other holders of Buyer Common Stock and Buyer Voting Common Stock for Buyer Common Stock issued or reserved for issuance to Buyer's management or debt financing sources.

"**Qualified Bid**" shall have the meaning ascribed to it in the Bidding Procedures Order.

"**Registered**" shall mean issued, registered, renewed or the subject of a pending application.

"**Related Party**" means (a) any officer, director, stockholder or Affiliate of any Seller or (b) any entity in which any such Person in clause (a) owns a controlling interest.

"**Representatives**" shall mean, with respect to a particular Person, any director, officer, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, financial advisors and restructuring advisors.

"**Schedules**" shall mean the disclosure schedule dated the date hereof regarding this Agreement that has been provided by Sellers to Buyer.

"**Seller Financial Statements**" shall mean, collectively, (a) the unaudited consolidated balance sheets and related unaudited consolidated statements of income, and cash flow for each Seller for the quarterly period ended May 31, 2013; (b) the unaudited balance sheet and related unaudited consolidated statements of income and cash flow for each Seller for the fiscal year ended February 24, 2013; and (c) the unaudited consolidated balance sheets and related unaudited consolidated statements of income and cash flow for each Seller for the fiscal years ended February 26, 2012, February 27, 2011 and February 28, 2010.

86

"**Subsidiary**" shall mean, with respect to any Person at any time, any Person of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned or controlled by such Person.

"**Target Net Working Capital**" shall mean $36,315,000.

"**Tax**" or "**Taxes**" shall mean any and all federal, state, county, local, foreign and other taxes, assessments, duties, charges or impositions of any kind whatsoever, including franchise, income, sales, use, real property, *ad valorem*, gross receipts, value added, profits, license, minimum, alternative minimum, environmental, withholding, payroll, employment, excise, property, customs and occupation taxes, together with any interest, fine, penalty, addition to tax and other amounts imposed with respect thereto.

"**Tax Return**" shall mean any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Tesco Loans**" means shall mean any transaction whereby Tesco Plc lends money to (i) Opco pursuant to the Master Loan Agreement, between Tesco Plc and Opco, dated November 23, 2007, including the Loan Agreement, dated March 29, 2012, between Tesco Plc and Opco, or (ii) Propco pursuant to the Master Loan Agreement, between Tesco Plc and Propco, dated December 10, 2009, including the Loan Agreement, dated January 22, 2010, between Tesco Plc and Propco and the Loan Agreement, dated March 29, 2012, between Tesco Plc and Propco.

"**Transaction Agreements**" shall mean this Agreement, the Warrants, the Campus Note, the Securityholders Agreement, the Assignment and Assumption Agreement[s], the Bill[s] of Sale, the Transition Services Agreement and the IP Assignment Agreement.

"**WARN Act**" shall mean the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (1988) and any similar federal, state, local or foreign "mass layoff" or "plant closing" laws.

"**Warrants**" shall mean, collectively, the Purchase Price Warrant and the Financing Warrant.

In addition to the foregoing definitions, the following terms shall have the definitions specified in the section of the Agreement listed in the following table:

Defined Term                                                                    Section

87

Defined Term                                                                    Section

Accounts Receivable.....................................................................1.01(a)(iv)
Accrued PTO .................................................................................2.10(a)
Acquired Assets .............................................................................1.01(a)
Acquired Owned Properties............................................................1.01(a)(i)
Acquired Properties .......................................................................1.01(a)(ii)
Additional Fixtures and Fittings ....................................................1.01(a)(x)
Affiliated Group.............................................................................2.12(b)
Agreement......................................................................................Preamble
Allocation.......................................................................................1.08(a)
Apportioned Obligations.................................................................9.09(a)
Approval Order ..............................................................................9.04(d)
Assignment and Assumption Agreement[s] ...................................1.07(a)(iii)
Assumed Contracts .........................................................................1.01(a)(iii)
Assumed Leases .............................................................................1.01(a)(ii)
Assumed Liabilities .......................................................................1.02(a)
Auction...........................................................................................9.04(a)
Bankruptcy Cases...........................................................................Recitals
Bankruptcy Code............................................................................Recitals
Bankruptcy Court...........................................................................Recitals
Bill[s] of Sale ................................................................................1.07(a)(iv)
Business .........................................................................................Recitals
Buyer..............................................................................................Preamble
Buyer Preferred Stock ....................................................................3.03(a)
Buyer Securities .............................................................................3.03(b)
Buyer Voting Common Stock.........................................................3.03(a)
Campus Note...................................................................................1.07(b)(iii)
CERCLA.........................................................................................Article 11
Closing............................................................................................1.04
Closing Date....................................................................................1.04
Closing Statement ..........................................................................1.03(b)
Code ...............................................................................................1.07(a)(xv)
Damages..........................................................................................8.03(a)
Debt Commitment Letters...............................................................3.05(b)
Debt Financing................................................................................3.05(b)
Delaware Courts..............................................................................10.02
Deloitte ..........................................................................................1.05(c)
Dispute ...........................................................................................1.05(c)
Dispute Notice ...............................................................................1.05(b)
Dunnhumby.....................................................................................1.07(a)(ix)
Equity Financing.............................................................................3.05(b)
Estimated Net Working Capital .....................................................1.03(b)
Excluded Assets .............................................................................1.01(b)

LA\3283950.15(NY) 19884/002/YUMA 363 SALE/Asset.Purchase.Agreement.docx

Defined Term                                      Section

Excluded Contracts ......................................................... 1.01(b)(iii)
Excluded Leases.............................................................. 1.01(b)(ii)
Excluded Leased Premises.............................................. 1.01(b)(ii)
Excluded Liabilities ....................................................... 1.02(b)
Excluded Owned Properties............................................ 1.01(b)(i)
Excluded Properties ....................................................... 1.01(b)(ii)
Final Net Working Capital.............................................. 1.05(d)
Financing........................................................................ 3.05(b)
Financing Warrant .......................................................... 1.07(b)(iv)
Ground Leases ................................................................ 1.01(a)(ii)
Guarantor ....................................................................... Preamble
HSR Act ......................................................................... 9.01(a)
Indemnified Party........................................................... 8.03(c)
Indemnifying Party......................................................... 8.03(c)
Intercompany Contracts.................................................. 1.01(b)(iv)
IP Assignment Agreement .............................................. 1.07(a)(vi)
Law ................................................................................ 2.02(b)(ii)
Leased Premises.............................................................. 1.01(a)(ii)
Liquor License Departments........................................... 9.12(a)
Liquor Licenses.............................................................. 9.12(a)
Marketing Materials ....................................................... 1.01(a)(xix)
Material Contract ........................................................... 2.15(c)
Neutral Firm ................................................................... 1.05(c)
Non-Assignable Card Program Elements ....................... 1.01(a)(xii)
Non-Assignable Marketing Elements ............................. 1.01(a)(xix)
Off-the-Shelf Software................................................... 2.04(b)
Opco ............................................................................... Preamble
Owned IP ........................................................................ 1.01(a)(vi)
Permits ........................................................................... 2.13
Post-Closing Statement.................................................. 1.05(a)
Post-Closing Tax Period................................................. 9.09(a)
Pre-Closing Tax Period................................................... 9.09(a)
Propco ............................................................................ Preamble
Purchase Price Warrant................................................... 1.03(a)
Securityholders Agreement ............................................ 1.07(a)(ii)
Seller .............................................................................. Preamble
Seller Benefit Plan ......................................................... 2.11(a)
Sellers............................................................................. Preamble
Stay Bonuses .................................................................. Article 11
Substitute Financing....................................................... 9.05(b)
Suit ................................................................................. 2.04(e)
Support Agreement ........................................................ Recitals

89

| Defined Term | Section |
|---|---|
| Termination Date | 7.01(d)(iv) |
| Third Party Claim | 8.03(c) |
| Trademarks | Article 11 |
| Transfer Expenses | 1.06 |
| Transferred Employees | 9.08(a) |
| Transition Services Agreement | 1.07(a)(v) |
| Warrant Retention Period | 8.03(b) |

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

LA\3283950.15(NY) 19884/002/YUMA 363 SALE/Asset.Purchase.Agreement.docx

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the date first set forth above.

FRESH & EASY
NEIGHBORHOOD MARKET INC.

By: _____
    Name: Timothy R. Ashdown
    Title: CEO, Chairman & President

FRESH & EASY PROPERTY
COMPANY LLC

By: _____
    Name: Timothy R. Ashdown
    Title: CEO, Chairman & President

YFE HOLDINGS, INC.

By: _____
    Name:
    Title:

OA3, LLC

By: _____
    Name:
    Title:

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the date first set forth above.

FRESH & EASY
NEIGHBORHOOD MARKET INC.

By:_____
    Name:
    Title:


FRESH & EASY PROPERTY
COMPANY LLC


By:_____
    Name:
    Title:


YFE HOLDINGS, INC.

By:_____
    Name:  Ira Tochner
    Title:   Vice President and
          Treasurer


OA3, LLC

By:_____
    Name:   Robert P. Bermingham
    Title:    Vice President and Secretary


*[Signature Page to Asset Purchase Agreement]*