**<u>EXHIBIT A</u>**

**Engagement Letter**

September 16, 2013


James Dibbo
Chief Financial Officer
Fresh & Easy Neighborhood Market Inc.
2120 Park Place, Suite 200
El Segundo, CA 90245

Dear James:

This letter amends and restates that certain engagement letter agreement, dated as of July 24, 2013 (the "Original Agreement") between Alvarez & Marsal North America, LLC ("A&M-NA") and Fresh & Easy Neighborhood Market Inc., and its assigns and successors (the "Company"), including the scope of the services to be performed and the basis of compensation for those services. Upon execution of this letter by each of the parties below and receipt of the retainer described below, this letter will constitute an agreement between the Company, A&M-NA and Alvarez & Marsal Securities, LLC ("A&M-S"; together with A&M-NA, "A&M") (the "Agreement"). This Original Agreement shall remain effective as to the services provided by A&M-NA up to the date hereof.

1.    Description of Services

    (a)    A&M shall make available certain personnel (the "Engagement Personnel") to provide advisory services to the Company at the direction of the Company's Chief Executive Officer, in order to assist the Company in its reorganization efforts and provide the services set forth below. The Engagement Personnel shall specifically include (i) Dennis Stogsdill, who will have primary responsibility for the rendering of the Restructuring Advisory Services pursuant to this Agreement and (ii) Marc Liebman, who will have primary responsibility for the rendering of the Investment Banking Services pursuant to this Agreement.

    (b)    Restructuring Advisory Services. It is anticipated that the services of the A&M-NA Engagement Personnel shall include the following:

        (i)    perform a financial review of the Company at the direction of the Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") or other officers of the Company as directed CEO or CFO;

        (ii)    assist in the development and implementation of asset liquidation strategies;

(iii)      assist the CEO and other Company engaged professionals (including its legal counsel) in developing for the Board's review possible restructuring plans or strategic alternatives for maximizing the enterprise value of the Company;

(iv)      assist in the development and management of a cash flow forecast;

(v)      assist in the preparation for a Chapter 11 filing, including but not limited to assistance with (a) the identification of executory contracts and leases, (b) analysis of creditor claims by type, entity, and individual claim, including assistance with development of databases, as necessary, to track such claims and (c) the preparation of information and analysis necessary for the confirmation of a plan of reorganization, including information contained in the disclosure statement;

(vi)      assist with management of disposition of real estate assets, including liaising with 3rd-party service providers for the disposition of real estate assets;

(vii)      advise in connection with the development and implementation of key employee compensation and other critical employee benefit programs

(viii)      assist management team and counsel focused on the coordination of resources related to the ongoing reorganization effort; and

(ix)      perform such other services as requested by the board of the directors of the Company (the "Board"), or in cooperation with other Company personnel as authorized by the Board, CEO or CFO, and agreed to by A&M, that is not duplicative of work others are performing for the Company.

(c)      <u>Investment Banking Services</u>.  It is anticipated that the services of the A&M-S Engagement Personnel shall include the following:

(i)      assist the Company in the management and execution of a Sale Transaction[1] including preparing informational materials for

---

[1] For purposes of this agreement, the term "Sale Transaction" is defined to include (whether in one or a series of transactions) any merger, sale or other transfer, directly or indirectly and whether in one or a series of transactions, of all or a significant portion of the assets or securities of the Company or any extraordinary corporate transaction involving a change in control of the Company, regardless of the form or structure of such transaction; or any other form of disposition which results in the effective disposition of all or a substantial amount of the business, operations, or assets of the Company or any of its businesses, subsidiaries or affiliates. For the avoidance of doubt, a Sale Transaction shall include a sale under section 363 of the Bankruptcy Code or a plan of reorganization or similar transaction, including (but not limited to) if such sale results in the shareholders, creditors or other existing constituents of the Company or YFE Holdings (or Yucaipa or another entity formed for similar purposes by Yucaipa) acquiring ownership interest in the Company or its assets.

distribution to potential purchasers, identifying and soliciting interest among prospective purchasers, evaluating proposals received for prospective purchasers, assisting in negotiating the financial terms and structure of any Sale Transaction and, in any bankruptcy case that may be filed by or against the Company, provide testimony, as necessary or advisable, in connection with the foregoing.

(d)     The Engagement Personnel shall report to the CEO or other applicable officers (as directed by the Board) or legal counsel and, at the request of the Board, will make recommendations to and consult with the Board.

(e)     The Engagement Personnel will continue to be employed by A&M and, while rendering services to the Company, will continue to work with other personnel at A&M in connection with unrelated matters that will not unduly interfere with the services rendered by the Engagement Personnel pursuant to this Agreement.    With respect to the Company, however, the Engagement Personnel shall operate under the direction of the Board and A&M shall have no liability to the Company for any acts or omissions of the Engagement Personnel related to the performance or non-performance of services at the direction of the Board, CEO or CFO and consistent with the requirements of the Engagement and this Agreement.

(f)     In connection with the services to be provided hereunder, from time to time A&M may utilize the services of employees of its affiliates and subsidiaries as Engagement Personnel.  Such affiliates and subsidiaries are wholly owned by A&M's parent company and employees.

2.    Information Provided by Company and Forward Looking Statements.  The Company shall use all reasonable efforts to:  (i) provide the Engagement Personnel with access to management and other representatives of the Company; and (ii) to furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company that Engagement Personnel reasonably request in connection with the services to be provided to the Company.  The Engagement Personnel shall rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by Engagement Personnel in connection with the services performed for the Company.  The Company acknowledges and agrees that the Engagement Personnel are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein. A&M and Engagement Personnel are under no obligation to update data submitted to them or to review any other areas unless specifically requested by the Company to do so.

The Company understands that the services to be rendered by the Engagement Personnel may include the preparation of projections and other forward-looking statements, and numerous factors can affect the actual results of the Company's

operations, which may materially and adversely differ from those projections. In addition, Engagement Personnel will be relying on information provided by the Company in the preparation of those projections and other forward-looking statements.

3.    <u>Limitation of Duties</u>.  Neither A&M, nor the Engagement Personnel make any representations or guarantees that, <u>inter alia</u>, (i) an appropriate restructuring proposal, transaction or strategic alternative can be formulated for the Company, (ii) any restructuring proposal, transaction or strategic alternative presented to the Company's management or the Board will be more successful than all other possible restructuring proposals or strategic alternatives, (iii) any transaction or restructuring is the best course of action for the Company, or (iv) if formulated, that any proposed restructuring plan, transaction or strategic alternative will be accepted by any of the Company's creditors, shareholders and other constituents.  Further, neither A&M, nor the Engagement Personnel, assume any responsibility for the Company's decision to pursue, or not pursue any business strategy, or to effect, or not to effect any transaction.  The Engagement Personnel shall be responsible for implementation only of the restructuring proposal or alternative approved by the Board and only to the extent and in the manner authorized by the Board.

4.    <u>Compensation</u>.

   (a)    As compensation for Restructuring Services,

        (i)    A&M-NA will receive fees for the services of the Engagement Personnel based on the following hourly rates:

| | |
|---|---|
| Managing Directors | $675-875 |
| Directors | $475-675 |
| Analysts/Associates | $275-475 |

Such rates shall be subject to adjustment annually at such time as A&M adjusts its rates generally.

Dennis Stogsdill will serve as overall engagement leader of the Restructuring Services and for his services, A&M will invoice the Company at a fixed rate of $75,000 per month.

        (ii)    In addition, A&M-NA will be entitled to incentive compensation in the amount of $1,500,000 (the "<u>Completion Fee</u>") payable upon the consummation of a Chapter 11 plan of reorganization.

   (b)    As compensation for the Investment Banking Services,

        (i)    Monthly Fee.  A&M-S will receive a monthly fee at the rate of $150,000 per month, which fee shall be paid in advance within two business days of execution of this agreement and thereafter on or prior to each monthly anniversary of this Agreement.  A&M-S agrees to

-4-

credit its monthly fees paid against any Sale Transaction Fee based on the following parameters[2]:

(1)    No Potential Bidder(s) and no Qualified Bid(s): 100% of all monthly fees will be credited;

(2)    At least one Potential Bidder and no Qualified Bid(s): 50% of all monthly fees will be credited;

(3)    At least one Potential Bidder and at least one Qualified Bid: 0% of all monthly fees will be credited

(ii)    Sale Transaction Fee.  In addition, A&M-S will receive a transaction fee in the amount of $1,250,000; plus 5% of any Aggregate Consideration[3] above that of the initial bid of YFE Holdings (or

---

[2]    The term Potential Bidder shall mean an interested party that provides an executed confidentiality agreement, statement or factual support demonstrating bona fide interest in purchasing the Company or its assets and sufficient information demonstrating financial wherewithal.  The term Qualified Bid shall mean a Potential Bidder that provides an irrevocable offer letter, an executed purchase agreement including a purchase price and written evidence of its ability to consummate the transaction, including any associated firm commitment letter. For the avoidance of doubt YFE Holdings (or Yucaipa or another entity formed for similar purposes by Yucaipa) shall not be considered under these parameters as a Potential Bidder or a Qualified Bid.

[3]    For the purposes of this Agreement, "Aggregate Consideration" shall mean (a) the total fair market value (at the time of closing) of all consideration including, without duplication or limitation, cash, notes, securities and property, payments made in installments and contingent payments (as defined below), paid or payable, or otherwise to be distributed, directly or indirectly, to the Company, the Company's subsidiaries or affiliates or the Company's stockholders, holders of warrants and convertible securities, and holders of options or stock appreciation rights, whether or not vested, debt holders or creditors in general, including unsecured creditors; plus (b) the principal amount of all indebtedness, obligations in general and leases assumed (directly or indirectly) or repaid by the purchaser of the Company (and any of its assets, businesses, subsidiaries or affiliates), or from which the Company (or any of its businesses, subsidiaries or affiliates) is relieved of in connection with a Sale Transaction. Aggregate Consideration shall be increased to reflect the value of: (a) any of the Company's interest bearing liabilities and other obligations (including unsecured creditors) that are assumed, decreased, converted or paid off in conjunction with a Sale Transaction; (b) the value of all shares or debt or other securities of the acquired company retained by the shareholders, debt holders or creditors in general (including unsecured creditors); (c) the value of any of the Company's assets that are retained for the benefit of any of the Company's stakeholders following the consummation of a Sale Transaction; and / or (d) the value of any of the Company's assets that are sold or otherwise transferred to another party prior or subsequent to, or as part of to the consummation of a Sale Transaction, the proceeds of which are for the benefit of its stakeholders; (E) amounts payable under consulting agreements, above-market employment contracts, non-compete or severance agreements, consulting contracts or similar arrangements with any equity holder; and / or (F) insurance proceeds upon the occurrence of an insurable event that diminishes the value of the Company.  Contingent Payments shall be defined as the consideration received or receivable by the Company and/or any other parties in the form of deferred performance based payments, "earn-outs", or other contingent payments based upon the future performance of any entity comprising the Company, or any of its businesses or assets. Upon the closing of a Transaction in which less than 100% of the ownership of the equity interests are sold, the Aggregate Consideration shall be calculated as if 100% of the ownership of the equity interests of the

Yucaipa or another entity formed for similar purposes by Yucaipa) (the "Sale Transaction Fee") upon consummation of a Sale Transaction and subject to the crediting mechanism described in paragraph 4(b)(i).

(iii)    Termination Fee.  In the event that the Company elects to not go forward with a Sale Transaction or the Company (or its creditors) elect to pursue a plan of reorganization or similar transaction (that is not a Sale Transaction), A&M-S shall receive a termination fee of $500,000 plus all monthly fees earned as of the date A&M-S is notified in writing of the Company's decision (the "Termination Fee").

(c)    In addition, A&M will be reimbursed for its reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging, duplicating, messenger and telephone charges.  All fees and expenses will be billed and payable on a monthly basis or, at A&M's discretion, more frequently.

(d)    The Company has remitted to A&M a retainer in the amount of $500,000, which shall be credited against any amounts due at the termination of this engagement and returned upon the satisfaction of all obligations hereunder.

5.    Bankruptcy Court Approval.

In the event that the Company is, or becomes, a debtor under Chapter 11 of the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of (i) this Agreement, including the attached indemnification, and (ii) A&M-S's retention by the Company under the terms of this Agreement and subject to the standard of review of Section 328(a) of the Bankruptcy Code and not subject to

Company on a fully diluted basis had been sold by dividing (I) the total consideration, whether in cash, securities, notes or other forms of consideration, received or receivable by the Company and/or any other parties by (II) the percentage of ownership which is sold.  If, in the Transaction, no consideration is being paid in respect of the existing equity, Aggregate Consideration of the retained equity shall be determined by the good faith agreement of the parties as to the value of such retained equity implied by the Transaction. Fees on amounts paid into escrow will be payable upon the establishment of such escrow.  If any portion of the Aggregate Consideration is payable in the form of securities, the value of such securities, for purposes of calculating our Sale Transaction Fee, will be determined based on the average closing price for such securities for the 5 trading days prior to the closing of the Sale Transaction.  In the case of securities or other non-cash assets or consideration that does not have an existing public market, our Sale Transaction Fee will be determined based on the fair market value of such securities or other non-cash assets or consideration as mutually agreed upon in good faith by the Company and A&M-S prior to the closing of the Sale Transaction. Fees relating to contingent payments other than escrowed amounts will be calculated based on the present value of the reasonably expected maximum amount of such contingent payments as determined in good faith by the Company and A&M-S prior to the closing of the Sale Transaction, utilizing a discount rate equal to the prime rate published in The Wall Street Journal on the last business day preceding the closing of the Sale Transaction..

any other standard of review under section 330 of the Bankruptcy Code. The Company shall supply A&M-S with a draft of such application and any proposed order authorizing A&M-S's retention sufficiently in advance of the filing of such application and proposed order to enable A&M-S and its counsel to review and comment thereon. A&M-S shall have no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless A&M-S's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to A&M-S in all respects. A&M-S acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, A&M-S's fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders provided however, that, unless the Bankruptcy Court orders otherwise, A&M-S shall not be required to maintain time records. In the event that the Company becomes a debtor under the Bankruptcy Code and A&M's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of A&M's hereunder as promptly as possible in accordance with the terms of this Agreement, the order of the Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with A&M to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court. If the order authorizing the employment of A&M is not obtained, or is later reversed or set aside for any reason, A&M may terminate this Agreement, and the Company shall reimburse A&M for all fees and expenses reasonably incurred prior to the date of termination, subject to the requirements of the Bankruptcy Code, Bankruptcy Rules and applicable local rules and orders.

With respect to A&M-S's retention under sections 327 and 328 of the Bankruptcy Code, the Company acknowledges and agrees that A&M-S's restructuring expertise, as well as its capital markets knowledge, financial skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of A&M-S's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of A&M-S's services hereunder could not be measured merely by reference to the number of hours expended by A&M-S professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of A&M-S and its professionals hereunder over the term of the engagement, and in light of the fact that such commitment may foreclose other opportunities for A&M-S and that actual time and commitment required of A&M-S and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for A&M-S. In addition, given the numerous issues which A&M-S may be required to address in the performance of its services hereunder, A&M-S's commitment to the variable level of time necessary to address all such issues as they arise, and the market prices for A&M-S's services for engagements of this nature in an

out-of-court context, the Company agrees that the fee arrangements hereunder (including monthly fees and the Sale Transaction Fee) are reasonable under the standards set forth in 11 U.S.C. Section 328(a).

6.    <u>Termination</u>.

(a)    This Agreement will apply from the commencement of the services referred to in Section 1 and may be terminated upon thirty (30) days' notice by either party without cause by written notice to the other party or with immediate effect by written notice for Cause or Good Reason (as such terms are defined in 5(d) below).

(b)    A&M normally does not withdraw from an engagement unless the Company misrepresents or fails to disclose material facts, fails to pay fees or expenses, or makes it unethical or unreasonably difficult for A&M to continue performance of the engagement, or other just cause exists.

(c)    On termination of the Agreement, any fees and expenses due to A&M shall be remitted promptly (including fees and expenses that accrued prior to but are invoiced subsequent to such termination).

(d)    If the Company terminates this Agreement without "Cause" or if A&M terminates this Agreement for "Good Reason", A&M shall also be entitled to receive the Completion Fee and Sale Transaction Fee, as applicable, upon the occurrence of the event specified in Section 4(a)(ii) or 4(b)(ii), as applicable, if such event occurs within 12 months of the termination. "Cause" shall mean gross negligence, willful default or fraud by A&M; "Good Reason" shall mean the Company's misrepresentation of or failure to disclose material facts, failure to pay fees or expenses when due (or circumstances indicating to A&M that fees or expenses will not be paid when due), circumstances such that it is unethical or unreasonably difficult for A&M to continue performance of the engagement, or other just cause.

(e)    The provisions of this Agreement that give the parties rights or obligations beyond its termination shall survive and continue to bind the parties.

7.    <u>Relationship of the Parties; No Audit</u>. The parties intend that an independent contractor relationship will be created by this Agreement. Neither A&M nor any of its Engagement Personnel are considered an employee or agent of the Company and the Engagement Personnel are not entitled to any of the benefits that the Company provides for the Company employees. Company acknowledges and agrees that A&M and Engagement Personnel are not being requested to perform an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of the AICPA, SEC or other state or national professional or regulatory body.

8.    <u>No Third Party Beneficiary</u>. The Company acknowledges that all advice (written or oral) provided by A&M-NA, A&M-S and/or the Engagement Personnel to the

Company in connection with this engagement is intended solely for the benefit and use of the Company (limited to its Board management and outside legal counsel) in considering the matters to which this engagement relates. The Company agrees that no such advice shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time in any manner or for any purpose other than accomplishing the tasks referred to herein without A&M's prior approval (which shall not be unreasonably withheld), except as required by law.

9. <u>Conflicts</u>. A&M is not currently aware of any relationship that would create a conflict of interest with the Company or those parties-in-interest of which the Company has made us aware. Recently, an A&M affiliate provided due diligence advisory services to a private equity firm in connection with such firm's investigation into a potential acquisition of the Company and/or certain of its assets (the "<u>Diligence Engagement</u>"). Such engagement has ceased and will not continue during the term of this engagement. In addition, no personnel that worked on the Diligence Engagement will work on this engagement nor will the Engagement Personnel have access to the information received or produced by A&M's affiliate in connection with the Diligence Engagement. Because A&M and its affiliates and subsidiaries comprise a consulting firm (the "<u>Firm</u>") that serves clients on an international basis in numerous cases, both in and out of court, it is possible that the Firm may have rendered or will render services to, or have business associations with, other entities or people which had or have or may have relationships with the Company, including creditors of the Company. The Firm will not be prevented or restricted by virtue of providing the services under this Agreement from providing services to other entities or individuals, including entities or individuals whose interests may be in competition or conflict with the Company's, provided the Firm makes appropriate arrangements to ensure that the confidentiality of information is maintained.

10. <u>Confidentiality/Non-Solicitation</u>. A&M and Engagement Personnel shall keep as confidential all non-public information received from the Company in conjunction with this engagement, except: (i) as requested by the Company or its legal counsel; (ii) as required by legal proceedings; or (iii) as reasonably required in the performance of this engagement. All obligations as to non-disclosure shall cease as to any part of such information to the extent that such information is, or becomes, public other than as a result of a breach of this provision. The Company, on behalf of itself and its subsidiaries and affiliates and any person which may acquire all or substantially all of its assets agrees that, until two (2) years subsequent to the termination of this engagement, it will not solicit, recruit, hire or otherwise engage any employee of A&M-NA, A&M-S or any of their affiliates who worked on this engagement while employed by A&M-NA, A&M-S or their affiliates ("<u>Solicited Person</u>"). Should the Company or any of its subsidiaries or affiliates or any person who acquires all or substantially all of its assets extend an offer of employment to or otherwise engage any Solicited Person and should such offer be accepted, A&M shall be entitled to a fee from the party extending such offer equal to the Solicited Person's hourly client billing rate at the time of the offer multiplied by 4,000 hours for a Managing Director, 3,000 hours for a Senior Director and 2,000 hours for any other A&M employee. The Company acknowledges and agrees that this fee fairly represents the loss that A&M

will suffer if the Company breaches this provision. The fee shall be payable at the time of the Solicited Person's acceptance of employment or engagement.

11.     Indemnification/Limitations on Liability. The provisions in the attached "Indemnification and Limitation on Liability Agreement" (the "indemnity provisions") are incorporated herein, and the termination of this Agreement or the engagement shall not affect the indemnity provisions, which shall remain in full force and effect.

12.     Miscellaneous. This Agreement (together with the attached indemnity provisions), including, without limitation, the construction and interpretation of this Agreement and all claims, controversies and disputes arising under or relating thereto, shall be governed and construed in accordance with the laws of the State of New York, without regard to principles of conflict of law that would defer to the laws of another jurisdiction. The Company, A&M-NA and A&M-S agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the engagement or the performance or non-performance of A&M-NA and/or A&M-S hereunder. The Company, A&M-NA and A&M-S agree, to the extent permitted by applicable law, that any Federal Court sitting within the Southern District of New York shall have exclusive jurisdiction over any litigation arising out of this Agreement; to submit to the personal jurisdiction of the Courts of the United States District Court for the Southern District of New York; and to waive any and all personal rights under the law of any jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to jurisdiction or venue within the State of New York for any litigation arising in connection with this Agreement.

This Agreement shall be binding upon A&M and the Company, their respective heirs, successors, and assignees, and any heir, successor, or assignee of a substantial portion of A&M's or the Company's respective businesses and/or assets, including any Chapter 11 Trustee. This Agreement incorporates the entire understanding of the parties with respect to the subject matter hereof and may not be amended or modified except in writing executed by the Company and A&M. Notwithstanding anything herein to the contrary, A&M may reference or list the Company's name and/or logo and/or a general description of the services in A&M's marketing materials, including, without limitation, on A&M's website.

[SIGNATURE PAGE FOLLOWS]

If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

Very truly yours,

Alvarez & Marsal North America, LLC

By: _____

Dennis Stogsdill
Managing Director

Alvarez & Marsal Securities, LLC

By: _____

Marc Liebman
Managing Director

Accepted and agreed:

Fresh & Easy Neighborhood Market Inc.

By: _____

James Dibbo
Chief Financial Officer

## INDEMNIFICATION AND LIMITATION ON LIABILITY AGREEMENT

This indemnification and limitation on liability agreement is made part of an agreement, dated September [--], 2013 (which together with any renewals, modifications or extensions thereof, is herein referred to as the "Agreement") by and among Alvarez & Marsal North America, LLC ("A&M-NA"), Alvarez & Marsal Securities, LLC ("A&M-S"; together with A&M-NA, "A&M") and Fresh & Easy Neighborhood Market Inc. (the "Company"), for services to be rendered to the Company by A&M.

A.      The Company agrees to indemnify and hold harmless each of A&M-NA, A&M-S, their affiliates and their respective shareholders, members, managers, employees, agents, representatives and subcontractors (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including the reasonable costs for counsel or others (including employees of A&M or their affiliates, based on their then current hourly billing rates) in investigating, preparing or defending any action or claim, whether or not in connection with litigation in which any Indemnified Party is a party, or enforcing the Agreement (including these indemnity provisions), as and when incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Indemnified Parties' acceptance of or the performance or nonperformance of their obligations under the Agreement; provided, however, such indemnity shall not apply to any such loss, claim, damage, liability or expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence, willful misconduct or fraud. The Company also agrees that (a) no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of A&M-NA and/or A&M-S, except to the extent that any such liability for losses, claims, damages, liabilities or expenses are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence, willful misconduct or fraud and (b) in no event will any Indemnified Party have any liability to the Company for special, consequential, incidental or exemplary damages or loss (nor any lost profits, savings or business opportunity). The Company further agrees that it will not, without the prior consent of an Indemnified Party, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which such Indemnified Party seeks indemnification hereunder (whether or not such Indemnified Party is an actual party to such claim, action, suit or proceedings) unless the Company has used its reasonable best efforts to obtain, as a term to such settlement, compromise or consent, an unconditional release of such Indemnified Party from all liabilities arising out of such claim, action, suit or proceeding.

B.      These indemnification provisions shall be in addition to any liability which the Company may otherwise have to the Indemnified Parties. In the event that, at any time whether before or after termination of the engagement or the Agreement, as a result of or in connection with the Agreement or A&M-NA's and/or A&M-S's and its personnel's role under the Agreement, A&M-NA, A&M-S or any Indemnified Party is required to produce any of its personnel (including former employees) for examination, deposition or

other written, recorded or oral presentation, or A&M or any of its or its affiliates' personnel (including former employees) or any other Indemnified Party is required to produce or otherwise review, compile, submit, duplicate, search for, organize or report on any material within such Indemnified Party's possession or control pursuant to a subpoena or other legal (including administrative) process, the Company will reimburse the Indemnified Party for its reasonable out of pocket expenses, including the reasonable fees and expenses of its counsel, and will compensate the Indemnified Party for the time reasonably expended by its personnel based on such personnel's then current hourly rate.

C.    If any action, proceeding or investigation is commenced to which any Indemnified Party proposes to demand indemnification hereunder, such Indemnified Party will notify the Company with reasonable promptness; provided, however, that any failure by such Indemnified Party to notify the Company will not relieve the Company from its obligations hereunder, except to the extent that such failure shall have actually prejudiced the defense of such action. The Company shall promptly pay expenses reasonably incurred by any Indemnified Party in defending, participating in, or settling any action, proceeding or investigation in which such Indemnified Party is a party or is threatened to be made a party or otherwise is participating in by reason of the engagement under the Agreement, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Indemnified Party hereby undertakes, and the Company hereby accepts its undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor. If any such action, proceeding or investigation in which an Indemnified Party is a party is also against the Company, the Company may, in lieu of advancing the expenses of separate counsel for such Indemnified Party, provide such Indemnified Party with legal representation by the same counsel who represents the Company, provided such counsel is reasonably satisfactory to such Indemnified Party, at no cost to such Indemnified Party; provided, however, that if such counsel or counsel to the Indemnified Party shall determine that due to the existence of actual or potential conflicts of interest between such Indemnified Party and the Company such counsel is unable to represent both the Indemnified Party and the Company, then the Indemnified Party shall be entitled to use separate counsel of its own choice, and the Company shall promptly advance its reasonable expenses of such separate counsel upon submission of invoices therefor. Nothing herein shall prevent an Indemnified Party from using separate counsel of its own choice at its own expense. The Company will be liable for any settlement of any claim within the scope of the indemnification under paragraph "A" above against an Indemnified Party made with the Company's written consent, which consent shall not be unreasonably withheld.

D.    In order to provide for just and equitable contribution if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification, then the relative fault of the Company, on the one hand, and the Indemnified Parties, on the other hand, in connection with the statements, acts or omissions which resulted in the losses, claims, damages, liabilities and

costs giving rise to the indemnification claim and other relevant equitable considerations shall be considered; and further provided that in no event will the Indemnified Parties' aggregate contribution for all losses, claims, damages, liabilities and expenses with respect to which contribution is available hereunder exceed the amount of fees actually received by any of the Indemnified Parties pursuant to the Agreement. No person found liable for a fraudulent misrepresentation shall be entitled to contribution hereunder from any person who is not also found liable for such fraudulent misrepresentation.

E.      In the event the Company and A&M seek judicial approval for the assumption of the Agreement or authorization to enter into a new engagement agreement pursuant to either of which A&M-NA or A&M-S would continue to be engaged by the Company, the Company shall promptly pay expenses reasonably incurred by the Indemnified Parties, including reasonable attorneys' fees and expenses, in connection with any motion, action or claim made either in support of or in opposition to any such retention or authorization, whether in advance of or following any judicial disposition of such motion, action or claim, promptly upon submission of invoices therefor and regardless of whether such retention or authorization is approved by any court. The Company will also promptly pay the Indemnified Parties for any expenses reasonably incurred by them, including reasonable attorneys' fees and expenses, in seeking payment of all amounts owed it under the Agreement (or any new engagement agreement) whether through submission of a fee application or in any other manner, without offset, recoupment or counterclaim, whether as a secured claim, an administrative expense claim, an unsecured claim, a prepetition claim or a postpetition claim.

F.      Neither termination of the Agreement nor termination of A&M-NA's and/or A&M-S's engagement nor the filing of a petition under Chapter 7 or 11 of the United States Bankruptcy Code (nor the conversion of an existing case to one under a different chapter) shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.

G.      The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the certificate of incorporation or bylaws of the Company, any other agreements, any vote of stockholders or disinterested directors of the Company, any applicable law or otherwise.

[SIGNATURE PAGE FOLLOWS]

-14-

Fresh & Easy Neighborhood Market Inc.    Alvarez & Marsal North America, LLC

By: _____          By: _____
          James Dibbo                    Dennis Stogsdill

Alvarez & Marsal Securities, LLC

By: _____
          Marc Liebman
          Managing Director