# **EXHIBIT A**

*EXECUTION VERSION*

## AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment (this "**Amendment**") is made and entered into as of November 7, 2013 by and among YFE Holdings, Inc., a Delaware corporation ("**Buyer**"), Fresh & Easy Neighborhood Market Inc., a Delaware corporation ("**Opco**"), Fresh & Easy Property Company LLC, a Delaware limited liability company ("**Propco**"; each of Opco and Propco are sometimes referred to herein together as "**Sellers**" and individually as a "**Seller**") and OA3, LLC, a California limited liability company ("**Guarantor**").

WHEREAS, the parties hereto entered into that Asset Purchase Agreement dated as of September 10, 2013 (as amended or modified from time to time, the "**Agreement**"); and

WHEREAS, the parties wish to amend the Agreement as expressly provided herein.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, and for other good and valuable consideration, the parties, intending to be legally bound, agree as follows:

1. *Certain Defined Terms*.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

2. *Additional Fixtures and Fittings*.

(a)  Section 1.01(a)(x) of the Agreement is hereby amended by replacing the proviso in such section with the following proviso:

> *provided* that the fixtures and fittings at the Excluded Properties set forth on <u>Schedule 1.01(a)(x)</u> (collectively, the "**Excluded Fixtures and Fittings**") shall be Excluded Assets.

(b)  Section 9.14 of the Agreement is hereby amended by adding the following sentence to the end of such section:

> In addition, Sellers shall not (i) relocate any fixtures and fittings that would otherwise constitute Acquired Assets to a store location that is an Excluded Asset or Excluded Property or (ii) sell or transfer any fixtures or fittings that were at any Acquired Property or an Excluded Property as of September 19, 2013 (it being understood that all fixtures and fittings owned by the Sellers as of September 19, 2013 are Acquired Assets other than the Excluded Fixtures and Fittings); *provided* that (x) Sellers may relocate, sell or otherwise transfer the Excluded Fixtures and Fittings and (y) Sellers may remove and relocate the Additional Fixtures and Fittings from Excluded Properties to locations mutually agreed-upon by Buyer and Sellers.

3.  *Transfer to Subsidiaries of Buyer*.

(a)  Section 1.01(a) of the Agreement is hereby amended by inserting the following at the end of such subsection:

> Notwithstanding anything herein to the contrary, Buyer may, at its sole discretion, elect by written notice delivered to Sellers no less than three (3) Business Days prior to Closing to have all such Acquired Assets assigned, transferred, conveyed and delivered by Seller to Y-Opco, LLC, a Delaware limited liability company and a wholly owned subsidiary of Buyer ("**Y-Opco**"), and may further elect by like notice to have the Campus Facility, and all assets located at or associated with such facility, assigned, transferred, conveyed and delivered by Seller to Campus Opco, LLC, a Delaware limited liability company and a wholly owned subsidiary of Buyer ("**Campus Opco**"); *provided, however,* that if Buyer so elects to have the Campus Facility and such assets located at or associated with such facility transferred to Campus Opco, then prior to such transfer, Buyer shall provide Sellers with duly executed guarantees of the Campus Note reasonably satisfactory to Sellers.

(b)  Section 1.02(a) of the Agreement is hereby amended by inserting the following at the end of such subsection:

> Notwithstanding anything herein to the contrary, Buyer may, at its sole discretion, elect to have all such Acquired Liabilities assumed by Y-Opco, and may further elect to have any and all obligations and liabilities associated with the Campus Facility (including, without limitation, the Campus Note) assumed by Campus Opco.

4.  *Closing Deliverables*.  Section 1.07(b)(iii) of the Agreement is hereby amended by deleting the words "as so reduced,".

5.  *Neutral Firm*.  The first sentence of Section 1.05(c) of the Agreement is hereby amended by inserting ", or if Buyer or Sellers object to Deloitte's acting with respect to such Dispute," immediately after "if Deloitte is unwilling or unable to act".

6.  *Consulting Services Agreement*.  The first sentence of Section 2.1 of Exhibit M of the Agreement is hereby deleted and replaced with the following sentence:

> Commencing on the date of the Closing, the Company shall pay to Yucaipa a consulting fee of .25% of the Company's consolidated gross sales; *provided* that such consulting fee shall be no less than $2,500,000 for any fiscal year.  In addition, during each of the four (4) full fiscal quarters following the date of the Closing, the Company shall pay to Yucaipa $500,000 per fiscal quarter (and such amount will not be included when calculating if Yucaipa has received a fee of no less than $2,500,000 during any fiscal year).

#78158509v23

7. *Target Net Working Capital*. References to "Target Working Capital" in Section 1.03(b) of the Agreement are hereby amended to be references to "Target Net Working Capital."

8. *Representations and Warranties of Buyer*. The last sentence of Section 3.04 of the Agreement is hereby amended by inserting "other than Y-Opco and Campus Opco" at the end of such sentence.

9. *Campus Note*. In the event that Buyer elects to have the Campus Facility assigned, transferred, conveyed and delivered by Seller to Campus Opco pursuant to the amendment to Section 1.01(a) set forth above, the form of Campus Note attached as Exhibit E to this Amendment shall be substituted for the form of such note attached as Exhibit E to the Agreement.

10. *Schedules*. Schedules 1.01(a)(i) (Acquired Owned Properties), 1.01(b)(i) (Excluded Owned Properties), 1.01(a)(ii)(A) (Assumed Ground Leases), 1.01(a)(ii)(B) (Assumed Leases), 1.01(b)(ii)(A) (Excluded Ground Leases) and 1.01(b)(ii)(B) (Excluded Leases) attached to the Agreement are hereby deleted and replaced with the amended versions of such schedules attached to this Amendment.

11. *No Other Amendments*. Except as specifically set forth herein, the Agreement shall remain in full force and effect, unamended.

12. *Governing Law; Consent to Jurisdiction*. This Amendment shall be governed, including as to validity, interpretation and effect, by, and construed in accordance with, the internal Laws of the State of Delaware applicable to agreements made and fully performed within the State of Delaware. Each of the parties hereto, for itself and its property, irrevocably submits to the exclusive jurisdiction of any state or federal courts sitting in Delaware. To the fullest extent permitted by applicable Law, each party hereto (a) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with this Amendment, the Transaction Agreements or the transactions contemplated hereby or thereby shall be brought only in (i) the Bankruptcy Court, if brought prior to the entry of a final decree closing the Bankruptcy Cases, and (ii) in the Delaware Courts, if brought after entry of such final decree closing the Bankruptcy Cases, and shall not be brought, in each case, in any other state or federal court in the United States of America or any court in any other country, (b) agrees to submit to the exclusive jurisdiction of the Bankruptcy Court or the Delaware Courts, as applicable, pursuant to the preceding clauses (a)(i) and (ii), for purposes of all claims, actions or proceedings arising out of, or in connection with this Amendment or the Transaction Agreements or the transactions contemplated hereby or thereby, (c) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (d) agrees that mailing of process or other papers in connection with any such claim, action or proceeding in the manner provided in Section 10.04 of the Agreement shall be valid and sufficient service thereof, and (e) agrees that a final judgment in any such Action or Proceeding shall be conclusive and may be enforced in

other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

13. *Waiver of Jury Trial*.  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM, ACTION OR PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AMENDMENT, THE TRANSACTION AGREEMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

14. *Counterparts*.  This Amendment may be executed in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute one (1) and the same agreement.  Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF the parties hereto have caused this Amendment to be executed as of the date first set forth above.

FRESH & EASY NEIGHBORHOOD
MARKET INC.

By: _____
    Name: Mary M. Kasper
    Title: Vice President, General Counsel & Secretary

FRESH & EASY PROPERTY COMPANY
LLC

By: _____
    Name: Mary M. Kasper
    Title: Vice President, General Counsel & Secretary

YFE HOLDINGS, INC.

By: _____
    Name:
    Title:

OA3, LLC

By: _____
    Name:
    Title:

IN WITNESS WHEREOF the parties hereto have caused this Amendment to be executed as of the date first set forth above.

FRESH & EASY NEIGHBORHOOD
MARKET INC.

By:_____
    Name:
    Title:


FRESH & EASY PROPERTY COMPANY
LLC

By:_____
    Name:
    Title:


YFE HOLDINGS, INC.

By:_____
    Name:  Robert A. Bendisyton
    Title:  V.P.


OA3, LLC

By:_____
    Name:  Robert A. Bendigh
    Title:  V.P.

**Schedule 1.01(a)(x)**
Excluded Fixtures and Fittings

| Ref # | FF&E Package[1] |
|---|---|
| P8W1K5 | Partial |
| E6B3V6 | Full |
| F8G1U5 | Full |
| R2U7I9 | Partial |
| G3F6T0 | Full |
| H2E7S9 | Full |
| S4E5V5 | Partial |
| I9D0R6 | Full |
| U3R6F0[2] | Partial |
| W4T5D4 | Partial |
| W8A1Z1 | Partial |
| N9K0M9 | Full |
| Z1X8C8 | Partial |

1. Represents whether the store had the full equipment package at the time of the transfer to the landlord.
2. Originally accounted for as a fully equipped store.  However, the following equipment had been removed from the store earlier in the year:
   All ACOs; all break room equipment and cabinetry; IT equipment; refrigerated case doors; fresh meals casing dismantled for parts; shelving and racking for frozen cases and certain store shelving.

**Schedule 1.01(a)(i)**
Acquired Owned Properties

1.      Properties described in the following: Grant Deed, dated December 22, 2010, from Sycamore III, a California limited liability company, to Fresh & Easy, recorded in the real property records of the County Recorder's Office of Riverside County ("Riverside") on December 28, 2010, as Document No. 2010-0620947.

2.      Properties described in the following: Grant Deed, dated June 30, 2010, from 2 Sisters Food Group Inc., a Delaware corporation, to Fresh & Easy Property Company LLC, a Delaware limited liability company, recorded in the real property records of Riverside on July 2, 2010, as Document No. 2010-0310941.

3.      Properties described in the following: Grant Deed from LNR Riverside BCW LLC, a California limited liability company, to Tesco Stores West Inc., a Delaware corporation ("TSW"), recorded in the real property records of Riverside on July 14, 2006, as Document No. 2006-0516480.

4.      Properties described in the following: Grant Deed from LNR Riverside LLC, a California limited liability company, to TSW, recorded in the real property records of Riverside on July 14, 2006, as Document No. 2006-0516481.

5.      Properties described in the following: Grant Deed from LNR Riverside II LLC, a Delaware limited liability company, to TSW, recorded in the real property records of Riverside on July 14, 2006, as Document No. 2006-0516482.

6.      All real property and improvements owned by Sellers with respect to the stores identified below.

| Ref # |
|-------|
| H5E4S5 |
| A1L8Z8 |
| J5G4Q5 |
| P0H9K0 |
| Z4M5A1 |
| C4U5F5 |
| D5A4W5 |
| D9T0G0 |
| E3H6V0 |
| F1R8I8 |
| G4D5T4 |
| S3T6H0 |
| O4I5R5 |
| B0K9Y7 |
| B5V4E4 |
| B6K3Y3 |
| B7Y2Y7 |
| C8Z1X8 |

| |
|---|
| Q3V6J0 |
| Q4N5J4 |
| E1H8V8 |
| F0R9U0 |
| H7P2K2 |
| T7D2W2 |
| V3S6E3 |
| J7G2Q7 |
| L2A7O9 |
| Z1W8A1 |
| M0J9N0 |
| N7J2Q2 |
| O3X6L0 |
| O6I3R3 |
| Z5X4C4 |

## Schedule 1.01(b)(i)
### Excluded Owned Properties

1.      Properties described in the following: Grant Deed, dated October 28, 2009, from First American Trust, FSB, Trustee of the Arch Road Trust, Trust No. 1082-0291-00, to Fresh & Easy, recorded in the real property records of the County Recorder's Office of Sacramento County on December 18, 2009, as Document No. 2009-179301.

2.      Properties described in the following: Grant Deed, dated October 28, 2009, from First American Trust, FSB, Trustee of the Arch Road Trust, Trust No. 1082-0291-00, to Fresh & Easy, recorded in the real property records of Sacramento on December 18, 2009, as Document No. 2009-179300.

3.      All real property and improvements owned by Sellers with respect to the stores identified below.

| Ref # | Ref # |
|-------|-------|
| T1Q8G1 | W1P8D8 |
| U7R2F4 | R3F6U6 |
| U8C1X1 | R3O6I3 |
| U9R0F6 | S5T4H2 |
| V4Q5E1 | T4S5G1 |
| Y4Y5B5 | S0P9H0 |
| Y6V3B6 | V6Q3E3 |
| Z1M9A7 | L7I2O7 |
| Y8Y1B1 | V9B0Y0 |
| T0S9G7 | W0A9Z9 |
| T9D0W0 | X6O3C3 |
| K5M4P5 | Y7N2B4 |
| X5U4C5 | Z3X6C6 |
| Y6Y3B3 | S7E2H4 |
| B3Y6Y3 | V1B8Y8 |
| Q4G5T5 | V2Q7E9 |
| D0I9W7 | X8O1C5 |
| Q5V4J2 | X9Z0A0 |
| R0U9I7 | O1X8L8 |
| R8F1I5 | Y9N0B6 |
| S9T0H6 | Y4V5B4 |
| U5R4F2 | |
| W3A6D0 | |
| W4A5Z5 | |
| W6A3Z3 | |
| W7P2D4 | |
| X4O5C1 | |

| |
|---|
| Y2N8B8 |
| Y3N6B0 |
| Z0M9A7 |
| V5B4Y4 |
| V7B2Y2 |

**Schedule 1.01(a)(ii)(A)**
Assumed Ground Leases

All ground leases of real property and the leasehold estates created thereby and subleases with respect to the store sites identified below.

| Ref # |
|-------|
| G2D7T2 |
| G9Q0T9 |
| I5D4R2 |
| I8O1L1 |
| K8H1P8 |
| L0A9O7 |
| L5L4O4 |
| C2U7F7 |
| D1T8G8 |
| E7H2V4 |
| K0M9N9 |
| L3L6O6 |
| M5Z4N2 |
| O2L7L2 |
| C8U1F1 |
| D3T6G6 |
| E2S7H7 |
| S4P5H4 |
| K6H3P6 |
| B2K7Y9 |
| G6Q3J3 |
| M3Z6N0 |
| P5H4S4 |
| E0B9V0 |
| E9H0V6 |
| G4Q5J5 |
| C5J4X2 |
| D2I7W9 |
| D9A0W9 |
| G7F2T4 |
| I0F9R0 |
| I4O5L5 |
| I7O2R7 |

| Ref # |
|-------|
| J1G8Q1 |
| K2M7N7 |
| E2B7V2 |
| F7R2I2 |
| I6O3L3 |
| J6C3Q3 |
| J7N2M2 |
| M3K6N3 |
| N2J7M2 |
| O1I8L1 |
| H5P4K4 |
| L8A1O5 |
| M8K1P1 |
| I6F3R6 |
| J8C1Q5 |
| M8J1N8 |
| N0Y9M7 |
| N1K8M1 |

**Schedule 1.01(a)(ii)(B)**
Assumed Leases

1.      Lease Agreement, dated August 10, 2011, between Continental 2120 Corporation, a Delaware corporation, and Fresh & Easy Neighborhood Market Inc., a Delaware corporation ("Fresh & Easy), as amended.

2.      Standard Industrial Lease, dated April 10, 2012, between 53 Eastridge Partnership L.P., a California limited partnership, and Fresh & Easy, as amended.

3.      License Agreement dated September 8, 2007, by and between Fresh & Easy and Cornerstone US Wine Imports LLC.

4.      Residential Lease Agreement, dated January 13, 2012, by and between Legacy Partners Residential, Inc. and Babu Gurunandan.

5.      California Rental Agreement, dated January 25, 2013, by and between BRE Properties, Inc. and Tesco Fresh & Easy / Malcolm Lionel Pais and Agrawal Varsha.

6.      All leases, subleases and licenses of real property (including any and all amendments, extensions, modifications an d renewals) with respect to the store sites identified below.

| Ref # | Ref # | Ref # |
|-------|-------|-------|
| L4L5O4 | P2W7K9 | G8D1T8 |
| A0W9D9 | P3H6S6 | A4W5D5 |
| A3L6Z0 | P6W3K3 | G5F4T2 |
| A9L0Z6 | Z5W4A5 | N2Y7M9 |
| B9Y0Y9 | P7H2S2 | A2W7D7 |
| C0U9F9 | A6W3D3 | B3V6E6 |
| C3J6X0 | A6X3Z6 | B8K1Y5 |
| E0S9H9 | A7L2Z4 | C0Z9X0 |
| E1S8V1 | A8X1Z8 | D4I5W1 |
| E5H4V2 | J4C5Q1 | E6S3H3 |
| E8S1H1 | K5B4P2 | H0E9S7 |
| F3C6U3 | K6M3N3 | K4M5N5 |
| R6U3I3 | K7B2P4 | Q7V2J4 |
| H3P6K6 | A2X7Z2 | G9F0T6 |
| H6E3S3 | A5L4Z2 | H4E5S1 |
| H8E1S5 | D6I3W3 | I1D8R8 |
| K1B8P8 | F2G7U9 | I4F5R4 |
| K2H7P2 | F6G3U3 | J1N8M8 |
| K3B6P0 | G1F8T8 | J5N4M4 |
| L9I0O9 | M4J5N4 | J6N3Q6 |
| M4K5P5 | O5X4L2 | L1L8O8 |

| | | |
|---|---|---|
| M7Z2N4 | O8I1R1 | L3I6O3 |
| M9Z0N6 | P3M6K3 | L6A3O3 |
| N6Y3M3 | P4W5K1 | M0K9P9 |
| N8Y1M5 | D1A8W1 | N4Y5M1 |
| N9J0Q0 | F9R0I0 | Z6M3A3 |
| O0L9L0 | H8P1S8 | C7J2X4 |
| O2I7R7 | W5P4D2 | F0G9U7 |
| O7X2L4 | M1Z8N8 | F5R4I4 |
| O9X0L6 | N3J6Q6 | F7C2U7 |
| P0W9K7 | N5K4M5 | H9E0S9 |
| P1H8S8 | G0Q9J9 | K9B0P6 |
| P1M8K1 | | |

**Schedule 1.01(b)(ii)(A)**
Excluded Ground Leases

All ground leases of real property and the leasehold estates created thereby and subleases with respect to the store sites identified below.

| Ref # |
|-------|
| H2E7S9 |
| S7T2H4 |
| I9D0R6 |
| T2S7G9 |
| U5C4F2 |
| V0Q9E7 |
| V7S2E7 |
| W9P0D6 |
| X2O7C9 |
| X7Z2A2 |
| Y5N4B2 |
| S8E1V1 |
| T6S3G3 |
| B1V8E8 |
| Q8N1J8 |
| E6B3V6 |
| Q9V0J6 |
| R1F8U8 |
| R2U7I9 |
| Y2Y7B7 |
| B9V0E0 |
| T5Q4G5 |
| Y1N8B8 |
| H9P0K0 |
| T1D8W8 |
| V8Q1E5 |
| L9L0O0 |
| I3D6R0 |
| T6D3G3 |
| C4Z5X4 |

**Schedule 1.01(b)(ii)(B)**
Other Excluded Leases

1.      Residential Lease or Month-to-Month Rental Agreement, dated August 30, 2011, by and between the Debra Turner Living Trust UAD 2-16-06 and Ian and Karen Fletcher.

2.      Residential Lease or Month-to-Month Rental Agreement, dated January 1, 2010, by and between Raju Chhabria and Philomina Chhabria, and Matt Edmonds and Justine Edmonds.

3.      Lease, dated October 30, 2012, by and between Paul and Lana Lee and Fresh & Easy / Matt Westlake and Bemis Coops.

4.      Residential Lease or Month-to-Month Rental Agreement, dated January 5, 2011, by and between Liam Thornton and Matthew and Katie Price.

5.      Residential Lease or Month-to-Month Rental Agreement, dated January 23, 2013, by and between Mehdi Kosrow-Pour and Fresh & Easy.

6.      Agreement to Rent or Lease, dated March 5, 2012, by and between Newsen Tsang and Paul Keaney.

7.      Residential Lease or Month-to-Month Rental Agreement, dated February 21, 2012, between John and Hillary Thomas and Fresh & Easy.

8.      All leases, subleases and licenses of real property (including any and all amendments, extensions, modifications and renewals) with respect to the store sites identified below.

| Ref # | Ref # |
| --- | --- |
| F4G5U1 | U6C3X3 |
| G3F6T0 | W3P6D0 |
| S4E5V5 | W4T5D4 |
| L4A5O1 | U6R3F6 |
| X0O9C7 | P7M2K7 |
| X1O7C9 | Q2N7J2 |
| I7D2R4 | D8I1W5 |
| U3R6F0 | J3N6M6 |
| W2T7D2 | X3U6C3 |
| Z8M1A5 | R5F4U4 |
| Q0G9T9 | H3E6S3 |
| Q2G7T7 | S1T8H8 |
| F8G1U5 | J2C7Q9 |
| R8U1I5 | U2R7F2 |
| S0E9V9 | X3Z6A6 |
| S2E7V7 | Y0V9B0 |

| | |
|---|---|
| T8S1G5 | D7T2G2 |
| U0C9X9 | F1C8U1 |
| U1R8F8 | I2O7L7 |
| U2C7X7 | W8T1D8 |
| P8W1K5 | N9K0M9 |
| B4K5Y1 | O6L3L6 |
| R9F0U0 | Z1X8C8 |
| W8A1Z1 | Z2M7A9 |
| X9U0C9 | J0C9Q7 |
| Q1V8J8 | T3D6W6 |
| C1J8X8 | V4B5E1 |
| C9J0X6 | X5Z4A4 |
| Q6G3T3 | Z7X2C2 |
| Q9G0J6 | Z7W2A7 |
| R4U5I1 | |
| R9O0I9 | |
| G8Q1J1 | |

**EXHIBIT E**

Form of Campus Note

See attached.

EXHIBIT E

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT WITH RESPECT TO THE SECURITY, FILED AND MADE EFFECTIVE UNDER THE SECURITIES ACT OF 1933 AND SUCH APPLICABLE STATE SECURITIES LAWS, OR UNLESS MAKER RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO MAKER TO THE EFFECT THAT REGISTRATION UNDER SUCH ACT AND SUCH APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

## SECURED PROMISSORY NOTE

$_____                                                                      [  ], 2013

FOR VALUE RECEIVED, CAMPUS OPCO, LLC, a Delaware limited liability company (the "**Maker**"), hereby promises to pay in accordance with the terms hereof to TESCO CORPORATE TREASURY SERVICES PLC, a public limited company organized under the laws of England and Wales (together with its assigns, the "**Holder**") at such place as the Holder may designate in writing from time to time, in lawful money of the United States of America and in immediately available funds, the principal amount of [_____] (US$[_____]) (the "**Principal Amount**"), together with interest thereon calculated from the date hereof in accordance with the terms of this Promissory Note (as amended, modified and supplemented from time to time, this "**Note**").[1]

1.    <u>Commitment and Advances</u>.

(a)    Subject to Section 1(b), on the date hereof the Holder shall make available to the Maker a loan in an aggregate amount equal to the Principal Amount (the "**Loan**"). Any advance hereunder may not be re-borrowed once it is repaid.

(b)    As conditions to the disbursement of the Loan under this Note on the date hereof (the "**Closing Date**"), (i) the Maker shall, at least three business days prior to the requested advance date, deliver to the Holder a written notice (the "**Borrowing Notice**") setting out the date on which the requested advance is to be disbursed (which must be a business day) and (ii) the Holder shall have received favorable written opinions of Latham & Watkins LLP, counsel for YFE Holdings, Inc. ("**Holdings**") and the Maker, covering matters customary for transactions of the type contemplated by this Note, the Security Agreement (as defined below) and the Mortgage (as defined below). Upon receipt of the Borrowing Notice and satisfaction or waiver of the conditions precedent set forth in Article 6 of the Asset Purchase Agreement dated as of September 10, 2013 among Holdings, Fresh & Easy Neighborhood Market Inc., Fresh & Easy Property Company LLC and OA3, LLC (the "**Asset Purchase Agreement**"), the Holder shall make available to the Maker on the Closing Date the Principal Amount of the Loan in immediately available funds.

2.    <u>Accrual of Interest</u>.   Interest shall accrue on the principal amount of this Note outstanding from time to time until repaid in full at a rate per annum equal to 5.00%; *provided* that interest shall accrue on Capitalized Interest Amounts at a rate per annum equal to 7.00%. Interest

---

1 Principal Amount to equal $120 million (as modified per the APA).

shall be calculated on the basis of a 365 (or 366)-day year, compounded quarterly and payable in cash on the last business day of each March, June, September and December during the term of this Note (each such date, an "***Interest Payment Date***"); *provided* that the Maker may, upon notice to the Holder at least five business days prior to any Interest Payment Date occurring on or prior to the fourth anniversary of the Closing Date, elect to capitalize any payment of interest then due (any such amount so capitalized, the "***Capitalized Interest Amount***").  If at any time and for any reason whatsoever, the interest rate payable on any amounts due hereunder shall exceed the maximum rate of interest permitted to be charged by the Holder to the Maker under applicable law, that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest permitted by applicable law shall be deemed a voluntary prepayment of principal.

      3.    <u>Payment of Principal and Interest; Pre-Payments</u>.

      (a)    <u>Maturity Date</u>.  All outstanding principal and interest hereunder shall be due and payable on the earlier of (i) [  ], 20[20] and (ii) the closing of a sale of the Campus (as defined below), a majority of the outstanding economic or voting interests in the Maker or all or substantially all of the kitchen facility forming part of the Campus (such date being referred to herein as the "***Maturity Date***").

      (b)    <u>Voluntary Prepayment</u>.  This Note may be prepaid, in whole or in part, at any time.

      (c)    <u>Mandatory Prepayment</u>.  This Note shall be prepaid immediately out of (i) the cash proceeds received by the Maker from the sale of the kitchen, meat and produce facilities of the Maker located in Riverside, California (together with all tangible and intangible assets (including, without limitation, real property interests and fixtures) relating thereto, the "***Campus***") or any portion thereof (net of (A) the actual amount of the reasonable, documented financial advisor fees and commissions payable by the Maker in connection with such sale other than to any of its affiliates, (B) the reasonable, documented out-of-pocket legal expenses and other reasonable, documented out-of-pocket costs and expenses directly related to such sale that are to be paid by the Maker (including, without limitation, transfer, sale, use and other similar taxes payable in connection with such sale), (C) income and other taxes reasonably estimated to be payable by the Maker as a result of such sale, (D) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to the seller's indemnities and representations and warranties to the purchaser in respect of such sale undertaken by the Maker in connection with such sale (*provided*, that as soon as the Maker reasonably determines that such reserve is no longer necessary, any unused funds shall become cash proceeds), and (E) the amount of any indebtedness (other than the Loan) which is secured by such property and is required or otherwise determined to be repaid or prepaid by the Maker as a result of such sale) and (ii) any insurance proceeds received in connection with a casualty or condemnation event affecting the Campus (net of (A) any actual and reasonable, documented out-of-pocket costs incurred by the Maker in connection with the collection thereof (including reasonable, documented out-of-pocket fees and expenses of counsel), (B) provisions for all taxes payable as a result of such event without regard to the consolidated results of operations of the Maker, and (C) the amount of any indebtedness (other than the Loan) which is secured by such property and is required or otherwise determined to be repaid or prepaid by the Maker as a result of such loss).

(d)    Prepayment Requirements.  Any prepayment of principal under this Section 3 shall be accompanied by the payment of all accrued interest thereon (other than Capitalized Interest Amounts).

4.    Security Interest; Use of Proceeds.  The Maker's performance of its obligations hereunder is secured by a perfected security interest that is first in priority (and is not subject to any other liens (other than Permitted Liens (as defined below)) in the Campus pursuant to that Security Agreement dated as of the date hereof between the Maker and the Holder (the "*Security Agreement*") and the Mortgage with respect to the Campus dated as of the date hereof between the Maker and the Holder (the "*Mortgage*" and, together with the Security Agreement, the "*Collateral Documents*").  For purposes hereof, "*Permitted Liens*" shall mean (i) liens for taxes not yet due or which are being contested in good faith by appropriate proceedings (*provided* that the Maker shall have set aside on its books adequate reserves with respect thereto in accordance with United States generally accepted accounting principles consistently applied ("*GAAP*") and such contest operates to suspend collection of such contested taxes), (ii) carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like liens arising in the ordinary course of business and securing obligations that are not due and payable or which are being contested in good faith by appropriate proceedings (*provided* that the Maker shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend the enforcement of such lien), (iii) pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations, (iv) deposits to secure the performance of bids, trade contracts (other than for indebtedness), leases (other than capital leases), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business, (v) zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of the Maker, (vi) judgment liens securing judgments not constituting an Event of Default and (vii) liens securing capital leases or purchase money indebtedness (1) existing on the date hereof (and any liens securing any indebtedness incurred to refinance any such capital lease or purchase money indebtedness; *provided* that (x) the principal amount of such refinancing indebtedness does not exceed the principal amount of the indebtedness being refinanced (except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such refinancing) and (y) any such liens do not encumber any assets forming part of the Campus that were not encumbered by liens securing the indebtedness being refinanced) or (2) with respect to fixtures and/or equipment located at the Campus acquired by the Maker after the date hereof.

5.    Loss, Destruction of the Note.  Upon the receipt of evidence reasonably satisfactory to the Maker of the loss, theft, mutilation or destruction of this Note and, in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Maker, or in the event of any such mutilation, upon surrender and cancellation of this Note, the Maker will make and deliver a new Note, of like tenor, as provided for in such lost, stolen, destroyed or mutilated Note, in lieu of such lost, stolen, destroyed or mutilated Note.  Any Note issued under the provisions of this Section 5 in lieu of any Note alleged to be lost, destroyed or stolen, or of any mutilated Note, shall constitute an original contractual obligation on the part of the Maker.

6.      Representations and Warranties.  The Maker (and, solely with respect to Sections 6(d) and 6(e) below, Holdings) hereby represents and warrants to the Holder that:

(a)      It is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, has the limited liability company power and authority to own its assets and to transact the business in which it is now engaged or proposes to be engaged, and is duly qualified and is in good standing under the laws of each other jurisdiction in which such qualification is required, except in jurisdictions where the failure to be so qualified or in good standing could not reasonably be expected to result in a Material Adverse Effect. As used herein, "***Material Adverse Effect***" means any event or circumstance that has or could reasonably be expected to have a material adverse effect on (a) the business, operations, financial condition, assets or liabilities (whether actual or contingent) of the Maker, (b) the ability of the Maker to pay the Loan in accordance with the terms of this Note, (c) the rights and remedies of the Holder under this Note and the Collateral Documents, (d) the Holder's security interest in the Campus or the perfection or priority of such security interests, or (e) the validity or enforceability of this Note or any of the Collateral Documents.

(b)      It has full power and authority to execute and deliver this Note and to incur the obligations provided for herein, and this Note has been duly authorized by all proper and necessary limited liability company action.  No consent or approval of any governmental or administrative authority, instrumentality, or agency is required as a condition to the validity of this Note.

(c)      This Note is legal, valid, and contains binding obligations of the Maker enforceable against it in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization or moratorium or similar laws affecting the rights of creditors generally and general principles of equity.

(d)      The execution, delivery and performance by the Maker of this Note does not and will not: (i) violate or contravene (x) any provisions of any existing law, statute, rule, regulation or ordinance, the violation or contravention of which would reasonably be expected to result in a Material Adverse Effect, or (y) the certificate of formation or the operating agreement of Holdings, the Maker or Y-Opco, LLC ("***Y-Opco***"), (ii) violate or contravene any provision of any order or decree of any court, governmental authority, bureau or agency to which Holdings, the Maker, Y-Opco or any properties or assets of any of the foregoing is subject, the violation or contravention of which would reasonably be expected to result in a Material Adverse Effect, (iii) violate or contravene any provision of any material mortgage, indenture, security agreement, contract, undertaking or other agreement or instrument to which Holdings, the Maker or Y-Opco is a party or which purports to be binding upon such entity or any of its properties or assets, the violation or contravention of which would reasonably be expected to result in a Material Adverse Effect, or (iv) result in the creation or imposition of any lien, encumbrance or security interest in any properties of Holdings, the Maker or Y-Opco pursuant to the provisions of any mortgage, indenture, security agreement, contract, undertaking or other agreement or instrument, except for liens created by the Collateral Documents.

(e)      Neither Holdings nor any of its subsidiaries has any indebtedness for borrowed money outstanding (which, for the avoidance of doubt, shall not include any obligations of such persons under any sale-leaseback transaction or any capital lease) other than

(i) the indebtedness created hereunder and (ii) an asset-based working capital facility in an aggregate principal amount not to exceed $100 million to be provided by Wells Fargo Bank, National Association.

(f)     The Maker has good and marketable title to the Campus, free and clear of all liens, encumbrances and security interests (other than those created by the Collateral Documents and Permitted Liens).

7.    <u>Affirmative Covenants</u>.  The Maker hereby agrees with the Holder that during the term hereof:

(a)     <u>Access to Business Information</u>.  The Maker shall maintain proper books of accounts and records and enter therein complete and accurate in all material respects entries and records of all of its transactions in accordance with generally accepted accounting principles and give representatives of the Holder access thereto at all reasonable times during normal business hours and upon reasonable advance notice.

(b)     <u>Maintenance of Existence; Business</u>.  The Maker shall do or cause to be done all things necessary to (i) preserve, renew and keep in full force and effect its legal existence, (ii) maintain and operate the business conducted at the Campus in substantially the manner in which it is presently conducted and operated and business activities reasonably related or complimentary thereto or which do not otherwise adversely affect the value of the Campus and (iii) at all times maintain and preserve in all material respects all property necessary to the conduct of such business and keep such property in good repair, working order and condition in all material respects, ordinary wear and tear excepted, and from time to time make, or cause to be made, all repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times.

(c)     <u>Liens</u>.  The Maker shall maintain the perfection of all liens on the Campus created pursuant to the Collateral Documents.

(d)     <u>Insurance</u>.  At its own cost, the Maker shall obtain and maintain insurance against (i) loss, destruction or damage to the Campus and the related business of the kinds and in the amounts customarily insured against by corporations with established reputations in the same general area engaged in the same or similar business as the Maker and (ii) public liability and third party property damage of the kinds and in the amounts customarily insured against by corporations with established reputations in the same general area engaged in the same or similar business as the Maker.

(e)     <u>Taxes</u>.  The Maker shall pay when due (including any extension thereof) all material taxes, assessments and other governmental charges imposed upon it or its assets, franchises, business, income or profits before any penalty or interest accrues thereon, and all material claims (including, without limitation, claims for labor, services, materials and supplies) for sums which by law might be a lien upon any of its assets; *provided* that (unless any material item or property would be lost, forfeited or materially damaged as a result thereof) no such charge or claim need be paid if it is being diligently contested in good faith and if the Maker establishes an adequate reserve or other appropriate provision required by generally accepted accounting principles.

(f)     Compliance with Laws.  The Maker shall comply with all federal, state and local laws, regulations and orders applicable to the Maker, except to the extent that noncompliance would not reasonably be expected to result in a Material Adverse Effect.  The Maker shall promptly notify Holder if Maker receives any written notice of any material violation of any rule, regulation, statute, ordinance, order or law relating to the public health or the environment and of any material written complaint or written notifications received by the Maker regarding any material environmental or safety and health rule, regulation, statute, ordinance or law.  The Maker shall obtain and maintain any and all licenses, permits, franchises, governmental authorizations, patents, trademarks, copyrights or other rights that in the reasonable business judgment of the Maker are necessary for the ownership of its properties and used or useful in the conduct of its business and as may be required from time to time by applicable law.

(g)     Notice of Default.  The Maker shall, promptly after any officer of the Maker has knowledge thereof, give written notice to Holder of the occurrence of any event or the existence of any condition which would be, after notice or lapse of applicable grace periods or both, an Event of Default.

(h)     Costs.  The Maker shall reimburse Holder for any and all reasonable, documented out-of-pocket fees, costs and expenses including, without limitation, reasonable attorneys' fees, other professionals' fees, appraisal fees, environmental assessment fees, expert fees, court costs, litigation and other expenses (collectively, the "***Costs***") incurred or paid by Holder or any of its officers, employees or agents after the date hereof in connection with: (i) the administration or enforcement of this Note and the Collateral Documents (or any amendment, waiver, modification or supplement thereof) or any instrument, agreement, document, policy, consent, waiver, subordination, release of lien, termination statement, satisfaction of mortgage, financing statement or other lien search, recording or filing related thereto (or any amendment, modification or extension to, or any replacement or substitution for, any of the foregoing), whether or not any particular portion of the transactions contemplated during such negotiations is ultimately consummated; and (ii) the defense, preservation and protection of Holder's rights and remedies thereunder, including without limitation, its security interest in the Campus or any other property pledged to secure the Secured Obligations (as defined in the Security Agreement), whether incurred in bankruptcy, insolvency, foreclosure or other litigation or proceedings or otherwise.  The Costs shall be due and payable promptly (and in any event within 10 business days) after demand by Holder.  If the Maker fails to pay the Costs when due, the Costs shall bear interest from the date due at the highest rate set forth in this Note.  This provision shall survive the termination of this Note and/or the repayment of any amounts due or the performance of any Secured Obligation.

(i)     Notice of Adverse Proceedings.  Promptly upon any officer of the Maker obtaining knowledge of (i) the institution of any adverse proceeding not previously disclosed in writing by the Maker to Holder, or (ii) any material development in any adverse proceeding that, in the case of either clause (i) or (ii) if adversely determined, would be reasonably expected to result in a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the Loan contemplated hereby, the Maker shall as promptly as reasonably practicable provide Holder with written notice thereof together with such other information as may be reasonably available to the Maker to enable Holder and its counsel to evaluate such matters.

(j)    _Further Assurances_.  The Maker shall execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, any and all such further assurances and other agreements or instruments, and take or cause to be taken all such other action, as shall be reasonably necessary from time to time to give full effect to this Note and the transactions contemplated hereby.  The Maker agrees to defend the title to the Campus owned by it and the security interest of the Holder against the claim of any other third party and to maintain and preserve the security interest of the Holder.

8.    _Negative Covenants_.  The Maker (and, solely with respect to Section 8(c) below, Holdings) covenants with the Holder that, from and after the execution date hereof until the Secured Obligations are paid and satisfied in full, unless otherwise approved by the Holder:

(a)    _Liens_.  The Maker shall not directly or indirectly, create, incur, assume or permit to exist any lien, encumbrance or security interest on or with respect to the Campus, or file or authorize the filing of any financing statement or similar notice of any lien with respect to such property or asset under the UCC or under any similar recording or notice statute, in each case other than Permitted Liens.

(b)    _Change in Nature of Business_.  The Maker shall not engage at any time in any business or business activity at or in connection with the Campus other than the business currently conducted at and in connection with the Campus and business activities reasonably related or complimentary thereto or which do not otherwise adversely affect the value of the Campus.

(c)    _No Dividends or Distributions_.  Holdings shall not declare or make, or permit any of its subsidiaries to declare or make (other than to Holdings), directly or indirectly, any dividend or other distribution (whether in cash, securities or other property) with respect to any of its Equity Interests, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any of its Equity Interests; _provided_, however, that Holdings may (i) redeem Equity Interests owned by officers, directors and employees of Holdings upon the death, disability or retirement of such persons and (ii) so long as no Event of Default (as defined below) or event or condition which upon notice, lapse of time or both would constitute an Event of Default has occurred and is continuing, pay cash dividends on preferred Equity Interests issued by Holdings.  For purposes of this Note, "**_Equity Interests_**" shall mean, with respect to any person, shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in such person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

9.    _Events of Default_.  If any of the following events shall occur and be continuing (each of the following to constitute an "**_Event of Default_**"); _provided_ that no Event of Default shall be deemed to have occurred unless the Holder has provided notice of the occurrence of such Event of Default to the Maker:

(a)The Maker fails to make any payment of principal when due hereunder and any payment of interest, fees or other amounts within three business days of when due hereunder;

(b) (i) The Maker fails to perform, keep or observe any of its covenants, conditions, promises, agreements or obligations under this Note and, except with respect to the covenant in Section 7(b)(i) above which shall constitute an Event of Default immediately upon the occurrence thereof, such failure is not cured by the Maker within thirty (30) days after the Maker receives notice of such failure from the Holder or (ii) Holdings fails to perform, keep or observe its covenants in Section 8(c) above  or Section 12 below and such failure is not cured by Holdings within thirty (30) days after Holdings receives notice of such failure from the Holder;

(c) The institution of proceedings against the Maker or any Guarantor (as defined in Section 12 below), or the filing by the Maker or any Guarantor of a petition or answer or consent seeking reorganization or release, in each case under the Federal Bankruptcy Code, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against the Maker or any Guarantor which is not dismissed within a period of sixty (60) days after filing, or consent by the Maker or any Guarantor to the filing of any such petition or the appointment of a receiver, liquidator, assignee, trustee or other similar official of the Maker or any Guarantor or of any substantial part of such entity's property, or the making by the Maker or any Guarantor of an assignment for the benefit of creditors;

(d) Any warranty or representation contained in this Note proves to have been false in any material respect when made or furnished;

(e) One or more final, non-appealable judgments or orders against the Maker or any Guarantor is entered for the payment of money in an aggregate amount (as to all such judgments) in excess of $5 million (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), the aggregate liquidity of the Maker and the Guarantors at the time of the judgment is less than $50 million and such judgment or order remains unsatisfied without procurement of a stay of execution within thirty (30) days after the date of entry of judgment;

(f)    (i) Ronald W. Burkle shall fail to be the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Securities and Exchange Act of 1934, as amended) of shares representing at least 51% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings or (ii) Holdings shall fail to own, beneficially and of record, 100% of the issued and outstanding Equity Interests of the Maker or any Guarantor;

(g)    Holdings shall be in breach of Section 2(d) or Section 5 of the warrants for the purchase of [ ] and [ ] shares, respectively, of common stock, par value [$0.01], of Holdings, issued by Holdings to [ ] on the date hereof and such failure is not cured by Holdings within thirty (30) days after Holdings receives notice of such failure from the Holder; or

(h)    Any lien intended to be created by any Collateral Document on any material portion of the collateral described in such Collateral Document shall at any time be invalidated or otherwise cease to be in full force and effect, for whatever reason, or any security interest purported to be created by any Collateral Document on any material portion of the collateral described in such Collateral Document shall cease to be, or shall be asserted by the Maker not to be, a valid, first priority (subject to Permitted Liens) perfected lien in the collateral covered thereby, except as a result of the sale or other disposition of the applicable collateral in a transaction permitted hereunder or under the Collateral Documents;

then, and in any such event, the Holder may declare all unpaid principal and accrued interest outstanding under this Note to be immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by the Maker; *provided* that in the case of any Event of Default under clause (c), all amounts owing under this Note shall automatically become due and payable.

10.    <u>GOVERNING LAW</u>.    THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE SUBSTANTIVE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW PROVISIONS.  IN ANY ACTION OR OTHER LEGAL PROCEEDING RELATING TO THIS NOTE, EACH OF THE MAKER AND THE HOLDER: (I) CONSENTS TO THE PERSONAL JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF DELAWARE, (II) WAIVES OBJECTION TO THE LAYING OF VENUE, (III) WAIVES PERSONAL SERVICE OF PROCESS, (IV) CONSENTS TO SERVICE OF PROCESS BY REGISTERED OR CERTIFIED MAIL DIRECTED TO SUCH PARTY AT THE ADDRESS SET FORTH ABOVE OR AT SUCH OTHER ADDRESS AS SUCH PARTY HAS OTHERWISE SPECIFIED IN ACCORDANCE WITH THE TERMS OF THIS NOTE, WITH SUCH SERVICE OF PROCESS TO BE DEEMED COMPLETED FIVE (5) DAYS AFTER MAILING, (V) WAIVES ANY RIGHT TO TRIAL BY JURY, (VI) WAIVES ITS RIGHT TO ATTACK ANY FINAL JUDGMENT THAT IS OBTAINED AS A DIRECT OR INDIRECT RESULT OF ANY SUCH ACTION, AND (VII) CONSENTS TO EACH SUCH FINAL JUDGMENT BEING SUED UPON IN ANY COURT HAVING JURISDICTION.

11.    <u>Miscellaneous</u>.  This Note, the Collateral Documents and any other documents executed by the Maker or the Holder in connection herewith and therewith contain the entire agreement of the parties with respect to the matters contained herein and therein, and supersede all other agreements, understandings and representations, oral or otherwise, between the Maker and the Holder with respect to the matters contained herein and therein.  This Note may not be amended or terminated orally.  No waiver shall be effective unless made specifically in writing by the Holder.  This Note shall be binding upon and shall inure to the benefit of the Maker, Holdings and the Holder and their respective successors, assigns, heirs, administrators, fiduciaries, next of kin and executors; *provided* that (i) this Note shall not be assigned by the Maker without the prior written consent of the Holder, and (ii) the Holder may assign this Note upon written notice to, but without the need for consent from, the Maker.  In the event any provision of this Note (or any part of any provision) is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note; but this Note shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had not been contained in this Note, but only to the extent it is invalid, illegal, or unenforceable.  Section headings used herein are for convenience only and shall not affect the meaning or construction of any of the provisions hereof.  This Note may be executed in any number of counterparts with the same effect as if the signatures thereto and hereto were upon the same instrument.

12.    <u>Guarantee</u>.  Concurrently with the execution and delivery of this Note (or, in the case of any subsidiary of Holdings formed hereafter, as soon as reasonably practicable after its formation), Holdings and the Maker shall cause to be delivered to the Holder and to remain in effect at all times a guarantee from each of Holdings, Y-Opco, and any other subsidiary of

Holdings that holds any of the assets acquired by Holdings, Y-Opco or the Maker under the Asset Purchase Agreement (Holdings, Y-Opco and any such subsidiary, each, a "***Guarantor***" and collectively, the "***Guarantors***") of all of the Maker's obligations and liabilities hereunder, in each case in a form reasonably satisfactory to the Holder.  Such guarantee shall be released upon the payment in full in cash of all obligations under this Note (other than contingent Costs with respect to which no claim has been made).

**IN WITNESS WHEREOF,** the Maker has caused this Note to be executed and delivered as of the day and year and at the place first above written.

CAMPUS OPCO, LLC

By: _____
    Name:
    Title:

Acknowledged:

TESCO CORPORATE TREASURY SERVICES PLC

By:_____
Name:
Title:

Acknowledged and agreed solely with respect to Sections 6(d), 6(e), 8(c) and 12:

YFE HOLDINGS, INC.

By:_____
Name:
Title: