# EXHIBIT A
# PART ONE

Pad only

**Site No. OC050227SW01**

## GROUND LEASE AGREEMENT

THIS GROUND LEASE AGREEMENT (this "**Lease**") is made as of August 19, 2010 (the "**Effective Date**") between PHILLIP M. BARDACK, as Successor Trustee of the GEORGE A. THATCHER, JR. TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the DIANE LINDA THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the THOMAS JEFFREY THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the NANCY JOANNE THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the SUZANNE KELLIHER DICKEY TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; LISA ELTINGE and PATRICIA ELTINGE, as Co-Trustees of the TESTAMENTARY TRUST created under the WILL OF MAXINE LOUISE ELTINGE, deceased, an undivided eight and one-third percent (8 and 1/3%) interest; PATRICIA ELTINGE, an Unmarried Woman, an undivided four and one-sixth percent (4 and 1/6%) interest; MARY LOU GRAZIADIO AREA, as Trustee of the MARY LOU GRAZIADIO AREA SEPARATE PROPERTY TRUST dated May 12, 2003, as to an undivided one-third of an undivided 12.5% interest; ALIDA CALVILLO, as Trustee of the ALIDA CALVILLO SEPARATE PROPERTY TRUST dated September 3, 1980, as amended, as to an undivided one-third of an undivided 12.5% interest; G. LOUIS GRAZIADIO, III, as Trustee of the G. LOUIS GRAZIADIO, III TRUST dated February 28, 2001, as amended, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Mary Lou Graziadio Area, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Alida Graziadio Calvillo, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O G. Louis Graziadio, III, as to an undivided one-third of an undivided 12.5% interest; and LISA ELTINGE, a married woman, as her sole and separate property, as to an undivided one-third of a 12.5% interest; and PATRICIA ELTINGE, an unmarried woman, as to an undivided one-third of a 12.5% interest (collectively, "**Landlord**"), and FRESH & EASY NEIGHBORHOOD MARKET INC., a Delaware corporation ("**Tenant**").  Landlord and Tenant are hereinafter referred to individually as a "**Party**" and collectively as the "**Parties.**"

Section 1.        Certain Defined Terms.  As used in this Lease, the following initially capitalized terms have the meanings set forth below.  Initially capitalized terms used in this Lease but not defined in this Section 1 have the respective meanings assigned to such terms in the remaining provisions of this Lease (including, but not limited to, **Schedule 1** and **Schedule 2**).

1.1      "**Shopping Center**" means that certain development, which is located at the southwest corner of the intersection of Harbor Boulevard and Gisler Avenue, City of Costa Mesa, County of Orange, State of California, including the Shopping Center Property and all related buildings, improvements, rights, easements, rights of way and appurtenances.

1.2      "**Shopping Center Property**" means the real property on which the Shopping Center is located, the legal description of which is set forth in **Exhibit A.**

1.3      "**Site Plan**" means the site plan attached hereto as **Exhibit B**; provided, however, that if the attached site plan is marked as preliminary, then the "**Site Plan**" shall mean the site plan approved by the Parties prior to the expiration of the Feasibility Period (as more fully set forth in **Schedule 2**).

1.4      "**Premises**" means (a) all of the Land and (b) any and all buildings, improvements, appurtenances, rights, privileges and easements benefiting, belonging to or pertaining to the Land.

1.5      "**Land**" means that certain approximately 14,500 square feet area of land within the Shopping Center identified as "Fresh & Easy's Premises" on the Site Plan.

1.6      "**Building**" means the building to be constructed on the Land in which Tenant shall have the right to operate its business in accordance with the terms and conditions of this Lease.

LA:17300769.9

1.7      "**Term**" means the Initial Term together with any and all Extension Periods for which the related Renewal Options are exercised.

1.8      "**Initial Term**" means the period beginning on the Term Start Date and ending 20 years after the Rent Start Date (or, if the Rent Start Date is not the first day of a calendar month, 20 years after the first day of the next calendar month), all subject to the terms and conditions of this Lease.

1.9      "**Extension Period**" means a period of 5 consecutive years.

1.10      "**Renewal Options**" means Tenant's rights to extend the Term for up to 4 successive Extension Periods. (*See* Section 3.2.)

1.11      "**Rent**" means, for any applicable period under this Lease, (a) the Fixed Rent for such period, (b) Tenant's Pro Rata Share of (i) the Insurance Charges for such period (*see* Section 5.2), (ii) the Real Estate Taxes for such period if the Premises are not separately assessed (*see* Section 6.2) and (iii) the Common Area Charges for such period (*see* Section 7.1), and (c) all other amounts for such period payable by Tenant to Landlord pursuant to this Lease. To the extent that Tenant shall pay the same directly to third parties, the term "**Rent**" does not include (x) premiums for commercial general liability and property insurance required to be maintained by Tenant (*see* Section 5.1), (y) the Real Estate Taxes for such period if the Premises are separately assessed (*see* Section 6.1), or (z) charges for utilities supplied to Tenant's Building (*see* Section 9.2).

1.12      "**Fixed Rent**" means the following:

| PERIOD | ANNUAL FIXED RENT | MONTHLY INSTALLMENT |
|---|---|---|
| Lease Years 1 through 5 | $230,000.00 | $19,166.67 |
| Lease Years 6 through 10 | $253,000.00 | $21,083.33 |
| Lease Years 11 through 15 | $278,300.00 | $23,191.67 |
| Lease Years 16 through 20 | $306,130.00 | $25,510.83 |
| First Extension Period: Lease Years 21 through 25 | $336,743.00 | $28,061.92 |
| Second Extension Period: Lease Years 26 through 30 | $370,417.30 | $30,868.11 |
| Third Extension Period: Lease Years 31 through 35 | $407,459.03 | $33,954.92 |
| Fourth Extension Period: Lease Years 36 through 40 | $448,204.92 | $37,350.41 |

Section 2.      Lease of Premises.

2.1      Lease. Subject to the terms and conditions of this Lease (including, but not limited to, Sections 11.2 and 33), Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, during the Term (as the same may be extended pursuant to Section 3.2), the Premises.

2.2      Rights to Ingress and Egress and Certain Common Areas. Tenant and Tenant's employees, vendors, customers, licensees and other invitees shall have the exclusive right to use and freely access the Premises. Tenant and Tenant's employees, vendors, customers, licensees and other invitees shall have the nonexclusive rights to use and freely access, without charge for the entire Term, all Common Areas of the Shopping Center and all areas of ingress to and egress from the Premises and the Common Areas shown on the Site Plan.

2

2.3     Use of Vestibules. Tenant may, without Landlord's prior written consent, place or maintain any merchandise or other articles in any vestibule at the front entrance of the Building or on the walkways adjacent thereto; provided, however, no such merchandise or other articles shall be permitted (i) in violation of applicable law, or (ii) which might unreasonably impede any loading/drop-off areas, fire-lanes, "no-parking" areas, or ingress/egress generally.

2.4     Ancillary Tenant Facilities. At no charge to Tenant, Tenant may maintain in the Common Areas near the Building any or all of the following as shown on the Site Plan: (a) Tenant's truck loading area, including the loading dock, as shown on the Site Plan (which loading dock shall be for the exclusive use of Tenant), (b) a dumpster or similar refuse container; and (c) a compactor. Tenant shall maintain any such dumpster, container, compactor, in a neat, clean and presentable manner and in accordance with Laws.

2.5     Site Plan. At Landlord's sole cost, Landlord shall develop the Shopping Center as shown on the Site Plan in compliance with all Laws. At all times during the Term Landlord shall maintain the position and size of the parking areas, roadways, passageways and accessways for trucks and service vehicles as shown on the Site Plan. Landlord shall not make any of the following modifications at any time prior to or during the Term unless Landlord obtains Tenant's prior written consent (which Tenant may give or withhold in its sole and absolute discretion): (a) any additional construction in or other modifications to the No Build Areas; (b) any change to the location, shape or dimensions of the Premises or the Building; (c) any change which would adversely affect access to the Premises or the visibility of Tenant's signs or storefronts; (d) any change to the parking within the No Build Areas; (e) any change to Tenant's signage; and (f) any change to the Critical Access Ways.

2.6     Quiet Enjoyment. During the Term, Tenant shall lawfully and quietly hold, occupy and enjoy the Premises and its rights in the Common Areas without hindrance, ejection or molestation by Landlord or any other Person lawfully claiming the same, subject to the terms of this Lease. Without limiting the foregoing, during the Term Landlord shall not permit any tenant or occupant in the Shopping Center to create or continue any nuisance, disturbance or other condition in the Shopping Center which unreasonably and adversely affects Tenant's enjoyment of the Premises or its rights in the Common Areas.

Section 3.     Term of Lease.

3.1     Term Commencement. The Initial Term shall commence on the Term Start Date.

3.2     Exercise of Renewal Options. Provided that there shall be no material Tenant Default under this Lease continuing and Tenant does not dispute that a material Tenant Default has occurred, on each and every date that is at least 6 months prior to the expiration of the then-current Term, Tenant shall automatically be deemed to have exercised, without further notice to Landlord, the Renewal Option for the Extension Period next scheduled to occur unless, at least the 6 months prior to the expiration of the then-current Term, Tenant has notified Landlord that Tenant does not wish to exercise such Renewal Option. The foregoing shall not apply if Tenant has exercised the last of the Renewal Options provided under this Lease.

3.3     Memorandum of Ground Lease. Within 15 days after receipt of Tenant's written request, Landlord shall execute and deliver to Tenant a memorandum of ground lease prepared by Tenant, which memorandum shall set forth the Initial Term, the Renewal Options and other information concerning this Lease (including the covenants and restrictions set forth in Sections 14.6 and 14.7 but excluding the Fixed Rent payable by Tenant) and shall otherwise be in form and substance reasonably acceptable to the Parties. At Tenant's sole cost, Tenant shall record such memorandum of lease in the appropriate public office; provided, however, that if any documentary transfer, recordation or similar tax is imposed as a condition or result of the recordation of such memorandum of lease, Landlord shall reimburse Tenant for the full amount of the tax within 30 days after receipt of Tenant's written demand for the same.

3.4     Termination Option of Tenant. Tenant shall have the ongoing right to terminate this Lease at any time (the "**Termination Option**") after the last day of the 10th Lease Year (the "**Termination Date**") on the following terms and conditions:

(a)     Notice. If Tenant desires to exercise the Termination Option, Tenant shall give Landlord 9 months prior written notice (the "**Termination Notice**") of Tenant's exercise of the Termination Option.

(b)     Termination Fee. No termination by Tenant hereunder shall be deemed effective until Tenant has paid to Landlord a non-refundable termination fee in an amount the equal to one year of Fixed Rent then due. For

3

example, if Tenant provides Landlord with the Termination Notice at any time during the 11th Lease Year, then the Termination Fee shall be $278,300.00.

(c)     Lease Ceases At Termination.  If Tenant properly and timely exercises the Termination Option and properly and timely satisfies all other monetary and non-monetary obligations under this Lease, then the Lease shall cease and expire on the Termination Date with the same force and effect as if the Termination Date were the date originally provided in this Lease as the expiration date of the Initial Term hereof.  From and after the Termination Date, the Lease shall be of no further force or effect, and Landlord and Tenant shall be released from any further obligations hereunder, except for those obligations that accrued prior to the Termination Date and those obligations and indemnifications that specifically survive expiration or earlier termination of the Lease or survive by operation of law.

(c)     Failure to Surrender Makes Tenant a Holdover.  If Tenant otherwise satisfies its obligations regarding termination but fails to surrender possession of the Premises to Landlord on or before the Termination Date in accordance with the terms hereof, Tenant shall be deemed to be a holdover tenant from and after the Termination Date (in accordance with Section 29 below, entitled "**Holdover**").  Landlord may accept any such sums from Tenant without prejudice to Landlord's right to evict Tenant from the Premises by any lawful means.

Section 4.     Rent.

4.1     Rent Commencement.  Subject to all of the other terms of this Lease, Fixed Rent and all other charges due under this Lease shall commence immediately upon the Rent Start Date.  If the Rent Start Date shall be on any day other than the first day of a calendar month, Fixed Rent and other charges for such month shall be pro rated on a per diem basis.

4.2     Fixed Rent.  Except as otherwise set forth herein, Tenant shall pay to Landlord Fixed Rent in the equal monthly installments specified in Section 1.12 in advance not later than the 1st day of each and every calendar month during the Term.

4.3     Longer or Shorter Lease Years.  For any Lease Year consisting of more than or less than 12 months, the annual Fixed Rent and other charges hereunder shall be increased or decreased (as applicable) in proportion to the number of months (including partial months) contained within that Lease Year.

4.4     Method of Payment.  All Fixed Rent and other payments to be made by Tenant to Landlord hereunder shall be paid without prior demand, deduction or set-off, except as expressly provided in this Lease, by wire transfer of funds to the bank account specified in the wiring instructions attached hereto as **Schedule 3** or to such other bank account as Landlord may designate from time to time upon not less than 30 days' prior written notice to Tenant.  At Tenant's option, Tenant may use any other commercially reasonable method reasonably acceptable to Landlord of making such payments to Landlord provided that Tenant gives Landlord 30 days' prior written notice thereof.

4.5     Landlord's Successors; Landlord's Agents.  If Landlord's interest in this Lease or any Rent hereunder shall be assigned to a third party or if a third party shall become entitled to collect any Rent due hereunder, Landlord shall give 30 days' prior written notice thereof to Tenant.  Until such notice shall be received by Tenant and become effective, Tenant may continue to pay Rent due hereunder to the Person to whom, and in the manner in which, the last preceding installment of Rent hereunder was paid, and each such payment shall fully discharge Tenant with regard to such payment.

Section 5.     Insurance.

5.1     Tenant's Insurance.

(a)     Commercial General Liability Insurance.  During the Term, Tenant at its sole cost shall maintain commercial general liability insurance coverage (or its equivalent) on an occurrence basis, in combined policy limits of not less than $2,000,000 per occurrence and $4,000,000 in the aggregate, with commercially reasonable deductibles, insuring Tenant (as named insured) and Landlord (as an additional insured) against all claims, demands, actions, suits or proceedings initiated or made by or for any Person as a result of bodily injury (including death), personal injury or property damage occurring upon, in or about the Premises or arising from any acts or omissions of Tenant or any of Tenant's agents or employees.

(b)    All Risks Property Insurance.  During the Term, Tenant shall maintain "all risks" property insurance (or its equivalent) covering all buildings and improvements erected by Tenant on the Land in a minimum amount equal to 100% of the reasonable replacement cost thereof (exclusive of excavation costs).  In addition, during the Term, Tenant shall either (i) maintain "all risks" property insurance (or its equivalent) covering all of Tenant's personal property at the Premises (including inventory, trade fixtures, furniture and other property removable by Tenant under the provisions of this Lease), or (ii) self-insure for loss of, or damage to, Tenant's personal property. Tenant's self-insurance shall comply with the terms and conditions applicable to such insurance as required in this Section 5, including, without limitation, a waiver of subrogation.

(c)    Blanket Coverage.  Notwithstanding Section 5.3, Tenant may include any of the insurance coverages set forth above in general or blanket policies of insurance provided that the coverage required hereunder will not be reduced or diminished by use of such general or blanket policies.

(d)    Landlord Cooperation Concerning Insurance.  In connection with any insurance claim by Tenant, Landlord shall, at Tenant's sole cost and expense, cooperate in good faith with Tenant in order to obtain the largest possible recovery and execute any and all commercially reasonable consents and other commercially reasonable instruments and take all other actions reasonably necessary or desirable in order to effectuate the same and to cause such proceeds to be paid as provided herein.

5.2    Landlord's Insurance.

(a)    Commercial General Liability Insurance.  During the Term, Landlord shall maintain commercial general liability insurance coverage (or its equivalent) on an occurrence basis, in combined policy limits of not less than $3,000,000 per occurrence and $5,000,000 in the aggregate, with commercially reasonable deductibles, insuring Landlord (as named insured) and Tenant (as an additional insured) against all claims, demands, actions, suits or proceedings initiated or made by or for any Person as a result of bodily injury (including death), personal injury or property damage occurring in the Common Areas, arising from the operation of the Common Areas or arising from any acts or omissions of Landlord or any of Landlord's agents or employees.

(b)    All Risks Property Insurance.  During the Term, Landlord shall maintain "all risks" property insurance (or its equivalent) covering all improvements located in the Common Areas in a minimum amount equal to 100% of the reasonable replacement cost thereof (exclusive of excavation costs).  Such insurance shall exclude flood coverage (unless the Shopping Center is located in a Flood Zone A or V) and shall also exclude earthquake coverage.

(c)    Tenant's Share of Landlord's Insurance Costs.  For each calendar year during the Fixed Rent Period, Tenant shall pay to Landlord Tenant's Pro Rata Share of the costs of the insurance (net of all Rebates and Credits) required to be maintained during the Term under Sections 5.2(a) and 5.2(b) above (the net costs of such insurance being hereinafter referred to as the "**Insurance Charges**").  Tenant's Pro Rata Share of the Insurance Charges shall be estimated, paid and reconciled as set forth in Section 8.

(d)    No Contributing Insurance.  Landlord shall not carry any insurance concurrent in coverage and contributing in the event of loss with any insurance required to be furnished by Tenant hereunder if the effect of such separate insurance would be to reduce the protection or the payment to be made under Tenant's insurance.

5.3    Insurance Requirements.

(a)    Licensed and Rated Companies.  All insurance coverage required to be carried hereunder shall be carried with insurance companies that are (i) licensed to do business in the State and (ii) rated in the then-most current Best's Insurance Guide (or any successor thereto) as having a general policyholder rating of A- or better and a financial rating of "VIII" or better.

(b)    Standard Forms; Notifications.  All insurance policies required to be carried by either Party shall (i) be effected under standard form policies and (ii) require the insured's insurance carrier to endeavor to notify the other Party (and any leasehold mortgagee) at least 30 days prior to any cancellation or material modification of such insurance.

(c)    Increased Amounts.  Upon the request of either Party, provided that such request shall be commercially reasonable taking into account the standard practices at comparable shopping centers in the area, the

LA:17300769.9

other Party shall increase the limits of insurance carried by it pursuant hereto and carry types of insurance in addition to the types required to be carried by it pursuant hereto.

(d)      Certificates of Insurance. Prior to the Term Start Date, Tenant and Landlord shall furnish each other with certificates of insurance evidencing the insurance coverage required herein. Current certificates of insurance for any insurance policy required hereunder shall be delivered to Landlord or Tenant, as the case may be, on or before the Term Start Date and thereafter not less than 10 days prior to the expiration of any policy.

(e)      Contractual Indemnity, Cross-Liability and Severability of Interests. All commercial general liability insurance policies shall insure for contractual indemnity and contain a cross-liability endorsement. All property insurance policies shall contain a severability of interests clause.

5.4      Waiver of Subrogation. Each Party hereby waives, and releases the other Party from, any and all claims, liabilities and rights of action with respect to any property loss caused by the other Party which is covered by the property insurance required to be maintained by such Party under Section 5.1(b) or 5.2(b) (as applicable). Each Party hereby agrees that any such property insurance maintained by it shall contain a waiver of subrogation clause preventing the insurance company from pursuing the other Party for any property loss that may be caused by the other Party.

5.5      Failure to Maintain Insurance. If any Party refuses or neglects to secure and maintain insurance policies complying with the provisions of this Lease or to provide copies of policies or certificates (including renewal policies or certificates) within the time provided herein, the other Party may, after providing notice and a reasonable opportunity to cure (not to exceed 10 days) to the Party obligated to provide such insurance, secure the appropriate insurance policies, in which event the Party obligated to provide such insurance shall, upon demand, reimburse the Party obtaining such insurance for the full cost thereof.

Section 6.      Real Estate Taxes.

6.1      Real Estate Taxes – Separately Assessed. If the Premises constitute a separate tax parcel that is separately assessed, (a) Tenant shall timely and fully pay all Real Estate Taxes levied against the Premises during the Fixed Rent Period and (b) Landlord shall timely and fully pay all Real Estate Taxes levied against the remainder of the Shopping Center (i.e., the Shopping Center excluding the Premises).

6.2      Real Estate Taxes – Not Separately Assessed. If the Premises do not constitute a separate tax parcel that is separately assessed, then (i) Landlord shall timely and fully pay all Real Estate Taxes levied against the Shopping Center (including the Premises) and (ii) Tenant shall pay to Landlord, with respect to each calendar year during the Fixed Rent Period, Tenant's Pro Rata Share of the Real Estate Taxes levied against the Shopping Center for such calendar year. In such event, Tenant's Pro Rata Share of the Real Estate Taxes shall be estimated, paid and reconciled as set forth in Section 8.

6.3      Tenant's Tax Obligations. Tenant agrees to pay to all tax authorities all personal property taxes which may be levied against Tenant's merchandise, trade fixtures and other personal property in and about the Premises, all sales taxes, all taxes required as a result of its hiring employees, and (if applicable) all transaction privilege, gross receipts and similar taxes imposed on the Fixed Rent paid hereunder.

Section 7.      Common Area Maintenance Charges.

7.1      Tenant's Share of Costs. Landlord shall pay all of the costs directly related to the maintenance, operation, repair and replacement of the Common Areas, including as set forth in Section 10.1. From and after the Rent Start Date, Tenant shall pay to Landlord Tenant's Pro Rata Share of all reasonable maintenance, operation, repair and replacement costs (net of all Rebates and Credits) that are incurred by Landlord during and relate to Common Areas and the Fixed Rent Period (such net costs being hereinafter referred to as the "**Common Area Charges**"). Notwithstanding the foregoing, the Common Area Charges shall not include, and Tenant shall not pay, any of the following:  (a) the original capital costs of the Shopping Center and the original equipment serving the same; (b) except as set forth in Section 7.2, the capital costs of any improvements, replacements, additions and alterations of the Common Areas or any other capital expenditures; (c) except as set forth in Section 7.3, any fee, cost or charge in the nature of an administrative, management, accounting, processing, custodial, overhead or similar fee, cost or charge, whether or not expressed as a percentage add-on to such maintenance, operation, repair and replacement costs (any such fee, cost or charge being referred to herein as an "**Administrative Fee**"); (d) any costs incurred solely for the benefit of one or more other tenants or occupants in the Shopping Center; (e) any expense for which Landlord may be reimbursed by a third party (including another tenant) or from insurance proceeds; and (f) any

6

costs incurred by Landlord to assess, remove or remediate any Hazardous Substances or to cure any Environmental Laws violation. For the avoidance of doubt, the Common Area Charges do not include any Insurance Charges or Real Estate Taxes. Furthermore, in no event shall Tenant's Pro Rata Share of controllable Common Area Charges (which "controllable" common area charges shall exclude taxes, insurance and utility charges) increase year over year by greater than 5% annually, calculated non-cumulatively. For purposes of this Lease, the term "Controllable Common Area Charges" shall include, but not be limited to, the cost of parking facility maintenance and the costs of janitorial services, security services, landscaping services and supplies, and life safety maintenance contracts, and other similar services provide to the Common Areas.

7.2     Certain Capital Expenditures. If during the Fixed Rent Period Landlord incurs any cost in making any improvement, replacement, addition or alteration of the Common Areas that benefits the then-existing Shopping Center and is not fully deductible as an expense in the year incurred under generally accepted accounting principles (excluding, for purposes of this Section 7.2, any improvement, replacement, addition or alteration that is designed to benefit specific tenants or is made in connection with any remodel, expansion, extension or other capital improvement of the Shopping Center), then (a) within 60 days after the end of the applicable year, Landlord shall give Tenant written notice thereof describing in reasonable detail the nature of the improvement, replacement, addition or alteration and setting forth the total cost, salvage or residual value and other relevant facts thereof, and (b) the total cost incurred by Landlord in making the improvement, replacement, addition or alteration (net of any salvage or residual value) shall be amortized on a straight-line basis over the useful life of the improvement, replacement, addition or alteration, as reasonably determined by Landlord, with the unamortized cost thereof bearing interest at a rate per annum equal to the Index Rate (it being understood and agreed that, for each calendar year during the Fixed Rent Period, only the amortized amount and any related interest thereon will be included in the Common Area Charges for such calendar year). This Section 7.2 shall not apply to the costs of signage, which are covered by Section 15.

7.3     Administrative Fee. Notwithstanding Section 7.1(c), Landlord shall be entitled to charge Tenant and Tenant shall pay to Landlord, as a component of Tenant's Pro Rata Share of the Common Area Charges, an Administrative Fee equal to 7% of Tenant's Pro Rata Share of the other Common Area Charges (i.e., the Common Area Charges excluding the Administrative Fee) for each calendar year or portion thereof during the Fixed Rent Period, it being understood and agreed that such Administrative Fee shall be inclusive of (and that Tenant shall not otherwise be required to pay any sum in respect of) all fees, costs and expenses of any kind incurred by Landlord in connection with the management and administration of the Shopping Center in general and/or the Common Areas in particular (including, but not limited to, all fees paid to property management companies and all salaries, bonuses and other compensation paid to Landlord's or any Related Party's employees, agents and contractors).

7.4     Payment. Tenant's Pro Rata Share of the Common Area Charges shall be estimated, paid and reconciled as set forth in Section 8.

7.5     Arm's-Length Dealings. Landlord represents and warrants that, with respect to the maintenance, operation, repair and replacement of the Common Areas, Landlord has not entered into and will not enter into any agreement, understanding or other arrangement with any Affiliate or other Related Party except upon terms at least as favorable to Landlord as an agreement, understanding or other arrangement with an independent third party on arm's-length and commercially reasonable terms and conditions.

Section 8.        Payments and Audit Rights

8.1     Estimated Payments. Not later than 90 days following the start of each calendar year during the Fixed Rent Period (including, for this purpose, any partial calendar year that may occur at the beginning or the end of the Fixed Rent Period), Landlord shall submit to Tenant, in writing, Landlord's reasonable estimates of the Insurance Charges, the Real Estate Taxes levied against the Shopping Center (but only if Section 6.2 applies) and the Common Area Charges (collectively, the "**Other Charges**") for such calendar year and Landlord's computation (showing the basis therefor) of Tenant's Pro Rata Share for such calendar year. Subject to Tenant's receipt of Landlord's submission, Tenant shall pay to Landlord Tenant's Pro Rata Share of the Other Charges, as reasonably estimated by Landlord, in approximately equal monthly installments as and when Tenant is required to pay its monthly installments of Fixed Rent under Section 4.2. Until Landlord delivers a new estimate to Tenant, Tenant will continue paying Tenant's estimated Pro Rata Share of such charges based on Landlord's estimate for the previous calendar year.

8.2     Reconciliation. Not later than 90 days after the end of each calendar year during the Fixed Rent Period (including, for this purpose, any partial calendar year that may occur at the beginning or the end of the Fixed Rent Period), Landlord shall provide to Tenant a statement setting forth in reasonable detail the actual amounts of the Other Charges for such calendar year and Tenant's Pro Rata Share thereof. Such statement shall also contain a

7

reconciliation of the amounts actually paid by Tenant for such calendar year pursuant to Section 8.1 with the amounts that should have been paid by Tenant for such calendar year pursuant to Sections 5.2(c), 6.2 and 7.1 through 7.3 (determined without regard to the making of estimated payments). Landlord's failure to timely furnish the statement for any Lease Year shall not prejudice Tenant from enforcing its rights under this Section 8.   If Tenant's Pro Rata Share of the Other Charges for any calendar year is less than the estimated payments for such calendar year previously made by Tenant, Landlord shall refund the excess to Tenant at such time as Landlord delivers the related annual statement. If Tenant's Pro Rata Share of the Other Charges for any calendar year is greater than the estimated payments for such calendar year previously made by Tenant, Tenant shall remit the balance due to Landlord within 30 days after receiving the related annual statement from Landlord.

8.3     Proration of Charges. All amounts payable by Tenant hereunder with respect to any partial calendar year or other partial period at the beginning or end of the Fixed Rent Period shall be prorated on a daily basis based on the actual number of days in such partial calendar year or other partial period. In addition, all costs included in the Other Charges that relate to insurance policy periods, tax years, service contract terms or other relevant periods commencing prior to the Rent Start Date or extending beyond the Lease Termination Date shall be appropriately prorated.

8.4     Audit. If Tenant is not satisfied with any statement, estimate, copies of paid bills and other evidence of payment furnished by Landlord to Tenant under any provision of this Lease or wishes to challenge the accuracy or validity of any items therein, Tenant shall give Landlord notice of its dissatisfaction and Tenant shall be entitled to an audit of Landlord's books and records, not to occur more frequently than once per calendar year, to be made by Tenant's representatives compensated on a non-contingency fee basis. Access to Landlord's books and records shall be provided to Tenant within 30 days after Tenant's written request therefor. If such access is not provided, Tenant shall be relieved of its obligation to pay Tenant's Pro Rata Share of the Other Charges until access is provided. If any such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant. If such audit shall disclose that any of Landlord's statements of amounts due provided to Tenant has overstated the total amount of such costs by 5% or more, Landlord shall promptly pay to Tenant the cost of such audit plus interest on the overstated amount at the Index Rate. If any amount payable under this Section 8.4 is not paid by Landlord within 30 days after invoice therefor, Tenant may offset the amount thereof against the next Fixed Rent payments due from Tenant to Landlord hereunder. Landlord shall retain documentation sufficient to substantiate all of the Other Charges for any calendar year for at least 3 years after the related annual statement is delivered to Tenant under Section 8.2. The records and related information obtained by Tenant shall be treated as confidential by Tenant and its auditors, consultants and other parties reviewing such records on behalf of Tenant (collectively, "**Tenant's Auditors**"), and, prior to making any records available to Tenant or Tenant's Auditors, Landlord may require Tenant and Tenant's Auditors to each execute a reasonable confidentiality agreement (to the extent agreeable in form and substance by Tenant and Tenant's Auditors) in accordance with the foregoing. Landlord shall maintain all other relevant financial records for at least 3 years.

8.5     Waiver of Certain Charges. Notwithstanding anything to the contrary in this Lease, if Landlord shall fail to bill Tenant for Tenant's Pro Rata Share of any Insurance Charges, Real Estate Taxes or Common Area Charges within 24 months from the date the applicable bill or invoice is issued (including the date of the issuance of any bill or invoice for any supplementary taxes or utilities) or the applicable payment is due (whichever is earlier), Tenant shall not be obligated to pay Landlord for Tenant's Pro Rata Share of such charges.

8.6     No Duplication of Charges; Survival. Notwithstanding anything to the contrary contained in this Lease, in no event shall there be any duplication of any of the fees, costs, charges and other amounts billed to Tenant under any provision of this Lease. The provisions of this Section 8 shall survive the expiration of the Term or the earlier termination of this Lease.

Section 9.     Utilities.

9.1     Service to the Premises. As more particularly set forth in Annex I in Schedule 2 below, Landlord shall provide, at locations in the Premises reasonably approved by Tenant, the facilities necessary to enable Tenant to obtain for the Premises water, sanitary sewer, telephone service, gas and electricity at a minimum of 1,200 amps (120/208 volts).

9.2     Payment for Utilities. During the Term, Tenant shall pay directly for all water, sanitary sewer, waste disposal service, electricity, telephone service, data service and all other similar utilities and services, and heating, ventilating and air conditioning used by Tenant in the Premises.

8

9.3     Phone and Internet. Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to choose its own telephone service provider, internet service provider, data line service provider and provider for any other similar services to the Building. Upon prior written notice to Landlord, Landlord shall permit the company chosen by Tenant to provide such services to have reasonable access to the lines, cables, conduits and the like within the Premises and Shopping Center to provide such services to Tenant.

9.4     Interruption of Service. Landlord shall not be liable for any interruption in utility service to the Premises unless any such interruption results from the willful or negligent acts or omissions of Landlord or its agents, employees or contractors. If any utility service to the Premises is interrupted as a result of any willful or negligent act or omission of Landlord or its agents, employees or contractors, Landlord shall have 24 hours after receipt of notice from Tenant to fully restore the interrupted utility service; thereafter Rent and all other charges hereunder shall be equitably abated until such service is fully restored. Furthermore, if any utility service to the Premises is interrupted as a result of any negligent act or omission of Landlord, Tenant's sole remedy under this Section 9.4 shall be the abatement of Rent and all other charges hereunder, as expressly provided in the preceding sentence.

Section 10.     Operation of Shopping Center and Maintenance of Common Areas.

10.1     Operation and Maintenance. At all times during the Term, Landlord shall operate and maintain the Shopping Center in a first-class manner consistent with the standards of other first-class Shopping Centers in the vicinity of the Shopping Center. Without limiting the foregoing, Landlord shall operate and maintain the Common Areas in a manner commensurate with the highest standards of retail operation and maintenance consistent with the standards of other first-class Shopping Centers in the vicinity of the Shopping Center, and shall provide therefor all such services as are reasonably required, including repairing, resurfacing, repaving, restriping and resealing of the parking areas and drive aisles; repairing all curbing, sidewalks and directional markers; cleaning and sweeping; snow and ice removal before 6:00 a.m. each applicable morning; provision of adequate lighting during all hours of darkness during the main operating hours of the Shopping Center; implementation of any security measures that Landlord in its reasonable business judgment may deem prudent; installing, maintaining and replacing landscaping as needed, and any other required maintenance, including inspection, testing or monitoring of any fire sprinkler system or alarm system serving more than one tenant's premises in the Building. In addition, Landlord shall adopt and implement a regular program of pest control as may be necessary to keep the areas adjoining the Premises free of pests and rodents. In undertaking such activities, Landlord shall use commercially reasonable efforts to avoid interfering with Tenant's business operations. Notwithstanding any security measures implemented by Landlord as set forth above, Landlord shall in no case be liable for personal injury or property damage for any error with regard to the admission to or exclusion from the Shopping Center of any person. Security within the Building shall be wholly the responsibility and at the cost of Tenant and Landlord encourages installation by Tenant of alarms and other security devices, and Landlord is hereby released from any responsibility for any damage either to person or property sustained or incurred by Tenant in connection with the operation and/or failure such Tenant's security system.

10.2     Interference with Common Areas. Landlord, at Landlord's sole cost, shall take all reasonable steps permitted by law to insure that any unlawful picketing, demonstrating or other disturbance in the Common Areas (except to the extent the same is the result of any direct acts of Tenant) is removed or eliminated so that Tenant's business is not hindered or interrupted.

10.3     Prohibited Activities in Shopping Center Common Areas. Landlord covenants that neither Landlord nor any tenant or occupant of the Shopping Center shall have a carnival or similar event in the Common Areas. Landlord further covenants that (a) neither Landlord, Tenant nor any other tenant or occupant of the Shopping Center shall have the right to use the Common Areas of the Shopping Center for income-producing (selling) promotional events including sidewalk and truckload sales; (b) except as otherwise provided in this Lease, in no event shall Landlord, Tenant or any other tenant or occupant of the Shopping Center be permitted to store merchandise in the Common Areas; (c) all deliveries to all tenants or occupants of the Shopping Center shall not interfere with Tenant's deliveries or operations; and (d) Landlord shall not allow any tenant or occupant of the Shopping Center to solicit business or display merchandise within the Common Areas or distribute handbills or other advertising matter in the Common Areas or on automobiles parked in the parking area or in other Common Areas. No leases for space in the Shopping Center executed after the date hereof shall grant any tenant or occupant the right to do anything prohibited by this provision.

10.4     Failure to Maintain. If Landlord shall fail to perform any of its obligations under this Section 10 within 7 days after receipt of notice from Tenant of the need therefor (except that no notice shall be required in the event of an emergency, including any snow or ice storm, utility interruption or other event or natural disaster requiring removal of debris), then, Tenant may do so on Landlord's behalf and charge Landlord for the reasonable cost thereof.

LA:17300769.9

If Landlord shall not pay Tenant within 30 days after receipt of an invoice therefor with supporting documentation, Tenant may deduct such cost from Fixed Rent and any other sums payable hereunder.

Section 11.     Maintenance and Repairs.

11.1     Tenant's Maintenance and Repairs. From and after the Term Start Date, Tenant shall at its sole cost keep the Building and all other improvements constructed on the Premises for the exclusive use of Tenant, Tenant's employees, visitors and invitees, in good condition and repair (including painting and cleaning) excepting reasonable wear and tear and damage arising from matters addressed by Sections 19, 20 and 21. Consistent with the foregoing, Tenant (a) shall keep all exterior and interior storefront surfaces clean and shall maintain the rest of the Building and other improvements in a clean and orderly condition and free of insects, rodents, vermin and other pests, (b) shall not permit accumulations of any refuse, but shall remove the same and keep such refuse in odor-proof, rat-resistant containers within the interior of the Building shielded from the view of the general public until removed, (c) shall not cause or permit unreasonably objectionable odors to emanate or be dispelled from the Building, and (d) shall not use the plumbing facilities for any other purpose than that for which they are constructed.

11.2     Title to Buildings; Depreciation. Notwithstanding anything to the contrary in this Lease, until the Lease Termination Date, title to any and all buildings or improvements that Tenant may construct on the Land, any and all building equipment and other items that Tenant may install therein, and any and all additions, changes or alterations that Tenant may make thereto shall be solely Tenant's property, Tenant's interest therein shall be as owner and not as tenant and Tenant alone shall be entitled to depreciate the same for tax purposes. On the Lease Termination Date, subject to Section 28, title to any buildings or improvements located on the Land and any additions, changes or alterations thereto shall vest in and become the full and absolute property of Landlord. Following the Lease Termination Date, Tenant shall, if requested by Landlord, promptly execute, acknowledge and deliver to Landlord a deed and bill of sale (in form and content provided by Landlord) which (i) conveys all of Tenant's right, title, and interest in and to the Premises; (ii) assigns all contracts designated by Landlord, relating to the operation, management or maintenance of the Premises or any part thereof; and (iii) conveys or assigns, as the case may be, all plans, records, registers, permits, and all other papers and documents which may be necessary or appropriate for the proper operation and management of the Premises.

11.3     Conflicts with Lease. To the extent of any conflict between the obligations of the Tenant hereunder as compared with obligations of set forth in any CC&R, REA (Declaration of Covenants, Conditions and Restrictions or a Reciprocal Easement Agreement) or similar instrument (other than with respect to any CC&Rs or REA that Landlord and Tenant enter into pursuant to the terms of Section 2(a) of Exhibit A, to which this Lease shall be subject), including any obligation that is greater than Tenant's obligations hereunder or which imposes any monetary obligation not provided for herein, compliance with such obligations shall be the sole responsibility of Landlord.

11.4     Right to Enter. Tenant agrees to permit Landlord, or its authorized representatives, to enter the Premises at all times during usual business hours upon giving Tenant reasonable written notice (except that no notice will be required in the event of an emergency) to inspect the same and to perform any work therein (a) that may be necessary to comply with any laws, ordinances, rules or regulations of any public authority, the Insurance Service Office or any similar body or (b) that Landlord may deem necessary to prevent waste or deterioration in connection with the Premises if Tenant does not make, or cause to be made, such repairs or perform, or cause to be performed, such work within a reasonable period after receipt of written demand from Landlord. Nothing herein contained shall imply any duty on the part of Landlord to do any such work which, under any provision of this Lease, Tenant may be required to do, nor shall Landlord's performance of any repairs on behalf of Tenant constitute a waiver of Tenant's default in failing to do the same. If Landlord makes or causes any such repairs to be made or performed, as provided for herein, Tenant shall pay the cost thereof to Landlord, as additional Rent within 30 days after receipt of an invoice therefor. Landlord shall have no obligation whatsoever concerning the maintenance, repair, alteration, improvement, reconstruction or replacement of the Premises or their compliance with Laws. In addition, upon reasonable prior notice to Tenant and solely during Tenant's business hours, Landlord may show the Premises to purchasers and potential purchasers of the Premises or Shopping Center, to mortgagees and potential mortgagees of the Premises or Shopping Center and (solely during the last 9 months of the Term) to potential tenants of the Premises. Landlord may make any such entry without being deemed liable for any breach of Landlord's covenant of quiet enjoyment or any eviction or constructive eviction of Tenant, and without abatement of rent except as may otherwise be provided in this Lease.

Section 12.     Alterations; Improvements.

12.1     Tenant Alterations. Subject to Landlord's prior written approval (which approval shall not be unreasonably withheld, conditioned or delayed), Tenant may, at its own cost and expense, at any time and from time

10

to time, alter, add to, change, demolish, remove or replace any of the buildings and improvements on the Land as Tenant may deem desirable, provided that (a) any such demolition, alterations, changes, additions or replacements shall be in compliance with all applicable building codes and ordinances, and (b) in the event of any such demolition or removal of the improvements on the Land (other than a demolition or removal due to a Casualty or a Taking, in which event the provisions of Section 19 or Section 21, as applicable, shall govern), the same shall be replaced with improvements of at least equal quality to the improvements so demolished or removed. In no event shall any of the foregoing, including without limitation any decrease in the square footage of the Premises, be deemed to entitle Tenant to any reduction or abatement of Rent hereunder.

12.2 <u>Additional Space Constructed By Tenant</u>. In no event shall any area or additional level constructed by Tenant be deemed to increase the square footage of the Premises for any purpose under this Lease, including the computation of Tenant's Pro Rata Share of any costs of Landlord pursuant to the terms of this Lease; provided, however, in no event shall any additional area or additional level be permitted to the extent such additional area or additional level would require an increase or other material modification in the amount or type of the then-available parking on the Premises or in the Shopping Center.

Section 13. <u>Mechanics' Liens</u>.

13.1 <u>Mechanics' Liens</u>. Each Party shall pay all costs for work performed by or on its account and shall keep the Premises and the Shopping Center free and clear of mechanics' liens or any other liens due to such work. Each Party shall give the other Party immediate notice of any lien filed against the Premises or the Shopping Center as a result of any work of improvement performed by or on behalf of the Party doing the work. Each Party shall discharge, within 30 days (by payment or by filing the necessary statutory lien release, bond, or otherwise), any mechanics', materialmen's or other lien against the Premises or the Shopping Center and/or the other Party's interest in the Premises or the Shopping Center, as applicable, which lien may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies, or equipment alleged to have been furnished to or for the Party doing the work. If the Party doing the work fails to discharge any such lien, the other Party shall have the right, but not the obligation, in addition to all other rights and remedies available to it under this Lease, and after 20 days prior notice to the Party doing the work, either to pay and discharge such lien, without regard to the validity thereof, or to procure and cause to be recorded a statutory lien release bond and to collect from the Party doing the work: (i) all costs incurred by the Party not doing the work in paying and discharging such lien, or in procuring such bond; and (ii) all expenses incurred by the Party not doing the work in connection with such lien, including reasonable attorneys' fees and costs, recording fees and administrative costs and expenses. Upon request, each Party doing work shall execute an indemnity agreement in form and substance reasonably satisfactory to the other Party's title company that will be sufficient to allow that Party's title company to delete any exception for mechanics' liens and materialmen's liens arising by, through or under the Party doing the work.

13.2 <u>Non-Liability for Liens Arising from Other Party's Work</u>. Notice is hereby given that neither Party shall be liable for any work or materials furnished to the other Party and that no mechanics' or other lien for any such work or materials shall attach to or affect the interest in the Premises or the Shopping Center of the Party not doing the work based on any work or material supplied to the Party doing the work or anybody claiming through such Party.

Section 14. <u>Use</u>.

14.1 <u>Intended Use of Premises</u>. Tenant intends to use the Premises for the operation of a retail grocery store offering a variety of food items for off-premises consumption, merchandise and services of the quality typically sold by other stores of Tenant and its Affiliates or other grocery stores, including beer, wine and liquor (if permitted by law). Tenant also intends to have an ATM inside or outside of the Premises. Tenant shall not use the Premises for any use prohibited by Section 14.7. Notwithstanding anything to the contrary set forth hereinabove, Tenant shall be responsible for operating and maintaining the Premises pursuant to, and in no event may Tenant's use of the Premises violate, (A) any applicable Laws and CC&Rs, (B) the character of the Shopping Center as consistent with comparable shopping centers in the vicinity, (C) any then existing exclusives of third party tenants in the Shopping Center listed on **Exhibit C** or (D) the Rules and Regulations attached hereto as **Exhibit G** (if any). Tenant shall also be responsible, at its sole cost and expense, for obtaining all operating permits, licenses and governmental approvals necessary for the operation of the Premises and for determining that the Premises is suitable for such use. Tenant shall not use the Premises for any purpose or in any manner that violates the laws of the United States of America, or the laws, ordinances, regulations and requirements of the state, county and city where the Premises are located or of other lawful authorities. Tenant shall not cause or permit waste to occur in the Premises.

14.2 <u>Permitted Use of Premises</u>. Notwithstanding Tenant's intended use as described in Section 14.1, Tenant shall nonetheless have the right to use the Premises for any lawful retail business 24 hours per day so long

11

as Tenant complies with reasonable rules and regulations set forth in **Exhibit G** (if any) and applicable laws that does not violate any of the exclusive use rights set forth in **Exhibit C** or any then existing exclusives of third party tenants in the Shopping Center to which Landlord has provided Tenant with notice of.  Landlord shall use commercially reasonable, good faith efforts to work with Tenant (at no cost to Landlord) in connection with any future Entitlements. Notwithstanding anything to the contrary set forth hereinabove, Tenant shall be responsible for operating and maintaining the Premises pursuant to, and in no event may Tenant's use of the Premises  violate, (A) any applicable Laws, (B) the character of the Shopping Center as consistent with comparable shopping centers in the vicinity and (C) the Rules and Regulations attached hereto as Exhibit G (if any).  Tenant shall also be responsible, at its sole cost and expense, for obtaining all operating permits, licenses and governmental approvals necessary for the operation of the Premises and for determining that the Premises is  suitable for such use.  Tenant shall not use the Premises for any purpose or in any manner that violates the laws of the United States of America, or the laws, ordinances, regulations and requirements of the state, county and city where the Premises are located or of other lawful authorities.  Tenant shall not cause or permit waste to occur in the Premises

14.3     ATM.  Subject to the terms of this Lease, Tenant shall have the right during the Term, at Tenant's sole cost and expense, to install, operate and maintain an automated teller machine ("**ATM**") accessible from either the inside or the outside of the Building.  Tenant hereby acknowledges and agrees that (i) Tenant shall be fully responsible for the maintenance, repair, compliance with laws and insuring of the ATM, (ii) Tenant shall comply with all laws, ordinances and regulations applicable to the ATM, (iii) Tenant's indemnity obligations set forth in this Lease shall specifically apply to any claims in connection with or related to the installation, operation maintenance or use of the ATM, and (iv) Tenant shall keep the ATM in good and clean working order and condition.  To the extent the ATM is accessible from the exterior of the Building, then all aspects of the ATM, including, without limitation, the size, design, color, and manner of installation, shall be subject to the approval of Landlord, which shall not be unreasonably withheld, conditioned or delayed.  Prior to the expiration or earlier termination of this Lease, Tenant shall, at its sole cost and expense, remove the ATM and shall repair any and all damage to the Premises and Building resulting from the installation and/or removal thereof.

14.4     Rooftop Rights.  Provided that Tenant is then in occupancy of the Premises, then Tenant may install and maintain, at Tenant's sole cost and expense, without the payment of any Rent or a license or similar fee or charge, satellite dishes/antennae on the roof of the Building for receiving of signals or broadcasts and two-way transmissions of electronic information (but not for the generation or transmission of any generally or widely distributed signals or broadcasts) servicing the business conducted by Tenant from within the Premises (all such equipment is defined collectively as the "**Telecommunications Equipment**").  Landlord makes no representations or warranties whatsoever with respect to the quality and clarity of any receptions and transmissions to or from the Telecommunications Equipment and the presence of any interference with such signals whether emanating from the Building or otherwise.  The physical appearance and the size of the Telecommunications Equipment shall be subject to Landlord's reasonable approval, and Landlord may require Tenant to install screening around such Telecommunications Equipment, at Tenant's sole cost and expense, as reasonably designated by Landlord.  Tenant shall maintain such Telecommunications Equipment, at Tenant's sole cost and expense.  Tenant shall remove such Telecommunications Equipment upon the expiration or earlier termination of this Lease, and shall return the affected portion of the rooftop and the Premises to the condition the rooftop and the Premises would have been in had no such Telecommunications Equipment been installed (reasonable wear and tear excepted).  Such Telecommunications Equipment shall, in all instances, comply with applicable governmental laws, codes, rules and regulations.

14.5     Shopping Center Uses.  Landlord covenants and agrees that all of the Shopping Center shall be used only for retail sales and services (specifically including, without limitation, food and food-related sales and services).

14.6     Exclusive Use.  Throughout the Term, Landlord shall not lease, or permit the assignment, sublease, license or other use of, any portion of the Shopping Center (other than the Premises) for the operation of any (a) retail grocery store, (b) except for the current space occupied by the liquor store as of the Effective Date, store selling beer, wine or liquor for off-premises consumption, or (c) convenience store.

14.7     Use Restrictions for Shopping Center.  Throughout the Term, Tenant shall not use the Premises or any portion thereof, and Landlord shall not lease, or permit the assignment, sublease, license or other use of, any portion of the Shopping Center for the operation of any secondhand store, or pinball, video game, nor any form of entertainment arcade, gambling or betting office (other than for the sale of lottery tickets), massage parlor, cinema, video store or bookstore selling, renting, or exhibiting primarily material of a pornographic or adult nature, adult entertainment bar or club, billiards parlor or pool hall, firearms shooting range or any other use which creates or causes excessive noise or odors, flea market, warehouse, or car rental business.

12

Section 15.        Signs.

15.1        Tenant's Signs.  Subject to compliance with Landlord's Sign Criteria (if any), attached hereto as **Exhibit F,** Tenant shall have the right to install, maintain, replace and relocate one or more signs, awnings and sign panels in conformity with applicable municipal codes, affixed anywhere in or on the exterior of the Building, and to use professionally prepared standard window banners (and self-adhesive appliqués), pre-opening announcements, sale or store closing signage in Tenant's trade dress and corporate colors.  Without limiting the foregoing, Tenant shall have the exclusive right to place signage of any kind on all exterior elevations of the Building, including as shown in the preliminary elevations attached hereto as **Exhibit D.**  Tenant shall obtain and pay for all Permits and Licenses related to such signs or required in connection therewith.

15.2        Pylon, Pole and Monument Signs.  Subject to compliance with Landlord's Sign Criteria (if any), attached hereto as **Exhibit F,** subject to municipal approval, notwithstanding anything in this Lease to the contrary, Tenant shall have the right, at its sole cost, to construct its own monument sign on Harbor Boulevard for its exclusive use.  The Parties shall cooperate with one another (including by executing applications) in obtaining any necessary entitlements, building permits or other governmental approvals for the foregoing signs.

15.3        Restrictions on Landlord.  During the Term, Landlord shall not install any structure, sign or (except as mandated by any applicable local ordinances) landscaping on any part of the Premises whatsoever, or take any other action in the Shopping Center, which will materially obstruct or interfere with the visibility or legibility of any of Tenant's signs or storefronts.

15.4        General Signage Terms.  All such signage shall be subject to Tenant's receipt of all required governmental permits and approvals and shall be subject to all applicable Laws affecting the Premises.  Tenant hereby acknowledges that Landlord has made no representation or warranty to Tenant with respect to the probability of obtaining all necessary governmental approvals and permits for any such signage.  In the event Tenant does not receive the necessary governmental approvals and permits for any of its signage, Tenant's and Landlord's rights and obligations under the remaining terms and conditions of the Lease shall be unaffected.  Upon the Lease Termination Date, Tenant shall, at Tenant's sole cost and expense, cause all Tenant's panels to be removed and shall cause the areas in which such panels were located to be restored to the condition existing immediately prior to the placement of such panels (reasonable wear and tear excepted).  If Tenant fails to timely remove its panels or to restore the areas in which such panels were located, as provided in the immediately preceding sentence, then Landlord may perform such work, and all actual and reasonable costs incurred by Landlord in so performing shall be reimbursed by Tenant to Landlord within 30 days after Tenant's receipt of an invoice therefore.

Section 16.        Shopping Center Parking.  Tenant shall have non-exclusive rights to use all parking areas serving the Shopping Center outside the Premises.  The 56 parking spaces most proximate to Tenant's front entrance, including 2 parent-and-toddler spaces, 2 cart corrals, 2 hybrid parking spaces, 3 ADA parking spaces shall be and remain available for primary use by Tenants and its customers.  Such parking areas are designated as such on the Site Plan (however the foregoing shall not be deemed to restrict Landlord from making any changes to such parking spaces if such change is required to comply with any governmental requirements including, without limitation, handicap access codes which were created in order to implement the Americans With Disabilities Act, as the same may be modified or amended).  Landlord shall at all times maintain a parking ratio for the Shopping Center as required by applicable municipal codes for all uses then in operation at the Shopping Center (such amount as applicable from time to time the "**Required Minimum Parking**").  Landlord shall not add any barriers to, impose any controls on or institute any charge for customer use of the parking areas serving the Shopping Center.  Landlord shall not designate any employee parking area or any bus stop, rapid transit stop, "park and ride" program or similar transit or parking program within the parking areas contained in the No Build Areas.

Section 17.        Compliance With Laws.

17.1        Landlord Compliance with Laws.  At Landlord's sole cost (subject to Tenant's payment obligations under Sections 5, 6, 7 and 8), Landlord shall comply with all Laws relating to the Common Areas and to real property, buildings and retail businesses in general.  Landlord shall maintain the Common Areas at all times so as to comply with and conform to all Laws.  Landlord shall be responsible, at its sole cost, for compliance with all Environmental Laws applicable to the Shopping Center (other than the Tenant's Building) other than those obligations expressly assumed by Tenant pursuant to Sections 11.1 and 20.1.

17.2        Tenant Compliance with Laws.  At Tenant's sole cost, Tenant shall comply with all Laws relating to the Building and Tenant's use and occupancy of the premises from and after the Term Start Date.  The foregoing covenant of Tenant shall not impose any liability for the presence of Hazardous Substances on the Building beyond

13

the express liability of Tenant set forth in Section 20.1.  During the Term, Tenant shall have no obligation with respect to Laws relating to property, buildings or retail businesses in general or to the Shopping Center (other than Tenant's Building).

Section 18.      Mutual Indemnities of Landlord and Tenant.

18.1      Mutual Indemnity.  Each Party (the "**Indemnifying Party**") hereby agrees to indemnify and hold harmless the other Party and its employees, agents and contractors (the "**Indemnified Parties**") from and against any and all Losses which (a) arise from any willful, negligent or tortious act or omission of the Indemnifying Party or its employees, agents or contractors on, about or concerning the Premises or the Shopping Center, (b) result from any breach of or default under this Lease by the Indemnifying Party or its employees, agents or contractors, or (c) result from bodily injury (including death) to any person or damage to any property arising out of any testing, inspections, construction, reconstruction, restoration, maintenance or other work performed or required to be performed hereunder by the Indemnifying Party or its employees, agents or contractors.  Tenant shall indemnify, defend, protect, and hold harmless the Landlord from any and all Losses (including, but not limited to, a slip and fall), incurred in connection with or arising from any cause in, on or about the Building.  The Indemnifying Party's obligations under this Section 18.1 shall not apply to any Losses to the extent caused by the willful, negligent or tortious act or omission of any of the Indemnified Parties.  Notwithstanding the foregoing, in no event shall Tenant be required to indemnify or hold harmless Landlord, its employees, agents and contractors from or against any Losses resulting from conditions that existed at the Shopping Center (including the Premises) prior to the Term Start Date.

18.2      Limitation.  Notwithstanding anything to the contrary in Section 18.1, the obligation of the Indemnifying Party to indemnify and hold harmless the Indemnified Parties shall not extend to any matter against which the Indemnified Parties shall be effectively protected by the insurance required to be carried hereunder by such Indemnifying Party; provided, however, that if the liability related to any such matter shall exceed the amount of the effective and collectible insurance in question, the obligation of the Indemnifying Party to indemnify and hold harmless the Indemnified Parties shall apply to such excess.

18.3      Obligation to Defend.  In case any claim, demand, action, suit or proceeding is initiated or made against an Indemnified Party by reason of any Losses specified in Section 18.1, the Indemnifying Party, upon notice from the Indemnified Party, shall, at the Indemnifying Party's sole cost, resist or defend such claim, demand, action, suit or proceeding, but the Indemnifying Party may make or cause to be made such investigation and such settlement of the claim, demand, action, suit or proceeding as the Indemnifying Party or its insurers shall deem expedient; provided, however, that the Indemnifying Party shall not admit liability on behalf of the Indemnified Party and shall obtain the appropriate releases and settlement documents.

18.4      Survival of Indemnification Obligations.  Each Party's obligations under this Section 18 shall survive the expiration of the Term or the earlier termination of this Lease.

Section 19.      Damage and Destruction.

19.1      Insured Casualty.  If, at any time during the Term, the buildings and improvements on the Land are destroyed or damaged in whole or in part by an Insured Casualty, Tenant shall commence construction and diligently pursue the Restoration of the affected buildings and improvements as nearly as possible to their value, condition and character immediately prior to the Insured Casualty within 12 months after receipt by Tenant of the applicable insurance proceeds; provided, however, that if the damage or destruction occurs during or after the last 2 years of the Term, Tenant may instead either (a) board up or otherwise secure the affected buildings and improvements as required by municipal ordinances or (b) cause the affected buildings and improvements to be razed, all rubble and debris removed, and the affected Land placed in a safe and sightly condition.  If Tenant elects either (a) or (b) of the immediately preceding sentence, then within 30 days after Tenant notifies Landlord of its election and either completes (a) or (b), as Tenant elects, Landlord shall have the right to terminate this Lease in which case neither Party shall have any further obligation to the other except for any provisions which survive the expiration or termination of this Lease.

19.2      Uninsured Casualty.  If, at any time during the Term, the buildings and improvements on the Land are destroyed or damaged in whole or in part by an Uninsured Casualty, then Tenant shall either (a) commence construction and diligently pursue the Restoration of the affected buildings and improvements or (b) board up or otherwise secure the affected buildings and improvements as required by municipal ordinances or (c) cause the affected buildings and improvements to be razed and the affected Land placed in a safe and sightly condition.

14

19.3    Shopping Center Casualty. If any part of the Shopping Center other than the Premises is damaged or destroyed in whole or in part by a risk or peril of any kind (a "**Shopping Center Casualty**"), Landlord shall promptly remove all resulting rubble and debris. If the Shopping Center Casualty is an Insured Casualty, Landlord shall diligently proceed to Restore the damaged or destroyed part of the Shopping Center as nearly as possible to its value, condition and character immediately prior to the Insured Casualty. If the Shopping Center Casualty is an Uninsured Casualty, Landlord shall either (a) diligently proceed to Restore the damaged or destroyed part of the Shopping Center as nearly as possible to its value, condition and character immediately prior to the Uninsured Casualty or (b) board up or otherwise secure the damaged or destroyed part of the Shopping Center as required by municipal ordinances or (c) raze the damaged or destroyed part of the Shopping Center and place the same in a safe and sightly condition. Landlord shall notify Tenant of any such election within 60 days (or, in the case of a Shopping Center Casualty caused by earthquake, 90 days) after the date of the Shopping Center Casualty. Notwithstanding the foregoing, if Landlord elects to Restore the damaged or destroyed part of the Shopping Center and the Restoration required to be performed under this Section 19.3 cannot reasonably be completed within 12 months (or, in the case of a Shopping Center Casualty caused by earthquake, 18 months) after the date of the Shopping Center Casualty, as reasonably determined by a licensed architect or engineer mutually acceptable to Landlord and Tenant, Landlord shall notify Tenant of such determination within 60 days (or, in the case of a Shopping Center Casualty caused by earthquake, 90 days) after the date of the Shopping Center Casualty, in which case Tenant shall have the right to terminate this Lease by giving notice thereof to Landlord not later than 30 days after Tenant's receipt of Landlord's notification. Notwithstanding the foregoing, if Landlord elects either to secure or to raze the damaged or destroyed part of the Shopping Center, Tenant shall have the right to terminate this Lease by giving notice thereof to Landlord not later than 30 days after Landlord notifies Tenant of such election; provided, however, that if the amount of the damage or destruction to the Shopping Center does not exceed 20% of the replacement cost and Landlord has notified Tenant of the same, Tenant shall not have the right to terminate this Lease by reason of such election.

19.4    Extension of Term. If, in connection with a Casualty affecting the buildings and improvements on the Land, Tenant is required or elects to pursue the Restoration of the affected buildings and improvements, at Tenant's option, the Term shall be tolled by a period of time equal to the time between the date of the Casualty and the date on which Tenant completes the Restoration.

19.5    Abatement of Rent. If, in connection with a Casualty affecting any part of the Shopping Center other than the Premises, Landlord is required or elects to pursue the Restoration of the damaged or destroyed part of the Shopping Center, then for the period of the Restoration, Rent and all other charges hereunder shall be equitably abated based on the nature and extent of the adverse impact on the operation of Tenant's business.

Section 20.    Environmental Matters.

20.1    Tenant's Obligations.

(a)    Tenant shall not use, generate, store, treat or dispose of any Hazardous Substances on the Premises. However, Tenant may (i) store and sell household and automotive cleaners and other chemicals (including motor oil) in standard retail containers as are commonly sold by supermarkets, grocery stores, and/or specialty food retailers, and (ii) store and use household cleaners, chemicals and ordinary office supplies to maintain the Premises and operate Tenant's business even if such cleaners, chemicals and supplies may constitute Hazardous Substances, provided that Tenant complies with Laws in doing so.

(b)    If, at any time during the Term, Tenant or any of its employees, agents, contractors or invitees shall release any Hazardous Substances in, on or under the Premises or shall otherwise violate any Environmental Laws affecting the Premises, then Tenant, at Tenant's sole cost, shall provide written notice of the same to Landlord and shall promptly remove or remediate the Hazardous Substances or cure the Environmental Laws violation, in each case to the extent required by and in full compliance with Laws. Tenant shall indemnify and hold harmless Landlord from and against any and all Losses arising out of or in connection with any such Hazardous Substances release or Environmental Laws violation.

20.2    Landlord's Obligations.

(a)    If (i) prior to the Term, any Person other than Tenant or any of its employees, agents or contractors shall have released any Hazardous Substances in, on or under the Premises or otherwise shall have violated any Environmental Laws affecting the Premises or (ii) during the Term, Landlord or any other tenant or occupant of the Shopping Center or any of Landlord's or such other tenant's or occupant's employees, agents, contractors or invitees (collectively, the "**Landlord Parties**") shall release any Hazardous Substances in, on or under the Premises or otherwise shall violate any Environmental Laws affecting the Premises, then Landlord, at no cost to

15

Tenant, shall promptly cause the Hazardous Substances to be removed or remediated or cause the Environmental Laws violation to be cured, in each case to the extent required by and in full compliance with Laws. Landlord shall indemnify and hold harmless Tenant from and against any and all Losses arising out of or in connection with the Hazardous Substances release or Environmental Laws violation affecting the Premises that is caused by any Person other than Tenant or any of its employees, agents or contractors prior to the Term or by Landlord or any of the other Landlord Parties during the Term.

(b)     If a Hazardous Substances release or Environmental Laws violation caused by Landlord or any of the other Landlord Parties prevents Tenant from reasonably operating its business at the Premises in the normal course, then Rent shall abate until such time as Tenant is able to reasonably resume operating its business in the normal course. If Tenant is unable to reasonably resume normal operation of its business at the Premises within 180 days after the date which Tenant was first prevented from reasonably operating its business at the Premises in the normal course, then until such inability to reasonably operate in the normal course has ended, Tenant shall have the right to terminate this Lease by giving written notice thereof to Landlord.

(c)     If Tenant terminates this Lease as provided in Section 20.2(b) above, Landlord shall promptly reimburse Tenant for the unamortized cost of Tenant's leasehold improvements (but only if the Hazardous Substances release or Environmental Laws violation is caused by Landlord or any of the other Landlord Parties during the Term) and shall repay any Rent or other charge paid in advance by Tenant. For this purpose, amortization shall be computed on a straight-line basis over a period equal to the then-current Term.

20.3     <u>Survival of Environmental Obligations</u>. Each Party's obligations under this Section 20 shall survive the expiration of the Term or the earlier termination of this Lease.

Section 21.          <u>Eminent Domain</u>.

21.1     <u>Taking of the Premises</u>.

(a)     If the use or possession of the entire Premises or any material portion thereof (*i.e.*, a portion which, in Tenant's reasonable business judgment, renders the balance of the Premises unsuitable for the continuation of Tenant's business; provided, however, with regard to the taking of any parking areas on the Premises, it shall only be deemed material if following such taking there does not remain space outside the Building to provide for the minimum amount of parking required by applicable law for the Premises) shall be taken in condemnation proceedings, by right of eminent domain or by sale to a condemning authority in lieu of such taking (each, a "**Taking**"), then this Lease shall automatically terminate when a right to occupancy or possession is acquired by the condemning authority and, upon such termination, all prepaid Rent and other charges payable hereunder shall promptly be repaid by Landlord to Tenant.

(b)     If only a non-material portion of the Premises shall be the subject of a Taking, then this Lease shall continue in full force and effect, except that Rent and all other charges hereunder shall be reduced in proportion with the degree to which Tenant's use of the Premises is impaired including the loss of any parking.

(c)     In the event of a Taking of all or any portion of the Premises, Landlord shall be entitled to an award based on the taking of or injury to Landlord's fee simple estate in the Land and including, without limitation, all rights as "Landlord" under this Lease, Landlord's residual interest in the Building and all other improvements on the Premises, and the cost of all Landlord's Work, and Tenant shall be entitled to an award based on any loss or reduction of its leasehold and any easement estates (through the remainder of the Initial Term or any then-in-effect Extension Period), loss of any building or other improvement constructed or placed on the Premises by Tenant, loss or interruption of business and the cost of any alterations or restoration resulting from the Taking. Any single award or settlement shall be allocated between the Parties in accordance with the foregoing; provided, however, that if Tenant elects to restore, replace or reconstruct any improvements which are the subject of a Taking, then Landlord shall deliver to Tenant Landlord's share of the award attributable to such improvements to the extent Tenant's share of the award attributable to such improvements is not sufficient to pay for the cost of restoration, replacement and reconstruction.

(d)     If a court fails or refuses to grant separate awards to Landlord and Tenant upon a Taking of all or any portion of the Premises and if Landlord and Tenant are unable to agree on the allocation of the award and such inability to agree continues for 30 days after the amount of the award is determined, Landlord and Tenant agree that the determination of such allocation shall be made in accordance with the following procedure. Landlord and Tenant shall each promptly appoint one appraiser (whose fees shall be paid by the appointing Party). Those two appraisers shall promptly appoint a third appraiser (whose fees shall be split and paid equally by the Parties). Each

16

appraiser appointed hereunder shall be a member of the American Institute of Real Estate Appraisers (or successor organization) having at least 5 years of experience in real estate appraisal for commercial retail use in the metropolitan area in which the Land is located. The three appraisers so appointed shall jointly make the required appraisals of the respective values of Landlord's and Tenant's interests in the Premises and shall allocate the award based upon such appraisals, and if they cannot agree, the appraisals of the third appraiser will be accepted by Landlord and Tenant. If, after notice by either Landlord or Tenant of the appointment of an appraiser by the Party giving such notice, the other Party to whom such notice is given shall fail, within a period of 10 days after such notice, to appoint an appraiser, then the appraiser so appointed by the Party giving the notice shall have the power to proceed as sole appraiser to make the appraisal and allocation hereunder.

21.2    Taking of the Shopping Center.

(a)    If, as a result of a Taking, (i) the gross leasable area of the Shopping Center is reduced by 20% or more, or (ii) the loading area for the Premises is, in Tenant's judgment, no longer suitable for Tenant's use (unless a substitute loading area satisfactory to Tenant is provided), or (iii) any part of the parking area in the No Build Areas is taken; or (iv) either (A) the parking area of the Shopping Center is reduced by 10% or more, or (B) such portion of the parking areas are taken as would result in the reduction of the number of parking spaces for standard size automobiles below the Required Minimum Parking after such Taking, or (C) the parking areas are decreased below the Required Minimum Parking, unless Landlord shall promptly add sufficient parking (by the addition of immediately contiguous land, or otherwise, in a manner acceptable to Tenant), or (v) any median cut, means of ingress or egress, traffic control device, or other means of access to the Premises (including the loading area) is altered so as to adversely affect, in Tenant's judgment, the flow of traffic in, to, from or about the Shopping Center, then Tenant may terminate this Lease by notice to Landlord sent within 60 days after possession is taken by the condemning authority or such alteration is effected and, upon such termination, all prepaid Rent and other charges hereunder shall promptly be repaid by Landlord to Tenant.

(b)    If, as a result of a Taking, (i) (A) the gross leasable area of the Shopping Center is reduced by 20% or more or (B) the parking areas of the Shopping Center are reduced to such an extent that the remaining parking areas do not comply with applicable zoning requirements and (ii) in either of such events, Landlord terminates the leases of all other tenants in the Shopping Center, then provided that neither Landlord nor a Related Party shall have been a proponent of the Taking in the underlying condemnation proceedings, Landlord may terminate this Lease by notice to Tenant sent within 60 days after possession is taken by the condemning authority and, upon such termination, all prepaid Rent and other charges hereunder shall promptly be repaid by Landlord to Tenant.

(c)    If this Lease is not terminated after a Taking affecting the remainder of the Shopping Center (*i.e.*, that portion of the Shopping Center other than the Premises), then (i) as soon as practicable, Landlord at its sole cost shall Restore the buildings and improvements on the remainder of the Shopping Center to substantially their former condition so as to constitute complete, integrated and sound structures, (ii) during the period when the remainder of the Shopping Center is being Restored, Rent and all other charges hereunder shall equitably abate, and (iii) thereafter, Rent and all other charges hereunder shall equitably abate based upon the extent and duration of the interference with Tenant's normal business operations. This subsection (c) shall not in any way limit Tenant's rights under Section 21.1(a).

21.3    Impediments Caused By Takings. If, due to a Taking, there shall be an impediment (*i.e.*, a temporary blockage or obstruction of entrances and exits) which materially adversely affects any means of ingress or egress by automobiles, trucks or pedestrians between the Shopping Center and any abutting street, Tenant may notify Landlord of the same. If, within 30 days after Landlord's receipt of such notice, such impediment shall not be removed, then, until such impediment is removed, Fixed Rent and all other charges due under this Lease shall equitably abate based upon the extent and duration of the interference with Tenant's normal business operations.

Section 22.    Assignment or Sublease by Tenant.

22.1    Assignment. Tenant shall have the right to assign this Lease, or to sublet the whole or any part of the Premises, to any Person for any lawful retail purpose as set forth in Section 14.2 above, with Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed, provided that (a) any assignee shall, in writing, assume and agree to keep, observe and perform all of Tenant's agreements, conditions, covenants and terms pursuant to this Lease and shall be and become liable for the nonperformance thereof accruing from the date of assignment and (b) notwithstanding any such assignment, Tenant shall remain liable for the obligations of Tenant hereunder, unless the assignee (or the guarantor of such assignee's full obligations under this Lease) has a net worth on the date of assignment equal to or in excess of $100,000,000, computed in accordance with generally accepted

17

LA:17300769.9

accounting principles consistently applied. If an assignee (or the guarantor of such assignee's full obligations under this Lease) has such net worth, Tenant shall be automatically released of all liability hereunder accruing after the date of assignment without the necessity of executing any other instruments and this Lease shall serve as evidence of such release of liability. Without limitation as to other reasonable grounds for withholding consent, the Parties hereby agree that it shall be reasonable under this Lease for Landlord to withhold consent to any proposed transfer where one or more of the following apply: (i) The transferee is engaged in a business which is not consistent with the tenant mix in the Shopping Center; (ii) The transferee intends to use the Premises for purposes which are not permitted under this Lease; (iii) The proposed transfer would cause a violation of another lease for space in the Shopping Center, or would give an occupant of the Shopping Center a right to cancel its lease; and (iv) The proposed transferee's business would result in a violation of an exclusive right granted to another tenant in the Shopping Center.

22.2    Assignment to Affiliate. Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to assign this Lease, or to sublet the whole or any part of the Premises, to any Affiliate of Tenant or to any other Entity which succeeds to the business of Tenant, whether by merger, consolidation, acquisition of assets or stock or otherwise, in each case without the further consent of Landlord.

22.3    Departments. Nothing herein contained shall be deemed to limit or restrict the rights of Tenant to operate departments within the Premises, without obtaining Landlord's consent, by means of sublease, license or concession agreements, subject to any restrictions or limitations applicable to Tenant under this Lease.

22.4    Leasehold Mortgages. Tenant shall have the right, from time to time upon prior written notice to Landlord, but without the further consent of Landlord, to convey or encumber Tenant's leasehold estate and interest in the Premises or any part thereof by mortgage, deed of trust or similar financing instrument in favor of an entity generally recognized in the real estate industry as an institutional lender engaged in the business of real estate financing. No leasehold mortgagee shall be deemed an assignee or transferee of this Lease so as to require such leasehold mortgagee to assume the performance of any of the covenants or agreements on the part of Tenant to be performed hereunder. If the leasehold mortgagee shall require that Landlord deliver a customary landlord estoppel as part of the leasehold mortgagee's financing arrangement with Tenant, Landlord shall execute, acknowledge and deliver such estoppel (subject to any changes that Landlord may reasonably request). Landlord shall not be required to subject its fee estate and interest in the Premises to the lien of any leasehold financing or mortgage sought or obtained by Tenant.

Section 23.        Assignment or Transfer by Landlord.

23.1    Transfer of Title. If Landlord shall transfer title to the entire fee estate in the Shopping Center Property to a Bona Fide Purchaser who assumes in writing all of Landlord's executory obligations under this Lease, Landlord shall have no liability for the performance of such executory obligations.

23.2    Partial Transfer. If Landlord plans to sell, convey, transfer or assign any portion, but less than all, of the fee estate in the Shopping Center, then prior to such sale, conveyance, transfer or assignment, Landlord shall record a reciprocal easement agreement, a declaration of covenants, conditions and restrictions or a similar document which shall cause the rights of Tenant, including those pertaining to exclusives, the Common Areas, ingress and egress, and maintenance of the Shopping Center, to run with the land.

23.3    Subordination. This Lease shall be subject and subordinate to the lien of any mortgage or deed of trust in favor of a bank or other institutional lender now or hereafter in force against the fee estate in the Shopping Center, and to all advances made upon the security thereof, provided that such lender executes and delivers to Tenant a subordination, nondisturbance and attornment agreement in form and substance reasonably acceptable to Tenant and such lender.

23.4    Access to Premises. Upon reasonable prior notice to Tenant and solely during Tenant's business hours, Landlord may show the Premises to purchasers and potential purchasers of the Shopping Center, to mortgagees and potential mortgagees of the Shopping Center and (solely during the last 6 months of the Term) to potential tenants.

Section 24.        Landlord's Warranties and Representations. As a material inducement to Tenant to enter into this Lease, Landlord warrants, represents, covenants and agrees as follows:

24.1    Landlord has the power and authority to execute, deliver and perform this Lease and to carry on its business as it is currently being conducted. This Lease does not violate the provisions of any agreement, instrument

18

LA:17300769.9

or document to which Landlord is a party or by which Landlord or its properties are bound. This Lease constitutes the legal, valid and binding obligation of Landlord enforceable against Landlord in accordance with its terms.

24.2     Landlord has obtained all consents and approvals (if any) required to be obtained on or before the Effective Date in connection with Landlord's execution, delivery and performance of this Lease.

24.3     Landlord is not bankrupt or insolvent under any applicable federal or state standard. Landlord has not filed for protection or relief under any applicable bankruptcy or creditor protection statute. Landlord has not been threatened by creditors with an involuntary application of any applicable bankruptcy or creditor protection statute. Landlord is not entering into the transactions described in this Lease with an intent to defraud any creditor or to prefer the rights of one creditor over any other.

24.4     There are no actions, suits or proceedings of any kind or nature whatsoever pending or, to Landlord's knowledge, threatened against the Premises, the Shopping Center Property or Landlord in any court or before or by any Governmental Authority, including any condemnation or eminent domain proceedings and further including any proposed changes to the highways, roadways and/or access ways adjoining or adjacent to the Shopping Center.

24.5     Landlord is the sole owner of the entire fee simple estate in the Premises and the Shopping Center, subject only to Tenant's ownership of the Building (once built). Landlord's title thereto is free and clear of all claims, liens, encumbrances, restrictions, reservations and defects in title other than those set forth in **Exhibits C** and **E**. No Person other than Tenant has any right or option whatsoever to acquire or lease the Premises or any portion thereof or interest therein.

24.6     To Landlord's knowledge, Landlord has not entered into, agreed to be bound by, filed or recorded and shall not enter into, agree to be bound by, file or record any exclusive use restrictions, restrictive covenants or other agreements, instruments or documents (whether or not the same are filed or recorded in any public office) which would materially adversely affect Tenant's ability to occupy or use the Premises for the purposes set forth herein, materially adversely impair the ability of Tenant and its customers, staff and invitees to use the parking areas as provided herein or materially prevent the Premises from being developed in accordance with the layout shown on the Site Plan.

24.7     The Shopping Center now has, and on completion of currently contemplated construction will have, full-sized parking stalls in an amount not less than the Required Minimum Parking (as in effect on the date of this Lease).

24.8     The slope of all drive-aisles, parking fields and sidewalks in the Shopping Center is not and will not be greater than 3.0%.

24.9     On the Term Start Date, the Shopping Center shall have full pedestrian and vehicular access from Harbor Boulevard, Gisler Avenue and Cinnamon Avenue, as shown on the Site Plan.

24.10     To Landlord's actual knowledge, as of the Effective Date and the Term Start Date, there is no existing violation of Laws applicable to the Premises. On the Term Start Date, the Premises shall not be subject to any citations, orders or other notices of violation of Laws which would materially adversely affect Tenant's ability to occupy or use the Premises for the purposes set forth herein. Notwithstanding the foregoing, this subsection 24.10 shall not apply to direct acts of Tenant which result in citations, orders or other notices of violation of Laws.

24.11     Landlord has not used or permitted the use of the Shopping Center in any manner for the storage, use, treatment, manufacture or disposal of any Hazardous Substances, and to Landlord's knowledge, the Shopping Center has never been used for the storage, use, treatment, manufacture or disposal of any Hazardous Substances. On the Term Start Date, the Premises and the rest of the Shopping Center shall be free from contamination by Hazardous Substances. Within 5 days after the Effective Date, Landlord shall provide Tenant with accurate and complete copies of all environmental site assessments, audits and similar reports concerning the Premises in Landlord's possession or control.

All references to Landlord's knowledge shall be limited to the actual knowledge of William R. Lang, Landlord's representative.

19

LA:17300769.9

Section 25.    Tenant's Warranties and Representations.  As a material inducement to Landlord to enter into this Lease, Tenant warrants, represents, covenants and agrees as follows:

25.1    Tenant is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.  Tenant has the corporate power and authority to execute, deliver and perform this Lease and to carry on its business as it is currently being conducted.  This Lease has been duly authorized by all necessary corporate action on the part of Tenant and has been duly executed and delivered by Tenant.  This Lease does not violate the provisions of any agreement, instrument or document to which Tenant is a party or by which Tenant or its properties are bound.  This Lease constitutes the legal, valid and binding obligation of Tenant enforceable against Tenant in accordance with its terms.

25.2    Tenant has obtained all consents and approvals (if any) required to be obtained on or before the Effective Date in connection with Tenant's execution, delivery and performance of this Lease.

25.3    Tenant is not bankrupt or insolvent under any applicable federal or state standard.  Tenant has not filed for protection or relief under any applicable bankruptcy or creditor protection statute.  Tenant has not been threatened by creditors with an involuntary application of any applicable bankruptcy or creditor protection statute.  Tenant is not entering into the transactions described in this Lease with an intent to defraud any creditor or to prefer the rights of one creditor over any other.

Section 26.    Default by Landlord; Remedies of Tenant.

26.1    Landlord's Defaults.  Each of the following occurrences shall be deemed an event of default hereunder by Landlord (each such occurrence, after the expiration of any applicable notice and cure period, being hereinafter referred to as a "**Landlord Default**"):

(a)    Default in the performance of any covenant or condition of Landlord pursuant to this Lease or material inaccuracy in any representation or warranty made by Landlord hereunder for a period of 30 days after notice from Tenant of the default or inaccuracy; provided, however, that if the nature of the default or inaccuracy is such that more than 30 (but not more than 90) days are required for its cure, there shall be no Landlord Default if Landlord commences to cure the default or inaccuracy within said 30 days and thereafter diligently prosecutes the same to completion within said 90 days.

(b)    The making by Landlord of any general assignment for the benefit of creditors; the filing by or against Landlord of a petition to have Landlord adjudged bankrupt or insolvent or of a petition for reorganization or arrangement under any federal or state bankruptcy or other insolvency law (unless, in the case of a petition filed against Landlord, the same is dismissed within 60 days after filing); the appointment of a trustee or receiver to take possession of all or substantially all of Landlord's assets or of Landlord's interest in this Lease and possession is not restored to Landlord within 60 days thereafter; or the attachment, execution or other judicial seizure of substantially all of Landlord's assets or of Landlord's interest in this Lease and possession is not restored to Landlord within 60 days thereafter.

26.2    Tenant's Remedies.  Upon the occurrence of any Landlord Default and the expiration without cure of any applicable notice and cure periods, Tenant may, at its option and in addition to all of Tenant's other rights and remedies at law or in equity, do any of the following:  (a) incur, and deduct from succeeding Rent, the cost actually and reasonably necessary to perform any obligation that Landlord has failed to perform to the extent not paid by Landlord within 10 Business Days following notice therefor from Tenant; and (b) exercise any other remedy explicitly provided in this Lease for the breach of a specific term or condition.

Section 27.    Default by Tenant; Remedies of Landlord.

27.1    Tenant's Defaults.  Each of the following occurrences shall be deemed an event of default hereunder by Tenant (each such occurrence, after the expiration of any applicable notice and cure period, being hereinafter referred to as a "**Tenant Default**"):

(a)    Default in the payment of Rent continuing for a period of 10 days after notice from Landlord of such default.

(b)    Default in the performance of any other covenant or condition of Tenant pursuant to this Lease or material inaccuracy in any representation or warranty made by Tenant hereunder for a period of 30 days

20

after notice from Landlord of the default or inaccuracy; provided, however, that if the nature of the default or inaccuracy is such that more than 30 (but not more than 90) days are required for its cure, there shall be no Tenant Default if Tenant commences to cure the default or inaccuracy within said 30 days and thereafter diligently prosecutes the same to completion within said 90 days.

(c)      The making by Tenant of any general assignment for the benefit of creditors; the filing by or against Tenant of a petition to have Tenant adjudged bankrupt or insolvent or of a petition for reorganization or arrangement under any federal or state bankruptcy or other insolvency law (unless, in the case of a petition filed against Tenant, the same is dismissed within 60 days after filing); the appointment of a trustee or receiver to take possession of all or substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease and possession is not restored to Tenant within 60 days thereafter; or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease and possession is not restored to Tenant within 60 days thereafter.

27.2      Landlord's Remedies. Upon the occurrence of any Tenant Default and the expiration without cure of any applicable notice and cure periods, Landlord shall have, in addition to Landlord's other rights and remedies at law or in equity, all of the following rights:

(a)      Landlord shall have the right at any time thereafter to give notice of termination to Tenant, and on the date specified in such notice (which shall not be less than 30 days after the giving of such notice) this Lease shall, subject to Section 27.3, terminate. If any such termination of this Lease occurs, Landlord may then or any time thereafter re-enter the Premises by summary proceedings or otherwise, remove therefrom all persons and property, and repossess and enjoy the Premises, without prejudice to any other remedies that Landlord may have by reason of Tenant's Default or of such termination.

(b)      Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has right to sublet or assign, subject only to reasonable limitations).

(c)      Landlord shall have the right, without terminating this Lease, to re-enter the Premises by summary proceedings or otherwise if allowed by Laws and remove all persons and property, and Tenant shall remain liable as hereinafter provided. No commencement and prosecution of any action by Landlord in unlawful detainer, ejectment or otherwise, or execution of any judgment or decree obtained in any action to recover possession of the Premises, nor any re-entry by Landlord, shall be construed as an election to terminate this Lease, unless Landlord shall give notice to Tenant of such intention.

27.3      Landlord's Damages. Should Landlord terminate this Lease for default pursuant to Section 27.2, Landlord shall be entitled, at Landlord's election, to damages as provided by law, including those set forth in California Civil Code Section 1951.2. Such damages shall include, subject to the limitations provided in said Section 1951.2 and in Section 27.4:

(a)      The worth at the time of award of the unpaid Rent and other sums owing by Tenant to Landlord under this Lease that had been earned at the time of termination of this Lease;

(b)      The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such loss of Rent that Tenant proves could have been reasonably avoided;

(c)      The worth at the time of award of the amount by which the unpaid Rent for the balance of the Term (specifically excluding any unexercised Extension Periods) after the time of award exceeds the amount of such loss of Rent that Tenant proves could be reasonably avoided; and

(d)      Any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform Tenant's obligations under this Lease or which in the ordinary course of things would be likely to result therefrom.

The "worth at the time of the award" of the amounts referred to in clauses (a) and (b) above is computed by allowing interest at the Index Rate (not to exceed 10%). The "worth at the time of the award" of the amount referred to in clause (c) above is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus 1%.

LA:17300769.9

27.4    Mitigation of Damages. In the event of any re-entry of the Premises or termination of this Lease pursuant to this Section 27, Landlord shall use commercially reasonable and diligent efforts to relet the Premises as soon as practicable at a commercially reasonable rent. Landlord may execute any lease made pursuant to the terms of this Section 27 in Landlord's own name, and Tenant shall have no right or authority whatsoever to collect any rent from such new tenant or subtenant. The provisions of this Section 27.4 shall survive the expiration of the Term or the earlier termination of this Lease.

Section 28.    Surrender of Premises and Removal of Property. On the Lease Termination Date, Tenant shall surrender the Premises to Landlord in a clean and orderly condition, subject to reasonable wear and tear, damage by casualty and any Takings. On or before the Lease Termination Date, Tenant shall remove from the Premises all personal property and fixtures of any kind installed by Tenant at, shipped by Tenant to or otherwise placed by Tenant in or upon the Premises (including all Tenant Removables), all debris and rubbish, and all similar articles of any other persons claiming under Tenant, and shall repair all damage caused by such removal. On the Lease Termination Date, except for the Tenant Removables and any other items permitted to be removed by Tenant (all of which shall remain Tenant's sole property) or required to be removed by Tenant pursuant to the immediately foregoing sentence, the Building and all other improvements on the Premises (including all additions, changes and alterations thereto) shall become the sole property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof. Before surrendering the Premises, Tenant shall have the right, subject to Landlord's reasonable approval, to alter the design and physical features of the façade of the Building to the extent deemed necessary or advisable by Tenant to protect Tenant's trade style and other intellectual property rights. To the extent that any signage or other Tenant Removables are located in the Common Areas, Tenant shall also remove those items on or before the Lease Termination Date and shall repair all damage caused by such removal.

Section 29.    Holdover. If Tenant shall hold over after the expiration date of the Term, or if Tenant shall hold over after the date specified in any termination notice given by Tenant then, in either such event, Tenant shall be a month-to-month Tenant on the same terms as herein provided, except that the monthly Fixed Rent will be 150% of the monthly Fixed Rent payable by Tenant for the last full calendar month of Tenant's tenancy hereunder. Nothing contained in this Section 29 shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the Lease Termination Date. The provisions of this Section 29 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender and any lost profits to Landlord resulting therefrom; provided, however, that in no event shall Tenant be liable for consequential damages attributable to the first 30 days of any holding over by Tenant; provided further, however, that Landlord shall give Tenant no less than 60 days prior written notice of such potential liability under this Section 29.

Section 30.    Effect of Termination of Lease. Should either Party terminate this Lease pursuant to any express right to terminate this Lease stated elsewhere herein, then, upon such termination, this Lease shall be of no further force or effect and neither Landlord nor Tenant shall have any further rights or obligations hereunder (except for any rights or obligations that expressly survive termination hereof).

Section 31.    Brokers' Commissions. Each Party represents that it has had no dealings or conversations with any real estate broker in connection with the negotiation and execution of this Lease other than Commerce Realty ("Landlord's Broker") and Western Retail Advisors ("Tenant's Broker"). Each Party agrees to defend, indemnify and hold harmless the other Party against all liabilities arising from any claim of any other real estate broker, including Attorneys' Fees and the costs and expenses of litigation, for causes of action or proceedings which may be instituted by any other broker, agent or finder (licensed or otherwise) claiming through, under or by reason of the conduct of the indemnifying Party in connection with this transaction or resulting from the indemnifying Party's breach of the above representation. On the Rent Start Date, Landlord shall pay a commission in the amount of $100,000 to Tenant's Broker. Landlord shall also pay any commission due to Landlord's Broker as and when required under the terms of a separate agreement between Landlord and Landlord's Broker. The Parties agree that neither Landlord's Broker nor Tenant's Broker shall be a Party to this Lease, although each of Tenant's Broker and Landlord's Broker shall be a third party beneficiary of this Lease for the limited purpose of enforcing Landlord's obligation to pay the applicable commission pursuant to this Section 31. The Parties further agree that no waiver or modification of the terms of this Lease shall require the consent of either Landlord's Broker or Tenant's Broker other than a waiver or modification of the last 4 sentences of this Section 31.

LA:17300769.9

Section 32.       Miscellaneous Provisions.

32.1      Governing Law.  This Lease shall be governed by and construed in accordance with the laws of the State (excluding any choice of law rules that may direct the application of the laws of another jurisdiction).

32.2      Integration; Counterparts; Modification; Waiver.  This Lease (together with any prior confidentiality, nondisclosure or similar agreement into which the Parties may have entered) constitutes the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to the subject matter hereof.  This Lease may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one lease agreement.  Counterparts may be delivered by facsimile.  No amendment, supplement or modification of any term hereof shall be effective unless set forth in writing and signed by both Landlord and Tenant.  No waiver of a covenant, condition or time period set forth herein shall be deemed a waiver of any other covenant, condition or time period.

32.3      Successors and Assigns.  All of the provisions of this Lease shall inure to the benefit of and shall bind the successors and assigns of the Parties, except to the extent expressly provided otherwise in Sections 22 and 23.

32.4      Relationship of Parties.  The relationship of the Parties is that of landlord and tenant, and nothing contained herein shall make either Party the fiduciary, agent or delegate of the other for any purpose.  This Lease shall not be deemed to create any form of business organization between the Parties.  If Landlord is comprised of more than one Person, the obligations of the Persons comprising Landlord are joint and several.

32.5      Severability, Further Assurances.  Should any one or more provisions of this Lease be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.  The exercise of any remedy under this Lease shall not be a waiver of any remedy provided by law or in equity.  Provisions for any remedy herein shall not exclude any other remedies unless they are expressly excluded.  Each of the Parties shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary, in connection with the performance of their obligations hereunder and to carry out the intent of this Lease. Without limiting the foregoing, upon the written request of either Party from time to time, the other Party, within 30 days after receipt thereof, shall execute and deliver to the requesting Party, without charge, a commercially reasonable estoppel certificate.

32.6      Notices.  ANY AND ALL NOTICES TO BE GIVEN HEREUNDER SHALL BE IN WRITING and given by express mail, reputable courier service, telefacsimile (if such telefacsimile is promptly followed by a notice sent by registered or certified mail), or registered or certified mail (with return receipt requested and postage prepaid) and addressed to the address or transmitted to the telefacsimile number for such Party set forth in **Schedule 4** (or to such substitute address or telefacsimile number for such Party as such Party may subsequently indicate in a notice given to the other Party).  Any such notice shall be deemed delivered upon receipt.  For purposes of this Lease, a "notice" includes a notification.

32.7      Time.  Time is of the essence of each provision of this Lease.  Wherever under this Lease there is a day or time period established for performance and such day is or such time period expires on a Saturday, Sunday or holiday, then such time for performance shall be automatically extended to the next Business Day.

32.8      Construction.  Each Party and its respective attorneys have participated equally in the drafting, preparation and negotiation of this Lease, which shall be construed accordingly.

32.9      Interpretation.  For purposes of this Lease, (a) the singular includes the plural and the plural includes the singular, (b) words importing any gender include the other genders (unless the context clearly indicates otherwise), (c) the words "and" and "or" are used in the conjunctive or disjunctive as the sense and circumstances may require, (d) any form of the word "include" shall be deemed to be followed by the words "without limitation," (e) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Lease as a whole and not to any particular section, subsection or part of this Lease, (f) a reference to any law, rule or regulation includes any amendment or modification thereto or thereof as well as any replacement therefor, (g) references herein to sections, subsections, schedules and exhibits without further identification of the document to which reference is made are references to provisions or parts of this Lease, (h) recitals, schedules and exhibits to this Lease are an integral part of this Lease, and (i) the section, subsection and other headings of this Lease are included solely for convenience of reference and shall not in any way alter, amend or define, or be used in the construction or interpretation of, any provision of this Lease.

23

LA:17300769.9

32.10   Confidentiality. Neither Party shall disclose, or shall permit any of its officers, directors, employees, agents, attorneys or representatives to disclose, to any third party any information about this Lease, or any of the transactions contemplated hereby or terms contained herein, or the Premises, or any other information relating to the respective businesses, business plans or planned or existing operations of the other Party or any of the other Party's Affiliates which is not publicly known (all such information that is not publicly known being sometimes referred to herein as "**Confidential Information**").   Notwithstanding the foregoing, neither Party shall be prohibited from disclosing the terms of this Lease to its attorneys, accountants, lenders, transferees, assignees, sublessees, and prospective lenders, transferees, assignees and sublessees to the extent reasonably necessary to assist such Party in the performance of its obligations hereunder, or to the extent reasonably related to Landlord's fee simple interest in the Shopping Center or Tenant's leasehold interest in the Premises, or to the extent reasonably necessary to obtain financing or to transfer or convey the Shopping Center or assign or sublease the Premises.  In addition, neither Party shall be obligated to protect Confidential Information which: (a) is or becomes generally known to the public without violation of this Lease by such Party or its officers, directors, employees or agents, (b) is obtained by such Party from a third party where such Party has no actual knowledge, or reason to know, that such third party is obligated to keep such information confidential, or (c) is independently developed by such Party.  Disclosure of Confidential Information by a Party or its officers, directors, employees, agents or attorneys shall not be prohibited if such disclosure is ordered pursuant to a legal, judicial or administrative proceeding, provided that (i) each Party subject to such order to disclose Confidential Information shall provide the other Party with prompt notice when such disclosure first is sought so that the other Party may seek a protective order or other appropriate remedy, and (ii) at the other Party's request and expense, each Party subject to such order to disclose Confidential Information shall vigorously oppose the request for disclosure through its counsel.  The obligations set forth in this Section 32.10 shall survive the expiration of the Term or the earlier termination of this Lease for a period of 2 years.

32.11   Force Majeure. If either Party shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, unusually severe weather, terrorism, earthquake, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a similar or dissimilar nature beyond the reasonable control of the party obligated to perform, then performance of any such act shall be extended for a period equivalent to the period of such delay.  In each case, the Party delayed, hindered or prevented shall promptly notify the other Party of the event causing the delay, hindrance or prevention. The foregoing, however, shall not operate to excuse either Party from securing necessary financing to meet its obligations or from making any payments due under this Lease.

32.12   Reasonable Consent. If the consent, approval or permission of any Party is required hereunder, such Party shall not unreasonably or arbitrarily withhold, delay or condition such consent, approval or permission.  If any Party fails to respond to any written request for consent, approval or permission within 15 days (or such longer or shorter period as is herein specified) after receipt of such written request from the other Party, then the requesting Party shall send a second request for consent, approval or permission and if the responding Party fails to respond within 5 days after receiving the second notice, then said consent, approval or permission shall be conclusively deemed to have been withheld or denied.  If any such consent, approval or permission is specifically withheld or denied, such Party shall set forth in writing its reasons for such withholding or denial, which reasons must be reasonable under the circumstances presented.  The preceding sentences (other than the second sentence) of this Section 32.12 shall not apply to any consent, approval, permission or other determination expressly permitted under this Lease to be made by any Party in its sole or sole and absolute discretion.

32.13   Attorneys' Fees. If any action or proceeding is instituted to enforce or interpret any provision of this Lease, then the prevailing Party shall be entitled to recover its Attorneys' Fees and costs from the losing Party.  The "prevailing Party" shall be a Party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party of its claim or defense.  As used in this Lease, the term "**Attorneys' Fees**" means and includes only the reasonable charges for services actually performed and rendered by independent outside legal counsel who are not the employees of the Party in question and related reasonable costs and expenses.

32.14   Reservation of Oil, Gas and Mineral Rights. Landlord reserves to itself the sole and exclusive right to all water rights, coal, oil, gas and other hydrocarbons, geothermal resources, precious metals ores, base metals ores, industrial-grade silicates and carbonates, fissionable minerals of every kind and character, metallic or otherwise, whether or not presently known to science or industry, now known to exist or hereafter discovered upon, within or underlying the surface of the Land regardless of the depth below the surface at which any such substance may be found; however, Landlord or its successors and assigns, shall not have the right for any purpose whatsoever to enter upon, into or through the surface or the first five hundred (500) feet of the subsurface of the Land in connection therewith.  Landlord covenants that Tenant shall not be disturbed in its quiet enjoyment and peaceful use of the Premises by any drilling and production activities.

24

32.15 <u>Landlord's Limited Liability</u>. Tenant agrees that if Landlord (or any party constituting Landlord) is a corporation, limited liability company, general partnership, limited partnership, limited liability partnership, trust or joint venture, or if Landlord at any time becomes a corporation, limited liability company, general partnership, limited partnership, limited liability partnership, trust or joint venture, Tenant shall not make any claims against any shareholder, officer, director, member, manager, partner (whether general or limited), trustee, beneficiary or joint venturer of Landlord by reason of any matter arising under the terms of this Lease or arising in connection with the use or occupancy of the Premises. No personal asset of any shareholder, officer, director, member, manager, partner (whether general or limited), trustee, beneficiary or joint venturer of Landlord (or any party constituting Landlord) shall be subject to levy, execution, attachment or other enforcement procedures by Tenant or any successor or assignee of Tenant on account of any matter whatsoever relating to this Lease or the use or occupancy of the Premises. Notwithstanding anything to the contrary contained in the other provisions of this Lease, Tenant agrees that in all events it shall look solely to the estate and property of Landlord in the Premises (including, for this purpose, all leases, licenses and concessions in any way relating to the shopping center, all rents, issues and profits of any kind derived from the Premises and all agreements relating to the sale or other transfer of any of Landlord's right, title, interest and estate in and to the shopping center), regardless of whether the entity constituting Landlord is a corporation, limited liability company, general partnership, limited partnership, limited liability partnership, trust or joint venture, for the collection of any judgment or other judicial process requiring the payment of money by Landlord with respect to any of the terms, covenants or conditions of this Lease, and any monetary judgment Tenant obtains against Landlord as a result of any default by Landlord under this Lease or any other claim by Tenant or the Tenant Parties against Landlord shall only be satisfied out of Landlord's interest in the shopping center (including, for this purpose, all leases, licenses and concessions in any way relating to the shopping center, all rents, issues and profits of any kind derived from the shopping center, all agreements relating to the sale or other transfer of any of Landlord's right, title, interest and estate in and to the shopping center, and all proceeds of any kind relating to the foregoing including proceeds of insurance maintained by Landlord). Notwithstanding the foregoing, in no event shall the limitations contained in this Section 32.15 apply to any fraudulent transfers or conveyances or to any prohibited distributions or obligations of Landlord under Section 20.2.

32.16 <u>Waiver of Trial by Jury</u>. To the extent enforceable under applicable laws, Landlord and Tenant hereby waive any and all rights to a trial by jury in any action, proceeding or counterclaim (including any claim for injury or damage and any emergency and other statutory remedy in respect thereof) brought by either against the other on any matter arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, and/or Tenant's use or occupancy of the Premises.

Section 33. <u>Development Matters</u>. Notwithstanding anything to the contrary contained in this Lease, (a) Landlord and Tenant shall have all of their respective rights and assume all of their respective obligations set forth in **Schedule 2**, which generally governs development-related matters, and (b) subject to the provisions of **Schedule 2** (including the provisions relating to notices and waivers), Tenant shall have the right to terminate this Lease if any of the Lease Conditions is not fully and timely satisfied.

Section 34. <u>Schedules and Exhibits</u>. This Lease includes the following Schedules and Exhibits which are fully incorporated as part of this Lease.

| Schedule 1 | Certain Definitions |
|---|---|
| Schedule 2 | Development Matters |
| Schedule 3 | Landlord Wiring Instructions |
| Schedule 4 | Notice Addresses |
| Exhibit A | Legal Description |
| Exhibit B | Site Plan |
| Exhibit C | Exclusive Use Rights and Primary Uses |
| Exhibit D | Preliminary Elevations |
| Exhibit E | Encumbrances and Other Title Matters |
| Exhibit F | Landlord's Sign Criteria |
| Exhibit G | Rules and Regulations for the Shopping Center |

LA:17300769.9

| Exhibit H | Property and Asset Management Agreement |

LA:17300769.9

IN WITNESS WHEREOF, the Parties have executed and delivered this Ground Lease Agreement as of the Effective Date.

**Landlord:**

On behalf of Landlord pursuant to that certain Property and Asset Management Agreement dated as of October 29, 2008 attached hereto as Exhibit H:

G.I.C. ENTERPRISES, INC., DBA COMMERCE REALTY, A CALIFORNIA CORPORATION, ITS PROPERTY MANAGER

BY: _William R. Lang_

William R. Lang, President

**Tenant:**

FRESH & EASY NEIGHBORHOOD MARKET INC.,
a Delaware corporation

By:_____
A.J. Eggs, Chief Real Estate Officer

27

LA:17300769.9

IN WITNESS WHEREOF, the Parties have executed and delivered this Ground Lease Agreement as of the Effective Date.

Landlord:

On behalf of Landlord pursuant to that certain Property and Asset Management Agreement dated as of October 29, 2008 attached hereto as Exhibit H:

G.I.C. ENTERPRISES, INC., DBA COMMERCE REALTY, A CALIFORNIA CORPORATION, ITS PROPERTY MANAGER

BY: _____
William R. Lang, President

Tenant:

FRESH & EASY NEIGHBORHOOD MARKET INC., a Delaware corporation

By: _____
A.J. Eggs, Chief Real Estate Officer

27

LA:17300769.9

## CERTAIN DEFINITIONS

For purposes of this Lease (including all schedules and exhibits hereto), the following initially capitalized terms have the meanings set forth below:

"**Affiliate**" means, with respect to any specified Person, any other Person or group of Persons acting in concert that controls, is controlled by, or is under common control with the specified Person. The term "control" means either of the following: (i) the beneficial ownership, directly or indirectly, by such Person or group of Persons of equity securities entitling such Person or group of Persons to exercise in the aggregate 20% or more of the voting power of the Entity in question; or (ii) the possession by such Person or group of Persons of the power, directly or indirectly, (a) to elect a majority of the board of directors or other governing body of the Entity in question or (b) to direct or cause the direction of the management and policies of or with respect to the Entity in question, whether by ownership of equity securities, by contract or otherwise. The terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**ATM**" means automated teller machine.

"**Bona Fide Purchaser**" means, with respect to any transfer and conveyance of the entire fee estate in the Shopping Center, a Person other than an Affiliate or other Related Party of Landlord that purchases such fee estate in good faith and for reasonably equivalent value.

"**Business Day**" means any day that is not a Saturday, Sunday or federal, state or legal holiday observed in the State.

"**Casualty**" means an Insured Casualty or an Uninsured Casualty.

"**City**" means the city in which the Shopping Center is located.

"**Common Areas**" means all areas within the exterior boundaries of the Shopping Center which are now or hereafter made available for the general use, convenience and benefit of the tenants of the Shopping Center and their respective employees, vendors, customers and other invitees, including landscaped and planted areas, paved parking areas, paved service areas, sidewalks, ramps, roadways, driveways, curbs, curb cuts and all similar facilities and areas now or hereafter existing in the Shopping Center including specifically, any portion of the Premises outside the Building, excluding any improvements on the Premises constructed for the exclusive use of Tenant, including, without limitation, trash enclosures and shopping cart corals and provided Tenant is not paying for same as part of Common Area Charges.

"**Critical Access Ways**" means those portions of the Common Areas used for ingress and egress that are designated as "Critical Access Ways" in the Site Plan.

"**Entitlements**" has the meaning specified in **Schedule 2**.

"**Entity**" means any corporation, limited liability company, partnership, firm, joint venture, entity, trust, estate, unincorporated organization, association, enterprise, government or political subdivision thereof or governmental department or agency.

"**Environmental Laws**" means any and all federal, state and local laws, regulations, rules, guidelines and ordinances relating to human health, safety, pollution and protection of the indoor or outdoor environment or otherwise relating to the presence, manufacture, processing, distribution, use, treatment, storage, release, transport, handling, recordkeeping, notification, disclosure and reporting requirements of and respecting Hazardous Substances, including, without limitation, the Comprehensive Environmental Response Compensation Liability Act, the Resource Conservation and Recovery Act, the Clean Water Act, the Clean Air Act and the Occupational Safety and Health Act.

"**Fixed Rent Period**" means that period commencing on the Rent Start Date and continuing until the Lease Termination Date.

S1-1

LA:17300769.9

**"Governmental Authority"** means any (a) nation, state, county, city, town, village, district, territory, or other jurisdiction of any nature, (b) federal, state, county, municipal or other government, (c) governmental authority or instrumentality of any nature (including any governmental agency, branch, department, commission, board, bureau or official and any court or other tribunal), or (d) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

**"Hazardous Substance"** means any condition or substance that violates or requires action under any applicable Environmental Law.

**"Index Rate"** means an annual rate of interest equal to the "prime rate" (as publicly quoted in The Wall Street Journal from time to time) plus 1%.

**"Insured Casualty"** means a risk or peril covered by the insurance required to be maintained by Tenant under Section 5.1(b) or by Landlord under Section 5.2(b) (as applicable), excluding for this purpose earthquakes (even if covered by such insurance).

**"Laws"** means all applicable laws, statutes, ordinances, codes, rules and regulations of local, state and federal Governmental Authorities, including those relating to public health and safety, access for persons with disability, fire safety and building codes and further including Environmental Laws.

**"Lease Conditions"** has the meaning specified in Schedule 2.

**"Lease Termination Date"** means the date on which the Term expires or, if earlier, the date on which this Lease terminates.

**"Lease Year"** means as follows: (a) in the case of the first Lease Year, the period beginning on the Rent Start Date and ending (i) if the Rent Start Date is the first day of a calendar month, on the last day of the calendar month which immediately precedes the one-year anniversary of the Rent Start Date or (ii) if the Rent Start Date is not the first day of a calendar month, the last day of the calendar month which includes the one-year anniversary of the Rent Start Date; and (b) in the case of each subsequent Lease Year, the period beginning on the day following the last day of the prior Lease Year and ending 12 calendar months thereafter or, if earlier, the last day of the Term.

**"Losses"** means, collectively, claims, demands, actions, suits, proceedings, losses, liabilities, damages, judgments, costs and expenses, including reasonable attorneys' fees and costs.

**"No Build Areas"** means those areas of the Shopping Center that are designated as "No Build Areas" in the Site Plan.

**"Permits and Licenses"** means any and all permissions, permits, licenses and other indicia of governmental approvals from the City and other Governmental Authorities deemed necessary or appropriate by Tenant.

**"Person"** (whether or not initially capitalized) means an individual or an Entity.

**"Real Estate Taxes"** means, with respect to any period, all real property taxes, assessments (excluding assessments levied prior to the Rent Start Date), water and sewer rates and charges, and other governmental levies and charges, general and special, ordinary and extraordinary, foreseen as well as unforeseen, which are assessed, levied or imposed on or against and create a lien upon the Premises or the Shopping Center (as applicable) as finally determined for such period (net of all Rebates and Credits). If any Real Estate Taxes are payable at the option of the taxpayer in installments, the Real Estate Taxes for any period shall be deemed to include only the installments which become due in such period. Real Estate Taxes shall not include (i) any interest or penalties imposed by any taxing authority for late payment or (ii) any inheritance, estate, succession, transfer, gift, franchise, corporation, income, profits, employment, payroll, sales, use, transaction privilege, rent, gross receipts or business license tax or any capital levy.

**"Rebates and Credits"** means, with respect to any fee, cost or charge (including, but not limited to, Insurance Charges, Real Estate Taxes and Common Area Charges) for which Tenant is required under this Lease to reimburse Landlord in whole or in part, any and all rebates, refunds, reductions, discounts, credits and allowances attributable to such fee, cost or charge (less, in each case, any reasonable costs incurred by Landlord in obtaining the same).

LA:17300769.9

"**Related Party**" means, with respect to any Person, (i) any Affiliate of the Person, (ii) any Senior Officer of the Person or an Affiliate of the Person and (iii) any family member of either the Person or a Senior Officer of the Person or an Affiliate of the Person.

"**Rent Start Date**" has the meaning specified in **Schedule 2**.

"**Required Minimum Parking**" has the meaning specified in Section 16.

"**Restoration**" means restoration, rebuilding and repairs.

"**Restore**" means rebuild, repair and restore.

"**Senior Officer**" means, with respect to any Entity, an officer or director of, or a Person performing similar functions with respect to, the Entity.

"**State**" means the state in which the Shopping Center is located.

"**Tenant Removables**" means, collectively, Tenant's installed equipment, sales floor equipment, loose equipment, refrigerators, refrigerated cabinets, shelving, gondolas, checkouts, counters, refrigeration plant (e.g., compressors), warehouse cooler rooms and warehouse racking, sales floor lighting, shopping carts, pallet jacks, forklifts, battery chargers, mobile scissor lifts, cleaning machines, shopping cart corrals, electronic equipment, CCTV monitors and cameras, cash registers, telephones, computers, computer systems, printers, fax machines, radio frequency equipment, satellite dishes, ATMs, furniture, trade fixtures, satellite communications dishes and related equipment, signs, security systems, safes, storage equipment, floor coverings, decorative wall panels (but not walls), stained glass windows, wall lanterns (if any), internal and external signage, and any and all other items that make up Tenant's trade style.

"**Tenant's Pro Rata Share**" means that proportion which the gross leasable ground floor area of the Building, excluding the square footage of any basement space and any equipment platform, bears to the gross leasable floor area of all leasable space in the Shopping Center, whether or not occupied. If, at any time during the Term, additional leasable floor area is added to the Shopping Center, then the denominator shall be changed to include the additional leasable floor area added to the Shopping Center.

"**Tenant's Work**" has the meaning specified in Schedule 2.

"**Term Start Date**" has the meaning specified in Schedule 2.

"**Uninsured Casualty**" means a risk or peril not covered by the insurance required to be maintained by Tenant under Section 5.1(b) or by Landlord under Section 5.2(b) (as applicable), including for this purpose earthquakes (even if covered by such insurance).

S1-3

**DEVELOPMENT MATTERS**

This **Schedule 2** addresses certain matters with respect to the period from the Effective Date to the Rent Start Date (such period, the "**Development Period**"). Initially capitalized terms not defined elsewhere in this Lease have the respective meanings set forth below in this **Schedule 2**.

1.      Overview. The Development Period consists of 3 conceptually distinct stages:

(a)      a preparatory stage ("**Stage 1**") during which Tenant (i) performs title, environmental and other due diligence investigations and assesses the suitability of the Premises for Tenant's intended use, (ii) applies for and pursues receipt of its Entitlements, and (iii) applies for and pursues receipt of its Alcoholic Beverage Entitlements;

(b)      an initial work stage ("**Stage 2**") during which Landlord completes its initial work on the Premises and then delivers possession of the Premises to Tenant; and

(c)      a final work stage ("**Stage 3**") during which Tenant constructs the Building and otherwise improves the Premises in anticipation of opening the Premises for business to the public and Landlord completes its remaining work on the Common Areas.

The respective rights and obligations of the Parties in connection with each of these stages is set forth in greater detail below.

2.      Development Stage 1. With respect to Stage 1 of the Development Period, which comprises the Feasibility Period, the Entitlements Period and the Alcoholic Beverage Period, the Parties shall have the following rights and obligations:

(a)      Feasibility Period.

(i)      Diligence Investigation. During the Feasibility Period, Tenant shall have the right at its sole cost to perform title, environmental and other due diligence investigations and otherwise to assess the suitability of the Premises for Tenant's intended use. In that connection, within 5 days after the Effective Date, Landlord shall provide to Tenant such maps, surveys, reports and other materials in its possession or control as Tenant may reasonably request.

(ii)      Access for Diligence. In addition, provided that Tenant gives Landlord reasonable prior notice and a certificate of insurance evidencing Tenant's commercial general liability policy, Tenant may enter the Premises to perform any due diligence and take any other actions that Tenant may deem appropriate to determine the suitability of the Premises for Tenant's intended use; provided, however, that Tenant shall not perform any invasive testing of the Premises (including, without limitation, any so-called "Phase II" environmental site assessment, but only to the extent that such Phase I contains a reasonable recommendation from the environmental consultant completing the Phase I that additional environmental studies or investigations be done) without Landlord's prior written consent. If the Premises are disturbed as a result of any such testing, Tenant shall restore the Premises as nearly as practicable to their condition immediately prior to such testing. Tenant shall be responsible for the proper treatment and disposal of all samples taken with respect to the Premises. If Tenant determines that a Phase II environmental site assessment shall be required due to matters shown on the Phase I environmental report, then Tenant and Landlord shall negotiate in good faith an appropriate extension of the Feasibility Period to allow Tenant's consultants to obtain such a Phase II environmental site assessment.

(iii)      Site Plan. If the site plan attached hereto as **Exhibit B** is marked as preliminary, the Parties shall use all reasonable efforts to prepare, prior to the expiration of the Feasibility Period, a site plan that has been approved by both Parties (such approval to be evidenced on the site plan itself by the initials of both Parties' Development Representatives), it being understood and agreed that any failure by the Parties to prepare a site plan that has been approved by both Parties prior to the expiration of the Feasibility Period shall be treated as a condition that adversely affects the suitability of the Premises for Tenant's intended use.

(iv)      Ancillary Documents. If any reciprocal easement agreement, declaration of covenants, conditions and restrictions, subordination, nondisturbance and attornment agreement, is required by Tenant or required by Landlord as a condition of feasibility, Landlord shall use commercially reasonable and diligent efforts to cause such agreement to be prepared in a manner acceptable to both Landlord and Tenant and then executed, acknowledged and delivered to Tenant prior to the end of the Feasibility Period. Any failure by Landlord to

cause any such agreement to be delivered to Tenant prior to the expiration of the Feasibility Period shall be treated as a condition that adversely affects the suitability of the Premises for Tenant's intended use.

(b)    Entitlements Period.  During the Entitlements Period, Tenant shall have the right at its sole cost to apply for and pursue receipt of its Entitlements.  In connection therewith, Landlord shall use commercially reasonable efforts to cooperate with Tenant, at no out-of-pocket cost to Landlord.

(c)    Alcoholic Beverage Period.  During the Alcoholic Beverage Period, Tenant shall have the right at its sole cost to apply for and pursue receipt of its Alcoholic Beverage Entitlements, and Permits and Licenses. In connection therewith, Landlord shall use commercially reasonable efforts to cooperate with Tenant, at no out-of-pocket cost to Landlord.

(d)    Required Notice of Satisfaction or Waiver.  Not later than the expiration of the Lease Condition Notice Period for each Lease Condition Period, Tenant shall notify Landlord whether the related Lease Condition has been satisfied and, if not, whether Tenant has elected to waive such Lease Condition.  If Tenant notifies Landlord that such Lease Condition has not been satisfied and does not notify Landlord that Tenant has elected to waive such Lease Condition, this Lease shall automatically terminate upon the expiration of such Lease Condition Notice Period.  Conversely, if Tenant notifies Landlord that such Lease Condition has been satisfied or that Tenant has elected to waive such Lease Condition, this Lease shall not terminate by reason of the failure of such Lease Condition to be satisfied.  If Tenant fails timely to notify Landlord that a Lease Condition has been satisfied or waived prior to the expiration of the related Lease Condition Notice Period, Tenant shall be deemed to have notified Landlord that such Lease Condition has not been satisfied or waived, in which event this Lease shall automatically terminate upon the expiration of the related Lease Condition Notice Period.

(e)    Satisfaction or Waiver of All Lease Conditions.  If all of the Lease Conditions are satisfied or waived as set forth above (the date on which the last of the Lease Conditions to be satisfied or waived shall occur being sometimes referred to herein as the "**Lease Conditions Satisfaction Date**"), Tenant shall have no further right to terminate this Lease due to the failure of any of the Lease Conditions to be satisfied.  On the Lease Conditions Satisfaction Date, Stage 1 shall end and Stage 2 shall begin.

3.    Development Stage 2.  With respect to Stage 2 of the Development Period, the Parties shall have the following rights and obligations:

(a)    Completion of Landlord's Work.  Landlord shall complete all of Landlord's Work in accordance with the specifications and other terms and conditions set forth in Annex I to this **Schedule 2** and, after completing the same, shall deliver possession of the Premises to Tenant in accordance with Section 3(b) below. Landlord shall give Tenant not less than 30 days' prior written notice of Landlord's intention to deliver possession of the Premises to Tenant.  In no event shall Landlord's delivery of possession of the Premises to Tenant take place prior to (i) the Lease Conditions Satisfaction Date and (ii) the Target Delivery Date (unless Tenant provides Landlord with 30 days' prior notice that Landlord may deliver possession of the Premises to Tenant prior to the Target Delivery Date).

(b)    Delivery.  Landlord shall deliver possession of the Premises to Tenant free and clear of any prior tenants or occupants, their trade fixtures and their personal property, unencumbered by any prior leases or tenancies and free of Hazardous Substances with all of Landlord's Work Substantially Completed at the time of delivery of possession and the area adjacent thereto being in Construction Ready Condition.  If at the time of delivery the Shopping Center or the Premises are encumbered by a mortgage, deed of trust or other consensual lien, then if Landlord has not done so previously, Landlord shall simultaneously deliver to Tenant any subordination, nondisturbance and attornment or similar agreement that Tenant may require.  Landlord's delivery of possession of the Premises to Tenant in accordance with, and Landlord's satisfaction of the other requirements set forth in, Section 5.2(a) and this Section 5.2(b) is hereinafter referred to as "**Delivery**."

(c)    Inspection of Landlord's Work.  Prior to Delivery, Landlord and Tenant shall both inspect Landlord's Work.  If Landlord's Work has been Substantially Completed but not fully completed, Landlord and Tenant shall mutually and in their good faith business judgment prepare a punch list of items which remain to be completed (the "**Punch List**").  Upon completion of the Punch List, Landlord shall diligently proceed to complete the items designated therein, taking all commercially reasonable steps to avoid delaying Tenant's Work; and if Landlord shall fail to complete such items within 30 days after its receipt of the Punch List, then upon written notice to Landlord, Tenant may complete such items on behalf of Landlord and charge Landlord the actual costs thereof.  If Landlord fails to reimburse any such amounts to Tenant within 30 days after Tenant's written request, then such amounts may be offset by Tenant against Fixed Rent next coming due under this Lease.  Notwithstanding anything to the contrary

LA:17300769.9

herein, to the extent Tenant is unable to complete its work or open for business as a result of incomplete items on the Punch List, then the Rent Start Date will be delayed for a number of days equal to the number of days that Tenant is delayed from completing its work or from opening for business.

(d)     Notice of Delivery Failure.  If after Landlord's and Tenant's inspection of the Premises as set forth above Landlord's Work has not been Substantially Completed or that Landlord has otherwise failed to Deliver the Premises to Tenant, Landlord shall use all reasonable and diligent efforts to remedy the same as soon as possible (but in no event later than the Outside Delivery Date).

(e)     Remedies.  If Landlord does not Deliver the Premises to Tenant by the Outside Delivery Date, Tenant may terminate this Lease upon 30 days' prior notice to Landlord, in which event this Lease shall terminate unless Landlord effects Delivery prior to the expiration of such 30-day period.  Alternatively, if Tenant does not so elect to terminate this Lease, then the Rent Start Date shall be extended on a day for day basis for each day of Landlord's delay in effecting Delivery past the Outside Delivery Date.

4.     Development Stage 3.  With respect to Stage 3 of the Development Period, the Parties shall have the following rights and obligations:

(a)     Tenant's Work.  During Stage 3, Tenant shall be entitled to build, finish and install its tenant improvements (including the Building), fixtures and personal property ("Tenant's Work") and to open for business.  Any construction of the Premises by Tenant shall be at Tenant's sole cost and in conformity with Laws, including compliance with any building codes, seismic requirements, fire, sprinkler and ADA or similar governmental requirements.  Tenant shall do Tenant's Work in a manner required by applicable codes consistent with obtaining a Certificate of Occupancy from the applicable Governmental Authorities (it being understood and agreed that Landlord will cooperate fully with Tenant in obtaining such Certificate of Occupancy).  Tenant's plans, drawings and specifications for the Building shall be subject to approval by Landlord which shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, Landlord acknowledges that it has pre-approved Tenant's plans, drawings or specifications to the extent that they conform to the Preliminary Elevations attached hereto as **Exhibit D**.

(b)     Obligation to Pay Rent.  Regardless of whether Tenant has completed its construction and other Tenant's Work under Section 4(c) above by the Rent Start Date, Tenant shall be obligated to pay Fixed Rent and other charges hereunder on the Rent Start Date (subject to any extensions set forth herein and any other applicable terms and conditions hereof).

(c)     Expiration of Development Period.  On the Rent Start Date (subject to the terms and conditions of this Lease), the Development Period shall expire and the Fixed Rent Period shall begin.

5.     Development Period Terms.  For purposes of this **Schedule 2** and the other provisions of this Lease, the following initially capitalized terms relating to the Development Period have the meanings set forth below:

"**Alcoholic Beverage Entitlements**"  means any and all final, non-appealable approvals, authorizations and entitlements relating to land use from the City and/or other Governmental Authorities that Tenant deems necessary or appropriate in order to engage in the retail sale at the Premises of beer, wine and liquor for off-premises consumption, including zone changes, general and/or specific plan amendments, and conditional use permits.

"**Alcoholic Beverage Permits**"  means any and all final, non-appealable Permits and Licenses of any kind (other than Entitlements) from any Governmental Authority necessary for Tenant to engage in the retail sale at the Premises of beer, wine and liquor for off-premises consumption.

"**Alcoholic Beverage Condition**"  means Tenant's final receipt of its Alcoholic Beverage Entitlements and Permits and Licenses, all without extraordinary costs or conditions that Tenant deems burdensome, and which are otherwise satisfactory to Tenant in its sole discretion.

"**Alcoholic Beverage Period**"  means the period from the Effective Date until the date that is 180 days thereafter; provided, however, that if Tenant has applied for and is diligently pursuing receipt of its Alcoholic Beverage Entitlements, and Permits and Licenses, Tenant shall have the option to extend the Alcoholic Beverage Period for an additional 60 days by giving written notice thereof to Landlord on or before the date when the Alcoholic Beverage Period would otherwise expire.  In addition, if a conditional use permit

LA:17300769.9

or special use permit is required, Tenant shall have the option to extend the Alcoholic Beverage Period for an additional 60 day period by giving written notice thereof to Landlord on or before the date when the previously extended Alcoholic Beverage Period would otherwise expire.

"**Certificate of Occupancy**" means an unconditional certificate of occupancy or certificate of inspection or any equivalent documentation which confirms that Landlord's Work has been completed and that it is lawful for Tenant to take possession of the Premises, make leasehold improvements, install fixtures, stock with merchandise and open for business.

"**Construction Ready Condition**" means, with respect to the Premises, that all of the following conditions are satisfied: (a) there is access from at least one public street to the Premises and the adjacent work site (including Tenant's Building Pad Area) and all other requirements imposed by fire departments and other Governmental Authorities for the commencement of construction on the Premises (other than Tenant's receipt of its building permit) have been satisfied, (b) within 100 feet of the Premises, there is temporary parking for at least 30 vehicles that has been reserved for the exclusive use of Tenant's contractor's employees and other personnel, (c) within 200 feet of the Premises there is temporary water and power available to and adequate for the reasonable needs for Tenant's contractor, and (d) immediately adjacent to the Premises, a 10,000 square feet or larger staging area has been set up for the exclusive use of Tenant's contractor while performing Tenant's Work.

"**Deliver**" means effect Delivery (as such term is defined in Section 3(b) of this **Schedule 2**).

"**Development Representative**" has the meaning specified in Section 6 of this **Schedule 2.**

"**Entitlements**" means any and all final, non-appealable approvals, authorizations and entitlements relating to land use from the City and/or other Governmental Authorities that Tenant deems necessary or appropriate in order to develop and improve the Premises as contemplated by Tenant, including (but not limited to) zone changes, general and/or specific plan amendments, tentative tract maps, conditional use permits, and site plan approvals, but specifically excluding Alcoholic Beverage Entitlements.

"**Entitlements Condition**" means Tenant's final receipt of its Entitlements, all without extraordinary costs or conditions that Tenant deems burdensome, and which are otherwise satisfactory to Tenant in its sole discretion.

"**Entitlements Period**" means the period from the Effective Date until the date that is 180 days thereafter; provided, however, that if Tenant has applied for and is diligently pursuing receipt of its Entitlements, Tenant shall have the option to extend the Entitlements Period for an additional 60 days by giving written notice thereof to Landlord on or before the date when the Entitlements Period would otherwise expire.

"**Feasibility Condition**" means Tenant's determination in its sole discretion that the Premises are suitable for Tenant's intended use.

"**Feasibility Period**" means the period from the Effective Date until the date that is 90 days thereafter.

"**Landlord's Work**" means the work, if any, required to be performed by Landlord as set forth in **Annex I** to this **Schedule 2**.

"**Lease Condition Notice Period**" means, with respect to any Lease Condition, the period commencing upon the expiration of the related Lease Condition Period and ending on the third Business Day thereafter.

"**Lease Condition Periods**" means, collectively, the Feasibility Period, the Entitlements Period and the Alcoholic Beverage Period.

"**Lease Conditions**" means, collectively, the Feasibility Condition, the Entitlements Condition and the Alcoholic Beverage Condition.

LA:17300769.9

"**Lease Conditions Satisfaction Date**" shall have the meaning set forth in Section 2(e) of this **Schedule 2**.

"**Outside Delivery Date**" means the date that is 365 days from the Effective Date, which is the date after which Tenant shall be entitled to exercise the remedies set forth in Section 3(e) of this **Schedule 2** if Landlord fails to effect Delivery on or before such date.

"**Rent Start Date**" means the earlier of (a) the date that is 180 days after the Term Start Date and (b) the date that Tenant initially opens the Premises for business to the public. Notwithstanding the foregoing, the Rent Start Date shall be subject to any extensions expressly set forth in this Lease.

"**Substantially Completed**" means that a Certificate of Occupancy shall have been issued and that Landlord's Work shall have been fully completed except for punch list items identified in the Punch List provided that any such punch list items shall not (i) unreasonably hinder or delay Tenant's work in or about the Premises or (ii) prevent Tenant from opening for business, or both.

"**Tenant's Building Pad Area**" means that area of land shown on the Site Plan as "Tenant's Building Pad Area.

"**Term Start Date**" means the date on which Landlord effects Delivery.

"**Title Company**" means Commonwealth Land Title Insurance Company, or such other title insurance company as Tenant may select in its reasonable discretion.

6.      Development Representatives. During the Development Period, each Party shall, consistent with the other provisions of this Lease, provide such commercially reasonable cooperation to the other Party as the other Party may reasonably request in discharging its duties and otherwise carrying on its activities under this Lease. To facilitate such cooperation and to assist the Parties' in resolving any practical issues that may arise during the Development Period (including, but not limited to, approval of a final site plan if the site plan attached as **Exhibit B** is marked as preliminary) and in otherwise coordinating their activities during the Development Period, each Party shall appoint a primary representative and a back-up representative (each, a "**Development Representative**") as such Party's principal points of contact for these purposes. Each Party shall instruct its Development Representatives to be generally available during normal business hours for discussions with, and otherwise responsive to, the other Party's Development Representatives. Either Party may replace its Development Representatives at any time by notifying the other Party in accordance with this Lease. The names, addresses, contact numbers and email addresses of each Party's initial Development Representatives are set forth in Annex II to this **Schedule 2**.

LA:17300769.9

**LANDLORD'S WORK - CONDITION OF PREMISES**
**(Certified Pad Delivery, Landlord Completes On-Site and Off-Site Improvements)**

Landlord, at Landlord's sole cost and expense (except as otherwise specified herein or in the Lease), shall design, permit and construct all off-site improvements and on-site improvements described herein that fall outside of the Premises and delivering a compacted, line and grade certified building pad (including truck well area) to Tenant, as described in Landlord's plans and as generally shown on the Site Plan ("**Landlord's Work**"). Landlord shall complete all on-site and off-site improvements as required by the city or other governmental agencies and as may be required for Tenant to obtain a building permit and Certificate of Occupancy. The plans and specifications for Landlord's Work (the "**Landlord's Plans**") must be approved by Tenant prior to Landlord submitting Landlord's Plans to the building department or other governmental agencies for permits. Landlord's Work shall be completed in accordance with the Lease, Landlord's construction schedule, Tenant's plans and specifications, and in accordance with generally accepted means, methods, and standards of the construction industry, and in conformance with all applicable codes.

All design development and engineering shall be prepared by an architect or professional engineer licensed by the state in which the Premises are located, employing trained and experienced tradesman as designated and approved by Tenant and employing trained and experienced tradesman.

Landlord agrees to incorporate this Exhibit as part of its construction contract with its general contractor. Landlord further agrees to comply with all local, state, and federal special testing requirements and Laws and provide Tenant with the results of such testing within 48 hours of completion of testing. If any portion of Landlord's Work fails to meet the minimum testing requirements, then Landlord agrees to immediately commence and remedy any deficiencies in Landlord's Work within 48 hours of written notice from Tenant. Landlord's architect, engineer and general contractor shall certify to Landlord and Tenant that their work was completed in accordance the Tenant's plans and specifications.

Landlord shall provide Tenant with a one-year warranty on all Landlords' Work effective from Landlord's Delivery. All Landlord's Work shall be completed in a good and workmanlike manner. Landlord, at its sole cost, shall be responsible for the filing of all applications, payments of all fees and securing all permits, approvals, and bonds as may be required by any governmental or quasi-governmental agency having jurisdiction over such work.

Upon Tenant's request and as specified in Provision 1.1 below, Landlord shall provide Tenant with a copy of Landlord's updated development and construction schedule, including the name, phone number and address of Landlord's construction representative. Additionally, Landlord shall provide Tenant with a bi-weekly construction status report with digital progress photos. Tenant's construction manager and/or designated representative may enter upon the Premises during construction of Landlord's Work to inspect progress, take progress photos, and to determine if Landlord's work is being completed in accordance with Tenant's standards, plans and specifications. Additionally, prior to Delivery, Tenant's construction manager may access the site to commence any necessary "preparation work" including, but not limited to, construction staking, provided such activities do not materially interfere with Landlord's Work.

1.1    PRE-DEVELOPMENT COORDINATION

    A.    Kick-Off Meeting. Within 21 days from the Effective Date, Landlord (including Landlord's architect and Landlord's civil engineer) and Tenant (including Tenant's representative and any consultants as deemed necessary by Tenant) shall participate in a Kick-Off Meeting to discuss the required steps and timeframes to complete the entitlements, prepare CD's and obtain permits, deliver the Premises, complete the on-site and off-site improvements, and construct Tenant's building and the balance of the shopping center. A preliminary development schedule shall be discussed at this meeting as presented by Landlord. The parties agree to finalize a master project schedule (with appropriate milestone dates for Landlord's work and Tenant's work) within 10 Business Days following first plan check submittal of Landlord's grading plan, and the parties agree to update the master project schedule every 30 days thereafter. Landlord shall be required to notify Tenant if Landlord becomes aware of any anticipated deviations from the current project schedule in excess of 20 calendar days. Landlord shall send such notification electronically and via US mail to Tenant.

    B.    Status Reports and Tenant's Contractor's Access. Landlord shall provide Tenant with a bi-weekly construction status report with digital progress photos. Tenant's construction manager and/or designated representative may enter upon the Premises during construction of Landlord's Work to inspect progress,

LA:17300769.9

take progress photos, and to determine if Landlord's Work is being completed in accordance with Tenant's standards, plans and specifications. Additionally, prior to Delivery, Tenant's construction manager may access the site to commence any necessary "preparation work" including, but not limited to, construction staking, provided such activities do not materially interfere with Landlord's Work.

1.2   ENVIRONMENTAL AND DEMOLITION

A.   Environmental. Landlord shall engage an environmental consulting firm approved by Tenant to prepare a Phase I ESA meeting Tenant's criteria and certified to Tenant for Tenant's review and approval. If the Phase I ESA indicates that Phase II testing is required, then Landlord shall engage an environmental consulting firm approved by Tenant to prepare a Phase II ESA meeting Tenant's criteria and certified to Tenant for Tenant's review and approval. Landlord shall deliver the Premises to Tenant free of all hazardous materials, including, but not limited to asbestos-containing materials (ACM) such as tile mastic and fireproofing, lead paint, PCB's, urea formaldehyde material, duct wrapping, drums or containers (empty, full or partial), above ground storage tanks and underground storage tanks. Landlord shall remediate any hazardous materials on the Premises, unless such materials were placed on the leased Premises by Tenant. If remediation is performed, Landlord shall furnish affidavits of abatement to Tenant certifying that complete and proper removal has been concluded in strict accordance with local, state and federal environment protection guidelines and requirements.

B.   Demolition. Landlord shall be responsible for demolition of any and all existing above-grade and below-grade improvements on or under the Premises, including, but not limited to, building, wall and sign foundations and wet and dry underground utilities. Demolition work shall be conducted in compliance with local, state and federal environmental protection guidelines and requirements. Landlord shall cap, plug and protect all conduit, sewers, storm drains and pipes that may be utilized for future improvements. Landlord shall clearly mark and identify the protected utility piping and provide an As Built drawing identifying the location and POC of these protected improvements.

1.3   IMPACT FEES, MITIGATION FEES, "DEVELOPMENT FEES", AND PERMIT FEES.

A.   General Requirements. Landlord shall pay all site work application fees related to the grading work and entitlement fees. Landlord shall also pay any and all impact, development and/or mitigation fees, and utility connection fees required by applicable governmental authority as a condition of developing the Premises and the adjacent shopping center and all related improvements, excluding only impact fees which are (i) calculated on a "building per SF basis" (ii) directly related to Tenant's use of the Premises and (iii) payable upon Tenant's building permit; such fees shall be the responsibility of Tenant. **Notwithstanding any provision herein to the contrary, Tenant shall not be responsible for any type of traffic mitigation fee, air quality management fee, storm drain fee, and/or intersection improvement fee regardless of the method or means of calculation of such fee or the timing of payment of such fee as such fees shall be paid by Landlord.** Tenant shall pay for all water meter fees, sewer fees and capacity charges associated with utilities for Tenant's building, unless such fees are due upon Landlord's submittal of its "engineering drawings" (i.e., G&D plan, utility plan, etc) or pulling of permits associated with the engineering drawings, then such costs and fees shall be the sole responsibility of Landlord. In no case shall Tenant's total for mitigation fees, impacts fees, utility meter fees, expedition costs, and capacity charges that Tenant is obligated to pay as set forth herein, exceed $100,000. Any amounts over $100,000 shall be paid by Landlord. Landlord shall provide to Tenant a list of all impact fees, mitigation fees, utility fees, and building permit fees that Tenant will be responsible for which must be approved prior to the Effective Date.

1.4   UTILITIES

A.   Temporary Construction Utilities. Tenant's responsibility.

B.   Utility Easement Agreements. Landlord shall promptly execute all easement agreements required by Tenant and/or utility companies to provide water, telephone, sewer, storm drain, gas and power service to Tenant's building. Landlord's permanent easements shall be created and recorded based on specific staking by Landlord's contractor. Blanket easement agreements should be reached with the utility companies to remain in force until such specific easements can be documented and recorded.

1.5   ACCESS TO PREMISES; STAGING AREA

A.   Access to Premises. Landlord shall provide all weather access as approved by local jurisdictions to the Premises for Tenant's employees, consultants, construction works and material delivery trucks.

B.   Staging Area. Landlord shall provide a temporary Staging Area directly adjacent to the Premises totaling 10,000 square feet of land area for Tenant's exclusive use. Tenant shall have the right to use the Staging Area 30 days prior to delivery of possession of Premises and continue until 30 days following the completion of Tenant's building. The location of the staging area shall be included in the site plan exhibit

S2-7

to Lease.   Landlord has the right to relocate the staging area one time provided Landlord provides Tenant with 14 days prior written notice.

C.   SWPPP Program.  Landlord shall maintain a SWPPP program as mandated by the city or other governing jurisdiction during the entire course of construction.

1.6   PAD DELIVERY

A.   Delivery of Compacted, Certified Building Pad.  Landlord warrants that the building pad will be prepared in strict accordance with Tenant's specifications.  Landlord shall be responsible for the construction of a compacted, line and grade certified building pad at the approved elevation (to within +/- one-tenth of one foot) in accordance with the recommendations of Landlord's geotechnical engineer and as approved by Tenant's geotechnical engineer.   The building pad compaction for the Premises shall be certified by Landlord's geotechnical engineer as meeting the requirements of a mutually approved geotechnical report and Tenant's structural engineering design requirements.   The building pad, including the truck well location, shall be line and grade certified by Landlord's civil engineer to meet Tenant's building footprint design both horizontally and vertically.  As part of the building pad preparation, all footing locations shall be per Tenant's foundation plan and shall be over-excavated and recompacted if required by the geotechnical report prepared by Landlord's geotechnical engineer and as approved by Tenant's architect. Any existing rock or other obstruction within 5' of the building footings and/or slab shall be removed by Landlord prior to pad delivery so that construction of Tenant's building and utilities can be completed without any rock or other atypical excavation by Tenant.  Landlord's geotechnical report shall be certified to Tenant.  Landlord shall provide Tenant with a preliminary grading plan within 30 days from the Effective Date. Within 30 days after receiving the City-approved civil engineering plans for the overall development of the Shopping Center, Tenant shall provide Landlord with Tenant's civil engineering plans, showing the required elevation of the building pad, and Tenant's foundation plan showing the footing locations, depths and sizes.

2.1   UTILITIES

A.   Installation and Relocation of Existing Utilities.   Landlord shall be responsible for the installation or relocation as the case may be of all on-site and off-site utilities necessary to complete the Premises and Shopping Center.   Landlord's off-site utility designs, including, but not limited to, sewer, storm drain, fire suppression, potable water, irrigation, gas, telephone, and electrical systems will be designed based on Tenant's specifications for on-site utility design.

B.   Utility Extensions.

a.   General.  Landlord shall be responsible for the extension of all utilities specified location corresponding to Tenant's building footprint at locations to be approved by Tenant and at least 24" under Tenant's finished floor elevation, unless otherwise specified by Tenant, Tenant's plans or local codes.   All utilities shall be service ready and have the availability to be live.   Connections, transformers, vaults, backflow devices, certificates, and acceptance by all utility companies shall be completed prior to Delivery.

b.   Water.  Landlord shall provide 1.5" domestic water line in location per Tenant's plans.

c.   Gas. Landlord shall provide a 1.5" gas line in location per Tenant's plans.

d.   Sewer.  Landlord shall install a 4" sanitary sewer stub 60" minimum below Tenant's finished floor elevation in location per Tenant's plans.

e.   Fire Suppression.  Landlord shall install a 6" fire suppression line with all fire hydrants, FDC's, PIV's and backflow preventers as required per code and Tenant requirements.  Landlord shall extend the 6" fire line to the building, terminating inside the building wall per Tenant's approved drawings with a flange installed 6" above the finished floor.  The flange, fire riser, thrust block, lateral line (lateral to be capped), and 1" conduit and pull string to all site devices (FDC, PIV, and double detector check valve) to a location approved by Tenant and shall be delivered no later than 10 days prior to the agreed-upon date for start of Tenant's construction. Landlord shall be responsible to provide pressure testing and chlorination of the entire fire suppression system and obtain all jurisdictional approvals for the system from the flange to the connection at the public main line completed prior delivery of Premises.

f.   Phone.  Landlord shall provide low voltage conduit including (2) 4" conduits with pull string and install/provide 50 pair telephone service from the telephone service pedestal to location approved by Tenant.

S2-8

LA:17300769.9

g. <u>Power and Electrical Equipment</u>. Landlord shall provide 1,200 AMPS 120/208 Volt three (3) phase, 100% rated breaker 4 wire service with "primary electrical" to, and including, the transformer and vault located within 75' of Tenant's electrical room, and the "secondary electrical" conduits from the transformer to the electrical panels per Tenant's plans and specifications.

2.2 <u>OFF-SITE IMPROVEMENTS.</u>

A. <u>General Requirements.</u>   Landlord shall be responsible for all off-site improvements (the "Offsite Improvements"), if any, required by applicable governmental authority as a condition of developing the Premises and the adjacent Shopping Center as contemplated in this transaction.   The Offsite Improvements may include, without limitation, street widening, re-paving and/or re-striping, curb, gutter, sidewalk, curb cuts, street lights, deceleration lanes, right turn lanes, medians, median breaks, traffic signals, bus bays, landscaping, utility undergrounding and relocations, water and sewer line extensions, and installation of all fire hydrants.

2.3 <u>SITE REQUIREMENTS AND COMMON AREA IMPROVEMENTS</u>

A. <u>General Requirements.</u>   Landlord shall be responsible for construction of all improvements to the Shopping Center as required by Tenant and applicable governmental authority as a condition to Tenant being able to construct its Building and obtain a Certificate of Occupancy to include but not be limited to landscaping, parking area screen walls, parking area lighting, curbs, sidewalks, pavement, striping, decorative concrete, storm water retention basins (including underground detention, if required by the municipality) and related improvements such as catch basins and piping as may be necessary for the diversion, retention and detention of all storm water including sewer lines and stubs as required by the governing municipality (retention and detention basins shall not exist in the parking lot or in a location that would otherwise interfere with Tenant's parking areas or pedestrian access to the Premises), fire hydrants, perimeter landscaping and screen walls along the interior perimeter boundary of the Premises, project signage, including conduit and wiring up to the Premises, **"On-Site Improvements."**

B. <u>ADA</u>. Landlord shall comply with all Federal, State and local Americans with Disabilities Act ("ADA") code site requirements for its construction of On-Site Improvements.

C. <u>Handicap Parking and Parent & Toddler Parking</u>.   Landlord shall be responsible for incorporating a minimum of 3 ADA stalls (or more, if required by code), 2 "parent & toddler" stalls, and 2 hybrid stalls in locations approved by Tenant.

D. <u>Cart Corrals</u>. Tenant's main parking field shall accommodate 2 cart corrals, per Tenant's specifications, in locations approved by Tenant.

E. <u>Parking Lot Slope</u>. Landlord shall construct all drive-aisles, parking fields, sidewalks, etc. The slope of these areas shall not exceed  3.0% unless approved in writing by Tenant prior to Landlord submitting Landlord's Plans to city.

F. <u>Truck Access</u>. If Tenant is unable to accomplish such access solely on the Premises, by using AutoTurn on the CAD site plan, utilizing the specifications of Tenant's delivery truck, Landlord shall confirm that Tenant's delivery truck (which has a trailer length of 53' and an overall length of 70') can ingress, egress, and circulate the site and Premises.

G. <u>Site Lighting</u>. Landlord shall furnish and install all site lights including pole lights within the Premises. The pole lights shall be compliant with Tenant's specifications.  Pole lighting shall include concrete bases, minimum 20' poles, luminaries, conduits, and wiring stubbed to Tenant's Building in locations determined by Tenant. Landlord shall provide site lighting with adequate wattage to provide an average maintained illumination minimum level of not less than three (3) FC and an average to minimum uniformity ratio of no more than 3:1.  Landlord shall provide a photometric plan showing footcandle distribution with the site lighting plan submittal for final approval by Tenant.   (Parking lot lights shall be connected to Landlord's house panel).

H. <u>Sidewalks</u>. The sidewalks directly adjacent to Tenant's Building shall be Tenant's responsibility.

I.   <u>Parking Stalls and Drive Aisles</u>.

a. <u>Site Markings</u>. Landlord shall provide all parking stalls, directional arrows, fire lanes and loading zones which shall be painted and/or marked approved by Tenant and in accordance with local, state and federal code.

LA:17300769.9

b. <u>Parking Stalls Dimension</u>. Parking stalls shall have a minimum width of nine feet (9') and a minimum length of eighteen feet (18'), unless approved by Tenant or City standards dictate otherwise. Cars shall not be permitted to overhang upon Tenant's adjacent building sidewalks unless expressly approved by Tenant.

c. <u>Minimum Parking Count and Parking Ratio.</u> Tenant shall be entitled to the primary use of a minimum of 56 parking spaces most proximate to Tenant's building, and the shopping center shall maintain a minimum parking ratio as set forth in the Lease.

d. <u>Minimum Drive Aisle Width and Configuration</u>. Drive aisles shall have a minimum width of twenty-five feet (25'). Tenant's main field of parking shall not incorporate one-way drive aisles and/or angled parking unless specifically approved by Tenant.

J. <u>Paving & Curbing.</u>

a. <u>General Specifications</u>. Landlord shall provide all parking within the Premises. Pavement shall be constructed in strict accordance with the recommendations of Landlord's geotechnical report approved by Tenant, to accommodate heavy duty (main drives and service areas) uses and light duty (parking areas) uses as shown on the Landlord's Engineered Plans. Landlord will provide parking lot pavement section design prepared by an approved asphalt engineer and designed to a thickness to achieve a 20-year life. The design mix shall be submitted and approved by the asphalt engineer. Subgrade parking lot soils will be sterilized prior to placement of base materials. Landlord shall certify elevations of parking lot subgrades and Landlord shall certify elevations after placement of parking lot base coarse. Landlord shall provide continuous inspection and certification of the placement of parking lot asphaltic concrete.

b. <u>Striping</u>. Parking lot striping will not occur until 15 days after the final placement of the asphaltic concrete. Parking lot striping shall be two coats applied 5 days apart.

c. <u>Concrete Curbing and Zero Curb Requirement</u>. Landlord shall provide all reinforced concrete curbing, which shall be provided around the entire pavement perimeter of all pavement edges. All curbing to be defined on the site construction drawings as to the curb type, configuration and location. Per Tenant's Specifications, Landlord shall provide flush curbing (zero curb) in the front and side of the sidewalk entrance, handicap stalls and proposed "parent & toddler" stalls consisting of approximately 3' of tactile warning strips related to and compliant with all applicable ADA requirements and municipal code, as indicated in Tenant's plans and specifications.

d. <u>Not Permitted</u>. No asphaltic curbing or extruded curbing epoxied to the pavement surface shall be used as part of the On-Site Improvements.

K. <u>Landscaping</u>

a. <u>Landscaping and Irrigation</u>. Landlord shall furnish and install all Landscaping, within the Premises, and as required by municipal authorities, with a complete irrigation system compliant with all applicable codes and designed to limit water consumption, in accordance with a final landscape plan to be approved by Tenant. Landlord shall correct any condition that creates standing water in paved areas, including the parking lot and sidewalk(s). Landlord shall connect the utility lines to Landlord's house meter.

b. <u>Obstructions and Impact on Sight Lines</u>. Any landscaping shall be designed in such a way as to prevent any major obstructions to reasonable lines of sight to major façade features, the front elevation of Tenant's buildings, attached building signage and monument signage.

2.4 <u>PROJECT SIGNAGE</u>

A. <u>Installation of Pylon and/or Monument Signs(s)</u>. Please see Section 15.2 of the Lease. The sign(s) may incorporate the maximum square footage allowable by code. Sign(s) may consist of a double face internally illuminated sign, incorporating Tenant's typical sign panels. The sign illumination shall be maintained during Tenant's hours of operation and shall not be turned off no earlier than one hour post closing.

B. <u>Directional Signs</u>. Tenant shall provide and install Tenant's Directional Signs per Tenant's Sign Plan.

LA:17300769.9

**DEVELOPMENT REPRESENTATIVES**

**Tenant's Development Representatives:**

*Primary Representative:*

Fresh & Easy Neighborhood Market Inc.
2120 Park Place, Suite 200
El Segundo, CA  90245
Attn:  Tom Scorer
Tel:  (310) 341-1200
Fax:  (310) 341-1501

**Landlord's Development Representatives:**

*Primary Representative:*

Commerce Realty
149 Palos Verdes Blvd., Suite E
Redondo Beach, CA 90277
Attn:  Bill Lang
Tel:  (310) 373-2797
Fax: (310) 373-4719

S2-11

LA:17300769.9

Schedule 3 to Ground Lease Agreement

**LANDLORD'S WIRING INSTRUCTIONS**

ACCOUNT NAME:        ELTINGE & GRAZIADIO DEVELOPMENT CO. DBA  HARBOR MESA

ACCOUNT NUMBER:      1891487306

BANK NAME & ADDRESS:   COMERICA BANK CALIFORNIA - EL SEGUNDO BRANCH

                     2321 ROSECRANS AVENUE, EL SEGUNDO, CA 90245

ROUTING NUMBER:      121137522

LA:17300769.9

<u>Schedule 4 to Ground Lease Agreement</u>

**NOTICE ADDRESSES**

**Address for notices to Tenant:**

Fresh & Easy Neighborhood Market Inc.
2120 Park Place, Suite 200
El Segundo, CA  90245
Attn:  Tom Scorer
Tel:  (310) 341-1200
Fax:  (310) 341-1501

**Address for notices to Landlord:**

Commerce Realty
149 Palos Verdes Blvd., Suite E
Redondo Beach, CA 90277
Attn:  Bill Lang
Tel:  (310) 373-2797
Fax: (310) 373-4719

With a mandatory copy to:

McKenna Long & Aldridge LLP
300 S. Grand Ave. 14th Floor
Los Angeles, CA  90071
Attn:  J. Timothy Scott, Esq.
and Andrea Chang, Esq.
Tel:  (213) 688-1000
Fax: (213) 243-6330

And, from and after the Term Start Date,
an additional mandatory copy to:

Jones Lang LaSalle
Fresh & Easy Neighborhood Market
  (Tesco) Lease Administration
c/o Jones Lang LaSalle Americas, Inc.
4851 LBJ Freeway, Suite 220
Dallas, TX 75244
Attn:  Cliff Stratton, Lease Analyst
Tel:  (972) 591-5536
Fax:  (214) 540-7978

LA:17300769.9

**LEGAL DESCRIPTION OF SHOPPING CENTER PROPERTY**

PARCEL A:

PARCELS 1 AND 2, IN THE CITY OF COSTA MESA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP FILED IN BOOK 25, PAGE 24 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL B:

TEAT PORTION OF LOT 42 OF TRACT NO. 5475, AS SHOWN ON A MAP RECORDED IN BOOK 207, PAGES 48, 49 AND 50 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE CENTERLINE INTERSECTION OF GISLER AVENUE AND CINNAMON AVENUE, AS SAID INTERSECTION IS SHOWN ON A MAP FILED IN BOOK 17, PAGE 7 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID ORANGE COUNTY; THENCE SOUTH 0° 39' 45" EAST ALONG THE CENTERLINE OF CINNAMON AVENUE 55.47 FEET; THENCE NORTH 89° 20' 15" EAST 25.00 FEET TO A POINT ON THE EXISTING EASTERLY RIGHT OF WAY LINE OF SAID CINNAMON AVENUE, AS SHOWN ON SAID PARCEL MAP; THENCE SOUTH 0° 39' 45" EAST ALONG SAID EXISTING RIGHT OF WAY LINE 334.83 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 0° 39' 45" WEST ALONG SAID EXISTING LINE 125.00 FEET; THENCE EAST 205.01 FEET TO A POINT ON THE EXISTING WESTERLY RIGHT OF WAY LINE OF HARBOR BOULEVARD, AS SHOWN ON SAID PARCEL MAP; THENCE SOUTH 0° 39' 45" EAST ALONG SAID EXISTING RIGHT OF WAY LINE 258.07 FEET; THENCE SOUTH 89° 27' 51" WEST 92.00 FEET; THENCE NORTH 0° 39' 56" EAST 133.93 FEET; THENCE WEST 113.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL C:

PARCEL 1, AS SHOWN ON A MAP FILED IN BOOK 57, PAGE 31 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

PARCEL D:

PARCEL 42B, AS SHOWN ON A MAP FILED IN BOOK 17, PAGE 7 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

PARCEL E:

LOT 43 OF TRACT 5475, IN THE CITY OF COSTA MESA, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP THEREOF RECORDED IN BOOK 207, PAGES 48, 49 AND 50 OF MISCELLANEOUS MAPS, RECORDS OF SAID ORANGE COUNTY.

LA:17300769.9

PARCEL F:

PARCELS 1 AND 2 AS SHOWN ON EXHIBIT "B" ATTACHED TO LOT LINE ADJUSTMENT LL 96-02, IN THE CITY OF COSTA MESA, COUNTY OF ORANGE, STATE OF CALIFORNIA, RECORDED MARCH 12, 1997 AS INSTRUMENT NO. 19970113608 OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

Addresses for the spaces are designated as follows:

1515 GISLER AVENUE (APN 139-501-07):

PARCEL 1, AS SHOWN ON A MAP FILED IN BOOK 25, PAGE 24 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

3195 GISLER AVENUE (APN 139-501-01):

LOT 43 OF TRACT 5475, AS SHOWN ON A MAP THEREOF RECORDED IN BOOK 207, PAGES 48, 49 AND 50 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

3181 HARBOR BOULEVARD (APN 139-501-08):

PARCEL 2, AS SHOWN ON A MAP FILED IN BOOK 25, PAGE 24 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

3161-3165 HARBOR BOULEVARD (APN 139-501-09):

THAT PORTION OF LOT 42 OF TRACT NO. 5475,  AS SHOWN ON A MAP RECORDED IN BOOK 207, PAGES 48, 49 AND 50 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE CENTERLINE INTERSECTION OF GISLER AVENUE AND CINNAMON AVENUE, AS SAID INTERSECTION IS SHOWN ON A MAP FILED IN BOOK 17,  PAGE 7 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID ORANGE COUNTY; THENCE SOUTH 0  39' 45" EAST ALONG THE CENTERLINE OF CINNAMON AVENUE 55.47 FEET; THENCE NORTH 89  20' 15" EAST 25.00 FEET TO A POINT ON THE EXISTING EASTERLY RIGHT OF WAY LINE OF SAID CINNAMON AVENUE, AS SHOWN ON SAID PARCEL MAP; THENCE SOUTH 0  39' 45" EAST ALONG SAID EXISTING RIGHT OF WAY LINE 334.83 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 0  39' 45" WEST ALONG SAID EXISTING LINE 125.00 FEET; THENCE EAST 205.01 FEET TO A POINT ON THE EXISTING WESTERLY RIGHT OF WAY LINE OF HARBOR BOULEVARD, AS SHOWN ON SAID PARCEL MAP; THENCE SOUTH 0  39' 45" EAST ALONG SAID EXISTING RIGHT OF WAY LINE 258.07 FEET; THENCE SOUTH 89  27' 51" WEST 92.00 FEET; THENCE NORTH 0  39' 56" EAST 133.93 FEET; THENCE WEST 113.00 FEET TO THE TRUE POINT OF BEGINNING.

3151 HARBOR BOULEVARD (APN 139-501-10):

PARCEL 42B, AS SHOWN ON A MAP FILED IN BOOK 17, PAGE 7 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

3141 HARBOR BOULEVARD (APN 139-501-11):

PARCEL 1, AS SHOWN ON A MAP FILED IN BOOK 57, PAGE 31 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

3135 HARBOR BOULEVARD (APN 139-501-15):

PARCEL 1, AS DESCRIBED ON EXHIBIT "A" ATTACHED TO LOT LINE ADJUSTMENT LL 96-02 RECORDED MARCH 12, 1997 AS INSTRUMENT NO. 19970113608 OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

A-2

**SITE PLAN OF SHOPPING CENTER AND PREMISES**

[Please see attached]

B-1

LA:17300769.9



B-2

LA:17300769.9



B-4

LA:17300769.9

Exhibit C to Ground Lease Agreement

**EXCLUSIVE USE RIGHTS AND PRIMARY USES**

None, except as follows:

From the McDonald's Lease:

1.    So long as Tenant continues to operate a quick service restaurant or food establishment selling hamburgers as a primary menu item on Parcel 1, Landlord covenants and agrees that no property (other than Parcel 1) now or hereafter owned, leased or controlled, directly or indirectly, by Landlord or, if Landlord is a corporation, any subsidiary of Landlord, located on Parcel 2 legally described on Exhibit B hereto (whether or not such other property is subsequently voluntarily conveyed by Landlord) shall, during the term of this Lease and any extensions, be leased, used or occupied as a quick service restaurant or food service establishment selling hamburgers as a primary menu item. A "quick service" restaurant or food establishment is one which does not offer food and drink orders taken and served at the customer's table by a waiter or waitress. By way of example, without limitation, the following restaurants are precluded under the is section:  Burger King, Carl's Jr., Wendy's, and In – N – Out Burger.

From the Chick-Fil-A Lease:

Section 29.  Covenant Not to Compete:  Landlord covenants and agrees that no portion of the Adjoining Property south of the Demised Premises on Harbor Boulevard to Nutmeg Place shall, during the term of this Lease, be leased, used or occupied as a quick service restaurant selling or serving chicken as a principal menu item.  A "quick service" restaurant or food establishment is one which does not offer food and drink orders taken and served at the customer's table by a waiter or waitress.  By way of example, without limitation, the following restaurants are precluded under this section: Kentucky Fried Chicken, Popeye's, Church's, El Pollo Loco, Koo-Koo Roo, Pollo Campero and Charo Chicken.

From the El Pollo Loco Lease:

(a) Tenant, and any subsidiaries or concessionaires as Tenant may desire, will occupy and use the Premises for an El Pollo Loco fast food drive thru facility, a Foster Freeze and any other legal use provided further that such uses other than El Pollo Loco and/or Foster Freeze do not directly or indirectly compete with or are similar to Landlord's then current tenants adjacent to and around the Premises.  Tenant's use shall include all other operations incident to the conduct of such businesses, and Tenant agrees not to use the Premises for any immoral or unlawful purpose. Landlord

C-1

Exhibit D to Ground Lease Agreement

**PRELIMINARY ELEVATIONS**

Please see attached Preliminary Elevations.

LA:17300769.9



LA:17300769.9



D-3

LA:17300769.9