# EXHIBIT A
# PART TWO

**ENCUMBRANCES AND OTHER TITLE MATTERS**

To be completed during the Feasibility Period.

LA:17300769.9

Exhibit F to Ground Lease Agreement

**LANDLORD'S SIGN CRITERIA**

This exhibit shall be agreed during the Feasibility Period.

E-2

LA:17300769.9

**RULES & REGULATIONS FOR THE SHOPPING CENTER**

(This Exhibit shall only be effective if the Rules & Regulations are provided and approved by Tenant In writing during the Feasibility Period.)

**PROPERTY AND ASSET MANAGEMENT AGREEMENT**

[Please see attached.]

E-4

LA:17300769.9

## PROPERTY AND ASSET MANAGEMENT AGREEMENT

This PROPERTY AND ASSET MANAGEMENT AGREEMENT (the "Agreement") is dated as of this 29 day of October, 2008, between PHILLIP M. BARDACK, as Successor Trustee of the George A. Thatcher, Jr. Trust, Diane Linda Thatcher Trust, Thomas Jeffrey Thatcher Trust, Nancy Joanne Thatcher Trust, Suzanne Kelliher Dickey Trust, PATRICIA ELTINGE, LISA ELTINGE, STEPHEN ELTINGE, LISA ELTINGE and PATRICIA ELTINGE, as Co-Trustees of the Testamentary Trust under the Will of Maxine Louise Eltinge, MARY LOU GRAZIADIO AREA, as Trustee of the Mary Lou Graziadio Area Separate Property Trust, ALIDA CALVILLO, as Trustee of the Alida Calvillo Separate Property Trust, G. LOUIS GRAZIADIO, III, as Trustee of the G. Louis Graziadio, III Trust, MARY LOU GRAZIADIO AREA, as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O MARY LOU GRAZIADIO AREA, ALIDA CALVILLO, as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O ALIDA CALVILLO, G. LOUIS GRAZIADIO, III, as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O G. LOUIS GRAZIADIO, III. (individually, a "Property Owner" and collectively, the "Property Owners"), and G.I.C. Enterprises, Inc. dba Commerce Realty, a California corporation (the "Property Manager").

The Property Owners own that certain real property located in Costa Mesa, California, commonly known as Harbor Mesa and as more particularly described in Exhibit "A" attached hereto and incorporated herein (the "Project"). The Property Owners desire to engage the Property Manager to supervise, manage, operate, and maintain the Project, and to perform certain other services as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Commencement and Termination.    The Property Manager's duties and responsibilities under this Agreement shall begin on the date of this Agreement and shall terminate at the time set forth herein.

2.    Property Manager's Responsibilities.

2.1    Status of the Property Manager.    The Property Owners and the Property Manager do not intend to form a joint venture, partnership or similar relationship. Instead, the parties intend that the Property Manager shall act solely in the capacity of an independent contractor for the Property Owners. Nothing in this Agreement shall cause the Property Manager and the Property Owners to be joint venturers or partners of each other, and neither shall have the power to bind or obligate the other party by virtue of this Agreement, except as expressly provided in this Agreement. Nothing in this Agreement shall deprive or otherwise affect the right of either party to own, invest in, manage, or operate, or to conduct business activities which compete with the business of the Project.

2.2    Management.    Subject to the provisions of this Agreement: The Property Manager shall use commercially reasonable efforts to manage, operate and maintain the Project in an efficient, economic, and satisfactory manner and shall arrange the performance of

029896, 000001, 102305443. 2

E-5

everything reasonably necessary for the proper operation of the Project for the tenants thereof, subject to (a) applicable governmental requirements and (b) the terms and provisions of this Agreement.   At the expense of the Property Owners, the Property Manager shall use commercially reasonable efforts to keep the Project clean and in good repair, shall order and supervise the completion of such repairs as may be required and shall generally do and perform, or cause to be done or performed, all things necessary, required or desirable for the proper and efficient management, operation, and maintenance of the Project; provided the Property Owners, in a manner reasonably satisfactory to the Property Manager, make available to the Property Manager such sums as are reasonably necessary to pay the costs thereof.   In addition to the foregoing, Property Manager shall have responsibility for interfacing and communicating with the owner and holder of any deed of trust or mortgage upon the Project (a "Lender") in connection with any loan secured by such deed of trust or mortgage ("Loan"), and shall (i) make all day to day business decisions customarily provided by a property manager and (ii) perform all services customarily provided by a property manager, with respect to interfacing with a Lender, including, without limitation, designating changes in address, receiving any and all notices including, without limitation default notices on behalf of the Property Owners, requesting waivers of provisions in any documents, including any deed of trust or mortgage, in respect of a Loan ("Loan Documents") and negotiating conditions to any such requested waivers that might be granted by any such Lender, depositing rents or other revenues in any lockbox account maintained under such Loan Documents, receiving into an operating account to be maintained by Property Manager for the benefit of the Property Owners all disbursements made out of any such lockbox to the Property Owners as the borrower thereunder for the payment of operating expenses of the Project, or otherwise to be made to or to the account of the Property Owners as such borrower, requesting and receiving any amounts out of any reserve accounts or escrow accounts maintained by such Lender on account of repairs, capital improvements, tenant improvements, leasing commissions, real estate taxes and assessments and insurance proceeds or otherwise.   The Property Manager shall perform all services in a diligent and professional manner.

2.3     Employees; Independent Contractor.   The Property Manager shall employ, directly or through third party contractors (e.g. employee leasing company), at all times a sufficient number of capable employees and/or independent contractors to enable the Property Manager to properly, adequately, safely and economically manage, operate and maintain the Project.  All matters pertaining to the supervision of such employees shall be the responsibility of the Property Manager.  All salaries and benefits and positions of employees who perform work in connection with the Project shall be consistent with the Budget (as defined in Section 2.5.1).

2.4     Compliance with Laws, Mortgages and Other Matters.

2.4.1   The Property Manager shall use commercially reasonable efforts to comply with any Loan Documents, and with all governmental requirements affecting the Project and the performance of Property Manager's duties hereunder (including all applicable licensing requirements applicable to Property Manager).   Property Manager may implement such procedures with respect to the Project as the Property Manager may deem advisable for the more efficient and economic management and operation thereof.  The Property Manager shall pay from the Operating Account (defined in Section 6.1) expenses incurred to remedy violations of laws.  However, the Property Manager shall not be obligated to remedy violations of law if

2

{20810.000001, 102303443. 2

LA:17300769.9

sufficient funds are not available in the Operating Account or if the Property Owners do not provide sufficient additional funds to do so.

2.4.2    The Property Manager shall furnish to the Property Owners, promptly after receipt, any notice of violation of any material governmental requirement or order issued by any governmental entity relating to the Project, any notice of default from a Lender or any notice of termination or cancellation of any insurance policy.

### 2.5    Budgets and Operating Plan.

2.5.1    The Property Manager shall prepare and submit to the Property Owners annually a capital and operating budget ("Budget") for the promotion, operation, leasing, repair, maintenance and improvement of the Project for each calendar year.  The Budget for the current calendar year is attached hereto as Exhibit "B" and is hereby approved by the Property Owners.  The Property Manager shall deliver each subsequent Budget for each subsequent calendar year on or prior to December 15th of the calendar year before the budget year, or as soon as possible thereafter to the Property Owners for their approval.  The Property Owners shall approve or disapprove of the Budget before the end of the calendar year, or as soon as possible thereafter.  The Property Manager may proceed under the terms of the proposed Budget for items that are not objected to and may take any action with respect to items not approved for Permitted Expenditures (as defined in Section 2.5.2).  In the event that the Property Owners and the Property Manager are unable to reach an agreement on the Budget, the Property Manager shall be entitled to operate the Project using the prior year's Budget for such items plus five percent (5%) until a new Budget is approved by the Property Owners.  The Property Manager shall provide the Property Owners with such information regarding the Budget as may be, from time to time, reasonably requested by the Property Owners.  The Property Manager may at any time submit a revised Budget to the Property Owners for their approval consistent with the terms of this Section.

2.5.2    The Property Manager shall charge all expenses to the proper account as specified in the Budget, provided that the Property Manager may reallocate savings from one line item to other line items.  The Property Manager shall submit (subject to the same procedures as set forth in Section 2.5.1) a revised Budget to the Property Owners before making any expenditure not within the Budget unless the expenditure is (a) less than Ten Thousand Dollars ($10,000) for any single expenditure or less than Fifty Thousand Dollars ($50,000) in the aggregate for any calendar year, or (b) is, in the Property Manager's reasonable judgment, required to avoid personal injury, significant property damage, a default under any loan encumbering the Project, a violation of applicable law or the suspension of a service (collectively, "Permitted Expenditures").

2.5.3    Together with the submission of the Budget, the Property Manager shall submit each year to the Property Owners for information purposes only an operating plan for the general operation of the Project, including a proposed list of improvements to the Project, the status of any construction, general insurance plan, leasing plans and leasing status, marketing plan and plan for the general operation and maintenance of the Project (the "Operating Plan").  The Property Manager may submit a revised Operating Plan to the Property Owners at any time.

025896, 000001, 102305443  2

E-7

LA:17300769.9

2.5.4    The Property Manager shall provide to the Lender copies of all budgets or reports relating to the Project required by any Loan Documents and comply with the provisions applicable to the Property Manager set forth in the Loan Documents.

2.5.5    During each calendar year, in the regular quarterly reports sent to the Property Owners, the Property Manager shall inform the Property Owners of, the status of any construction, leasing plans, leasing status and any material increases in costs and expenses not foreseen and not included in the Budget within a reasonable time after the Property Manager learns of such changes.

2.6    Leasing.

2.6.1    The Property Manager shall use commercially reasonable efforts to obtain tenants for all leasable space in the Project (collectively, "Leases"). The Property Manager shall have the authority to negotiate new Leases and renewals of existing Leases, and amendments to existing Leases, on behalf of the Property Owners and to execute and deliver on behalf of the Property Owners any such Leases, renewals or amendments that are approved or deemed approved (as set forth below) by the Property Owners. Upon execution of any letter of intent, term sheet or similar document ("Term Sheet") by Property Manager and any tenant or proposed tenant regarding a new Lease, a renewal of an existing Lease, or a material modification to an existing Lease, Property Manager will forward a copy thereof to Property Owners for their approval. Unless the Property Owners deliver to Property Manager notice of their objection to any such Term Sheet within five (5) business days after submission of such Term Sheet, Property Owners will be deemed to have approved of the Term Sheet, and Property Manager will thereafter have full power and authority to execute a Lease, or a renewal or modification of a Lease, on behalf of Property Owners, as long as the final Lease, renewal or modification does not materially deviate from the provisions of the Term Sheet. Any material deviation requires the sending of a new and revised Term Sheet to Property Owners for their approval (or deemed approval) in the manner set forth above. If Property Manager receives a timely objection to any such Term Sheet from Property Owners, then Property Manager shall not execute such Lease or renewal or modification until the objections have been withdrawn by notice from the Property Owners.

2.6.2    The Property Manager shall not, without the prior written approval of the Property Owners, give free rental or discounts or rental concessions of any nature to any employees, officers or shareholders of the Property Manager or anyone related to such employees, officers or shareholders unless such discounts or concessions are in lieu of salaries or other benefits to which they would be contractually entitled. The Property Manager shall not lease any space in the Project to itself or to any of its affiliates or subsidiaries without the prior written approval of the Property Owners.

2.6.3    The Property Manager shall use commercially reasonable efforts to investigate all prospective tenants, and shall not rent to persons not meeting credit standards reasonable for the market. The Property Manager may, in its discretion, obtain a credit check for all prospective tenants through a credit check company. The Property Manager shall retain such information for the duration of the tenancy, and shall make it available to the Property Owners upon reasonable notice, subject to compliance with any confidentiality restrictions required by

4

C20836, 000001, 102305443 2

E-8

LA:17300769.9

any tenant or any credit check company. The Property Manager does not guarantee the accuracy of any such information or the financial condition of any tenant.

2.6.4    The Property Manager and the Property Owners agree that there shall be no discrimination against or segregation of any person or group of persons on account of age, race, color, religion, creed, handicap, sex or national origin in the leasing of the Project, nor shall the Property Owners or the Property Manager permit any such practice or practices of discrimination or segregation with respect to the selection, location, number or occupancy of tenants.

2.6.5    The Property Manager is hereby authorized to negotiate and execute on behalf of Property Owners any and all reasonable Subordination and Non-Disturbance Agreements required by a Lender, and any Tenant Estoppel Certificates required by a Lender.

2.6.6    The Property Manager shall engage contractors, engineers, architects and other consultants on behalf of the Property Owners to design and construct customary tenant improvements required by the Leases that are in accordance with the Leases or the Budget. The Property Manager shall oversee the design and construction of such tenant improvements. For any contract requiring payment in excess of Fifty Thousand Dollars ($50,000), the Property Manager shall follow the bidding requirements specified in Section 2.9.

2.7    Collection of Rents and Other Income. Unless otherwise required by any Loan Documents affecting the Project, the Property Manager shall bill all tenants and shall use its commercially reasonable efforts to collect all rent and other charges due and payable from any tenant or from others for services provided in connection with the Project. The Property Manager shall deposit all monies so collected in the Operating Account (as defined in Section 6.1). However, the Property Manager shall not terminate any Lease, or institute legal action against any tenant without the prior approval of Property Owners.

2.8    Repairs and Maintenance. The Property Manager shall maintain the buildings, appurtenances and common areas of the Project in good order and condition, and in the condition required by the Leases, other than areas that are the responsibility of the tenants. The Property Manager shall pay actual and reasonable expenses for materials and labor for such purposes from the Operating Account. The Property Manager shall take reasonable precautions against fire, vandalism, burglary and trespass to the Project.

2.9    Capital Expenditures. The Property Manager may make any capital expenditure within any Budget approved by the Property Owners without any further consent. All other capital expenditures other than Permitted Expenditures shall be subject to submittal of a revised Budget to the Property Owners. Unless the Property Owners specifically waives such requirements, or approves a particular contract, the Property Manager shall award any contract for a capital improvement exceeding Fifty Thousand Dollars ($50,000) in cost on the basis of competitive bidding, selected from a minimum of two (2) written bids. The Property Manager shall accept the bid of the lowest bidder determined by the Property Manager in its reasonable discretion, provided that such bidder is responsible, qualified and capable of completing such improvements on a reasonable schedule and as bid.

5

729896, 000001, 102305443_2

LA:17300769.9

2.10    Service Contracts, Supplies and Equipment.

2.10.1 The Property Manager may enter into or renew any contract for cleaning, maintaining, repairing or servicing the Project or any of the constituent parts of the Project (including contracts for fuel oil, security or other protection, extermination, landscaping, architectural or engineering services) contemplated by the Budget and consistent with the Operating Plan with any unrelated third party without the consent of the Property Owners. Each such service contract shall (a) be in the name of the Property Owners or in the name of the Property Manager as agent for the Property Owners, (b) be assignable to the nominee of the Property Owners and (c) be for a term not to exceed one (1) year. Unless the Property Owners specifically waives such requirements or approve a particular contract, all service contracts for amounts in excess of Fifty Thousand Dollars ($50,000) per year shall be subject to the bidding requirements specified in Section 2.9.

2.10.2 If this Agreement terminates or is not renewed pursuant to Section 10, the Property Manager, at the option of the Property Owners, shall assign to the Property Owners or to the nominee of the Property Owners all of the Property Manager's interest in all service agreements pertaining to the Project, if any.

2.10.3 At the expense of the Property Owners, the Property Manager may purchase, provide, and pay for all needed janitorial and maintenance supplies, tools and equipment, restroom and toilet supplies, light bulbs, paints, and similar supplies necessary to the efficient and economical operation and maintenance of the Project. Such supplies and equipment shall be the property of the Property Owners. All such supplies, tools, and equipment shall be delivered to and stored at the Project and shall be used only in connection with the management, operation, and maintenance of the Project.

2.11    Taxes, Mortgages. The Property Manager, unless otherwise requested, shall obtain and verify bills for real estate and personal property taxes, general and special real property assessments and other like charges (collectively "Taxes") which are or may become liens against the Project and appeal such Taxes as the Property Manager may decide in its reasonable judgment. The Property Manager, if requested by the Property Owners, will cooperate to prepare an application for correction of the assessed valuation (in cooperation with representatives of the Property Owners) to be filed with the appropriate governmental agency. The Property Manager shall pay, within the time required to obtain discounts, from funds provided by the Property Owners or from the Operating Account, all utilities, Taxes and payments due under each Lease or Loan Document, if any, affecting the Project. To the extent contemplated by the Budget and in conformance with the Operating Plan (as either may be revised from time to time), the Property Manager may make any such payments.

2.12    Miscellaneous Duties. The Property Manager shall (a) maintain at the Property Manager's office at the Property Manager's address as set forth in Section 13 or at the Project and readily accessible to the Property Owners orderly files containing rent records, insurance policies, leases and subleases, correspondence, bank statements, canceled checks and all other documents and papers pertaining to the Project or the operation thereof; (b) provide information about the Project necessary for the preparation and filing by the Property Owners of their income or other tax returns required by any governmental authority, including annual

6

829896, 000001, 102105443. 2

LA:17300769.9

statements; (c) consider and record tenant service requests in systematic fashion showing the action taken with respect to each, and thoroughly investigate all complaints of a nature which might have a material adverse effect on the Project or the Budget; (d) supervise the moving in and out of tenants and subtenants; arrange, to the extent possible, the dates thereof to minimize disturbance to the operation of the Project and inconvenience to other tenants or subtenants; (e) check all bills received for the services, work and supplies ordered in connection with maintaining and operating the Project and, except as otherwise provided in this Agreement, pay such bills when due and payable; and (f) not knowingly permit the use of the Project for any purpose that might void any policy of insurance held by the Property Owners or which might render any loss thereunder uncollectible.   All such records are the property of the Property Owners and may be inspected by the Property Owners at the Property Manager's office or at the Project upon request, and will be delivered to the Property Owners upon written request.

    2.13   Limitation.   Notwithstanding anything to the contrary contained herein, the Property Manager shall only provide customary services to tenants of the Project (along with such services as required under Leases) and shall not be required to provide any other services to the tenants on behalf of the Property Owners.

    3.   Basic Insurance.

        3.1   Insurance.

            3.1.1   The Property Manager, at the Property Owners' expense, will obtain and keep in force adequate insurance against physical damage (such as fire with extended coverage endorsement, boiler and machinery) and against liability for loss, damage or injury to property or persons that might arise out of the occupancy, management, operation or maintenance of the Project, as contemplated by the Operating Plan and any Loan Documents affecting the Project (including the Loan Documents) and to the extent available at commercially reasonable rates.   The Property Manager shall not be required to maintain earthquake or flood insurance unless expressly directed to do so by a specific written notice from the Property Owners or as required by any Loan Documents affecting the Project, but may do so in the Property Manager's reasonable discretion.   The Property Manager shall be an additional insured on all liability insurance maintained with respect to the Project.   In the event the Property Manager receives insurance proceeds for the Project, the Property Manager will take any required actions as set forth in any Loan Documents affecting the Project.   In the event that the Property Manager receives insurance proceeds that are not governed by the terms of any Loan Documents affecting the Project, the Property Manager will either (i) use such proceeds to replace, repair or refurbish the Project or (ii) distribute such proceeds to the Property Owners, as directed by the Property Owners.   The foregoing notwithstanding, in all events the Property Manager will obtain on behalf of the Property Owners, at the Property Owners' expense, all applicable insurance coverage as may be required by the terms of any Loan Documents.

            3.1.2   The Property Manager shall investigate and submit, as soon as reasonably possible, a written report to the insurance carrier and the Property Owners as to all accidents, claims for damage relating to the ownership, operation and maintenance of the Project, any damage to or destruction of the Project and the estimated costs of repair thereof, and prepare and file with the insurance company in a timely manner required reports in connection therewith.

7

129896, 00.0001, 102305443.2

LA:17300769.9

Notwithstanding the foregoing, the Property Manager shall not be required to give such notice to the Property Owners if the amount of such claims, damage or destruction, as reasonably estimated by the Property Manager, does not exceed Fifty Thousand Dollars ($50,000) for any one occurrence. The Property Manager shall settle all claims against insurance companies arising out of any policies, including the execution of proofs of loss, the adjustment of losses, signing and collection of receipts and collection of money, except that the Property Manager shall not settle claims in excess of Fifty Thousand Dollars ($50,000) without the prior approval of the Property Owners.

3.2 Additional Insurance. Any insurance obtained by the Property Manager for its own account and not for the benefit of the Property Owners or the Project shall be at the Property Manager's own expense and for its sole benefit.

3.3 Contractor's and Subcontractor's Insurance. The Property Manager shall require all contractors and subcontractors entering upon the Project to perform services to have insurance coverage at the contractor's or subcontractor's expense, in the following minimum amounts: (a) worker's compensation - statutory amount; (b) employer's liability (if required under applicable law) -- Five Hundred Thousand Dollars ($500,000) (minimum); and (c) comprehensive general liability insurance, including comprehensive auto liability insurance covering the use of all owned, non-owned and hired automobiles, with bodily injury and property damage limits of One Million Dollars ($1,000,000) per occurrence. The Property Manager may waive such requirements in its reasonable discretion. The Property Manager shall obtain and keep on file a certificate of insurance that shows that each contractor and subcontractor is so insured.

3.4 Waiver of Subrogation. To the extent available at commercially reasonable rates, all property damage insurance policies required hereunder shall contain language whereby the insurance carrier thereunder waives any right of subrogation it may have with respect to the Property Owners or the Property Manager.

4. Financial Reporting And Record Keeping.

4.1 Books of Accounts. The Property Manager shall maintain adequate and separate books and records for the Project with the entries supported by sufficient documentation to ascertain their accuracy with respect to the Project. The Property Owners agree to provide to the Property Manager any financial or other information reasonably requested by the Property Manager to carry out its services hereunder. The Property Manager shall maintain such books and records at the Property Manager's office at the Property Manager's address as set forth in Section 13 or at the Project. The Property Manager shall bear losses arising from the fraud or gross negligence of the Property Manager or any of its employees or agents.

4.2 Financial Reports. On or about the forty-fifth (45th) day following the end of each calendar quarter, the Property Manager shall furnish to the Property Owners a report of all significant transactions occurring during such prior quarter. These reports shall include a cash flow statement, a current rent roll and a Property Manager update on the status of the Project. The Property Manager also shall deliver to the Property Owners within a reasonable time after (i) the close of a calendar year and (ii) the termination of this Agreement, an operating

8

statement, a cash flow statement, a balance sheet for the Project and such other financial information as the Property Manager, in its discretion, prepares. The financial statements and reports shall be prepared on a cash basis and in compliance with all reporting requirements relating to the operations of the Project and required under any Loan affecting the Project.

4.3    Supporting Documentation. At the expense of the Property Owners, the Property Manager shall maintain and make available for inspection at the Property Manager's office at the Property Manager's address as set forth in Section 13 or at the Project, copies of the following: (a) all bank statements and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) rent roll of tenants; (d) paid invoices (or copies thereof); and (e) market study of competition (annually). Property Manager shall deliver a copy of the documents described above to the Property Owners upon written request.

4.4    Tax Information. The Property Manager shall provide the Property Owners with sufficient information so that the Property Owners can prepare their income tax returns on the cash method of accounting or, if requested with appropriate adjustment to convert the information to an accrual basis.

5.    Right to Audit. The Property Owners and their representatives may examine all books, records and files maintained for the Property Owners by the Property Manager. The Property Owners may perform any audit or investigations relating to the Property Manager's activities at the appropriate office of the Property Manager if such audit or investigation relates to the Property Manager's activities for the Property Owners. Should the Property Owners discover defects in internal control or errors in record keeping, the Property Manager shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. The Property Manager shall inform the Property Owners in writing of the action taken to correct any audit discrepancies.

6.    Bank Accounts.

6.1    Operating Account. To the extent funds are not required to be placed in a lockbox pursuant to any Loan Documents affecting the Project, the Property Manager shall deposit all rents and other funds collected from the operation of the Project in a reputable FDIC insured bank or financial institution in a special trust or depository account or accounts for the Project maintained by the Property Manager for the benefit of the Property Owners. The Property Manager shall maintain books and records of the funds deposited in the accounts and withdrawals therefrom (such accounts together with any interest earned thereon, shall collectively be referred to herein as the "Operating Account"). The Property Manager shall maintain, with funds from the Property Owners, the Operating Account so that an amount at least as great as the budgeted expenses for such month is in such Operating Account as of the first of each month. The Property Manager shall pay from the Operating Account the operating expenses of the Project and any other payments relative to the Project as required by this Agreement. If more than one account is necessary to operate the Project, each account shall have a unique name, except to the extent any Lender requires sub-accounts within any account. All rents and other funds collected in the Operating Account after payment of all operating expenses, debt service and such amounts as may be determined by the Property Manager to be retained for reserves or improvements, shall be paid to the Property Owners.

9

639896, 000001, 102305445. 3

E-13

6.2   Security Deposit Account.   If applicable law or a Lender requires a segregated account of security deposits, the Property Manager will open a separate account at a reputable bank or other financial institution. The Property Manager shall maintain such account in accordance with applicable law and/or the applicable Loan Documents.   The Property Manager may return such deposits to any tenant in the ordinary course of business in accordance with the terms of the applicable Lease.

6.3   Access to Account.   As authorized by signature cards, representatives of the Property Manager shall have access to and may draw upon all funds in the accounts described in Sections 6.1 and 6.2 without the approval of the Property Owners.  Additionally, representatives of the Property Manager shall have access to and may draw upon any funds escrowed or held in reserve for capital expenditures without the approval of the Property Owners, provided that the requirements of Section 2.9 and any additional Lender requirements with respect to such amounts are satisfied.  The Property Owners may not withdraw funds from such accounts without the Property Manager's prior written consent, except following the Property Manager's default after expiration of  all applicable notice and cure periods or the termination of this Agreement.

7.   Payments of Expenses.

7.1   Eligible Costs.   The Property Manager shall pay all expenses of the operation, maintenance and repair of the Project contemplated by the Budget directly from the Operating Account or shall be reimbursed by the Property Owners, subject to the conditions set forth in Section 2, including the following:   (a) costs of the gross salary and wages or proportional shares thereof, payroll taxes, worker's compensation insurance, and all other benefits of employees, who devote substantially all of their time to the Project, required to manage, operate and maintain the Project properly, adequately, safely and economically, subject to this Agreement, provided that the Property Manager shall not pay such employees in advance; (b) cost to correct the violation of any governmental requirement relating to the leasing, use, repair and maintenance of the Project, or relating to the rules, regulations or orders of the local Board of Fire Underwriters or other similar body, if such cost is not the result of the Property Manager's gross negligence or willful misconduct; (c) actual and reasonable cost of making all repairs, decorations and alterations if such cost is not the result of the Property Manager's gross negligence or willful misconduct; (d) cost incurred by the Property Manager in connection with all service agreements; (e) cost of collection or attempted collection of delinquent rents collected by a collection agency or attorney; (f) legal fees of attorneys (subject to any required Property Owners' approval to institute legal action as set forth herein); (g) cost of capital expenditures subject to the restrictions in Section 2.9 and in this Section; (h) cost of printed checks for each account required by the Project and the Property Owners; (i) cost of utilities; (j) cost of advertising; (k) cost of printed forms and supplies required for use at the Project; (l) management compensation set forth in Section 9; (m) the cost of tenant improvements to the Project; (n) all hiring, relocation and termination costs for any employee whose salaries and benefits are paid by the Property Owners; (o) broker commissions; (p) debt service; (q) the cost of  utilities, services, contractors and insurance; (r) reimbursement of the Property Manager's out-of-pocket costs and expenses to the extent not prohibited by Section 8; and (s) all other costs directly related to the Project, including, but not limited to, communication costs (telephone, postage, etc.).

10

LA:17300769.9

7.2    Operating Account Deficiency.    If there are not sufficient funds in the Operating Account to make any such payment, Property Manager shall notify the Property Owners, if possible, at least ten (10) days prior to any delinquency so that the Property Owners have an opportunity to deposit sufficient funds in the Operating Account to allow for such payment prior to the imposition of any penalty or late charge.    In no event shall the Property Manager be required to expend any of its own funds for the operation or maintenance of the Project; however, should it do so, the Property Manager shall be entitled to reimbursement from the Property Owners within thirty (30) days after such advance.

8.    Property Manager's Costs Not to Be Reimbursed.

8.1    Non-reimbursable Costs.    The following expenses or costs incurred by or on behalf of the Property Manager in connection with the management and leasing of the Project shall be at the sole cost and expense of the Property Manager and shall not be reimbursed by the Property Owners:    (a) costs attributable to losses arising from gross negligence, willful misconduct or fraud on the part of the Property Manager, the Property Manager's associates or employees; (b) cost of insurance purchased by the Property Manager for its own account; (c) costs of Property Manager's general overhead, compensation of its employees (other than employees who devote substantially all of their time to the Project) and (d) other costs or expenses which are not normally reimbursed to Property Managers.

8.2    Litigation.    The Property Manager will be responsible for and hold the Property Owners harmless from, all costs relating to disputes with its employees (other than those who are employees of Property Owners, or employees of Property Manager who perform services for the Project, but only to the extent that the claim relates to services performed on the Project) for worker's compensation (to the extent not covered by insurance), discrimination or wrongful termination, including legal fees and other expenses.

9.    Compensation.

9.1    Property Management Fee.    The Property Manager shall receive, for its services in managing the day-to-day operations of the Project in accordance with the terms of this Agreement, an annual property management fee (the "Property Management Fee") equal to six percent (6%) of the Gross Revenues (defined below) and prorated for any partial year, payable in monthly installments, which Property Management Fee shall be in addition to any costs or expenses that are reimbursable pursuant to Section 7.    "Gross Revenues" shall be all gross collections from the operations of the Project including rental receipts, late fees, application fees, pet fees, lease buy-out payments (but only to the extent that such payment is in lieu of rent), and reimbursements by tenants for common area expenses, operating expenses and taxes and similar pass-through obligations paid by tenants, but excluding (i) security deposits received from tenants and interest accrued thereon for the benefit of the tenant until such deposits or interest are included in the taxable income of the Property Owners; (ii) advance rents until such payments are included in the taxable income of the Property Owners; (iii) reimbursements by tenants for work done for that particular tenant, (iv) proceeds from the sale or other disposition of all or any part of the Project, (v) insurance proceeds received by the Property Owners as a result of any insured loss (except proceeds of rent loss insurance), (vi) condemnation proceeds, to the extent not attributable to rent, (vii) capital contributions made by

11

829896, 000001, 102305443. 2

LA:17300769.9

the Property Owners; (viii) proceeds from capital, financing and any other transactions not in the ordinary course of the operation of the Project, (ix) income derived from interest on investments or otherwise, (x) abatement of taxes, awards arising out of takings by eminent domain, discounts and dividends on insurance policies, and (xi) rental concessions not paid by third parties or (xii) any other revenues which are not in lieu of rent and which would not customarily be included in Gross Revenues. The Property Management Fee shall be payable monthly from the Operating Account or from other funds timely provided by the Property Owners. Upon termination of this Agreement, the parties will prorate the Management Fee on a daily basis to the effective date of such cancellation or termination.

9.2    Consulting Fee. The Property Manager shall receive, for its services in supervising the overall management and operation of the Project in accordance with the terms of this Agreement, including, but not limited to obtaining all necessary land use entitlements required by any redevelopment of the Project, or for any new Lease, and in connection therewith coordination with all applicable governmental authorities and supervision and coordination with third party professionals engaged in the development process in connection with such land use approval process, a Consulting Fee equal to 1/10 of one percent (1%) of the Annual Project Value. The Property Manager shall prepare and submit to the Property Owners annually a project valuation schedule ("PV Schedule").The Consulting Fee shall be paid monthly and shall be pro rated for any partial year. The current year PV Schedule is attached hereto as Exhibit "C" and is hereby approved by the Property Owners. The Property Manager shall deliver each subsequent PV Schedule for each subsequent calendar year on or prior to December 15th of the calendar before the PV Schedule year, or as soon as possible thereafter. If the Property Owners fail to approve any PV Schedule, then the previously approved PV Schedule shall remain in effect until the Property Owners approve of any revised PV Schedule, and if a new PV Schedule is not approved by the Property Owners, the Property Manager's sole remedy shall be to terminate this Agreement under Section 10.3(b). The Property Manager may at any time submit a revised PV Schedule to the Property Owners for their approval consistent with the terms of this Section.  Upon termination of this Agreement or upon a sale of the Project, the parties will prorate the Asset Management Fee on a daily basis to the effective date of such cancellation or termination.

9.3    Leasing Commissions. The Property Manager, or an affiliate, shall receive, for its services in leasing the Project in accordance with the terms of this Agreement, a leasing commission (the "Leasing Commission") equal to six percent (6%) of the value ("value" being the base rent due under the Lease, without accounting for CPI or other increases other than fixed increases, for the initial term of the Lease) of any Lease entered into during the term of this Agreement, or three percent (3%) of the value (as defined above) of any Lease renewal or renegotiation entered into during the term of this Agreement (but not with respect to any option exercised by an existing tenant). If the Property Manager engages an outside broker to represent the Property Owners, the commissions payable to such broker shall be paid by the Property Manager from the Leasing Commission, but not in excess of the Leasing commission paid.

9.4    Construction Management Fee. The Property Manager, or an affiliate, shall receive, for its services in supervising any construction or repair project in or about the Project, a construction management fee (the "Construction Management Fee") equal to five percent (5%) of the cost of the amounts expended for construction, tenant improvements or

12

029286, 000001, 101705443. 3

LA:17300769.9

repair projects including any budgeted capital expenditure in excess of Five Thousand Dollars ($5,000). Cost shall mean "hard costs" (i.e., actual costs of material and labor) and "soft costs" (including but not limited to architects, engineers and similar professionals engaged to perform the work.)

9.5   Financing Fee. The Property Manager, or an affiliate, will receive from the Property Owners, a fee (the "Financing Fee") equal to one-half percent (.5%) of the principal amount of any Loan obtained for the Property Owners by the Property Manager. Any Loan must be approved by the Property Owners.

9.6   Payment of Fees. The Leasing Commissions shall be paid fifty percent (50%) when the Lease is signed and fifty percent (50%) when the tenant takes occupancy and commences payment of rent. The Construction Management fee shall be paid when the construction work is complete. The Financing Fee shall be paid when the Loan has closed.

10.   Term and Termination.

10.1   Term. This Agreement shall commence as of the date first above written and shall continue for a period of five (5) years, unless terminated earlier as provided herein.

10.2   Termination by Property Owners.

(a)   For Cause. Property Owners may terminate this Agreement at any time by notice to Property Manager "for cause." For cause means any breach of this Agreement by Property Manager which is not cured within thirty (30) days after notice from Property Owners, or any fraud or intentional misconduct by Property Manager in the performance of its duties hereunder, or if Property Manager dissolves, is liquidated or files a bankruptcy (or similar) petition or is adjudicated a bankrupt or if there is a change in the senior officers, as of the date of this agreement, of the Property Manager. The decision to terminate the Property Manger "for cause" shall be made only by the vote of seventy-five percent (75%) of those Property Owners who are not affiliated with or related to the Property Manager.

(b)   Without Cause. Property Owners may terminate this Agreement at any time by not less than 60 days notice to Property Manager "without cause." For clarification, such decision requires the act of all Property Owners.

(c)   Sale of Project. This Agreement shall automatically terminate upon the sale or other disposition of the Project by Property Owners.

10.3   Termination by the Property Manager.

(a)   For Cause. The Property Manager shall have the right to terminate this Agreement "for cause", if the Property Owners are in default in the performance of any of its obligations hereunder, and such default remains uncured for thirty (30) days following the Property Manager's giving of written notice of such default to the Property Owners.

13

025896, 000001, 103.0.5043. 2

LA:17300769.9

(b)    Without Cause. The Property Manager shall have the right to terminate this Agreement without cause, at any time, upon not less than 60 days notice to Property Owners.

10.4    Final Accounting. Within forty-five (45) days after termination of this Agreement for any reason, the Property Manager shall: (a) deliver to the Property Owners a final accounting, setting forth the balance of income and expenses on the Project as of the date of termination; (b) transfer to any account indicated by the Property Owners any balance or monies of the Property Owners or tenant security deposits held by the Property Manager with respect to the Project (or transfer the accounts in which such sums are held as instructed by the Property Owners); and (c) deliver to a subsequent property manager or other agent indicated by the Property Owners all materials and supplies, keys, books and records, contracts, leases, receipts for deposits, unpaid bills and other papers or documents that pertain to the Project. For a period of forty-five (45) days after such expiration or cancellation for any reason other than a termination by Property Manager "for cause", the Property Manager shall be available, through its senior executives familiar with the Project, to consult with and advise the Property Owners or any person or entity succeeding to the Property Owners as owner of the Project or such other person or persons selected by the Property Owners regarding the operation and maintenance of the Project. In addition, the Property Manager shall cooperate with the Property Owners in notifying all tenants of the Project of the expiration and termination of this Agreement, and shall use reasonable efforts to cooperate with the Property Owners to accomplish an orderly transfer of the operation and management of the Project to a party designated by the Property Owners. The Property Manager shall receive reasonable compensation for such post termination services. The Property Manager shall, at its cost and expense, promptly remove all signs wherever located indicating that it is the Property Manager and replace and repair any damage resulting therefrom. Termination of this Agreement shall not release either party from liability for failure to perform any of the duties or obligations as expressed herein and required to be performed by such party for the period before the termination.

11.    Approval Procedures. In any event where the approval, vote, consent or waiver (individually or collectively, an "Approval") of the Property Owners are required under this Agreement, it shall mean the written Approval (or the deemed Approval as set forth herein) of the Property Owners who hold at least seventy-five percent (75%) of the ownership interests in the Property (provided, however, that if one Property Owner or group of related or affiliated Property Owners owns more than seventy-five percent (75%) of the ownership interests, then the Approval, or deemed Approval, of at least one other, unrelated and unaffiliated Property Owners shall also be required). Property Manager shall send notice to the Property Owners of any event which requires its Approval, together with copies of any relevant documents or other materials. Unless the Property Owners who own the requisite percentage of ownership interests (i.e., 25% if there is no Property Owner or group of related and affiliated Property Owners which own more than 75%) deliver notice to the Property Manager objecting to the matter for which Approval is being sought within five (5) business days after receipt of such notice from the Property Manager, then the Property Owners will be deemed to have given their Approval of the matter in question. If the Property Manager receives a timely objection to any such matter from the Property Owners and if the requisite number of Property Owners shall not have given their Approval (or be deemed to have given their Approval) the matter, then the Property Manager

14

029896. 000001. 102305443. 2

LA:17300769.9

shall not take the action proposed until the objections have been withdrawn by notice from the objecting requisite number of Property Owners.

The foregoing provisions do not apply to the approval of new Leases, or renewals or modifications of existing Leases, which are governed by Section 2.6.1, or termination of the Property Manager pursuant to Section 10.2(a) or 10.2(b).

12.     Conflicts. The Property Manager shall not deal with or engage, or purchase goods or services from, any subsidiary or affiliated company of the Property Manager in connection with the management of the Project for amounts above market rates in arms length transactions.

13.     Notices. Any notice to be given by any party to any other party hereunder shall be addressed to the party for whom intended, as follows:

To the Property Manager at:

G.I.C. Enterprises dba Commerce Realty
149 Palos Verdes Boulevard, Suite E
Redondo Beach, California 90277

To the Property Owners at:

PHILLIP M. BARDACK, as Successor Trustee of the George A. Thatcher, Jr. Trust, Diane Linda Thatcher Trust, Thomas Jeffrey Thatcher Trust, Nancy Joanne Thatcher Trust, Suzanne Kelliher Dickey Trust
c/o Phillip M. Bardack, CPA
16633 Ventura Blvd., Suite 510
Encino, CA  91436-1807
Telephone: (818) 990-1125

PATRICIA ELTINGE and PATRICIA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge
1469 Palisades Dr.
Pacific Palisades, CA 90272

LISA ELTINGE and LISA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge
3861 22ND Street
San Francisco, CA  94114

STEPHEN ELTINGE
2553 SW Arden Road
Portland, OR  97201

15

029896, 060001, 102305443. 2

LA:17300769.9

MARY LOU GRAZIADIO AREA, as Trustee of the Mary Lou Graziadio Area Separate Property Trust, ALIDA CALVILLO, as Trustee of the Alida Calvillo Separate Property Trust, G. LOUIS GRAZIADIO, III, as Trustee of the G. Louis Graziadio, III Trust, MARY LOU GRAZIADIO AREA, as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O MARY LOU GRAZIADIO AREA, ALIDA CALVILLO, as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O ALIDA CALVILLO, G. LOUIS GRAZIADIO, III, as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O G. LOUIS GRAZIADIO, III.
c/o G.I.C. Enterprises dba Commerce Realty
149 Palos Verdes Boulevard, Suite E
Redondo Beach, CA  90277

Any party hereto may from time to time, by written notice to the others, designate a different address which shall be substituted for the one above specified. Unless otherwise specifically provided for herein, all notices given hereunder shall be in writing and shall be deemed to have been duly given and received (i) upon personal delivery, or (ii) the immediately succeeding business day after deposit with Federal Express or other similar overnight delivery system.

14.    Miscellaneous.

14.1    Assignment.    The Property Manager may not assign this Agreement without the prior written consent of the Property Owners, except with respect to an assignment to an affiliate, including, but not limited to a wholly-owned subsidiary, which shall be permissible under this Agreement, which consent may be withheld in the Property Owners' sole and absolute discretion; provided, however, that the Property Manager may subcontract or delegate the day-to-day management responsibilities, leasing services and/or disposition services to one or more local property managers or leasing companies in its sole discretion so long as the Property Manager continues to supervise the overall management of the Project and provided further then no such delegation or subcontract shall release Property Manager from its obligations hereunder. The Property Owners may assign this Agreement in connection with the sale of the Project. In connection with Property Owners' assignment of this Agreement, the Property Owners and the purchaser of the Project ("Purchaser") shall execute an agreement whereby (i) the Property Owners assign to the Purchaser all of its right, title and interest in and to this Agreement; and (ii) the Purchaser assumes and agrees to perform faithfully and to be bound by all of the terms, covenants, conditions, provisions and agreements of this Agreement. Upon execution of such assignment and assumption agreement, the Property Owners shall be relieved of all liability accruing after the effective date of the assignment and, without further action by the Property Manager, the Purchaser shall become a party to this Agreement.

14.2    Gender.    Each gender shall include each other gender. The singular shall include the plural and vice-versa.

14.3    Amendments.    Except as otherwise provided, each amendment, addition or deletion to this Agreement shall not be effective unless approved by the Property Owners and the Property Manager in writing. Notwithstanding the foregoing, any amendment to Section 11, or to Sections 2.6.1, 10.2(a) or 10.2(b), with respect to voting or approval rights, must be executed by all Property Owners.

16

030896, 000.001, 102.303443. 2

E-20

LA:17300769.9

14.4    Attorneys' Fees.    In any action or proceeding between the Property Manager and the Property Owners arising from or relating to this Agreement or the enforcement or interpretation hereof, the party prevailing in such action or proceeding shall be entitled to recover from the other party all of its reasonable attorneys' fees actually incurred at standard hourly rates and other costs and expenses of the action or proceeding.

14.5    Governing Law.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without regard to any choice of law rules.

14.6    Venue.    Any action relating to or arising out of this Agreement shall be brought only in a court of competent jurisdiction located in Orange County, California.

14.7    Headings.    All headings are only for convenience and ease of reference and are irrelevant to the construction or interpretation of any provision of this Agreement.

14.8    Representations.    The Property Manager represents and warrants that it is (and will remain, during the Term) fully qualified and licensed, to the extent required by law, to manage and lease real estate and perform all obligations assumed by the Property Manager hereunder.    The Property Manager shall use reasonable efforts to comply with all such laws now or hereafter in effect.

14.9    Indemnification by the Property Manager.    The Property Manager shall indemnify, defend and hold the Property Owners and their respective, trustees, beneficiaries, shareholders, officers, directors, members, partners and employees harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, sustained or incurred by or asserted against the Property Owners where such loss, cost or expense is the result of the gross negligence, willful misconduct or fraud of the Property Manager, its agents, employees, subcontractors or delegates, or the Property Manager's breach of this Agreement.    If any person or entity makes a claim or institutes a suit against the Property Owners on a matter for which the Property Owners claim the benefit of the foregoing indemnification, then (a) the Property Owners shall give the Property Manager prompt notice thereof in writing; (b) the Property Manager may defend such claim or action by counsel of its own choosing provided such counsel is reasonably satisfactory to the Property Owners; and (c) neither the Property Owners nor the Property Manager shall settle any claim without the other's written consent.

14.10    Indemnification by the Property Owners.    The Property Owners shall indemnify, defend and hold the Property Manager and its shareholders, members, partners, officers, directors, managers and employees harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, sustained or incurred by or asserted against the Property Manager by reason of the operation, management, and maintenance of the Project and the performance by the Property Manager of the Property Manager's obligations under this Agreement, except those which arise from the Property Manager's gross negligence, willful misconduct or fraud.    If any person or entity makes a claim or institutes a suit against the Property Manager on matter for which the Property Manager claims the benefit of the foregoing indemnification, then (a) the

17

02959o, 005-01, 1623o5443. 2

LA:17300769.9

Property Manager shall give the Property Owners prompt notice thereof in writing; (b) the Property Owners may defend such claim or action by counsel of its own choosing provided such counsel is reasonably satisfactory to the Property Manager; (c) neither the Property Manager nor the Property Owners shall settle any claim without the other's written consent; and (d) this subsection shall not be so construed as to release the Property Owners or the Property Manager from any liability to the other for a breach of any of the covenants agreed to be performed under the terms of this Agreement.

14.11   Complete Agreement. This Agreement shall supersede and take the place of any and all previous agreements entered into between the parties with respect to the Project.

14.12   Severability. If any provisions of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement, where the application of such provisions or circumstances other than those as to which it is determined to be invalid or unenforceable shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

14.13   No Waiver. The failure by either party to insist upon the strict performance of or to seek remedy of any one of the terms or conditions of this Agreement or to exercise any right, remedy, or election set forth herein or permitted by law shall not constitute or be construed as a waiver or relinquishment for the future of such term, condition, right, remedy or election, but such item shall continue and remain in full force and effect. All rights or remedies of the parties specified in this Agreement and all other rights or remedies that they may have at law, in equity or otherwise shall be distinct, separate and cumulative rights or remedies, and no one of them, whether exercised or not, shall be deemed to be in exclusion of any other right or remedy of the parties.

14.14   Binding Effect. This Agreement shall be binding and inure to the benefit of the parties and their respective successors and assigns.

14.15   Counterparts. This Agreement may be executed in several counterparts, and all so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

LA:17300769.9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

PROPERTY OWNERS

_____

PHILLIP M. BARDACK,
as Successor Trustee of the Suzanne Kelliher Dickey Trust, Nancy Joanne Thatcher Trust, Diane Linda Thatcher Trust, Thomas Jeffrey Thatcher Trust and George A. Thatcher, Jr. Trust

_____

PATRICIA ELTINGE an individual and PATRICIA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

_____

LISA ELTINGE an individual and LISA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

_____

STEPHEN ELTINGE an individual

_____

MARY LOU GRAZIADIO AREA, as Trustee of the Mary Lou Graziadio Area Separate Property Trust and as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O MARY LOU GRAZIADIO AREA

19

E-23

LA:17300769.9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

PROPERTY OWNERS

PHILLIP M. BARDACK,
as Successor Trustee of the Suzanne Kelliher Dickey Trust, Nancy Joanne Thatcher Trust, Diane Linda Thatcher Trust, Thomas Jeffrey Thatcher Trust and George A. Thatcher, Jr. Trust

PATRICIA ELTINGE an individual and PATRICIA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

LISA ELTINGE an individual and LISA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

STEPHEN ELTINGE an individual

MARY LOU GRAZIADIO AREA, as Trustee of the Mary Lou Graziadio Area Separate Property Trust and as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O MARY LOU GRAZIADIO AREA

19

029896. 000001. 102305443. 2

E-24

LA:17300769.9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

PROPERTY OWNERS

---

PHILLIP M. BARDACK,
as Successor Trustee of the Suzanne Kelliher Dickey Trust, Nancy Joanne Thatcher Trust, Diane Linda Thatcher Trust, Thomas Jeffrey Thatcher Trust and George A. Thatcher, Jr. Trust

---

PATRICIA ELTINGE an individual and PATRICIA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

---

LISA ELTINGE an individual and LISA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

---

STEPHEN ELTINGE an individual

---

MARY LOU GRAZIADIO AREA, as Trustee of the Mary Lou Graziadio Area Separate Property Trust and as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O MARY LOU GRAZIADIO AREA

19

029896. 000001. 102305443. 2

E-25

LA:17300769.9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

PROPERTY OWNERS

---

PHILLIP M. BARDACK,
as Successor Trustee of the Suzanne Kelliher Dickey Trust, Nancy Joanne Thatcher Trust, Diane Linda Thatcher Trust, Thomas Jeffrey Thatcher Trust and George A. Thatcher, Jr. Trust

---

PATRICIA ELTINGE an individual and PATRICIA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

---

LISA ELTINGE an individual and LISA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

---

STEPHEN ELTINGE an individual

---

MARY LOU GRAZIADIO AREA, as Trustee of the Mary Lou Graziadio Area Separate Property Trust and as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O MARY LOU GRAZIADIO AREA

19

029896.000001, 102305443. 2

LA:17300769.9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

PROPERTY OWNERS

---

PHILLIP M. BARDACK,
as Successor Trustee of the Suzanne Kelliher Dickey Trust, Nancy Joanne Thatcher Trust, Diane Linda Thatcher Trust, Thomas Jeffrey Thatcher Trust and George A. Thatcher, Jr. Trust

---

PATRICIA ELTINGE an individual and PATRICIA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

---

LISA ELTINGE an individual and LISA ELTINGE as Co-Trustee of the Testamentary Trust under the Will of Maxine Louise Eltinge

---

STEPHEN ELTINGE an individual

---

MARY LOU GRAZIADIO AREA, as Trustee of the Mary Lou Graziadio Area Separate Property Trust and as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO AND G. LOUIS GRAZIADIO III

19

029896.000001, 102305443.2

ALIDA CALVILLO, as Trustee of the ALIDA
CALVILLO Separate Property Trust and as Trustee
of the Reva M. Graziadio Irrevocable Trust F/B/O
MARY LOU GRAZIADIO AREA, ALIDA
GRAZIADIO CALVILLO AND G. LOUIS
GRAZIADIO III

G. LOUIS GRAZIADIO III, as Trustee of the G.
LOUIS GRAZIADIO III Trust and as Trustee of
the Reva M. Graziadio Irrevocable Trust F/B/O
MARY LOU GRAZIADIO AREA, ALIDA
GRAZIADIO CALVILLO AND G. LOUIS
GRAZIADIO III

PROPERTY MANAGER

G.I.C. ENTERPRISES, INC., DBA COMMERCE
REALTY, a California corporation

By:_____

    William R. Lang, President

20

, 000001. 102305443. 2

E-28

LA:17300769.9

ALIDA CALVILLO, as Trustee of the ALIDA CALVILLO Separate Property Trust and as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO AND G. LOUIS GRAZIADIO III

G. LOUIS GRAZIADIO III, as Trustee of the G. LOUIS GRAZIADIO III Trust and as Trustee of the Reva M. Graziadio Irrevocable Trust F/B/O MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO AND G. LOUIS GRAZIADIO III

PROPERTY MANAGER

G.I.C. ENTERPRISES, INC., DBA COMMERCE REALTY, a California corporation

By: _____
William R. Lang, President

20

16,000001, 102305443. 2

E-29

EXHIBIT "A"

REAL PROPERTY IN THE CITY OF COSTA MESA, COUNTY OF ORANGE, STATE OF CALIFORNIA DESCRIBED AS FOLLOWS:

1515 GISLER AVENUE (APN 139-501-07):
PARCEL 1, AS SHOWN ON A MAP FILED IN BOOK 25, PAGE 24 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

3195 GISLER AVENUE (APN 139-501-01):
LOT 43 OF TRACT 5475, AS SHOWN ON A MAP THEREOF RECORDED IN BOOK 207, PAGES 48, 49 AND 50 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

3181 HARBOR BOULEVARD (APN 139-501-03):
PARCEL 2, AS SHOWN ON A MAP FILED IN BOOK 25, PAGE 24 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

3161-3165 HARBOR BOULEVARD (APN 139-501-09):
THAT PORTION OF LOT 42 OF TRACT NO. 5475, AS SHOWN ON A MAP RECORDED IN BOOK 207, PAGES 48, 49 AND 50 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE CENTERLINE INTERSECTION OF GISLER AVENUE AND CINNAMON AVENUE, AS SAID INTERSECTION IS SHOWN ON A MAP FILED IN BOOK 17, PAGE 7 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID ORANGE COUNTY; THENCE SOUTH 0 39' 45" EAST ALONG THE CENTERLINE OF CINNAMON AVENUE 55.47 FEET; THENCE NORTH 89 20' 15" EAST 25.00 FEET TO A POINT ON THE EXISTING EASTERLY RIGHT OF WAY LINE OF SAID CINNAMON AVENUE, AS SHOWN ON SAID PARCEL MAP; THENCE SOUTH 0 39' 45" EAST ALONG SAID EXISTING RIGHT OF WAY LINE 334.83 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 0 39' 45" WEST ALONG SAID EXISTING LINE 125.00 FEET; THENCE EAST 205.01 FEET TO A POINT ON THE EXISTING WESTERLY RIGHT OF WAY LINE OF HARBOR BOULEVARD, AS SHOWN ON SAID PARCEL MAP; THENCE SOUTH 0 39' 45" EAST ALONG SAID EXISTING RIGHT OF WAY LINE 258.07 FEET; THENCE SOUTH 89 27' 51" WEST 92.00 FEET; THENCE NORTH 0 39' 56" EAST 133.93 FEET; THENCE WEST 113.00 FEET TO THE TRUE POINT OF BEGINNING.

3151 HARBOR BOULEVARD (APN 139-501-10):
PARCEL 42B, AS SHOWN ON A MAP FILED IN BOOK 17, PAGE 7 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

3141 HARBOR BOULEVARD (APN 139-501-11):
PARCEL 1, AS SHOWN ON A MAP FILED IN BOOK 57, PAGE 31 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

3135 HARBOR BOULEVARD (APN 139-501-15):
PARCEL 1, AS DESCRIBED ON EXHIBIT "A" ATTACHED TO LOT LINE ADJUSTMENT LL 96-02 RECORDED MARCH 12, 1997 AS INSTRUMENT NO. 19970113608 OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

3131 HARBOR BOULEVARD (APN 139-501-13 & 139-501-14):
PARCEL 2, AS SHOWN ON EXHIBIT "B" ATTACHED TO LOT LINE ADJUSTMENT LL 96-02 RECORDED MARCH 12, 1997 AS INSTRUMENT NO. 19970113608 OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

3125 HARBOR BOULEVARD (139-551-14):
PARCEL 1, AS SHOWN ON A MAP FILED IN BOOK 89, PAGE 50 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY, CALIFORNIA.

3115 HARBOR BOULEVARD (139-551-15):
PARCEL 2, AS SHOWN ON A MAP FILED IN BOOK 89, PAGE 50 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY, CALIFORNIA

3105 HARBOR BOULEVARD (139-551-21):
PARCEL 3, AS SHOWN ON A MAP FILED IN BOOK 68, PAGE 50 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

3095 HARBOR BOULEVARD (APN 139-551-20):
PARCEL 1, AS SHOWN ON A MAP FILED IN BOOK 68, PAGE 50 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.

1520 NUTMEG (APN 139-551-18 & 139-551-16):
PARCEL 2, AS SHOWN ON A MAP FILED IN BOOK 68, PAGE 50 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA AND PARCEL 3, AS SHOWN ON A MAP FILED IN BOOK 89, PAGE 50 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY, CALIFORNIA.

LA:17300769.9

**FIRST AMENDMENT TO GROUND LEASE AGREEMENT**
(Harbor & Gisler, Costa Mesa, California)

THIS FIRST AMENDMENT TO GROUND LEASE AGREEMENT (this "**First Amendment**") is entered into as of November 12, 2010 by and between PHILLIP M. BARDACK, as Successor Trustee of the GEORGE A. THATCHER, JR. TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the DIANE LINDA THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the THOMAS JEFFREY THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the NANCY JOANNE THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the SUZANNE KELLIHER DICKEY TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; LISA ELTINGE and PATRICIA ELTINGE, as Co-Trustees of the TESTAMENTARY TRUST created under the WILL OF MAXINE LOUISE ELTINGE, deceased, an undivided eight and one-third percent (8 and 1/3%) interest; PATRICIA ELTINGE, an Unmarried Woman, an undivided four and one-sixth percent (4 and 1/6%) interest; MARY LOU GRAZIADIO AREA, as Trustee of the MARY LOU GRAZIADIO AREA SEPARATE PROPERTY TRUST dated May 12, 2003, as to an undivided one-third of an undivided 12.5% interest; ALIDA CALVILLO, as Trustee of the ALIDA CALVILLO SEPARATE PROPERTY TRUST dated September 3, 1980, as amended, as to an undivided one-third of an undivided 12.5% interest; G. LOUIS GRAZIADIO, III, as Trustee of the G. LOUIS GRAZIADIO, III TRUST dated February 28, 2001, as amended, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Mary Lou Graziadio Area, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Alida Graziadio Calvillo, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O G. Louis Graziadio, III, as to an undivided one-third of an undivided 12.5% interest; and LISA ELTINGE, a married woman, as her sole and separate property, as to an undivided one-third of a 12.5% interest; and PATRICIA ELTINGE, an unmarried woman, as to an undivided one-third of a 12.5% interest (collectively, "**Landlord**") and FRESH & EASY NEIGHBORHOOD MARKET INC., a Delaware corporation ("**Tenant**") with reference to the following facts:

A.     Landlord and Tenant have entered into that certain Ground Lease Agreement dated August 19, 2010 (the "**Lease**"), pursuant to which Landlord leased to Tenant and Tenant agreed to lease from Landlord that certain real property located at the southwest corner of the intersection of Harbor Boulevard and Gisler Avenue, in the City of Costa Mesa, County of Orange, State of California, legally described in Exhibit A of the Lease and identified as "Fresh & Easy's Premises" on the Site Plan attached to the Lease (the "**Premises**").

B.     Landlord and Tenant desire and intend by this First Amendment to extend the Feasibility Deadline. Any capitalized term not defined herein shall have the meaning ascribed to such term in the Lease. All section number references shall apply to provisions in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby modify and amend the Lease and all applicable provisions thereof, as follows:

1.     **Feasibility Period**. The definition of "Feasibility Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

LA:17794118.1

"**Feasibility Period**" means the period from the Effective Date until December 21, 2010.

2.      **General Provisions**.  Except as expressly modified and amended herein, the Lease and all provisions hereof remain in full force and effect and are hereby ratified and confirmed.  Each party or parties executing this First Amendment represents and warrants that each signatory hereto for such party has been duly authorized and empowered to execute and deliver this First Amendment on behalf of such party and that, by such execution and delivery, this First Amendment shall be the binding obligation of the party on whose behalf the signatory acted.  This First Amendment may be executed by the parties in counterpart and all such originally executed counterparts, when taken together, shall constitute one and the same original.

**IN WITNESS WHEREOF**, the parties hereto have executed this First Amendment to Ground Lease Agreement (Triple Net) as of the day and date first set forth above.

**LANDLORD:**

On behalf of Landlord pursuant to that certain Property and Asset Management Agreement dated as of October 29, 2008 attached hereto as Exhibit H:

G.I.C. ENTERPRISES, INC., DBA COMMERCE REALTY, A CALIFORNIA CORPORATION, ITS PROPERTY MANAGER

BY:_____
   William R. Lang, President

**TENANT:**

FRESH & EASY NEIGHBORHOOD MARKET INC., a Delaware corporation

By:_____
   Tom Scorer, Regional Real Estate Director

## SECOND AMENDMENT TO GROUND LEASE AGREEMENT
(Harbor & Gisler, Costa Mesa, California)

THIS SECOND AMENDMENT TO GROUND LEASE AGREEMENT (this "**Second Amendment**") is entered into as of December 13, 2010 by and between PHILLIP M. BARDACK, as Successor Trustee of the GEORGE A. THATCHER, JR. TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the DIANE LINDA THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the THOMAS JEFFREY THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the NANCY JOANNE THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the SUZANNE KELLIHER DICKEY TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; LISA ELTINGE and PATRICIA ELTINGE, as Co-Trustees of the TESTAMENTARY TRUST created under the WILL OF MAXINE LOUISE ELTINGE, deceased, an undivided eight and one-third percent (8 and 1/3%) interest; PATRICIA ELTINGE, an Unmarried Woman, an undivided four and one-sixth percent (4 and 1/6%) interest; MARY LOU GRAZIADIO AREA, as Trustee of the MARY LOU GRAZIADIO AREA SEPARATE PROPERTY TRUST dated May 12, 2003, as to an undivided one-third of an undivided 12.5% interest; ALIDA CALVILLO, as Trustee of the ALIDA CALVILLO SEPARATE PROPERTY TRUST dated September 3, 1980, as amended, as to an undivided one-third of an undivided 12.5% interest; G. LOUIS GRAZIADIO, III, as Trustee of the G. LOUIS GRAZIADIO, III TRUST dated February 28, 2001, as amended, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Mary Lou Graziadio Area, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Alida Graziadio Calvillo, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O G. Louis Graziadio, III, as to an undivided one-third of an undivided 12.5% interest; and LISA ELTINGE, a married woman, as her sole and separate property, as to an undivided one-third of a 12.5% interest; and PATRICIA ELTINGE, an unmarried woman, as to an undivided one-third of a 12.5% interest (collectively, "**Landlord**") and FRESH & EASY NEIGHBORHOOD MARKET INC., a Delaware corporation ("**Tenant**") with reference to the following facts:

A.      Landlord and Tenant have entered into that certain Ground Lease Agreement dated as of August 19, 2010, as amended by that certain First Amendment to Ground Lease Agreement dated as of November 12, 2010 (collectively, the "**Lease**"), pursuant to which Landlord leased to Tenant and Tenant agreed to lease from Landlord that certain real property located at the southwest corner of the intersection of Harbor Boulevard and Gisler Avenue, in the City of Costa Mesa, County of Orange, State of California, legally described in Exhibit A of the Lease and identified as "Fresh & Easy's Premises" on the Site Plan attached to the Lease (the "**Premises**").

B.      Landlord and Tenant desire and intend by this Second Amendment to extend the Feasibility Deadline. Any capitalized term not defined herein shall have the meaning ascribed to such term in the Lease. All section number references shall apply to provisions in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby modify and amend the Lease and all applicable provisions thereof, as follows:

LA:17800555.1

1.      **Feasibility Period.**  The definition of "Feasibility Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

"**Feasibility Period**" means the period from the Effective Date until January 21, 2011.

2.      **General Provisions.**  Except as expressly modified and amended herein, the Lease and all provisions hereof remain in full force and effect and are hereby ratified and confirmed.  Each party or parties executing this Second Amendment represents and warrants that each signatory hereto for such party has been duly authorized and empowered to execute and deliver this Second Amendment on behalf of such party and that, by such execution and delivery, this Second Amendment shall be the binding obligation of the party on whose behalf the signatory acted.  This Second Amendment may be executed by the parties in counterpart and all such originally executed counterparts, when taken together, shall constitute one and the same original.

**IN WITNESS WHEREOF**, the parties hereto have executed this Second Amendment to Ground Lease Agreement (Triple Net) as of the day and date first set forth above.

**LANDLORD:**                                              **TENANT:**

On behalf of Landlord pursuant to that certain          FRESH & EASY NEIGHBORHOOD MARKET INC.,
Property and Asset Management Agreement                 a Delaware corporation
dated as of October 29, 2008 attached hereto as
Exhibit H:

                                                        By:_____
G.I.C. ENTERPRISES, INC., DBA COMMERCE                      Tom Scorer, Regional Real Estate Director
REALTY, A CALIFORNIA CORPORATION, ITS
PROPERTY MANAGER


BY:_____
     William R. Lang, President

LA:17800555.1

1.      **Feasibility Period.**  The definition of "Feasibility Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

"**Feasibility Period**" means the period from the Effective Date until January 21, 2011.

2.      **General Provisions.**  Except as expressly modified and amended herein, the Lease and all provisions hereof remain in full force and effect and are hereby ratified and confirmed.  Each party or parties executing this Second Amendment represents and warrants that each signatory hereto for such party has been duly authorized and empowered to execute and deliver this Second Amendment on behalf of such party and that, by such execution and delivery, this Second Amendment shall be the binding obligation of the party on whose behalf the signatory acted.  This Second Amendment may be executed by the parties in counterpart and all such originally executed counterparts, when taken together, shall constitute one and the same original.

**IN WITNESS WHEREOF,** the parties hereto have executed this Second Amendment to Ground Lease Agreement (Triple Net) as of the day and date first set forth above.

**LANDLORD:**                                               **TENANT:**

On behalf of Landlord pursuant to that certain          FRESH & EASY NEIGHBORHOOD MARKET INC.,
Property and Asset Management Agreement                 a Delaware corporation
dated as of October 29, 2008 attached hereto as
Exhibit H:

                                                        By:_____
G.I.C. ENTERPRISES, INC., DBA COMMERCE                      Tom Scorer, Regional Real Estate Director
REALTY, A CALIFORNIA CORPORATION, ITS
PROPERTY MANAGER


BY:_____
      William R. Lang, President

LA:17800555.1

**THIRD AMENDMENT TO GROUND LEASE AGREEMENT**
(Harbor & Gisler, Costa Mesa, California)

**THIS THIRD AMENDMENT TO GROUND LEASE AGREEMENT** (this "**Third Amendment**"), effective as of January 18, 2011 by and between PHILLIP M. BARDACK, as Successor Trustee of the GEORGE A. THATCHER, JR. TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the DIANE LINDA THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the THOMAS JEFFREY THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the NANCY JOANNE THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the SUZANNE KELLIHER DICKEY TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; LISA ELTINGE and PATRICIA ELTINGE, as Co-Trustees of the TESTAMENTARY TRUST created under the WILL OF MAXINE LOUISE ELTINGE, deceased, an undivided eight and one-third percent (8 and 1/3%) interest; PATRICIA ELTINGE, an Unmarried Woman, an undivided four and one-sixth percent (4 and 1/6%) interest; MARY LOU GRAZIADIO AREA, as Trustee of the MARY LOU GRAZIADIO AREA SEPARATE PROPERTY TRUST dated May 12, 2003, as to an undivided one-third of an undivided 12.5% interest; ALIDA CALVILLO, as Trustee of the ALIDA CALVILLO SEPARATE PROPERTY TRUST dated September 3, 1980, as amended, as to an undivided one-third of an undivided 12.5% interest; G. LOUIS GRAZIADIO, III, as Trustee of the G. LOUIS GRAZIADIO, III TRUST dated February 28, 2001, as amended, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Mary Lou Graziadio Area, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Alida Graziadio Calvillo, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O G. Louis Graziadio, III, as to an undivided one-third of an undivided 12.5% interest; and LISA ELTINGE, a married woman, as her sole and separate property, as to an undivided one-third of a 12.5% interest; and PATRICIA ELTINGE, an unmarried woman, as to an undivided one-third of a 12.5% interest (collectively, "**Landlord**") and FRESH & EASY NEIGHBORHOOD MARKET INC., a Delaware corporation ("**Tenant**") with reference to the following facts:

A.      Landlord and Tenant have entered into that certain Ground Lease Agreement dated as of August 19, 2010, as amended by that certain First Amendment to Ground Lease Agreement dated as of November 12, 2010, as further amended by that certain Second Amendment to Ground Lease Agreement dated as of December 13, 2010 (collectively, the "**Lease**"), pursuant to which Landlord leased to Tenant and Tenant agreed to lease from Landlord that certain real property located at the southwest corner of the intersection of Harbor Boulevard and Gisler Avenue, in the City of Costa Mesa, County of Orange, State of California, legally described in Exhibit A of the Lease and identified as "Fresh & Easy's Premises" on the Site Plan attached to the Lease (the "**Premises**").

B.      Landlord and Tenant desire and intend by this Third Amendment to extend the Feasibility Deadline.  Any capitalized term not defined herein shall have the meaning ascribed to such term in the Lease.  All section number references shall apply to provisions in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby modify and amend the Lease and all applicable provisions thereof, as follows:

1.      **Feasibility Period.**  The definition of "Feasibility Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

"**Feasibility Period**" means the period from the Effective Date until April 18, 2011.

2.      **General Provisions.**  Except as expressly modified and amended herein, the Lease and all provisions hereof remain in full force and effect and are hereby ratified and confirmed.  Each party or parties executing this Third Amendment represents and warrants that each signatory hereto for such party has been duly authorized and empowered to execute and deliver this Third Amendment on behalf of such party and that, by such execution and delivery, this Third Amendment shall be the binding obligation of the party on whose behalf the signatory acted.  This Third Amendment may be executed by the parties in counterpart and all such originally executed counterparts, when taken together, shall constitute one and the same original.

**IN WITNESS WHEREOF**, the parties hereto have executed this Third Amendment to Ground Lease Agreement (Triple Net) as of the day and date first set forth above.

**LANDLORD:**                                                          **TENANT:**

On behalf of Landlord pursuant to that certain        FRESH & EASY NEIGHBORHOOD MARKET INC.,
Property and Asset Management Agreement           a Delaware corporation
dated as of October 29, 2008:

G.I.C. ENTERPRISES, INC., DBA COMMERCE        By:_____
REALTY, A CALIFORNIA CORPORATION, ITS                  Tom Scorer, Regional Real Estate Director
PROPERTY MANAGER

BY:_____
        William R. Lang, President

1.      **Feasibility Period.**   The definition of "Feasibility Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

"**Feasibility Period**" means the period from the Effective Date until April 18, 2011.

2.      **General Provisions.**   Except as expressly modified and amended herein, the Lease and all provisions hereof remain in full force and effect and are hereby ratified and confirmed.   Each party or parties executing this Third Amendment represents and warrants that each signatory hereto for such party has been duly authorized and empowered to execute and deliver this Third Amendment on behalf of such party and that, by such execution and delivery, this Third Amendment shall be the binding obligation of the party on whose behalf the signatory acted.   This Third Amendment may be executed by the parties in counterpart and all such originally executed counterparts, when taken together, shall constitute one and the same original.

**IN WITNESS WHEREOF**, the parties hereto have executed this Third Amendment to Ground Lease Agreement (Triple Net) as of the day and date first set forth above.

**LANDLORD:**                                                      **TENANT:**

On behalf of Landlord pursuant to that certain            FRESH & EASY NEIGHBORHOOD MARKET INC.,
Property and Asset Management Agreement              a Delaware corporation
dated as of October 29, 2008:

G.I.C. ENTERPRISES, INC., DBA COMMERCE        By:
REALTY, A CALIFORNIA CORPORATION, ITS             Tom Scorer, Regional Real Estate Director
PROPERTY MANAGER

BY:_____
        William R. Lang, President

**FOURTH AMENDMENT TO GROUND LEASE AGREEMENT**
(Harbor & Gisler, Costa Mesa, California)

**THIS FOURTH AMENDMENT TO GROUND LEASE AGREEMENT** (this "**Fourth Amendment**") is entered into as of March 21, 2011 by and between PHILLIP M. BARDACK, as Successor Trustee of the GEORGE A. THATCHER, JR. TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the DIANE LINDA THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the THOMAS JEFFREY THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the NANCY JOANNE THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the SUZANNE KELLIHER DICKEY TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; LISA ELTINGE and PATRICIA ELTINGE, as Co-Trustees of the TESTAMENTARY TRUST created under the WILL OF MAXINE LOUISE ELTINGE, deceased, an undivided eight and one-third percent (8 and 1/3%) interest; PATRICIA ELTINGE, an Unmarried Woman, an undivided four and one-sixth percent (4 and 1/6%) interest; MARY LOU GRAZIADIO AREA, as Trustee of the MARY LOU GRAZIADIO AREA SEPARATE PROPERTY TRUST dated May 12, 2003, as to an undivided one-third of an undivided 12.5% interest; ALIDA CALVILLO, as Trustee of the ALIDA CALVILLO SEPARATE PROPERTY TRUST dated September 3, 1980, as amended, as to an undivided one-third of an undivided 12.5% interest; G. LOUIS GRAZIADIO, III, as Trustee of the G. LOUIS GRAZIADIO, III TRUST dated February 28, 2001, as amended, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Mary Lou Graziadio Area, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Alida Graziadio Calvillo, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O G. Louis Graziadio, III, as to an undivided one-third of an undivided 12.5% interest; and LISA ELTINGE, a married woman, as her sole and separate property, as to an undivided one-third of a 12.5% interest; and PATRICIA ELTINGE, an unmarried woman, as to an undivided one-third of a 12.5% interest (collectively, "**Landlord**") and FRESH & EASY NEIGHBORHOOD MARKET INC., a Delaware corporation ("**Tenant**") with reference to the following facts:

A.    Landlord and Tenant have entered into that certain Ground Lease Agreement dated as of August 19, 2010, as amended by that certain First Amendment to Ground Lease Agreement dated as of November 12, 2010, as amended by that certain Second Amendment to Ground Lease Agreement dated as of December 13, 2010, as further amended by that certain Third Amendment to Ground Lease Agreement effective as of January 18, 2011 (collectively, the "**Lease**"), pursuant to which Landlord leased to Tenant and Tenant agreed to lease from Landlord that certain real property located at the southwest corner of the intersection of Harbor Boulevard and Gisler Avenue, in the City of Costa Mesa, County of Orange, State of California, legally described in Exhibit A of the Lease and identified as "Fresh & Easy's Premises" on the Site Plan attached to the Lease (the "**Premises**").

B.    Landlord and Tenant desire and intend by this Fourth Amendment to extend the Entitlements Period and the Alcohol Period. Any capitalized term not defined herein shall have the meaning ascribed to such term in the Lease. All section number references shall apply to provisions in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby modify and amend the Lease and all applicable provisions thereof, as follows:

LA:17808405.1

1.    **Entitlements Period.** The definition of "Entitlements Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

"**Entitlements Period**" means the period from the Effective Date until May 18, 2011..

2.    **Alcoholic Beverage Period Period.** The definition of "Alcoholic Beverage Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

"**Alcoholic Beverage Period**" means the period from the Effective Date until May 18, 2011.

3.    **General Provisions.** Except as expressly modified and amended herein, the Lease and all provisions hereof remain in full force and effect and are hereby ratified and confirmed. Each party or parties executing this Fourth Amendment represents and warrants that each signatory hereto for such party has been duly authorized and empowered to execute and deliver this Fourth Amendment on behalf of such party and that, by such execution and delivery, this Fourth Amendment shall be the binding obligation of the party on whose behalf the signatory acted. This Fourth Amendment may be executed by the parties in counterpart and all such originally executed counterparts, when taken together, shall constitute one and the same original.

**IN WITNESS WHEREOF,** the parties hereto have executed this Fourth Amendment to Ground Lease Agreement (Triple Net) as of the day and date first set forth above.

**LANDLORD:**                                      **TENANT:**

On behalf of Landlord pursuant to that certain        FRESH & EASY NEIGHBORHOOD MARKET INC.,
Property and Asset Management Agreement        a Delaware corporation
dated as of October 29, 2008:

G.I.C. ENTERPRISES, INC., DBA COMMERCE        By:_____
REALTY, A CALIFORNIA CORPORATION, ITS            Tom Scorer, Regional Real Estate Director
PROPERTY MANAGER

BY:_____
    William R. Lang, President

1.      **Entitlements Period**.  The definition of "Entitlements Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

> "**Entitlements Period**" means the period from the Effective Date until May 18, 2011..

2.      **Alcoholic Beverage Period Period**.  The definition of "Alcoholic Beverage Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

> "**Alcoholic Beverage Period**" means the period from the Effective Date until May 18, 2011.

3.      **General Provisions**.  Except as expressly modified and amended herein, the Lease and all provisions hereof remain in full force and effect and are hereby ratified and confirmed.  Each party or parties executing this Fourth Amendment represents and warrants that each signatory hereto for such party has been duly authorized and empowered to execute and deliver this Fourth Amendment on behalf of such party and that, by such execution and delivery, this Fourth Amendment shall be the binding obligation of the party on whose behalf the signatory acted.  This Fourth Amendment may be executed by the parties in counterpart and all such originally executed counterparts, when taken together, shall constitute one and the same original.

**IN WITNESS WHEREOF**, the parties hereto have executed this Fourth Amendment to Ground Lease Agreement (Triple Net) as of the day and date first set forth above.

**LANDLORD:**                                    **TENANT:**

On behalf of Landlord pursuant to that certain      FRESH & EASY NEIGHBORHOOD MARKET INC.,
Property and Asset Management Agreement             a Delaware corporation
dated as of October 29, 2008:

G.I.C. ENTERPRISES, INC., DBA COMMERCE      By: _____
REALTY, A CALIFORNIA CORPORATION, ITS            Tom Scorer, Regional Real Estate Director
PROPERTY MANAGER


BY: _____
        William R. Lang, President

LA:17808405.1

**FIFTH AMENDMENT TO GROUND LEASE AGREEMENT**
(Harbor & Gisler, Costa Mesa, California)

THIS FIFTH AMENDMENT TO GROUND LEASE AGREEMENT (this "**Fifth Amendment**") is entered into as of April 18, 2011 by and between PHILLIP M. BARDACK, as Successor Trustee of the GEORGE A. THATCHER, JR. TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the DIANE LINDA THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the THOMAS JEFFREY THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the NANCY JOANNE THATCHER TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; PHILLIP M. BARDACK, as Successor Trustee of the SUZANNE KELLIHER DICKEY TRUST, established by a Declaration of Trust dated December 28, 1976, George A. Thatcher and Georgia R. Thatcher as Trustors, an undivided 10% Interest; LISA ELTINGE and PATRICIA ELTINGE, as Co-Trustees of the TESTAMENTARY TRUST created under the WILL OF MAXINE LOUISE ELTINGE, deceased, an undivided eight and one-third percent (8 and 1/3%) interest; PATRICIA ELTINGE, an Unmarried Woman, an undivided four and one-sixth percent (4 and 1/6%) interest; MARY LOU GRAZIADIO AREA, as Trustee of the MARY LOU GRAZIADIO AREA SEPARATE PROPERTY TRUST dated May 12, 2003, as to an undivided one-third of an undivided 12.5% interest; ALIDA CALVILLO, as Trustee of the ALIDA CALVILLO SEPARATE PROPERTY TRUST dated September 3, 1980, as amended, as to an undivided one-third of an undivided 12.5% interest; G. LOUIS GRAZIADIO, III, as Trustee of the G. LOUIS GRAZIADIO, III TRUST dated February 28, 2001, as amended, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Mary Lou Graziadio Area, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O Alida Graziadio Calvillo, as to an undivided one-third of an undivided 12.5% interest; MARY LOU GRAZIADIO AREA, ALIDA GRAZIADIO CALVILLO, and G. LOUIS GRAZIADIO, III, as Trustees of the REVA M. GRAZIADIO IRREVOCABLE TRUST F/B/O G. Louis Graziadio, III, as to an undivided one-third of an undivided 12.5% interest; and LISA ELTINGE, a married woman, as her sole and separate property, as to an undivided one-third of a 12.5% interest; and PATRICIA ELTINGE, an unmarried woman, as to an undivided one-third of a 12.5% interest (collectively, "**Landlord**") and FRESH & EASY NEIGHBORHOOD MARKET INC., a Delaware corporation ("**Tenant**") with reference to the following facts:

A.      Landlord and Tenant have entered into that certain Ground Lease Agreement dated as of August 19, 2010, as amended by that certain First Amendment to Ground Lease Agreement dated as of November 12, 2010, as amended by that certain Second Amendment to Ground Lease Agreement dated as of December 13, 2010, as amended by that certain Third Amendment to Ground Lease Agreement effective as of January 18, 2011, as further amended by that certain Fourth Amendment to Ground Lease Agreement effective as of March 21, 2011 (collectively, the "**Lease**"), pursuant to which Landlord leased to Tenant and Tenant agreed to lease from Landlord that certain real property located at the southwest corner of the intersection of Harbor Boulevard and Gisler Avenue, in the City of Costa Mesa, County of Orange, State of California, legally described in Exhibit A of the Lease and identified as "Fresh & Easy's Premises" on the Site Plan attached to the Lease (the "**Premises**").

B.      Landlord and Tenant desire and intend by this Fifth Amendment to extend the Feasibility Period.  Any capitalized term not defined herein shall have the meaning ascribed to such term in the Lease. All section number references shall apply to provisions in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby modify and amend the Lease and all applicable provisions thereof, as follows:

LA:17830653.1

1.     **Feasibility Period**.  The definition of "Feasibility Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

"**Feasibility Period**" means the period from the Effective Date until May 12, 2011.

2.     **General Provisions**.  Except as expressly modified and amended herein, the Lease and all provisions hereof remain in full force and effect and are hereby ratified and confirmed.  Each party or parties executing this Fifth Amendment represents and warrants that each signatory hereto for such party has been duly authorized and empowered to execute and deliver this Fifth Amendment on behalf of such party and that, by such execution and delivery, this Fifth Amendment shall be the binding obligation of the party on whose behalf the signatory acted.  This Fifth Amendment may be executed by the parties in counterpart and all such originally executed counterparts, when taken together, shall constitute one and the same original.

**IN WITNESS WHEREOF**, the parties hereto have executed this Fifth Amendment to Ground Lease Agreement (Triple Net) as of the day and date first set forth above.

**LANDLORD:**

On behalf of Landlord pursuant to that certain Property and Asset Management Agreement dated as of October 29, 2008:

G.I.C. ENTERPRISES, INC., DBA COMMERCE REALTY, A CALIFORNIA CORPORATION, ITS PROPERTY MANAGER

BY:_____
William R. Lang, President

**TENANT:**

FRESH & EASY NEIGHBORHOOD MARKET INC., a Delaware corporation

By:_____
    Tom Scorer, Regional Real Estate Director

LA:17830653.1

1.      **Feasibility Period.**  The definition of "Feasibility Period" set forth in Paragraph 5 of Schedule 2 to Ground Lease Agreement of the Lease is hereby deleted in its entirety and the following is inserted in lieu thereof:

"**Feasibility Period**" means the period from the Effective Date until May 12, 2011.

2.      **General Provisions.**  Except as expressly modified and amended herein, the Lease and all provisions hereof remain in full force and effect and are hereby ratified and confirmed.  Each party or parties executing this Fifth Amendment represents and warrants that each signatory hereto for such party has been duly authorized and empowered to execute and deliver this Fifth Amendment on behalf of such party and that, by such execution and delivery, this Fifth Amendment shall be the binding obligation of the party on whose behalf the signatory acted.  This Fifth Amendment may be executed by the parties in counterpart and all such originally executed counterparts, when taken together, shall constitute one and the same original.

**IN WITNESS WHEREOF**, the parties hereto have executed this Fifth Amendment to Ground Lease Agreement (Triple Net) as of the day and date first set forth above.

**LANDLORD:**                                   **TENANT:**

On behalf of Landlord pursuant to that certain        FRESH & EASY NEIGHBORHOOD MARKET INC.,
Property and Asset Management Agreement        a Delaware corporation
dated as of October 29, 2008:

G.I.C. ENTERPRISES, INC., DBA COMMERCE        By: _____
REALTY, A CALIFORNIA CORPORATION, ITS        Tom Scorer, Regional Real Estate Director
PROPERTY MANAGER

BY:_____
      William R. Lang, President