## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| OLD FENM INC., *et al.,*[1] | : | Case No. 13-12569 (KJC) |
| | : | |
| Debtors. | : | |
| | : | (Jointly Administered) |
| | : | |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF OLD FENM INC. AND OLD FEPC LLC, AS MODIFIED AND RESTATED

Mark D. Collins (DE 2981)
John H. Knight (DE 3848)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Paul D. Leake
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

ATTORNEYS FOR DEBTORS

---

[1] The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers follow in brackets): Old FENM Inc. (f/k/a Fresh & Easy Neighborhood Market Inc.) [7028] and Old FEPC LLC (f/k/a Fresh & Easy Property Company LLC) [9636]. The address of each of the Debtors is 2120 Park Place, Suite 200, El Segundo, California 90245.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................. 3

I.      History of the Debtors ............................................................................... 3

II.     Events During the Bankruptcy Case ........................................................ 4

III.    Facts Relating to Plan Feasibility ............................................................ 6

IV.    Objections to Confirmation ...................................................................... 7

THE PLAN MODIFICATIONS ARE APPROPRIATE .................................... 7

THE PLAN MEETS ALL APPLICABLE CONFIRMATION REQUIREMENTS ................... 9

I.      The Plan Complies With Section 1129(a) of the Bankruptcy Code ......... 9

        A.     Section 1129(a)(1) of the Bankruptcy Code ................................ 9

               1.     Section 1122 of the Bankruptcy Code – Classification of Claims and Interests ............................................ 10

               2.     Compliance With Section 1123(a) of the Bankruptcy Code – Mandatory Contents of the Plan ............................... 11

               3.     Section 1123(b) of the Bankruptcy Code – Discretionary Contents of the Plan ....................................... 16

        B.     Section 1129(a)(2) of the Bankruptcy Code ................................ 17

        C.     Section 1129(a)(3) of the Bankruptcy Code ................................ 20

        D.    Section 1129(a)(4) of the Bankruptcy Code ................................ 22

        E.     Section 1129(a)(5) of the Bankruptcy Code ................................ 24

        F.     Section 1129(a)(6) of the Bankruptcy Code ................................ 25

        G.    Section 1129(a)(7) of the Bankruptcy Code ................................ 25

        H.    Section 1129(a)(8) of the Bankruptcy Code ................................ 27

        I.      Section 1129(a)(9) of the Bankruptcy Code ................................ 27

        J.     Section 1129(a)(10) of the Bankruptcy Code .............................. 29

        K.    Section 1129(a)(11) of the Bankruptcy Code .............................. 30

        L.     Section 1129(a)(12) of the Bankruptcy Code .............................. 31

        M.    Section 1129(a)(13) of the Bankruptcy Code .............................. 31

II.     Section 1129(b) – The Plan Satisfies the "Cramdown" Requirements For Confirmation ........................................................................................... 32

# TABLE OF CONTENTS
### (continued)

**Page**

III.    Section 1129(c) – No Other Plan Has Been Proposed Or Confirmed ............................ 34

IV.    Section 1129(d) – The Plan's Purpose Is Consistent With the Bankruptcy Code............ 34

OTHER PLAN PROVISIONS ARE NECESSARY AND APPROPRIATE ............................ 34

I.    The Tesco Settlement and Related Releases and Limitation of Liability Should Be Approved............................................................................................................................ 34

II.    The Assumptions, Assumption and Assignment or Rejection of the Executory Contracts and Unexpired Leases Under the Plan Should Be Approved......................... 40

III.    Limited Substantive Consolidation For Plan Purposes Only Is Appropriate ................. 42

IV.    Payment of Creditors' Committee Member Fee Claims .................................................. 42

WAIVER OF STAY ................................................................................................................... 43

CONCLUSION............................................................................................................................ 44

## TABLE OF AUTHORITIES

**Page**

Cases

Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.,
  25 B.R. 484 (Bankr. S.D. Ohio 1982)....................................................................41

Borman's, Inc. v. Allied Supermarkets, Inc.,
  706 F.2d 187 (6th Cir. 1983), cert. denied, 464 U.S. 908 (1983)............................41

City of Covington v. Covington Landing Ltd. P'ship,
  71 F.3d. 1221 (6th Cir. 1995) ..............................................................................40

CoreStates Bank v. United Chem. Techs., Inc.,
  202 B.R. 33 (E.D. Pa. 1996) ................................................................................21

Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd.
  P'ship),
  116 F.3d 790 (5th Cir. 1997) ...............................................................................21

Fry's Metals, Inc. v. Gibbons (In re Rfe Indus., Inc.),
  283 F.3d 159 (3d Cir. 2002).................................................................................35

Grp. of Inst'l Investors v. Chi., M., St. P., & P.R.R. Co.,
  318 U.S. 523 (1943)............................................................................................40

Hanson v. First Bank of S.D.,
  828 F.2d 1310 (8th Cir. 1987) .............................................................................20

In re AbitibiBowater Inc.,
  418 B.R. 815 (Bankr. D. Del. 2009) .....................................................................41

In re Acequia, Inc.,
  787 F.2d 1352 (9th Cir. 1986) ...................................................................11, 15, 33

In re Aleris Int'l, Inc.,
  No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)..................... *passim*

In re AOV Indus.,
  31 B.R. 1005 (D.D.C. 1983), aff'd in part, rev'd in part, 792 F.2d 1140 (D.C. Cir.
  1986), vacated in light of new evidence, 797 F.2d 1004 (D.C. Cir. 1986).............................25

In re Apex Oil Co.,
  118 B.R. 683 (Bankr. E.D. Mo. 1990)...................................................................30

In re Armstrong World Indus., Inc.,
  348 B.R. 136 (D. Del. 2006).........................................................................8, 10, 25, 33

In re Bildisco,
    682 F.2d 72 (3d Cir. 1982), aff'd sub nom. NLRB v. Bildisco & Bildisco, 465 U.S.
    513 (1984) .................................................................................................................41

In re Block Shim Dev. Co.,
    939 F.2d 289 (5th Cir. 1991) .....................................................................................21

In re Cellular Info. Sys., Inc.,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994) .......................................................................30

In re Celotex Corp.,
    204 B.R. 586 (Bankr. M.D. Fla. 1996) .........................................................................8

In re Century Glove, Inc.,
    Nos. 90-400, 90-401 (SLR), 1993 WL 239489 (D. Del. Feb. 10, 1993)..................21

In re Chapel Gate Apartments, Ltd.,
    64 B.R. 569 (Bankr. N.D. Tex. 1986)........................................................................23

In re Combustion Eng'g, Inc.,
    391 F.3d 190 (3d Cir. 2004)................................................................................20, 21

In re Coram Healthcare Corp.,
    271 B.R. 228 (Bankr. D. Del. 2001) ..........................................................................20

In re Crdentia Corp.,
    No. 10-10926 (BLS), 2010 WL 3313383 (Bankr. D. Del. May 26, 2010).............23

In re Crowthers McCall Pattern, Inc.,
    120 B.R. 279 (Bankr. S.D.N.Y. 1990).......................................................................26

In re DBSD N. Am., Inc.,
    419 B.R. 179 (Bankr. S.D.N.Y.) aff'd, Sprint Nextel Corp. v. DBSD N. Am., Inc. (In
    re DBSD N. Am., Inc.), 2010 U.S. Dist. LEXIS 33253 (S.D.N.Y. Mar. 24, 2010) ...............38

In re Drexel Burnham Lambert Grp.,
    134 B.R. 493 (Bankr. S.D.N.Y. 1991)........................................................................36

In re Drexel Burnham Lambert Grp.,
    138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) ..............................................................30

In re Eagle-Picher Indus., Inc.,
    203 B.R. 256 (S.D. Ohio 1996) ..............................................................9, 10, 22, 26

In re Econ. Lodging Sys., Inc.,
    205 B.R. 862 (Bankr. N.D. Ohio 1997) .....................................................................26

In re Elm Creek Joint Venture,
  93 B.R. 105 (Bankr. W.D. Tex. 1988) ....................................................................30

In re Enron Corp.,
  No. 01-16034 (ALG), 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) ..............18

In re Exide Techs,
  303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................38

In re Fairfield Residential LLC,
  No. 09-14378 (BLS), 2010 WL 2904990 (Bankr. D. Del. July 6, 2010) ...............................20

In re Indianapolis Downs, LLC,
  486 B.R. 286 (Bankr. D. Del. 2013) ...................................................................39

In re Int'l Distrib. Ctrs., Inc.,
  103 B.R. 420 (S.D.N.Y. 1989) ...........................................................................36

In re Jartran, Inc.,
  44 B.R. 331 (Bankr. N.D. Ill. 1984) ..................................................................26

In re Johns-Manville Corp.,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part on other grounds, 78
  B.R. 407 (S.D.N.Y. 1987) aff'd, Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir.
  1988) .........................................................................................................23

In re Koelbl,
  751 F.2d 137 (2d Cir. 1984)................................................................................21

In re Lapworth,
  No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998).............................18

In re Louise's, Inc.,
  211 B.R. 798 (D. Del. 1997) ...............................................................................35

In re Market Square Inn, Inc.,
  978 F.2d 116 (3d Cir. 1992)................................................................................41

In re Martin,
  66 B.R. 921 (Bankr. D. Mont. 1986) ...................................................................29

In re Marvel Entm't Group, Inc.,
  222 B.R. 243 (Bankr. D. Del. 1998) ...............................................................35, 36

In re Master Mortg. Inv. Fund,
  168 B.R. 930 (Bankr. W.D. Mo. 1994).........................................................37, 38, 39

In re Mount Vernon Plaza Cmty. Urban Redev. Corp. I,
    79 B.R. 305 (Bankr. S.D. Ohio 1987)......................................................................9

In re Owens Corning,
    419 F.3d 195, 419 F.3d (3d Cir. 2005) ...............................................................42

In re Placid Oil Co.,
    92 B.R. 183 (Bankr. N.D. Tex. 1988)...................................................................8

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000)................................................................................17

In re Riodizio, Inc.,
    204 B.R. 417 (Bankr. S.D.N.Y. 1997)................................................................41

In re Rivers End Apartments, Ltd.,
    167 B.R. 470 (Bankr. S.D. Ohio 1994)...............................................................30

In re S. Indus. Banking Corp.,
    41 B.R. 606 (Bankr. E.D. Tenn. 1984) ...............................................................23

In re Sherwood Square Assocs.,
    107 B.R. 872 (Bankr. D. Md. 1989) ....................................................................24

In re Sound Radio, Inc.,
    93 B.R. 849 (Bankr. D.N.J. 1988), aff'd in part, remanded in part on other grounds,
    103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990) ...........................21

In re Stolrow's, Inc.,
    84 B.R. 167 (B.A.P. 9th Cir. 1988)......................................................................22

In re Terrell,
    892 F.2d 469 (6th Cir. 1989) ..............................................................................41

In re Texaco, Inc.,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988)...................................................18, 24, 31

In re Toy & Sports Warehouse, Inc.,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)...................................................................9

In re Tranel,
    940 F.2d 1168 (8th Cir. 1991) .............................................................................25

In re Trans World Airlines, Inc.,
    185 B.R. 302 (Bankr. E.D. Mo. 1995).................................................................8

In re U.S. Concrete, Inc.,
    No. 10-11407, 2010 WL 3493066 (Bankr. D. Del. July 29, 2010) .........................8

In re Victory Constr. Co.,
 42 B.R. 145 (Bankr. C.D. Cal. 1984) ................................................................26

In re W.E. Parks Lumber Co.,
 19 B.R. 285 (Bankr. W.D. La. 1982) ................................................................24

In re Washington Mut., Inc.,
 442 B.R. 314 (Bankr. D. Del. 2011) .................................................................38

In re Zenith Elecs. Corp.,
 241 B.R. 92 (Bankr. D. Del. 1999) ...................................................................32

John Hancock Mut. Life Ins. Co v. Route 37 Bus. Park Assocs.,
 987 F.2d 154 (3d Cir. 1993) .............................................................................32

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
 843 F.2d 636 (2d Cir. 1988) ........................................................................10, 30

Key3 Media Group, Inc. v. Pulver.com, Inc. (In re Key3 Media Group, Inc.),
 336 B.R. 87 (Bankr. D. Del. 2005) ...............................................................35, 36

Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship),
 115 F.3d 650 (9th Cir. 1997) ...........................................................................32

Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.),
 150 F.3d 503 (5th Cir. 1998) ...........................................................................32

McCormick v. Banc One Leasing Corp. (In re McCormick),
 49 F.3d 1524 (11th Cir. 1995) .........................................................................20

Myers v. Martin (In re Martin),
 91 F.3d 389 (3d Cir. 1996) ..............................................................................36

NLRB v. Bildisco & Bildisco,
 465 U.S. 513 (1984) .......................................................................................40

Nordhoff Invs., Inc. v. Zenith Elecs. Corp.,
 258 F.3d 180 (3d Cir. 2001) ............................................................................44

Official Comm. of Unsecured Creditors v. Michelson (In re Michelson),
 141 B.R. 715 (Bankr. E.D. Cal. 1992) ..............................................................18

Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.),
 200 F.3d 154 (3d Cir. 1999) ............................................................................20

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
 390 U.S. 414 (1968) .......................................................................................34

Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.),
    755 F.2d 1336 (8th Cir. 1985) ................................................................30

Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.),
    177 B.R. 791 (S.D.N.Y. 1995), aff'd, 68 F.3d 26 (2d Cir. 1995) ...........................35

Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.),
    407 B.R. 576 (Bankr. D. Del. 2009) .....................................................42

Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,
    872 F.2d 36 (3d Cir. 1989)...............................................................41

U.S. Nat'l Bank Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.),
    426 B.R. 114 (Bankr. D. Del. 2010) (Carey, J.) ...........................................37, 38

**FEDERAL RULES**

Federal Rules of Bankruptcy Procedure ............................................................... *passim*

**OTHER AUTHORITIES**

H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963 (1977) ..........................9, 18

S. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 (1978)................................9, 18

**MISCELLANEOUS**

7 Alan N. Resnick et al., Collier on Bankruptcy ¶ 1123.01[7] (16th ed. rev. 2010) ....................15

7 Alan N. Resnick, et al., Collier on Bankruptcy ¶ 1129.03[11] (16th ed. rev. 2010) .................30

## INTRODUCTION

1.      Debtors Old FENM Inc. (f/k/a Fresh & Easy Neighborhood Market Inc.)

and Old FEPC LLC (f/k/a Fresh & Easy Property Company LLC) (collectively, the "Debtors")

submit this memorandum of law in support of the First Amended Joint Plan of Reorganization of

Old FENM Inc. and Old FEPC LLC, as Modified and Restated (as it may be further modified or

amended, the "Plan") pursuant to Section 1129 of title 11 of the United States Code (collectively,

the "Bankruptcy Code").[1]  In addition, as set forth herein, the Debtors request (a) authorization to

make certain modifications to the Plan (the "Plan Modifications") and (b) a waiver of the 14-day

stay of the confirmation order imposed by Rule 3020(e) of the Federal Rules of Bankruptcy

Procedure.  Concurrently herewith, the Debtors filed the Declaration of Dennis Stogsdill in

Support of the First Amended Joint Plan of Reorganization of Old FENM Inc. and Old FEPC

LLC, as Amended and Restated (the "Stogsdill Declaration"), which provides additional factual

support for this memorandum of law and confirmation of the Plan.[2]

## PRELIMINARY STATEMENT

2.      Following extensive negotiations, the Debtors and their primary

stakeholders agreed to the terms of the Plan.  The Plan's central component is a global settlement

between the Debtors, the Creditors' Committee and the Debtors' shareholder and largest creditor,

Tesco (the "Tesco Settlement").  Under the Tesco Settlement, Tesco has agreed to subordinate its

Claims to the Claims held by Entities with no affiliation to the Debtors.  Tesco's agreement to

subordinate the Tesco Claims has allowed the Debtors to propose the Plan, which will pay all

---

[1]    Capitalized terms and phrases not otherwise defined herein have the meanings given to them in the Plan.

[2]    As set forth in Section IV below, the Debtors received only one objection to confirmation.  The objection was
      filed by the United States Trustee.  The Debtors have resolved nearly every issue raised in the objection of the
      United States Trustee other than with respect to the Plan's provisions regarding payment of the Creditors'
      Committee Member Fee Claims.  As described below, that issue should have no impact Plan confirmation
      because, pursuant to the Plan, it can be severed from the confirmation process.  See Plan § XI.B.

Allowed Claims of all non-affiliated Entities in full (with interest).  Absent the Tesco Settlement, it is uncertain whether the Debtors would possess the ability to pay their non-affiliated creditors in full, and any ability to do so would only arise after costly and protracted litigation.

3.     As part of the Tesco Settlement, Tesco also has agreed that the Plan's treatment of the Tesco Claims renders Tesco unimpaired solely for purposes of the Plan.  As such, the Plan renders all of the Debtors' creditors unimpaired for purposes of Confirmation. Stated simply, in the absence of the Tesco Settlement and assuming the Debtors were successful in pursuing a timely and expensive litigation strategy that ultimately led to the subordination of the Tesco Claims, the Debtors' non-affiliated creditors would receive, at most, the same distribution they will receive under the Plan.  As such, the benefit that the Tesco Settlement ultimately provides to the Debtors' non-affiliated creditors more than justifies the recovery Tesco will receive on account of the Tesco Claims and the consideration the Debtors will provide to Tesco under the Tesco Settlement, which includes (i) providing certain Debtor and third-party releases; (ii) the payment of the Debtors' remaining cash after the completion of all other required distributions under the Plan; and (iii) Tesco's receipt of the stock of each of the Reorganized Debtors.

4.     Given the immense benefit provided to all of the Debtors' constituents under the Tesco Settlement, it logically follows that the Plan enjoys full support from each of the Debtors' primary constituencies.  In fact, only one party filed an objection to confirmation of the Plan, and the Debtors believe that nearly all issues raised in that objection have been resolved through modifications contained in the Plan.  As set forth below, the Debtors submit that the Plan satisfies all relevant requirements for confirmation under the Bankruptcy Code, and therefore confirmation of the Plan is appropriate.

## STATEMENT OF FACTS

I.         **History of the Debtors**

5.        The Debtors previously operated a chain of grocery stores in California, Nevada and Arizona.  The Debtors focused their business strategy on offering healthy and wholesome foods, including prepared foods, at affordable prices and, through Tesco's financial support, quickly expanded.  As of the Petition Date, the Debtors operated 167 store locations.  Of these store locations, the Debtors held a freehold interest in 25, leased 50 locations pursuant to ground leases and leased an additional 92 locations pursuant to store leases.  The Debtors also owned an additional 61 non-operating store locations and were a party to leases for 36 non-operating store locations (six pursuant to ground leases and 30 pursuant to store leases).

6.        In addition to their stores portfolio, the Debtors operated state of the art production facilities in Riverside, California, including meat and produce facilities and a kitchen, each housed in its own building.  The Riverside campus allowed the Debtors to provide "Fresh & Easy" branded fresh food products.  The Debtors also owned one active distribution center, located in close proximity to the Campus, and a second, inactive distribution center, located in Stockton, California.

7.        The economic downturn beginning in 2008 adversely affected the entire retail grocery industry, including the Debtors' business. Given the Debtors' geographic focus on California, Nevada and Arizona, the effect of the real estate market correction was especially pronounced, as many of the Debtors' leases were substantially above market relative to their competitors.  Additionally, the Debtors' retail format had been unsuccessful in obtaining a sufficiently broad customer-base.  As a result, the Debtors incurred annual operating losses in each year they operated.

8.      Despite these operating losses, Tesco remained committed to the Debtors' business and continued to provide significant amounts of additional funds (in the form of both of debt and equity) to the Debtors to support their business operations.  After retaining Greenhill & Co., Inc. ("Greenhill") to help conduct a strategic review of the Debtors' business, however, Tesco made the decision to exit the United States market and tasked Greenhill with pursuing a sale of the Debtors' business with the goal of continuing the Debtors as a going concern, which Tesco felt would be in the best interests of the Debtors' creditors, employees, vendors and other stakeholders.

9.      After an extensive marketing process the Debtors ultimately entered into an agreement (the "YFE APA") to sell the majority of the Debtors' operating assets to YFE Holdings, Inc. ("YFE"), a company associated with the Yucaipa Companies, LLC.  With YFE acting as a stalking horse bidder, the Debtors commenced these cases on September 30, 2013 to, among other things, effectuate the sale of their operating business to YFE, with plans to market and sell the Debtors' remaining operating and real estate assets during the course of the Bankruptcy Case.

**II.        Events During the Bankruptcy Case**

10.      After further marketing their operating assets after the Petition Date, the Debtors eventually closed on the sale of a substantial portion of their operating assets to YFE (the "YFE Sale").[3]  As part of the consideration of the YFE Sale, the Debtors received warrants (the "Warrants") executable for 22.5 percent of YFE's outstanding equity at the time of the YFE

---

[3]     See Order (I) Approving the Sale of a Substantial Portion of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (III) Granting Certain Related Relief [Docket No. 378].

Sale, and YFE agreed to assume certain of the Debtors' liabilities in the amount of approximately
$130 million.

11.    In addition to the YFE Sale, the Debtors have sold four other categories of
assets during these cases: (a) the Debtors' right to designate certain unexpired leases for
assumption and assignment; (b) certain real property assets consisting primarily of 53 parcels of
real property in Arizona, California and Nevada; (c) the Debtors' inactive distribution center in
Stockton, California; and (d) various other miscellaneous assets, such as liquor licenses,
equipment, computers, office furniture and various other types of personal property.[4]  The
Debtors received approximately $96 million in the aggregate as a result of these sales.

12.    On May 29, 2014, the Debtors filed the Plan and the accompanying
Disclosure Statement [Docket No. 857].  On May 30, 2014, the Court entered the Order
Approving (I) Disclosure Statement, (II) Form and Manner of Notice of Disclosure Statement
Hearing, (III) Form and Manner of Notice of Confirmation Hearing, and (IV) Certain Related
Relief [Docket No. 864] (the "Disclosure Statement Order").  In accordance with the Disclosure
Statement Order, the Debtors caused copies of the Disclosure Statement to be sent to creditors,
interest holders and other parties in interest in the Bankruptcy Cases.[5]  The Court set a hearing to
consider the confirmation of the Plan for July 2, 2014 at 9:00 a.m., Eastern Time.

---

[4]    See Order (I) Approving the Sale of Designation Rights with Respect to Certain of the Debtors' Leases Free
and Clear of Liens, Claims, Encumbrances and Other Interests, (II) Establishing Assumption and Assignment
Procedures, and (III) Granting Certain Related Relief [Docket No. 447]; Order (I) Approving the Sale of
Certain of the Debtors' Assets Free and Clear of all Non-Assumed Liens, Claims, Encumbrances, and Interests,
(II) Approving the Assumption and Assignment of Certain Contracts and Leases and (III) Granting Certain
Related Relief [Docket No. 448]; Order (I) Approving the Sale of the Debtors' Assets Free and Clear of all
Non-Assumed Liens, Claims, Encumbrances and Interests, (II) Approving the Assumption and Assignment of
Certain Executory Contracts and Unexpired Leases, and (III) Granting Certain Related Relief [Docket
No. 558].

[5]    Affidavit of Service of Richard M. Allen Regarding Disclosure Statement Order [Docket No. 871].

13.     The Plan divides holders of Claims against, and Interests in, the Debtors into five separate Classes.  Class 1, which consists of holders of Secured Claims against the Debtors, will receive such treatment that renders the holders of Secured Claims unimpaired.  Class 2, which consists of holders of Priority Claims, will receive a Cash distribution in the amount of each Allowed Priority Claim, thus rendering each holder of an Allowed Priority Claim unimpaired.  Class 3, which consists of the Debtors' non-insider General Unsecured Claims, will receive the amount of such Allowed General Unsecured Claim in Cash, plus the Post-Petition Interest Amount in respect of such Allowed General Unsecured Claim, thus rendering holders of Allowed General Unsecured Claims unimpaired.

14.     Class 4 includes only the Tesco Claims.  Class 4 will receive the Tesco Settlement Distribution, which consists of (a) distribution on the Effective Date of the Old FENM Inc. New Securities and the Old FEPC LLC New Securities and (b) any Surplus Cash available for distribution.  In accordance with the Tesco Settlement, the Plan also renders Class 4 unimpaired for purposes of Confirmation.  Finally, Class 5 consists of the equity Interests of the Debtors.  The Plan cancels these equity Interests and provides no distribution to holders of equity Interests in the Debtors.

### III.        Facts Relating to Plan Feasibility

15.     As set forth in greater detail in the Stogsdill Declaration, the Plan is feasible.  The Plan proposes to make distributions in Cash, including the payment by the Reorganized Debtors of all Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Old FENM Inc. General Unsecured Claims and Allowed Old FEPC LLC General Unsecured Claims in full.  As set forth in paragraph 18 of the Stogsdill Declaration and exhibit II to the Disclosure Statement, the Reorganized Debtors have assets in sufficient amount to make all distributions required under

the Plan, eliminating any possibility that the Debtors will need to undergo a further financial restructuring.  Further, by providing for the Debtors' reorganization, the Plan allows for the Debtors to comply with the terms of the YFE APA, which requires that the Reorganized Debtors hold the Warrants for a period of no less than two years.[6]

## IV.        Objections to Confirmation

16.       The United States Trustee filed the sole objection [Docket No. 291] to the Confirmation of the Plan (the "Objection").  The Debtors resolved a substantial portion of the United States Trustee's objection by agreeing to certain Plan Modifications whereby the Debtors will revise the following:  (a) the definition of "Exculpated Parties" under Section I.A.45 of the Plan; (b) the definition of "Other Sales" under Section I.A.67 of the Plan; and (c) Section VII.B of the Plan.  The remainder of the United States Trustee's objection concerning the Plan's proposed provisions regarding payment of the Creditors' Committee Member Fee Claims remains unresolved.

## THE PLAN MODIFICATIONS ARE APPROPRIATE

17.       The Debtors request authority to make certain modifications to the Plan. The Plan Modifications, which the Debtors filed contemporaneously herewith, have no material or adverse affect on, and cause no change in the treatment of, any Claim against or Interest under the Plan.  The Plan Modifications are technical changes or clarifications that the Debtors have made in their continuing review of the Plan or in response to informal and formal objections or requests from parties in interest.  As a result, approval of the Plan Modifications is appropriate under Section 1127(a) of the Bankruptcy Code.

18.       Section 1127(a) of the Bankruptcy Code provides as follows:

---

[6]      See YFE APA, Ex. D, § 9.11(f) (stating the Debtors and their Estates "shall not transfer, distribute or pledge" the Warrants acquired under the YFE APA "to any party prior to the date that is two years from the date of the Closing [of the YFE Sale]").

(a)     The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of Sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

11 U.S.C. § 1127(a).

19.     Bankruptcy Rule 3019(a) further provides as follows:

(a)     In a chapter 9 or chapter 11 case, after the plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

20.     Courts consistently have held that all creditors and equity security holders that have previously accepted a chapter 11 plan also will be deemed to have accepted proposed modification to such plan when the proposed modification causes no material adverse change in the treatment of such creditors' claims or such equity holders' interests.  See, e.g., In re Armstrong World Indus., Inc., 348 B.R. 136, 168 (D. Del. 2006) (approving modifications to proposed plan of reorganization when such modifications caused no adverse affect on any creditors); In re U.S. Concrete, Inc., No. 10-11407, 2010 WL 3493066, at *3 (Bankr. D. Del. July 29, 2010) (holding that holders of claims and interests were conclusively presumed to have accepted plan modifications in the absence of any adverse affects for such holders as a result of the modifications); In re Celotex Corp., 204 B.R. 586, 608-09 (Bankr. M.D. Fla. 1996) (same); In re Trans World Airlines, Inc., 185 B.R. 302, 322 (Bankr. E.D. Mo. 1995) (same); In re Placid

Oil Co., 92 B.R. 183, 190 (Bankr. N.D. Tex. 1988) (same); In re Mount Vernon Plaza Cmty.

Urban Redev. Corp. I, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (same).

21.     In the instant cases, the Plan Modifications consist of technical changes

that address certain concerns of the United States Trustee and cause no adverse impact on

claimants or interest holders in these cases.  Thus, under the above-cited legal authority, the Plan

Modifications are appropriate and should be deemed accepted by the holders of all Claims and

Interests in the Debtors.

## THE PLAN MEETS ALL APPLICABLE CONFIRMATION REQUIREMENTS

22.     As set forth below, both the Plan and the Debtors meet all the

requirements of Section 1129 of the Bankruptcy Code and should be confirmed.

**I.          The Plan Complies With Section 1129(a) of the Bankruptcy Code**

**A.     Section 1129(a)(1) of the Bankruptcy Code**

23.     The Plan complies with Section 1129(a)(1) of the Bankruptcy Code,

which provides that a plan of reorganization may be confirmed only if "[t]he plan complies with

the applicable provisions of this title."  11 U.S.C. § 1129(a)(1); In re Eagle-Picher Indus., Inc.,

203 B.R. 256, 270-73 (S.D. Ohio 1996) (examining each requirement of chapter 11 to

demonstrate that Section 1129(a)(1) was satisfied; In re Toy & Sports Warehouse, Inc., 37 B.R.

141, 149 (Bankr. S.D.N.Y. 1984) ("In order for a plan of reorganization to pass muster . . . it

must comply with all the requirements of Chapter 11 . . . .").

24.     The legislative history of Section 1129(a)(1) indicates that the primary

focus of this requirement is to ensure that a plan complies with Sections 1122 and 1123 of the

Bankruptcy Code, which govern classification of claims and interests and the contents of a plan,

respectively.  See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912

(1978); H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368

(1977); see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 648-49 (2d Cir. 1988) (holding that legislative history indicates that Section 1129(a)(1) was intended to require compliance with Sections 1122 and 1123).

**1.      Section 1122 of the Bankruptcy Code – Classification of Claims and Interests**

25.      Section 1122 of the Bankruptcy Code provides that the claims or interests within a given class must be "substantially similar" to the other claims or interests in that class:

> (a)      Except as provided in subsection (b) of this Section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122.  Courts consistently have held that Section 1122(a) of the Bankruptcy Code is satisfied so long as similar claims are classified together.  See Armstrong World Indus., 348 B.R. at 160 (holding that Section 1122(a) of the Bankruptcy Code was satisfied where similar claims were classified together); In re Aleris Int'l, Inc., No. 09-10478 (BLS), 2010 WL 3492664, at *12 (Bankr. D. Del. May 13, 2010) (same); see also Eagle-Picher Indus., 203 B.R. at 270 (same).

26.      The Plan classifies Claims in accordance with Section 1122(a) of the Bankruptcy Code, as each of the Plan's Classes contains Claims that share the same priority status and enforcement rights against the Debtors' Estates.  In particular, Article II of the Plan segregates into separate Classes Secured Claims (Class 1), Priority Claims (Class 2), General Unsecured Claims (Class 3), Tesco Claims (Class 4) and Interests (Class 5).[7]  The number of Classes in the Plan reflects the diverse characteristics of the Claims and Interests classified in the various Classes, and the legal rights under the Bankruptcy Code of each of the holders of Claims

---

[7]      In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

or Interests within a particular Class are substantially similar to other holders of Claims or

Interests within the same Class.

27.     In addition, valid business, factual and legal reasons exist for the separate

classification of Claims and Interests.  At a threshold level, the Plan separates Claims from

Interests, Priority Claims from General Unsecured Claims and Other Secured Claims from both

Priority and General Unsecured Claims.  The Debtors also separately classified the Tesco Claims

(Class 4) from the Claims held by other General Unsecured Creditors (Class 3).  This separate

classification reflects Tesco's agreement to subordinate the Tesco Claims to the Claims held by

other General Unsecured Creditors in accordance with the Tesco Settlement.

### 2.     Compliance With Section 1123(a) of the Bankruptcy Code – Mandatory Contents of the Plan

28.     Section 1123(a) of the Bankruptcy Code requires that a chapter 11 plan

(a) designate classes of claims and interests; (b) specify unimpaired classes of claims and

interests; (c) specify treatment of impaired classes of claims and interests; (d) provide for

equality of treatment within each class; (e) provide adequate means for the plan's

implementation; (f) provide for the prohibition of nonvoting equity securities and provide an

appropriate distribution of voting power among the classes of securities; and (g) contain only

provisions that are consistent with the interests of the creditors and equity security holders and

with public policy with respect to the  manner of selection of the reorganized company's officers

and directors.  See 11 U.S.C. § 1123(a).  In analyzing a plan's provisions with respect to the

selection of officers and directors, a court is to consider "the shareholders' interest in

participating in the corporation, the desire to preserve the debtor's reorganization, and the overall

fairness of the provisions."  In re Acequia, Inc., 787 F.2d 1352, 1362 (9th Cir. 1986).

29.     The Plan fully complies with each requirement of Section 1123(a) described above.  As previously noted with respect to the Plan's compliance with Section 1122 of the Bankruptcy Code, Article II of the Plan designates five separate Classes of Claims and Interests, as required by Section 1123(a)(1) of the Bankruptcy Code.  Section III.B of the Plan specifies that Classes 1, 2, 3 and 4 are unimpaired under the Plan, as required by Section 1123(a)(2) of the Bankruptcy Code.  Section III.B of the Plan also specifies that Interests in Class 5 are impaired and describes the treatment of such Class in accordance with Section 1123(a)(3) of the Bankruptcy Code.  Further, as required by Section 1123(a)(4) of the Bankruptcy Code, the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in such class.

30.     In accordance with the requirements of Section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for its implementation through Article IV and various other provisions.  Specifically, the Plan provides for:

(a)     the consummation of the Tesco Settlement under Section IV.A of the Plan;

(b)     authorization of the Reorganized Debtors to settle any Secured Claim, Administrative Claim, Priority Tax Claim, Priority Claim or Unsecured Claim without the supervision or approval by the Bankruptcy Court under Section IV.C.16 of the Plan;

(c)     the substantive consolidation of the Debtors' respective Estates for Plan purposes only and solely for administrative convenience for distribution purposes under Section IV.C.1 of the Plan;

(d)     the continuation of each Reorganized Debtor's corporate existence, each with all of the powers of corporation or limited liability company, as applicable under the laws of its respective jurisdiction of organization under Section IV.C.2 of the Plan;

(e)     the cancellation of all issued and outstanding Interests in the Debtors and issuance of (i) the Old FENM Inc. New Securities to a Tesco Entity designated by Tesco and (ii) the Old FEPC LLC New Securities to a Tesco Entity designated by Tesco under Section IV.C.3 of the Plan;

(f)     the exemption of the Old FENM Inc. New Securities and the Old FEPC LLC New Securities from registration under the Securities Act, to the maximum extent provided by Section 1145 of the Bankruptcy Code and applicable non-bankruptcy law under Section IV.C.4 of the Plan;

(g)     the revesting of all of the Reorganized Debtors' Assets in the relevant Reorganized Debtor on the Effective Date under Section IV.C.5 of the Plan;

(h)     the termination of all existing employee benefit plans and workers' compensation benefits not previously expired or terminated by the Debtors and the authority of the Reorganized Debtors to enter into new employment, retirement, welfare, severance, indemnification and other agreements for the Reorganized Debtors' officers, directors and employees under Sections IV.C.6 and IV.C.11 of the Plan;

(i)     the adoption of the corporate organizational documents that will govern the Reorganized Debtors and the identification of the initial boards of directors and officers of the Reorganized Debtors under Sections IV.C.8, IV.C.9 and IV.C.10 of the Plan;

(j)     the approval of agreements and transactions by the holders of Claims under the Plan under Section IV.C.12 of the Plan;

(k)     the establishment of the Administrative/Priority Claims Reserve and the General Unsecured Claims Trust Account under Sections IV.C.14 and IV.C.15 of the Plan;

(l)     the authorization of the Reorganized Debtors to conduct Other Sales under Section IV.C.17 of the Plan;

(m)     the authorization to execute the (i) general releases provided by the Debtors to any of the Released Parties, (ii) third party releases provided by each holder of a Secured Claim, Administrative Claim, Priority Tax Claim, Priority Claim and General Unsecured Claim to any of the Released Parties, (iii) permanent injunction related to the releases, and (iv) limitation of liability applicable to the Exculpated Parties under Section IV.D of the Plan;

(n)     the special provisions with respect to the Allowed Insured Claims under Section IV.E of the Plan;

(o)     the release of all Liens on, in or against the Reorganized Debtors' Assets under Section IV.F of the Plan;

(p)     the authorization to effectuate various documents and enter into various transactions to effectuate the Plan under Section IV.G of the Plan;

(q)     the exemption from certain transfer taxes under Section IV.G of the Plan; and

(r)     the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases under Article V of the Plan.

31.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate organizational documents prohibit the issuance of nonvoting equity securities.  In

accordance with that requirement, Section IV.C.9 of the Plan provides that the Reorganized

Debtors' Organizational Documents will prohibit the issuance of nonvoting equity securities to

the extent required by Section 1123(a)(6) of the Bankruptcy Code.  In addition, this prohibition

is stated in the in the Reorganized Debtors' Organizational Documents, which are attached as

Exhibit III to the Plan.

        32.      Finally, Section 1123(a)(7) of the Bankruptcy Code requires that a plan of

reorganization "contain only provisions that are consistent with the interests of creditors and

equity security holders and with public policy with respect to the manner of selection of any

officer, directors, or trustee under the plan . . . ."  11 U.S.C. § 1123(a)(7).  This provision is

supplemented by Section 1129(a)(5) of the Bankruptcy Code, which directs the scrutiny of the

court to the methods by which the management of the reorganized corporation is to be chosen to

provide adequate representation of those whose investments are involved in the

reorganization — i.e., creditors and equity holders.  See 7 Alan N. Resnick et al., Collier on

Bankruptcy ¶ 1123.01[7] (16th ed. rev. 2010); see also Acequia, Inc., 787 F.2d at 1361-62.

        33.      The Plan complies with Section 1123(a)(7) and ensures that the selection

of the officers and directors of each Reorganized Debtor are consistent with the interests of

creditors and equity security holders and with public policy.  Section IV.C.10 of the Plan

provides that the initial directors and officers of each Reorganized Debtor will consist of the

individuals set forth set forth in Exhibit IV of the Plan.  Further, this Section of the Plan

describes that each such director and officer will serve from and after the Effective Date until his

or her successor is duly elected or appointed and qualified or until his or her earlier death,

resignation or removal in accordance with the terms of the certificate of incorporation and

bylaws (or comparable constituent documents) of the respective Reorganized Debtor and state

law.  The Plan's provisions with respect to the selection of directors and officers are, thus, consistent with the interests of creditors and public policy.

### 3.   Section 1123(b) of the Bankruptcy Code – Discretionary Contents of the Plan

34.   Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan of reorganization, but are not required.  For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases.  11 U.S.C. §§ 1123(b)(1)-(2).  A plan also may provide for (a) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate;" (b) "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest"; or (c) "the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests."  11 U.S.C. §§ 1123(b)(3)(A)-(B); 11 U.S.C. §§ 1123(b)(4).  Finally, a plan may "modify the rights of holders of secured claims . . . or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims" and may "include any other appropriate provision not other appropriate provision not inconsistent with the applicable provisions of [Title 11]."  11 U.S.C. §§ 1123(b)(5)-(6).

35.   The Plan includes various provisions that fall under the spectrum of Section 1123(b) of the Bankruptcy Code.  For instance, the Plan impairs the sole Class of Interests, Class 5, while leaving all Classes of Claims unimpaired.  The Plan further provides for the retention of certain Causes of Action.  See Plan Ex. I.  Article V of the Plan includes provisions that provide for the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases to which the Debtors are parties.  See Plan Art. V.

Sections  V.C and D of the Plan also provides for the satisfaction of Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code.  See Plan §§ V.C & D.

36.    In accordance with Section 1123(b)(6) of the Bankruptcy Code, the Plan includes numerous other provisions designed to ensure its implementation that are consistent with the Bankruptcy Code, including the provisions of (a) Article VI of the Plan, governing distributions of Allowed Claims; (b) Article VII of the Plan, establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (c) Article IX of the Plan establishing discharge of Claims and injunctions against certain actions; and (d) Article X of the Plan regarding retention of jurisdiction by the Bankruptcy Court over certain matters after the Effective Date.

37.    Finally, the Plan includes the Tesco Settlement and certain related release and limitation of liability provisions that the Debtors believe are appropriate under applicable law, including Sections 1123(b)(1), (3) and (6) and Bankruptcy Rule 9019.  A further analysis of these provisions is set forth below.

### B.    Section 1129(a)(2) of the Bankruptcy Code

38.    The Plan complies with Section 1129(a)(2) of the Bankruptcy Code, which requires that a plan proponent comply with applicable provisions of the Bankruptcy Code. The legislative history accompanying Section 1129(a)(2) indicates that the principal purpose of this section is to ensure compliance with the disclosure and solicitation requirements set forth in Section 1125 of the Bankruptcy Code.  See In re PWS Holding Corp., 228 F.3d 224, 248 (3d Cir. 2000) ("[Section] 1129(a)(2) [of the Bankruptcy Code] requires that the plan proponent comply with the adequate disclosure requirements of § 1125"); Aleris Int'l, 2010 WL 3492664, at *20 ("The legislative history of Section 1129(a)(2) of the Bankruptcy Code reflects that this

provision is intended to encompass the solicitation and disclosure requirements under Sections

1125 and 1126 of the Bankruptcy Code."); In re Lapworth, No. 97-34529 (DWS), 1998 WL

767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of [Section] 1129(a)(2)

specifically identifies compliance with the disclosure requirements of [Section] 1125 as a

requirement of [Section] 1129(a)(2)."); Official Comm. of Unsecured Creditors v. Michelson (In

re Michelson), 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) ("Compliance with the disclosure and

solicitation requirements is the paradigmatic example of what the Congress had in mind when it

enacted Section 1129(a)(2)."); In re Texaco, Inc., 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988)

("[The] principal purpose of Section 1129(a)(2) is to assure that the proponents have complied

with the requirements of Section 1125 in the solicitation of acceptances to the plan"); see also In

re Enron Corp., No. 01-16034 (ALG), 2004 Bankr. LEXIS 2549, at *210 (Bankr. S.D.N.Y. July

15, 2004) ("Section 1129(a)(2) is intended to encompass disclosure and solicitation requirements

under section 1125 of the Bankruptcy Code."); S. Rep. No. 95-989, at 126 (1978), reprinted in

1978 U.S.C.C.A.N. 5787, 5912 (1978) ("Paragraph (2) [of Section 1129(a)] requires that the

proponent of the plan comply with the applicable provisions of chapter 11, such as Section 1125

regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N.

5963, 6368 (1977).

      39.    The Debtors have complied with the applicable provisions of the

Bankruptcy Code, including the provisions of Section 1125 regarding disclosure and plan

solicitation.  Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or

rejections of a plan of reorganization from holders of claims or interests "unless, at the time of or

before such solicitation, there is transmitted to such holder the plan or summary of the plan, and

a written disclosure statement approved . . . by the court as containing adequate information."

11 U.S.C. § 1125(b).  In the instant cases, the Debtors possessed no reason to solicit votes in favor or against the Plan, as each Class of Claims or Interests was deemed to either accept or reject the Plan under Section 1126(f) and (g) of the Bankruptcy Code.  Nevertheless, the Debtors sought and obtained approval of the Disclosure Statement and certain related confirmation procedures.

40.    Pursuant to the Disclosure Statement Order, the Bankruptcy Court specifically determined that the Debtors' Disclosure Statement contained adequate information within the meaning of Section 1125 of the Bankruptcy Code.  <u>See</u> Disclosure Statement Order, ¶ E.  The Bankruptcy Court further approved the form of notice of the confirmation hearing (the "<u>Confirmation Hearing Notice</u>") and required that the Debtors mail the Confirmation Hearing Notice to various parties no less than 21 days prior to the Confirmation Hearing.  The Bankruptcy Court also required that the Debtors publish the Confirmation Hearing Notice and approved the form of publication notice, the method of publication and the timing for such publication.  <u>See</u> Disclosure Statement Order, ¶¶ 4-9.

41.    The Debtors have complied with the Disclosure Statement Order and caused the mailing and publication of the Confirmation Hearing Notice to occur in accordance with the requirements of the Disclosure Statement Order.  <u>See</u> Affidavit of Richard M. Allen Regarding Mailing Confirmation Hearing Notice [Docket Nos. 904, 919]; Affidavit of Publication of Richard M. Allen Regarding Confirmation Hearing [Docket Nos. 887, 899].  The Debtors further have complied with all applicable provisions of the Bankruptcy Code, including Section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  As a result, the Plan meets the requirements of Section 1129(a)(2) of the Bankruptcy Code.

### C.       Section 1129(a)(3) of the Bankruptcy Code

42.      The Plan satisfies Section 1129(a)(3) of the Bankruptcy Code, which

requires that a plan of reorganization be "proposed in good faith and not by any means

forbidding by law." 11 U.S.C. § 1129(a)(3).  Courts consider a plan as proposed in good faith "if

there is a reasonable likelihood that the plan will achieve a result consistent with the standards

prescribed under the [Bankruptcy] Code."  Hanson v. First Bank of S.D., 828 F.2d 1310, 1315

(8th Cir. 1987); see also In re Combustion Eng'g, Inc., 391 F.3d 190, 246 (3d Cir. 2004) ("[F]or

purposes of determining good faith under Section 1129(a)(3) … the important point of inquiry is

the plan itself and whether such a plan will fairly achieve a result consistent with the objectives

and purposes of the Bankruptcy Code.") (quoting In re PWS Holding Corp., 228 F.3d at 242);

Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154,

165 (3d Cir. 1999) (the good faith standard in Section 1129(a)(3) requires that there be "'some

relation'" between the chapter 11 plan and the "reorganization-related purposes" that chapter 11

was designed to serve) (citations omitted); In re Coram Healthcare Corp., 271 B.R. 228, 234

(Bankr. D. Del. 2001) ("The good faith standard requires that a plan be proposed with honest,

good intentions and a basis for expecting that a reorganization can be effected with results

consistent with the objectives and purposes of the Bankruptcy Code.") (quoting In re Zenith

Elecs. Corp., 241 B.R. 92, 107 (Bankr. D. Del. 1999)) (internal quotations omitted).

43.      One must view the requirement of good faith solely in the context of the

totality of the circumstances surrounding the formulation of a chapter 11 plan.  See In re

Fairfield Residential LLC, No. 09-14378 (BLS), 2010 WL 2904990, at *10 (Bankr. D. Del. July

6, 2010) (holding that requirements of Section 1129(a)(3) of the Bankruptcy Code were satisfied

after examining the "totality of the circumstances"); see also McCormick v. Banc One Leasing

Corp. (In re McCormick), 49 F.3d 1524, 1526 (11th Cir. 1995) ("The focus of a court's inquiry is

the plan itself, and courts must look to the totality of the circumstances surrounding the

plan, . . . keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable

opportunity to make a fresh start."); In re Block Shim Dev. Co., 939 F.2d 289, 292 (5th Cir.

1991) (finding that the good faith requirement "is viewed in the context of the circumstances

surrounding the plan"); CoreStates Bank v. United Chem. Techs., Inc., 202 B.R. 33, 57 (E.D. Pa.

1996) (concluding that courts must view good faith by looking at the totality of the

circumstances).

        44.     In determining whether a plan of reorganization will succeed and

accomplish goals consistent with the Bankruptcy Code, courts look to the terms of the plan itself.

See Combustion Eng'g, 391 F.3d at 246; In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr.

D.N.J. 1988) (concluding that the good faith test provides the court with significant flexibility

and is focused on an examination of the plan itself, rather than other, external factors), aff'd in

part, remanded in part on other grounds, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir.

1990).

        45.     The plan proponent must show, therefore, that the plan has not been

proposed by any means forbidden by law and that the plan has a reasonable likelihood of

success.  See In re Century Glove, Inc., Nos. 90-400, 90-401 (SLR), 1993 WL 239489, at *4

(D. Del. Feb. 10, 1993) ("A court may only confirm a plan for reorganization if . . . 'the plan has

been proposed in good faith and not by any means forbidden by law. . . .'  Moreover, '[w]here the

plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope

of success, the good faith requirement of Section 1129(a)(3) is satisfied.'") (citations omitted);

see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd.

P'ship), 116 F.3d 790, 802 (5th Cir. 1997) (same); In re Koelbl, 751 F.2d 137, 139 (2d Cir. 1984)

(noting that plan provisions may not contravene any law, including state law, and a plan must have been proposed with "a basis for expecting that a reorganization can be effected'") (citations omitted).

46.     The Debtors drafted the Plan in a manner that effectuates the objectives and purposes of the Bankruptcy Code.  The Debtors also actively involved their major creditor constituencies — namely Tesco and the Creditors' Committee — throughout these cases, including while negotiating and ultimately drafting the Plan.  See Stogsdill Declaration, ¶ 6.  The Plan reflects the consensus that the Debtors and their major constituents reached as a result of their negotiations and demonstrates that the Debtors proposed the Plan in good faith.  See In re Stolrow's, Inc., 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) (holding that good faith in proposing a plan "also requires a fundamental fairness in dealing with one's creditors"); Eagle-Picher Indus., 203 B.R. at 274 (finding that a plan of reorganization was proposed in good faith when, among other things, it was based on extensive arms-length negotiations among the plan proponents and other parties in interest).  The support of the Debtors' major constituents and the ability of the Debtors to render all Classes of Claims unimpaired further demonstrate the Plan's overall fairness.  In addition, the Plan contains no provision that is contrary to state or other laws nor is there any indication the Debtors lack the ability to consummate the Plan.  Accordingly, the Plan satisfies the requirements of Section 1129(a)(3) of the Bankruptcy Code.

### D.     Section 1129(a)(4) of the Bankruptcy Code

47.     The Plan also complies with Section 1129(a)(4) of the Bankruptcy Code, which states the following:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection

> with the plan incident to the case, has been approved by, or
> is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).  In essence, Section 1129(a)(4) of the Bankruptcy Code requires that any and all fees promised or received in connection with or in contemplation of a chapter 11 case must be disclosed and subject to the court's review.  See In re Crdentia Corp., No. 10-10926 (BLS), 2010 WL 3313383, at *8 (Bankr. D. Del. May 26, 2010) (holding that plan complied with Section 1129(a)(4) where all final fees and expenses payable to professionals remained subject to final review by the bankruptcy court); In re Johns-Manville Corp., 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y. 1987) aff'd, Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988); In re Chapel Gate Apartments, Ltd., 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation"); In re S. Indus. Banking Corp., 41 B.R. 606, 612 (Bankr. E.D. Tenn. 1984) (even absent challenge, a court has an independent duty to determine the reasonableness of professional fees).

48.    Section III.A.1 of the Plan provides for the Payment of Professional Fee Claims and makes all such payments subject to Court approval in accordance with applicable legal standards.  While the Bankruptcy Court has authorized the interim payment of fees and expenses incurred by Professionals in connection with the Bankruptcy Cases, all such fees and expenses remain subject to the Court's final review.  In addition, Article X of the Plan provides that the Bankruptcy Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.  See Plan § X.2.  Accordingly, the Plan fully complies with the requirements of Section 1129(a)(4) of the Bankruptcy Code.

E.       **Section 1129(a)(5) of the Bankruptcy Code**

49.      The Plan satisfies Section 1129(a)(5) of the Bankruptcy Code, which

requires that a plan proponent disclose (a) the identify of those individuals who will serve as

management of the reorganized debtor; (b) the identity of any insider to be employed or retained

by the reorganized debtor; and (c) the nature of the compensation proposed to be paid to such

insider.  In addition, under Section 1129(a)(5)(A)(ii), the appointment or continuation in office of

existing management must be consistent with the interests of creditors, equity security holders

and public policy.

50.      In determining whether the post-confirmation management of a debtor is

consistent with the interests of creditors, equity security holders and public policy, a court must

consider proposed management's competence, discretion, experience and affiliation with entities

having an interests adverse to the debtor.  See In re W.E. Parks Lumber Co., 19 B.R. 285, 292

(Bankr. W.D. La. 1982) (a court should consider whether "the initial management and board of

directors of the reorganized corporation will be sufficiently independent and free from conflicts

and the potential of post-reorganization litigation so as to serve all creditors and interested parties

on an even and loyal basis") (emphasis omitted).  In general, however, "[t]he [d]ebtor should

have first choice of its management, unless compelling cause to the contrary exists. . . ."

In re Sherwood Square Assocs., 107 B.R. 872, 878 (Bankr. D. Md. 1989).  The case law also is

clear that a plan may contemplate the retention of the debtor's existing directors and officers.

See, e.g., Texaco, 84 B.R. at 908 (holding that Section 1129(a)(5) was satisfied where notice was

provided that the debtor's existing directors and officers would continue to serve in office after

plan confirmation).

51.      The Debtors have disclosed in Exhibit IV to the Plan, or will disclose at or

prior to the Confirmation Hearing, all necessary information regarding the Reorganized Debtors'

officers and directors.  See Plan, Ex. IV. [Docket No. 910].  In addition, as established by these

disclosures, the Reorganized Debtors' officers are qualified and experienced.  As such, the

appointment of the proposed directors and officers is consistent with the interests of holders of

Claims and Interests and with public policy, and the Plan satisfies the requirements of Section

1129(a)(5) of the Bankruptcy Code.

**F.      Section 1129(a)(6) of the Bankruptcy Code**

52.      Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Debtors,

as it requires that "[a]ny governmental regulatory commission with jurisdiction, after

confirmation of the plan, over the rates of the debtor has approved any rate change provided for

in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C.

§ 1129(a)(6).  The Debtors' businesses have no involvement with the establishment of rates over

which any regulatory commission has jurisdiction or will have jurisdiction after the Plan's

confirmation.  Accordingly, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the

Debtors.

**G.      Section 1129(a)(7) of the Bankruptcy Code**

53.      The Plan satisfies the "best interests of creditors" test set forth in

Section 1129(a)(7) of the Bankruptcy Code.  This test requires that, with respect to each

impaired class of claims or interests, each holder of such claims or interests (a) has accepted the

plan or (b) will receive or retain property of a value not less than what such holder would receive

or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  See Armstrong

World Indus., 348 B.R. 111, 165-66 (Bankr. D. Del. 2006); see also In re Tranel, 940 F.2d 1168,

1172 (8th Cir. 1991); In re AOV Indus., 31 B.R. 1005, 1008-13 (D.D.C. 1983), aff'd in part,

rev'd in part, 792 F.2d 1140, 1144 (D.C. Cir. 1986) (if no impaired creditor receives less than

liquidation value, a plan of reorganization is in the best interests of creditors), vacated in light of

new evidence, 797 F.2d 1004 (D.C. Cir. 1986); In re Econ. Lodging Sys., Inc., 205 B.R. 862,

864-65 (Bankr. N.D. Ohio 1997); Eagle-Picher Indus., 203 B.R. at 266.  A court, in considering

whether a plan is in the "best interests" of creditors, is not required to consider any alternative to

the plan other than the dividend projected in a liquidation of all the debtor's assets under chapter

7 of the Bankruptcy Code.  See, e.g., In re Victory Constr. Co., 42 B.R. 145, 151 (Bankr. C.D.

Cal. 1984); see also In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 297 (Bankr. S.D.N.Y.

1990); In re Jartran, Inc., 44 B.R. 331, 389-93 (Bankr. N.D. Ill. 1984) (best interests test satisfied

by showing that, upon liquidation, the cash received would be insufficient to pay priority claims

and secured creditors so that unsecured creditors and stockholders would receive no recovery).

54.     As Section 1129(a)(7) of the Bankruptcy Code itself makes clear, the "best

interests" of creditors test is applicable only to *nonaccepting* holders of *impaired* claims and

interests.  See 11 U.S.C. § 1129(a)(7).  Thus, in the instant Bankruptcy Case, the "best interests"

test applies only to Class 5, as the holders of Interests in this Class will receive no distribution on

account of such Interests and are deemed to reject the Plan under section 1126(g) of the

Bankruptcy Code.  Additionally, as all Claims are rendered unimpaired under the Plan, it is

without question that all holders of Claims are receiving property that is of value that is not less

than what such holder would receive in a Chapter 7 liquidation.

55.     As set forth on the liquidation analysis attached as exhibit II to the

Disclosure Statement (the "Liquidation Analysis"), it is clear that the Plan satisfies the "best

interests" test with respect to Class 5, because holders of Interests in Class 5 would receive no

consideration on account of their Interests in a hypothetical Chapter 7 liquidation.  See

Disclosure Statement, Ex. II.  As a result, the Plan satisfies the requirements of Section

1129(a)(7) of the Bankruptcy Code.

### H.    Section 1129(a)(8) of the Bankruptcy Code

56.    The Plan fails to comply with Section 1129(a)(8) of the Bankruptcy Code, which requires that "with respect to each class of claims or interests — (A) such class has accepted the plan; or (B) such class is not impaired under the Plan."  Specifically, Class 5 is deemed to reject the Plan under section 1126(g) of the Bankruptcy Code, because the Plan provides no distribution to the holders of Interests in Class 5.  Nevertheless, as set forth below, the Debtors have satisfied the necessary requirements under section 1129(b) of the Bankruptcy Code to obtain confirmation of the Plan notwithstanding Class 5's deemed rejection of the Plan.

57.    In contrast, the Plan renders Classes 1 through 4 unimpaired and therefore such Classes are deemed to accept the Plan under Section 1126(f) of the Bankruptcy Code.  As a result, the Plan satisfies Section 1129(a)(8) with respect to Classes 1 through 4.

### I.    Section 1129(a)(9) of the Bankruptcy Code

58.    The Plan satisfies Section 1129(a)(9) of the Bankruptcy Code, which requires that a chapter 11 plan provide for the payment of certain priority claims in full on the effective date and for the payment of certain other priority claims receive deferred cash payments in the allowed amount of such claims.  In particular, pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, unless otherwise agreed by the holder, holders of claims of a specific kind specified in Section 507(a)(1) of the Bankruptcy Code — administrative claims allowed under Section 503(b) of the Bankruptcy Code — must receive cash equal to the allowed amount of such claims on the effective date of a plan.  Section 1129(a)(9)(B) further requires that the holders of claims of a kind specified in Sections 507(a)(1) and 507(a)(4) through (7) (generally, wage and employees benefit claims and consumer deposits that are entitled to priority) must receive, if the class in which such claimants are members has accepted the plan, deferred cash payments of a value equal to the allowed amount of these claims; or, if the class in which such

claimants are members has not accepted the plan, cash equal to the allowed amount of these claims on the effective date of a plan. Finally, Sections 1129(a)(9)(C) and (D) of the Bankruptcy Code provide for the payment of priority tax claims, including secured claims that would otherwise meet the requirements of Section 507(a)(8) of the Bankruptcy Code absent the secured status of such claims, in cash in regular installments.

59.     In accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, Section III.A.1 of the Plan provides that, subject to certain Bar Date provisions and unless otherwise agreed by the holder of an Administrative Claim or an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim shall receive Cash equal to the amount of such Allowed Administrative Claim, payable by the Reorganized Debtors from the Administrative/Priority Claim Reserve, in full satisfaction of its Administrative Claim either (a) as soon as reasonably practicable after the Effective Date; or (b) if the Administrative Claim is not allowed as of the Effective Date, within 30 days after the date on which such Administrative Claim becomes an Allowed Administrative Claim. In addition, the Reorganized Debtors shall satisfy Administrative Claims based on ordinary course liabilities pursuant to the terms and conditions of the particular transactions giving rise to such Administrative Claims, without any further action by holder of such Administrative Claims or further approval of the Bankruptcy Court.

60.     In accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, Section III.A.2 of the Plan provides that the Reorganized Debtors shall pay Priority Tax Claims in Cash in an amount equal to such Priority Tax Claim (a) as soon as reasonably practicable after the Effective Date; or (b) if the Priority Tax Claim is not Allowed as of the Effective Date, no

later than 30 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.

61.     In accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, Section III.B.2 of the Plan provides that, unless otherwise agreed to by a holder of an Allowed Priority Claim, holders of such Priority Claims shall receive Cash equal to the amount of such Allowed Priority Claim, payable by the Reorganized Debtors from the Administrative/Priority Claim Reserve, in full satisfaction of such Priority Claim either (a) as soon as reasonably practicable after the Effective Date; or (b) if the Priority Claim is not Allowed as of the Effective Date, 30 days after the date on which such Priority Claim becomes an Allowed Priority Claim.

62.     Accordingly, the Plan satisfies the requirements set forth in Section 1129(a)(9) of the Bankruptcy Code.

**J.     Section 1129(a)(10) of the Bankruptcy Code**

63.     Section 1129(a)(10) of the Bankruptcy Code, is inapplicable to the Plan, as it provides the following:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10); see In re Martin, 66 B.R. 921, 924 (Bankr. D. Mont. 1986) (holding that acceptance by three classes of impaired creditors, exclusive of insiders, satisfied requirement of Section 1129(a)(10)).   In the instant case, the Plan impairs no Classes of Claims, thus rendering Section 1129(a)(10) of the Bankruptcy Code inapplicable to the Plan.   See Plan § III.B.1-4.

### K.    Section 1129(a)(11) of the Bankruptcy Code

64.    The Plan satisfies Section 1129(a)(11) of the Bankruptcy Code, which provides that a court may confirm a plan of reorganization only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need further financial reorganization, of the debtor or any successor to the debtor under the plan."  11 U.S.C. § 1129(a)(11).  One commentator has stated that this Section "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable."  7 Alan N. Resnick, et al., Collier on Bankruptcy ¶ 1129.03[11] (16th ed. rev. 2010); accord Aleris Int'l, 2010 WL 3492664, at *27; In re Cellular Info. Sys., Inc., 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994);  In re Rivers End Apartments, Ltd., 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994); Johns-Manville, 68 B.R. at 635.

65.    Section 1129(a)(11), however, does not require a guarantee of the plan's success; rather, the proper standard is whether the plan offers a "reasonable assurance" of success.  See Aleris Int'l, 2010 WL 3492664, at *27 ("The feasibility test set forth in Section 1129(a)(l1) requires the Bankruptcy Court to determine whether the reorganized debtor has a reasonable assurance of commercial viability."); see also In re Johns-Manville Corp., 843 F.2d at 649 (noting a plan may be feasible although its success is not guaranteed); Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.), 755 F.2d 1336, 1341 (8th Cir. 1985) (same); Rivers End Apartments, 167 B.R. at 476 (to establish feasibility, "a plan proponent must demonstrate that its plan offers a reasonable prospect of success and is workable"); In re Drexel Burnham Lambert Grp., 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) ("'Feasibility does not, nor can it, require the certainty that a reorganized company will succeed.'") (citations omitted); In re Apex Oil Co., 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990) (a guarantee of success is not required to meet the feasibility standard of Section 1129(a)([11])); In re Elm Creek Joint Venture, 93 B.R.

105, 110 (Bankr. W.D. Tex. 1988) (a guarantee of success is not required under Section

1129(a)(11), only a reasonable expectation that payments will be made); <u>Texaco</u>, 84 B.R. at 910

("All that is required is that there be reasonable assurance of commercial viability.").

   66. As set forth in the Liquidation Analysis and the Stogsdill Declaration, the

Debtors possess the necessary assets to make all distributions called for under the Plan.[8]

<u>See </u>Stogsdill Declaration, ¶ 18.  Further, because the Reorganized Debtors, in accordance with

the requirements of the YFE APA, are being reorganized as holding companies that are wholly-

owned by Tesco, there is no likelihood that the Reorganized Debtors will require a further

financial restructuring.  Accordingly, the Plan satisfies the feasibility standard of

Section 1129(a)(11) of the Bankruptcy Code.

   **L.** **Section 1129(a)(12) of the Bankruptcy Code**

   67. The Plan complies with Section 1129(a)(12) of the Bankruptcy Code,

which requires that, as a condition precedent to the confirmation of a plan of reorganization,

"[a]ll fees payable under Section 1930 of title 28, as determined by the court at the hearing on

confirmation of the plan, have been paid or the plan provides for the payment of all such fees on

the effective date of the plan."  11 U.S.C. § 1129(a)(12).  The Plan specifically provides that all

fees payable pursuant to Section 1930 of Title 28 of the United States Code will be paid in Cash

on or after the Effective Date.  <u>See</u> Plan § III.A.1.b.  As such, the Plan complies with Section

1129(a)(12) of the Bankruptcy Code.

   **M.** **Section 1129(a)(13) of the Bankruptcy Code**

   68. Section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan, as

it requires that a plan of reorganization provide for the continuation of all retiree benefits at the

---

[8] As set forth in exhibit II to the Disclosure Statement, the estimated total amount of all Allowed Claims is
approximately $39.5 million and the total amount of assets available for distribution to all creditors as of the
Effective Date is approximately $94.5 million.

level established by agreement or by court order pursuant to Section 1114 of the Bankruptcy

Code at any time prior to confirmation of the plan, for the duration of the period that the debtor

has obligated itself to provide such benefits.  The Debtors have no obligations to pay retiree

benefits (as defined in Section 1114(a) of the Bankruptcy Code).  <u>See</u> Stogsdill Declaration, ¶ 20.

Accordingly, Section 1129(b)(13) of the Bankruptcy Code is inapplicable to the Plan.

**II.        Section 1129(b) – The Plan Satisfies the "Cramdown" Requirements For
             Confirmation**

69.        The Plan complies with Section 1129(b)(1) of the Bankruptcy Code,

which states the following:

> [I]f all of the applicable requirements of subsection (a) of
> this Section other than paragraph (8) are met with respect to
> a plan, the court, on request of the proponent of the plan,
> shall confirm the plan notwithstanding the requirements of
> such paragraph if the plan does not discriminate unfairly, is
> fair and equitable, with respect to each class of claims or
> interest that is impaired under, and has not accepted the
> plan.

11 U.S.C. § 1129(b)(1).  Thus, to confirm a plan that has not been accepted by all impaired

classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair

and equitable" with respect to impaired, non-accepting classes.  <u>See</u> <u>Zenith Elecs.</u>, 241 B.R.

at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of

reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly

and is fair and equitable'"); <u>see also</u> <u>Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec.

Power Coop., Inc.)</u>, 150 F.3d 503, 519 (5th Cir. 1998); <u>Liberty Nat'l Enters. v. Ambanc La Mesa

Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)</u>, 115 F.3d 650, 653 (9th Cir. 1997); <u>John

Hancock Mut. Life Ins. Co v. Route 37 Bus. Park Assocs.</u>, 987 F.2d 154, 157 n.5 (3d Cir. 1993).

70.        In the instant cases, Class 5, which consists solely of Interests, is the sole

impaired, non-accepting Class under the Plan.  As such, Section 1129(b)(2)(C) provides the

relevant "fair and equitable" standard for purposes of Class 5, requiring that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property"  11 U.S.C. § 1129(b)(2)(C).  The Plan is "fair and equitable" with respect to Class 5, because Class 5 includes Interests that possess the most junior distribution rights of any Claim or Interest classified under the Plan and, as a result, there exists no possibility that any class junior to Class 5 will receive or retain property under the Plan.  As such, the Plan complies with the "fair and equitable" requirement of Section 1129(b) of the Bankruptcy Code with respect to Class

71.    With respect to the "unfair discrimination" requirement of Section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates against a class if (a) there exists another class of claims with similar legal rights and such class receives better treatment under the plan than the class at issue; and (b) there is no reasonable basis for treating the class at issue less favorably.  See, e.g., Armstrong World Indus., 348 B.R. at 121 ("[T]his standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.") (citing Johns-Manville, 68 B.R. at 636); see also Acequia, Inc., 787 F.2d at 1364 (finding that provision requires that plan "allocate [ ] value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor.").

72.    The Plan causes no discrimination against the holders of Interests in Class 5.  The Interests classified in Class 5 represent the sole Class of Interests classified under the Plan and possess a junior distribution right to the Claims classified in Classes 1 through 4 of the Plan.  As a result, there is no discrimination with respect to Class 5, and the requirements of Section 1129(b) of the Bankruptcy Code are satisfied with respect to Class 5.

**III.**        **Section 1129(c) – No Other Plan Has Been Proposed Or Confirmed**

73.    The Plan satisfies Section 1129(c) of the Bankruptcy Code, which provides that, with a limited exception, a bankruptcy court may only confirm one plan.  The Plan is the only plan that has been filed in these cases and is the only plan that satisfies the requirements of subsections (a) and (b) of Section 1129 of the Bankruptcy Code.  Accordingly, the requirements of Section 1129(c) of the Bankruptcy Code are satisfied.

**IV.**        **Section 1129(d) – The Plan's Purpose Is Consistent With the Bankruptcy Code**

74.    The Plan satisfies Section 1129(d) of the Bankruptcy Code, which provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act of 1933.  In the instant case, the Plan's principal purpose is not the avoidance of taxes or the avoidance of the requirements of Section 5 of the Securities Act of 1933, and there has been no filing by any governmental agency asserting the contrary.  <u>See</u> Stogsdill Declaration, ¶21.  Accordingly, the Plan complies with Section 1129(d) of the Bankruptcy Code.

## OTHER PLAN PROVISIONS ARE NECESSARY AND APPROPRIATE

**I.**        **The Tesco Settlement and Related Releases and Limitation of Liability Should Be Approved**

75.    As described above, the Debtors have incorporated the terms of a key settlement with its ultimate parent, Tesco, into the Plan.  The Tesco Settlement is a critical component of the Plan and satisfies the standards for approval under Section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  Settlements and compromises are "a normal part of the process of reorganization."  <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968) (quoting <u>Case v. Los Angeles Lumber Prods. Co.</u>, 308 U.S. 106, 130 (1939)).  As part of the restructuring process, the Court "may approve a

compromise or settlement" under Bankruptcy Rule 9019(a).  Fed. R. Bankr. P. 9019(a).

Similarly, as set forth above, Section 1123(b)(3) of the Bankruptcy Code states that a plan may

"provide for … the settlement or adjustment of any claim or interest belonging to the debtor or

the estate."  11 U.S.C. § 1123(b)(3).

76.     A decision to approve or reject a proposed compromise or settlement falls

within the court's sound discretion.  Key3 Media Group, Inc. v. Pulver.com, Inc. (In re Key3

Media Group, Inc.), 336 B.R. 87, 92 (Bankr. D. Del. 2005); see also In re Louise's, Inc., 211

B.R. 798, 801 (D. Del. 1997).  When exercising such discretion, the bankruptcy court must

determine whether the compromise is "fair, reasonable, and in the best interests [sic] of the

estate."  Key3 Media Group, 336 B.R. at 92; see also Fry's Metals, Inc. v. Gibbons (In re Rfe

Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); Louise's Inc., 211 B.R. at 801; In re Marvel

Entm't Group, Inc., 222 B.R. 243, 249 (Bankr. D. Del. 1998).

77.     Courts have consistently recognized that plan settlements under

Section 1123(b)(3) of the Bankruptcy Code should be evaluated under the same "fair, reasonable

and in the best interests of the estate" standard applicable to Bankruptcy Rule 9019 settlements.

E.g., Aleris Int'l, 2010 WL 3492664, at *18; Resolution Trust Corp. v. Best Prods. Co. (In re

Best Prods. Co.), 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is

settled as part of a plan pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to

a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court

for approval are the same."), aff'd, 68 F.3d 26 (2d Cir. 1995).

78.     In evaluating whether a proposed settlement is fair and equitable, courts in

the Third Circuit consider the following four factors:  (a) the probability of success in the

litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the

complexity of the litigation involved, and the expense, inconvenience and delay necessarily

attendant thereto; and (d) the paramount interests of the creditors and a proper deference to their

reasonable opinions.  See  Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996);

Aleris Int'l, 2010 WL 3492664, at *19; Key3 Media Group, 336 B.R. at 93; Marvel, 222 B.R. at

249.  To properly balance these values, the Court should consider all factors "relevant to a full

and fair assessment of the wisdom of the proposed compromise."  Marvel, 222 B.R. at 249

(quoting TMT Trailer Ferry, Inc., 390 U.S. at 424).

       79.     In applying these factors, "a bankruptcy court need not decide the

numerous issues of law and fact raised by the settlement, but rather should canvass the issues and

see whether the settlement fall[s] below the lowest point on the range of reasonableness."  Aleris

Int'l, Inc., 2010 WL 3492664, at *19 (alteration in original) (citations omitted) (internal quotation

marks omitted); see also In re Drexel Burnham Lambert Grp., 134 B.R. 493, 497 (Bankr.

S.D.N.Y. 1991).  Moreover, when considering a proposed settlement, a court should exercise its

discretion in light of "the general public policy of encouraging settlements and favoring

compromise."  Aleris Int'l, 2010 WL 3492664, at *18 (citing Martin, 91 F.3d at 393).  In fact,

courts generally accord great deference to the recommendations of an estate representative when

considering negotiated agreements.  See, e.g., In re Int'l Distrib. Ctrs., Inc., 103 B.R. 420, 423

(S.D.N.Y. 1989).

       80.     Under the Tesco Settlement, Tesco has agreed to subordinate its Claim to

the Claims of all other General Unsecured Creditors.  This voluntary subordination has allowed

the Debtors to propose a Plan that will pay all General Unsecured Claims other than the Tesco

Claim in full.  This represents the absolute best possible result for each of the Debtors' non-

affiliated creditors with respect to their respective distributions under the Plan.  In fact, even if

the Debtors expended the resources necessary to litigate the validity of the Tesco Claims and ultimately prevailed in that litigation, any other plan would allow for no greater distribution to the Debtors' non-affiliated creditors than the Tesco Settlement and Plan provide.

81.     The immense benefit that the Tesco Settlement provides to the Debtors, their Estates and their non-affiliated creditors entirely justifies the consideration that the Debtors will provide to Tesco under the Tesco Settlement, including the Debtors' and third-party releases contained in Sections IV.D.1 and 2 of the Plan.  Each of these provisions is tied directly to the Tesco Settlement and the Debtors' ability to reach a consensus on the Plan with the Debtors' primary constituents, Tesco and the Creditors' Committee and is therefore essential to the Debtors' reorganization.  See In re Master Mortg. Inv. Fund, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) (listing the importance of the releases to the debtor's reorganization as a factor courts should consider in deciding whether to approve third-party releases).

82.     Section IV.D.1 of the Plan provides that the Debtors will release all Causes of Action arising prior to the Effective Date that the Debtors may possess against the Released Parties, which include Tesco, the Creditors' Committee and its members and the Debtors' current and former directors and officers.  "Courts in this district have held that a plan may provide for releases by a debtor of non-debtor third parties after considering the specific facts and equities of each case."  U.S. Nat'l Bank Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.), 426 B.R. 114, 142 (Bankr. D. Del. 2010) (Carey, J.) (citing Zenith Elecs., 241 B.R. at 110).  Given "specific facts and equities" of the instant cases, namely that there is no possibility for the Debtors to achieve a better result than provided for under the Tesco Settlement, the Debtors' release of certain potential direct claims and causes of action under Section IV.D.1 of the Plan clearly is an exercise of the Debtors' sound business judgment and

entirely appropriate.[9]  See Spansion, 426 B.R. at 142-43 ("[A] debtor may release claims in a

plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the

debtor's business judgment, is fair, reasonable, and in the best interests of the estate."); see also

In re DBSD N. Am., Inc., 419 B.R. 179, 217 (Bankr. S.D.N.Y.) (finding "[t]he releases and

discharges of claims and causes of action by the Debtors . . . represent a valid exercise of the

Debtors' business judgment, and are fair, reasonable and in the best interests of the estate.") aff'd,

Sprint Nextel Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.), 2010 U.S. Dist. LEXIS

33253 (S.D.N.Y. Mar. 24, 2010).  Because the Tesco Settlement has allowed the Debtors to pay

the Allowed Claims of their non-affiliated creditors in full, there exists no economic reason for

the Debtors to pursue any of the Causes of Action released under Section IV.D.1 of the Plan.[10]

      83.    Similarly, because the Tesco Settlement allows the Plan to render all

Claims unimpaired, the third party releases required thereunder, and specifically provided for in

Section IV.D.2 of the Plan, also are appropriate.  See Spansion, 426 B.R. at 144 (finding third

---

[9]    The "facts and equities" of the instant cases are distinguishable from those in In re Exide Techs, 303 B.R. 48 (Bankr. D. Del. 2003).  In Exide, the debtors' releases of non-debtor third parties proposed to bind certain unsecured creditors that were receiving no distribution under the plan. Id. at 73-75.  Here, in light of the immense benefit provided by the Tesco Settlement, the Debtors' releases of the Released Parties, will not harm any creditor because the Plan proposes to pay all Allowed Claims of the Debtors' non-affiliated creditors in full (with interest).

[10]   The United States Trustee's objection asserts that this Court must apply the following five factors when determining whether a plan may provide for releases by debtors of non-debtor entities:  (1) there is an identity of interests between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to the reorganization, to the extent that, without the injunction, there is little likelihood of success; (4) a substantial majority of the creditors agree to such the injunction, specifically if the impacted class or classes "overwhelmingly" voted to accept the proposed plan; and (5) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.  See Master Mortg., 168 B.R. at 935; see also In re Washington Mut., Inc., 442 B.R. 314, 346 (Bankr. D. Del. 2011).  The set forth under Master Mortgage, however, are, "neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness."  Washington Mut., 442 B.R. at 346.  Accordingly, the Debtors believe that, given their ability to reach a consensual agreement with the Creditors' Committee and Tesco that provides for the payment of all Allowed Claims of the Debtors' non-affiliated creditors in full, the debtor releases are appropriate and consistent with the overall fairness of the proposed Plan under Master Mortgage or the business judgment standard the Court appeared to apply in Spansion.  See id.

party release provision was not overreaching to the extent it bound unimpaired classes deemed to accept the plan since those creditors were being paid in full and had received adequate consideration for the release); see also In re Indianapolis Downs, LLC, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (approving third party releases and finding such were properly characterized as consensual where certain unimpaired creditors who were deemed to accept the plan were also bound by such third party releases); Master Mortg., 168 B.R. at 935 (listing the payment of all or substantially all claims of creditors as a factor courts should consider in deciding whether to approve third party releases).  Moreover, the third party releases contained in Section IV.D.2 of the Plan reflect each of the Released Parties' efforts and contributions to the negotiation and documentation of the Plan and were integral to the Debtors' ability to reach a consensus with their two primary constituents—Tesco and the Creditors' Committee.  See Master Mortg., 168 B.R. at 935 (listing the substantial contributions of non-debtors as a factor to consider in deciding whether to approve third party releases).

84.     Finally, the exculpation provision in Section IV.D.4 of the Plan is appropriate.  The exculpation provision provides for the exculpation of the Exculpated Parties, which is defined to include:  (a) the Debtors, (b) any Disbursing Agent, (c) the Creditors' Committee and its members; (d) the Tesco Entities; and (e) Representatives of each of the foregoing that have served as fiduciaries during the course of the Bankruptcy Case.  See Plan § I.A.45.  As described above, the Debtors, the Creditors' Committee and Tesco each were intimately involved in the Bankruptcy Case and in negotiating and formulating the Plan.

85.     Simply put, the Tesco Settlement enables the Debtors to pay all Allowed Claims of their non-affiliated creditors in full, the best possible result in these cases.  The release and exculpation provisions are an integral part of the Tesco Settlement; because all Allowed

Claims are unimpaired by the Plan, the inclusion of the releases and exculpation provision causes no harm to any of the Debtors' creditors. Thus, for the reasons stated above, the Debtors respectfully submit that the Tesco Settlement and releases provided for in connection therewith are appropriate and should be approved.

**II.        The Assumptions, Assumption and Assignment or Rejection of the Executory Contracts and Unexpired Leases Under the Plan Should Be Approved**

86.    The Plan also proposes that the Debtors will assume certain Executory Contracts and Unexpired Leases. Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, and pursuant to Section 365 of the Bankruptcy Code, the applicable Debtor or Reorganized Debtor will reject each of its Executory Contracts and Unexpired Leases other than those listed on Exhibit II to the Plan or otherwise assumed by order of the Bankruptcy Court. The Debtors reserve the right, however, at any time prior to the Effective Date, to amend Exhibit II to the Plan to (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to Section V.A of the Plan; or (b) add any Executory Contract or Unexpired Lease to Exhibit II of the Plan, thus providing for its assumption under Section V.C.1 of the Plan.

87.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts routinely approve motions to assume, assume and assign or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. See, e.g., NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Grp. of Inst'l Investors v. Chi., M., St. P., & P.R.R. Co., 318 U.S. 523, 550 (1943); City of Covington v. Covington Landing Ltd.

P'ship, 71 F.3d. 1221, 1226 (6th Cir. 1995); In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (the "resolution of th[e] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court"); In re Terrell, 892 F.2d 469, 471 (6th Cir. 1989); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); Borman's, Inc. v. Allied Supermarkets, Inc., 706 F.2d 187, 189 (6th Cir. 1983), cert. denied, 464 U.S. 908 (1983); In re AbitibiBowater Inc., 418 B.R. 815, 831 (Bankr. D. Del. 2009); In re Riodizio, Inc., 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997).

88.     The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate.  See AbitibiBowater Inc., 418 B.R. at 831 (satisfying the business judgment standard for purposes of Section 365 of the Bankruptcy Code "is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate"); Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc., 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982) ("As long as assumption of a lease appears to enhance a debtor's estate, Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code . . . ."); see also Borman's, 706 F.2d at 189; In re Bildsco, 682 F.2d 72, 79 (3d Cir. 1982), aff'd sub nom. NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984).

89.     In the instant cases, the Debtors have reviewed their Executory Contracts and Unexpired Leases and, in the exercise of their sound business judgment, have decided to reject all Executory Contracts and Unexpired Leases other than those Executory Contracts and Unexpired Leases listed on Exhibit II to the Plan.  In the identical exercise of their sound business judgment, the Debtors have decided to assume the Executory Contracts and Unexpired

Leases contained on Exhibit II to the Plan and assign those Executory Contracts and Unexpired

Leases to the Reorganized Debtors.  See Stogsdill Declaration, ¶ 22.  As a result, the assumption,

assumption and assignment and rejection of Executory Contracts and Unexpired Leases as set

forth in the Plan should be approved.

### III.            Limited Substantive Consolidation For Plan Purposes Only Is Appropriate

90.        Sections IV.A.1 and IV.C.1 of the Plan provide that the Estates will be

substantively consolidated for Plan purposes only.[11]  See Plan §§ IV.A.1 & IV.C.1.  This limited

consolidation will enable the Debtors to administer the Plan more efficiently and given the non-

impairment of all General Unsecured Claims under the Plan, this limited substantive

consolidation will cause no harm to any non-consenting creditors (to the extent any such creditor

exists).  The lack of objection to the proposed limited substantive consolidation is also evidence

of the absence of any harm to creditors.  See Schroeder v. New Century Liquidating Trust (In re

New Century TRS Holdings, Inc.), 407 B.R. 576, 591 (Bankr. D. Del. 2009) (recognizing that

substantive consolidation is also "appropriate" where parties consent to it).  As a result, the

Debtors submit the limited substantive consolidation of their Estates set forth in the Plan is

appropriate.  See Owens Corning, 419 F.3d at 214-15 (focusing its analysis on the

appropriateness of deemed substantive consolidation on the harm such consolidation may cause

on each creditor).

### IV.            Payment of Creditors' Committee Member Fee Claims

91.        Section III.A.3 of the Plan provides for the payment of the Creditors'

Committee Member Fee Claims.  The United States Trustee argues this provision is contrary to

---

[11]     The text of Section 1123(a)(5) contemplates that a consolidation may be used as a means to implement a plan.
11 U.S.C. § 1123(a)(5)(C) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . .
provide adequate means for the plan's implementation, such as . . . consolidation of the debtor with one or
more persons."); see In re Owens Corning, 419 F.3d 195, 419 F.3d at 208, n.14 (3d Cir. 2005) (noting the text
of Section 1123(a)(5)(C) of the Bankruptcy Code permits substantive consolidation pursuant to a plan).

Sections 1129(a)(1), (2) and (4) of the Bankruptcy Code.  Section III.A.3 of the Plan was an integral component of the Debtors' ability to reach a consensus with the Creditors' Committee and Tesco on the Plan's terms and the Debtors submit that the unique circumstances of these cases makes payment of the Creditors' Committee Member Fee Claims appropriate under the Plan.  Nevertheless, under Section XI.B of the Plan, however, the resolution of the United States Trustee's objection to the payment of the Creditors' Committee Member Fee Claims has no impact on the Court's ability to confirm the Plan.

## WAIVER OF STAY

92.    The Debtors respectfully request that this Bankruptcy Court cause the Confirmation Order to become effective immediately upon its entry notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e), which states that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P 3020(e); see also Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend (stating that a"court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately") (emphasis added).  According to the Advisory Committee notes to the 1999 amendments to the Bankruptcy Rules, the purpose of Bankruptcy Rule 3020(e) is to permit a party in interest to request a stay of the confirmation order pending appeal before the plan is implemented and an appeal becomes moot.  Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.  In the instant cases, no significant legal issues exist, and an appeal of the Confirmation Order is, at best, unlikely. Further, to the extent a party wishes to seek an appeal, it may seek to stay the effectiveness of the Confirmation Order in connection with the appeal.[12]  As a result, the immediate consummation

---

[12]    If for some reason a party in interest does decide to appeal the Confirmation Order, such party is on notice that the Debtors are asking the Court for a waiver of the stay imposed by Bankruptcy Rule 3020(e).  Therefore,

of the Plan will not prejudice any party in interest and may allow the Debtors to make the distributions required under the Plan on a faster timeline.  As a result, the Debtors respectfully request that the Bankruptcy Court cause the Confirmation Order to become effective immediately upon its entry.

## **CONCLUSION**

93.    For the reasons set forth in this Memorandum of Law, the Debtors submit that (a) the Plan fully satisfies all applicable requirements of the Bankruptcy Code and should be confirmed by the Court; (b) the Debtors should be authorized to make the Plan Modifications to the Plan, which should be deemed accepted by all creditors and equity security holders of the Debtors; and (c) the 14-day stay of the Confirmation Order should be waived.

---

(continued…)

such party is on notice that it must request a stay pending appeal immediately after the entry of the Confirmation Order.  See, e.g., Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 187 (3d Cir. 2001) (noting that all parties were on notice that the plan called for "Immediate Effectiveness," allowing appellants the opportunity to seek a stay immediately upon confirmation of the plan).

Dated:  June 30, 2014
         Wilmington, Delaware

Respectfully submitted,

/s/ *Amanda R. Steele*
Mark D. Collins (DE 2981)
John H. Knight (DE 3848)
Amanda R. Steele (DE 5530)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Paul D. Leake
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR THE DEBTORS